**FILED**

JUL 2 0 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GREAT OLD BROADS )
FOR WILDERNESS )  Civil Action No.
850 ½ Main Avenue )
Durango, CO 81302 )
                                           )
CENTER FOR BIOLOGICAL )
DIVERSITY )
1333 N. Oracle Road )
Tucson, AZ 85705 )
                                           )
                              Plaintiffs, )
      v. )
                                           )  CASE NUMBER  1:05CV01433
GALE NORTON )
Secretary of the Interior )  JUDGE: Ellen Segal Huvelle
1849 C Street, N.W. )
Washington, D.C. 20240 )  DECK TYPE: Administrative Agency Review
                                           )
NATIONAL PARK SERVICE )  DATE STAMP: 07/20/2005
1849 C Street, N.W. )
Washington, D.C. 20240 )
                                           )
BUREAUOF LAND MANAGEMENT )
1849 C Street, N.W. )
Washington, D.C. 20240 )
                                           )
                              Defendants. )
_____ )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Congress recognized Glen Canyon in southern Utah and northern Arizona as a

national treasure in 1972 by including it in the national park system as the Glen Canyon National

Recreation Area ("Glen Canyon"). Encompassing and surrounding Lake Powell, Glen Canyon

typifies the beauty and diversity of the Colorado Plateau. The area includes an incredible

diversity of plant and wildlife species, riparian areas that are critical in the area's arid

1

environment, breathtaking vistas that attract visitors from around the world, and a rich deposit of cultural resources from the Ancestral Puebloan and Freemont cultures.

2.    Livestock grazing is significantly damaging these resources. Yet, Defendants, Secretary of the Interior Gale Norton, the National Park Service, and the Bureau of Land Management, continue to authorize livestock grazing within Glen Canyon without considering or preventing this damage. In doing so, Defendants have violated the (1) National Park Service Organic Act ("Park Service Organic Act"), 16 U.S.C. §§ 1-18; (2) Glen Canyon National Recreation Area Enabling Act ("Glen Canyon Enabling Act"), 16 U.S.C. §§ 460dd-460dd-9; (3) National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332; and (4) National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470-470w-6.

3.    Although the National Park Service attempted to address the damage to Glen Canyon resources by developing a Grazing Management Plan in 1999, the agency has not implemented the plan. Rather, the Park Service sat by idly while the Bureau of Land Management reauthorized grazing on at least twenty-three allotments within Glen Canyon since 1999 without conducting the appropriate environmental analysis. Although the Grazing Plan identified damage to Glen Canyon resources and contained specific standards for reducing the damage, the Park Service did not implement the Plan on these allotments. Plaintiffs, Great Old Broads for Wilderness and the Center for Biological Diversity, seek to force Defendants to comply with the law by taking into account the impacts of livestock grazing on the precious resources of Glen Canyon and preventing any further damage.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction under 28 U.S.C. § 1331 (federal question).

5.    This Court may grant the requested relief under 28 U.S.C. §§ 2201-02 (declaratory and injunctive relief) and 5 U.S.C. §§ 701-06 (Administrative Procedure Act).  An actual, justiciable controversy exists between Plaintiffs and Defendants within the meaning of the Declaratory Judgment Act.

6.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because Defendants Gale Norton, the National Park Service, and the Bureau of Land Management reside in the District of Columbia.

## PARTIES

### I.    Plaintiffs

7.    Plaintiff GREAT OLD BROADS FOR WILDERNESS ("Great Old Broads") is a non-profit organization located in Durango, Colorado with over 1,880 members.  Great Old Broads is dedicated to protecting and restoring the wildlands, public lands, wildlife, and other natural resources of the United States.  Great Old Broads brings this action on behalf of itself and its adversely affected members and staff.

8.    Plaintiff the CENTER FOR BIOLOGICAL DIVERSITY ("Center") is a non-profit organization with over 15,000 members.  The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, and public lands.  The Center brings this action on behalf of itself and its adversely affected members and staff.

9.    Plaintiffs' members have scientific, recreational, educational, religious, and aesthetic interests in the resources of Glen Canyon.  Plaintiffs' members regularly use lands and waters throughout Glen Canyon that are subject to livestock grazing for hiking, observing wildlife, conducting scientific research, as well as other recreational and educational activities.

They intend to continue these uses in the future. Plaintiffs' members also attach religious and cultural importance to the archeological resources within Glen Canyon.

10.     Plaintiffs also have an interest in obtaining information about livestock grazing on public lands and participating in legally-mandated public processes. Great Old Broads has participated in many public processes involving livestock grazing in Glen Canyon. For example, Great Old Broads submitted extensive comments to the Park Service on the 1999 Grazing Management Plan. Great Old Broads also submitted scoping comments on the Grand Staircase-Escalante National Monument Grazing Environmental Impact Statement ("EIS") and has met with Monument staff repeatedly since 2000 to discuss the progress and content of this EIS. On May 24, 2002, Great Old Broads notified the Park Service that it was in violation of the law by allowing livestock grazing to significantly and permanently impair Glen Canyon resources and provided the Park Service with evidence of this impairment. On October 24, 2001, Great Old Broads filed a protest to BLM's Proposed Grazing Decision and Environmental Assessment for the White Canyon Allotment within Glen Canyon.

11.     Plaintiffs' interests are adversely affected and irreparably injured by Defendants' failure to comply with the law. Livestock grazing impairs their members' ability to recreate and undertake scientific and educational activities on these lands. Livestock use diminishes these experiences by removing vegetation, increasing erosion, degrading wildlife habitat, damaging cultural resources, polluting water, and marring scenic vistas. Compliance with the environmental laws at issue would reduce harm from livestock grazing within Glen Canyon.

12.     Defendants' failure to comply with the law also adversely impacts Plaintiffs' informational interest in reviewing environmental documents, conveying that information to their members and the public, and providing input on the negative impacts of livestock grazing in Glen

4

Canyon. Because the Secretary of the Interior has failed to conduct any environmental analysis under NEPA or assess impacts to cultural resources under NHPA and solicit required public comment for most of the allotments within Glen Canyon, Plaintiffs' opportunities to participate in the public process have been limited. Unless the requested relief is granted, Plaintiffs and their members will continue to suffer on-going and irreparable harm and injury to their interests.

## II.     Defendants

13.     Defendant GALE NORTON is sued in her official capacity as the Secretary of the Interior ("Secretary"). As Secretary, Ms. Norton is charged with management of Glen Canyon and is responsible for the actions of the National Park Service and Bureau of Land Management.

14.     Defendant the NATIONAL PARK SERVICE ("Park Service") is a federal agency within the Department of the Interior responsible for managing national park system units, including Glen Canyon.

15.     Defendant the BUREAU OF LAND MANAGEMENT ("BLM") is a federal agency within the Department of the Interior charged with administering livestock grazing in Glen Canyon.

## LEGAL BACKGROUND

## I.     Glen Canyon Enabling Act

16.     The Glen Canyon Enabling Act established Glen Canyon as a national park system unit in 1972:

> to provide for public outdoor recreation use and enjoyment of Lake Powell and lands adjacent thereto in the States of Arizona and Utah and to preserve scenic, scientific, and historic features contributing to public enjoyment of the area.

16 U.S.C. § 460dd.

17.    Pursuant to the Enabling Act, the Secretary must "administer, protect, and develop the recreation area in accordance with the provisions of [the Park Service Organic Act]." Id. § 460dd-3.

18.    Congress specified that BLM is responsible for "administering" livestock grazing permits within Glen Canyon, subject to the Park Service Organic Act. Id. §§ 460dd-3, -5.

19.    Therefore, under the Secretary of the Interior, both BLM and the Park Service play key roles in managing livestock grazing in Glen Canyon.  BLM administers permits for livestock grazing subject to the Organic Act, and the Park Service must ensure that livestock grazing is consistent with the Organic Act.  Id.

20.    In order to coordinate their overlapping roles in Glen Canyon, the Park Service and BLM signed a 1984 Memorandum of Understanding ("MOU") and 1993 Interagency Agreement ("IA").

21.    Under these agreements, BLM must consult, cooperate, and coordinate with the Park Service to ensure authorized grazing does not conflict with the Glen Canyon Enabling Act, the Park Service Organic Act, or the General Management Plan for Glen Canyon.

22.    Before BLM may authorize any grazing in Glen Canyon, the Park Service must provide BLM with a written determination regarding the potential effect of the action on the purposes and values of Glen Canyon. 1984 MOU ¶ 2.c; 1993 IA ¶ 3.a.  The Park Service refers to this finding as a Values and Purposes Determination.  The Park Service must also specify any grazing permits terms and conditions deemed necessary to protect Glen Canyon resources under the Organic Act.  1984 MOU ¶ 2.c; 1993 IA ¶ 3.a.

## II.     Park Service Organic Act

23.     The Park Service Organic Act governs management of all national park system units, including Glen Canyon.

24.     Pursuant to the Organic Act, the Park Service must manage Glen Canyon in order to "conserve the scenery and the natural and historic objects and the wildlife therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1 (emphasis added).

25.     The Organic Act forbids the Park Service from allowing any activity to occur in Glen Canyon that will cause "derogation of the values and purposes for which [the area has] been established." 16 U.S.C. § 1a-1 (emphasis added).

26.     In 2001, the Park Service adopted new Management Policies to govern management of park resources under the Organic Act. National Park Service, 2001 Management Policies ("Policies"). The Policies define the Park Service's duty to conserve and to prevent impairment and derogation of park resources and values.

27.     In order to "conserve," the Park Service "must always seek ways to avoid, or to minimize to the greatest degree practicable, adverse impacts on park resources and values." Policies § 1.4.3. Park managers may allow impacts to Park resources only "when necessary and appropriate to fulfill the purposes of a park, so long as the impact does not constitute impairment of the affected resources and values." Id.

28.     The Park Service treats the "impairment" and "derogation" standards of the Organic Act as one mandate to prevent impairment. Id. § 1.4.2.

29.     Before allowing any activity within Glen Canyon, including livestock grazing, the Park Service must consider the impact of the activity on the area's resources and values and

7

determine in writing that it will not lead to impairment (Values and Purposes Determination). Id. §

1.4.7 (emphasis added). The Park Service cannot allow any activity that will cause impairment. Id.

30.     Furthermore, if the Park Service becomes aware that on-going grazing may have

caused impairment or may cause impairment in the future, the Park Service must investigate and

take appropriate action as soon as possible. Id.

31.     Impairment is defined as an impact that "would harm the integrity of park resources

and values, including the opportunities that would otherwise be present for the enjoyment of those

resources or values." Id. § 1.4.5. In order to determine whether an activity will lead to impairment,

the Park Service must consider the "severity, duration, and timing of the impact; the direct and

indirect effects of the impact; and the cumulative effects of the impact in question and other

impacts." Id.

**III.     National Environmental Policy Act**

32.     The Secretary of the Interior, through the BLM and the Park Service, must

comply with the National Environmental Policy Act ("NEPA") before approving federal actions

that will impact Glen Canyon. 42 U.S.C. § 4332.

33.     NEPA requires the agencies to take a "hard look" at the environmental

consequences of any proposed actions and consider alternatives to those actions. NEPA also

requires the agencies to involve the public in the decision-making process. Id.

34.     If the agency determines a proposed action may "significantly affect" the

environment, it must prepare an environmental impact statement ("EIS"). 42 U.S.C. §

4332(2)(C). Only if a proposed action will not significantly impact the environment may an

agency rely on a less extensive environmental assessment ("EA") and a finding of no significant

impact ("FONSI").  40 C.F.R. §§ 1501.4(e), 1508.  An EA must include a convincing statement of reasons to explain why a project's impacts are insignificant.  Id. § 1508.13.

35.    To comply with NEPA, the agency must consider the site-specific impacts of the action as well as the cumulative impact of the proposed action when combined with other past, present, and reasonably foreseeable future actions.  Id. §§ 1500-08.

36.    When an agency is faced with "incomplete or unavailable information" about the impacts of an activity on the environment and the information is "essential to a reasoned choice among alternatives," the agency must include the information in the NEPA document, provided the costs of obtaining it are not exorbitant.  Id. § 1502.22.  If the costs are exorbitant, the agency must at least include:

    (1)    A statement that such information is incomplete or unavailable;
    (2)    A statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment;
    (3)    A summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment; and
    (4)    The agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community.

Id.

## IV.    National Historic Preservation Act

37.    The Secretary of the Interior, through the BLM and the Park Service, must also comply with the National Historic Preservation Act ("NHPA") before engaging in any federal undertaking affecting Glen Canyon.  42 U.S.C. § 4332.

38.    Pursuant to Section 106 of the NHPA, federal agencies shall "take into account the effect of [any federal] undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register."  The agency shall "afford the

Advisory Council on Historic Preservation . . . a reasonable opportunity to comment with regard to such undertaking." 16 U.S.C. § 470f.

39.    The agency must complete the Section 106 consultation process "<u>prior to</u> the issuance [or undertaking] of any license." <u>Id.</u> (emphasis added); 36 C.F.R. § 800.1(c).

40.    An undertaking is any "project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including . . . those requiring a Federal permit, license or approval." 36 C.F.R. § 800.16(y).

41.    The goal of Section 106 consultations is to "identify historic properties potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects on historic properties." <u>Id.</u> § 800.1.

42.    The agencies must involve the State Historic Preservation Officer ("SHPO"), any Indian tribes that may attach religious or cultural significance to affected historic properties, and the public in each stage of a Section 106 consultation. <u>Id.</u> §§ 800.2, 800.14(B)(2)(i).

43.    Prior to engaging in any undertaking, at a minimum, an agency must: (1) identify the area of potential effects; (2) review existing information on historic properties within this area (including possible historic properties not yet identified); (3) seek information about historic properties from relevant parties, (4) evaluate the undertaking's potential effects on historic properties; and (5) develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties. <u>Id.</u> §§ 800.3-800.7.

44.    Federal agencies may choose to negotiate a "programmatic agreement" to govern NHPA consultation for certain agency programs. <u>Id.</u> § 800.14. However, a programmatic agreement must be consistent with NHPA and its implementing regulations. <u>Id.</u> § 800.14(a). Both the Park Service and BLM have signed programmatic agreements ("PAs") with the

Advisory Council on Historic Preservation and the National Conference of State Historic

Preservation Officers to govern NHPA consultation with respect to their management of public

lands. The BLM State Directors in both Arizona and Utah have developed state protocols to

determine how they will operate under the PA.

**STATEMENT OF FACTS**

**I.    Glen Canyon**

45.    Glen Canyon is located in northern Arizona and southern Utah in the heart of the

Colorado Plateau's red rock country. The recreation area surrounds the confluence of the

Colorado and San Juan rivers.

46.    The most well-known feature of Glen Canyon is Lake Powell, a 163,000 acre

reservoir on the Colorado River that was created when Glen Canyon Dam was closed in 1963.

47.    However, Lake Powell is only thirteen percent of the area Congress included

within Glen Canyon. The area also includes over a million acres of public lands managed by the

Park Service that represent the richness and diversity of the Colorado and San Juan River

ecosystems.

48.    Glen Canyon is in a desert-like environment. Annual rainfall within the

recreation area varies from four to twelve inches.

49.    As a result, water resources are critically important to the area's flora and fauna.

Glen Canyon includes Lake Powell, five major rivers (the Colorado, Dirty Devil, San Juan,

Escalante and Paria), intermittent and perennial streams, and springs and seeps. Side canyons off

Lake Powell with permanent streams and springs contain extensive wetland and riparian

communities.

11

50.     Riparian areas, while they constitute only a fraction of the surface area of Glen Canyon, are critical from a biological perspective. These areas support high numbers of species and species diversity. "Ribbons of green" across the desert-like landscape, streams and riparian areas provide essential habitat for fish, birds, mammals, and other wildlife that live in or migrate through Glen Canyon.

51.     Glen Canyon is home to many wildlife species, including 285 species of birds, thirty-five species of reptiles and amphibians, and seventy-five species of mammals. There are at least ten wildlife species living in Glen Canyon that are protected as threatened or endangered under state or federal law.

52.     Vegetation cover is sparse within Glen Canyon. Above the canyons, there are tracts of shrublands, pinyon-juniper woodlands, and grasslands. The grasslands, which are relatively rare, are used for livestock grazing and have been for more than 100 years.

53.     Although vegetation is sparse, it is diverse. Glen Canyon contains at least 780 plant species, including several species listed as rare or endangered by state or federal agencies.

54.     Glen Canyon also contains thousands of important cultural and archeological sites dating back to the Pre-Formative and Formative periods (AD 600 to 1300) of the Ancestral Puebloan and Fremont cultures, including prehistoric sites containing artifacts, dwellings, structures, and rock art. These sites have considerable spiritual importance to Native Americans. In addition, they allow scientists to gain important insights into the lives of the early inhabitants of this area.

55.     The Park Service has documented at least 1750 cultural resource sites in the areas remaining after Lake Powell was flooded. It estimates there may be more than 19,000 additional sites that it has not yet identified in areas that are currently subject to grazing.

12

56.     Glen Canyon contains impressive scenic vistas, which include deep canyons, sheer cliffs, distant mountain ranges, and a unique collection of mesas, buttes, and spires.

57.     Because of these unique resources, millions of visitors use the recreation area each year.

## II.     Management of Livestock Grazing in Glen Canyon

### A.     Grazing Allotments

58.     There are thirty-four livestock grazing allotments (covering approximately 882,678 acres) within Glen Canyon.  Twenty-four of these allotments are the subject of this complaint.[1]

59.     Lower Warm Creek is the only allotment that is wholly contained in Glen Canyon. Each of the twenty-three other allotments has a portion that lies within the recreation area and a portion that lies on BLM lands outside the recreation area.

60.     The twenty-four allotments fall under the direction of four separate BLM field offices:  Henry Mountains Field Station (which is part of the Richfield Field Office), Monticello (formerly known as the San Juan Resource Area), Grand Staircase-Escalante National Monument, and Arizona Strip.

61.     The Henry Mountains Field Station manages grazing on the Sewing Machine, Rockies, Waterpocket, and Bullfrog allotments.

62.     The Monticello Field Office manages grazing on the Indian Creek, White Canyon, Lake Canyon, Slickhorn, Perkins Brothers, and Texas Muley allotments.

---

[1] Five of the thirty-four allotments (approximately 120,361 acres) are currently unallotted and not subject to grazing (Spencer Bench, Navajo Bench, Harvey's Fear, Flint Trail, and Slickrock). BLM has accepted voluntary relinquishment of the grazing permits or substantial reductions in numbers of livestock on five of the remaining allotments:  Moody, Wagon Box Mesa, Last Chance, Big Bowns Bench, and Robbers Roost.  None of these allotments is the subject of this Complaint.

63.     The Grand Staircase-Escalante National Monument Field Office manages grazing on the Upper Cattle, Lower Cattle, Forty Mile Ridge, Soda, Lake, Upper Warm Creek, Lower Warm Creek, Nipple Bench, Rock Creek-Mudholes, and Wiregrass allotments.

64.     The Arizona Strip Field Office manages grazing on the Lee's Ferry (Soap Creek), Ferry Swale, Wahweap, and Bunting Well allotments.

65.     BLM authorizes grazing on these allotments by issuing term permits, generally for a period of ten years. In addition, each year BLM approves grazing applications or issues grazing bills authorizing use of the allotment for that year.

66.     BLM has authorized grazing, either through a term permit or annual authorization, on each of these allotments in the last six years.

67.     Prior to authorizing livestock grazing on these allotments, neither the BLM nor the Park Service conducted a Values and Purposes Determination to establish whether grazing would impair Glen Canyon resources as required by the Organic Act.

68.     Prior to authorizing livestock grazing on these allotments, neither the BLM nor the Park Service completed an environmental analysis under NEPA. The only exception is the Lee's Ferry (Soap Creek) allotment; BLM completed an environmental assessment in 2000.

69.     Prior to authorizing livestock grazing on these allotments, neither the BLM nor the Park Service engaged in Section 106 consultation under the NHPA.

**B.      Park Service Grazing Plan**

70.     The Park Service manages all activities within the Glen Canyon, including livestock grazing, pursuant to its 1979 General Management Plan ("GMP").

71.     The 1979 GMP identified the need for the Park Service to develop an additional planning document to address grazing resources more specifically. This "grazing component"

14

was to include a "detailed description of the condition of the range, recommendations for specific range improvement practices and devices, management activities, and maximum grazing intensities compatible with the purpose of the recreation area."

72.    After twenty years of inaction, the Park Service developed the Grazing Management Plan ("Grazing Plan"). The Park Service completed an environmental assessment ("EA") of the Grazing Plan on February 8, 1999; made a finding of no significant impact ("FONSI") on July 22, 1999; and issued the final Grazing Plan in August of 1999.

### 1.    Grazing Plan EA Identifies Impairment

73.    In preparing the Grazing Plan and EA, the Park Service identified the purposes of Glen Canyon as providing for the public recreation use and enjoyment of the NRA and to preserve the scenic, scientific, and historic features that add to this enjoyment. The Park Service identified the values of Glen Canyon as vegetation, soils, water quality, wildlife, and cultural, paleontological, quaternary, scenic, and recreational resources.

74.    The Grazing Plan EA finds livestock grazing is impairing or may impair each of these purposes and values.

75.    The Grazing Plan EA shows that livestock grazing in arid and semi-arid environments like Glen Canyon leads to a decline in desirable native vegetation and an increase in undesirable exotics.

76.    The EA also documents severe over-utilization of grasses by livestock within Glen Canyon. Although BLM has set utilization levels at 50-60%, the Park Service documented many instances of utilization over 80% and even two cases of utilization as high as 95%. At these levels, grasses can take decades to recover and may not recover at all.

77.     According to the EA, soils in high use areas within Glen Canyon are being negatively impacted by grazing. In arid environments, livestock trample and compact living soil crusts and remove vegetation, which inhibits nutrient cycling, reduces soil productivity and stability, and increases erosion.

78.     The Park Service's EA identified a number of springs within Glen Canyon that have been severely damaged by livestock trampling, including some cases where there was almost total elimination of riparian vegetation.

79.     The Park Service found that implementation of the Grazing Plan was critical to maintaining water quality within Glen Canyon.

80.     The EA recognizes that livestock grazing can lead to negative impacts to wildlife and changes in their distribution. For example, bighorn sheep numbers within Glen Canyon have declined drastically from historical levels. The EA found that livestock grazing is one of the most important factors responsible for continued declines in bighorn populations today.

81.     With respect to cultural and archeological resources, the EA finds that livestock topple above ground historical structures and undermine their walls and foundations, trample individual artifacts, and erode rock art sites by rubbing against them.

82.     According to the EA, cattle have negatively impacted 33 of the 130 sites (25%) the Park Service assesses regularly. The Park Service found it was common to find sites where structures remained only as chunks of mortar scattered among cow feces; wherever livestock had access, surface artifacts were rare; and livestock had churned up midden deposits that are important windows into the subsistence, culture, and burial practices of early inhabitants.

83.     In other areas, the Park Service found livestock grazing was impacting anywhere from 44% up to 86% of artifacts surveyed.

16

84.    The EA finds that no research has been done to determine whether livestock grazing is impacting paleontological resources, such as dinosaur tracks.  However, the EA finds that livestock grazing degrades quaternary resources such as packrat middens, preserved faunal and floral remains, skeletal material, and other materials that provide information about the environment in the past and changes over time.  Livestock damage these resources by churning and trampling the soil and mixing manure and hair with historical materials.

85.    The EA finds that livestock use negatively impacts the recreational experience of Glen Canyon visitors, particularly backcountry users.  The presence of cattle, roads related to cattle operations, water developments, and stock trails negatively impacts the scenery of the area. The EA also recognizes that visitors encounter cows, cow manure at campsites, insects associated with manure, and water sources that have been polluted by cows.  In fact, backcountry users complain more about the impacts of grazing than anything else in comments to the Park Service.

### 2.    Park Service Developed a Grazing Plan to Address Impairment.

86.    In response to the impairment identified above, the Park Service developed the Grazing Plan.

87.    The Grazing Plan establishes:  (1) goals for each of the values and purposes of Glen Canyon, (2) objectives designed to obtain the goals, and (3) specific actions necessary to achieve the objectives.

88.    For example, the Grazing Plan states the goal for vegetation as "maintain[ing] naturally diverse plant communities and species populations . . . [that] include a full complement of native species, plant vigor and health, natural structure for wildlife habitat, dynamic changes, reproductive success, and populational genetic and evolutionary responses."

17

89.     To achieve this goal, the Grazing Plan adopts an objective to "maintain in upland plant communities, as natural a community as possible, including the full range of native species, a viable seedbank, and minimal presence of increasing undesirable species."

90.     In order to obtain this objective, the Grazing Plan recommends the following actions:  (1) setting maximum non-spring utilizations levels at 45% for Indian ricegrass in all key areas, (2) setting spring utilization levels at 25%, (3) shortening grazing seasons, (4) establishing grazing exclosures to determine long term effects and recovery from grazing, and (5) adjusting stocking rates.

91.     The Park Service established similar goals, objectives, and actions for each of the remaining purposes and values.

### 3.     Park Service Failed to Implement the Grazing Plan

92.     The Grazing Plan did not address impacts from livestock grazing BLM had already authorized under existing permits.

93.     Instead, the Park Service established a process for addressing impacts only with respect to <u>future</u> grazing decisions.  The Park Service planned to address the impacts of grazing only when a qualifying change in grazing activities took place, such as issuance of a new grazing permit, a change in the existing grazing permit, or a permit transfer.

94.     However, BLM has issued new livestock grazing permits or otherwise authorized grazing on all twenty-four allotments relevant to this Complaint since the Grazing Plan was finalized in August 1999, and the Park Service has failed to apply the Grazing Plan.

95.     The Park Service stated that it plans to implement the Grazing Plan when BLM conducts NEPA analysis on authorized grazing.  However, BLM has not completed proper NEPA analysis for twenty-three of the twenty-four allotments challenged in this complaint.

### 3.    Deficiencies of Grazing Plan EA

96.    The Grazing Plan EA shows that the Park Service does not have much of the information necessary to determine how grazing impacts the purposes and values of Glen Canyon. For example, the Parks Service claims that little is known about the status and trend of vegetation or soils, water quality in water bodies away from Lake Powell, or the impacts of grazing on wildlife.

97.    At the same time, the Park Service ignored the considerable evidence that is available with respect to these issues, including but not limited to utilization and ecological trend and status data for vegetation, evidence of severe over-utilization of vegetation by cattle, evidence of the location of special status species (including species protected under the Endangered Species Act) and their habitat, and evidence of the location of and damage to cultural resources.

98.    Where information regarding the impacts of livestock grazing was unavailable, the Park Service made no effort to either obtain the data or provide an explanation for why the data was unattainable. For example, the Park Service made no effort to obtain or discuss information on the impacts of livestock grazing in combination with drought.

99.    The Grazing Plan EA also does not consider the past, present, and future impacts of livestock grazing on Glen Canyon resources as well as the cumulative impacts of grazing and other activities including off-road vehicle use and recreation.

### FIRST CLAIM FOR RELIEF
### (Violation of the Glen Canyon Enabling Act and Park Service Organic Act)

100.    Paragraphs 1-99 of this Complaint are incorporated herein, by reference.

101.    In managing livestock grazing in Glen Canyon, the Secretary has a mandatory duty to "conserve" and prevent "impairment" of the "scenery and the natural and historic objects

19

and the wildlife" of the recreation area. 16 U.S.C. §§ 1, 460dd-3. The Secretary must also prevent the "derogation" of the values and purposes for which Glen Canyon was established. 16 U.S.C. §§ 1a-1, 460dd.

102.    The Secretary, through the Park Service, "must always seek ways to avoid, or to minimize to the greatest degree practicable, adverse impacts on park resources and values." Policies § 1.4.3. Park managers may allow impacts to Park resources only "when necessary and appropriate to fulfill the purposes of a park, so long as the impact does not constitute impairment of the affected resources and values." Id.

103.    Before authorizing livestock grazing, the Secretary must determine in writing whether the levels of grazing authorized will impair or derogate park resources. 16 U.S.C. §§ 1, 1a-1; Policies § 1.4.7.

104.    In addition, once the Secretary becomes aware of potential or actual impairment, she has a duty to investigate and correct any problems. 16 U.S.C. § 1, 1a-1; Policies § 1.4.7.

105.    The Secretary has authorized livestock grazing on all twenty-four allotments challenged in this Complaint without conducting a Values and Purposes Determination necessary to establish whether grazing will derogate or impair recreation area resources.

106.    The Secretary has recognized authorized livestock grazing within Glen Canyon is causing impairment to the purposes and values in some areas and may be causing impairment in others. Yet, the Secretary has failed to further investigate and determine where impairment is occurring or correct problems where they exist.

107.    The Secretary's actions violate the Glen Canyon Enabling Act and Park Service Organic Act and are arbitrary, capricious, an abuse of discretion, and not in accordance with law under the Administrative Procedure Act ("APA"). 5 U.S.C. § 706.

## SECOND CLAIM FOR RELIEF
### (Violation of NEPA—Authorization of Grazing)

108.    Paragraphs 1-99 of this Complaint are incorporated herein, by reference.

109.    In authorizing livestock grazing on twenty-four allotments challenged in this Complaint, the Secretary has undertaken major federal actions with significant environmental impacts or the potential for significant impacts within the meaning of NEPA.

110.    The Secretary authorized livestock grazing on these allotments without completing any analysis of the environmental impacts of the authorized levels of grazing under NEPA. The only exception is the Lee's Ferry (Soap Creek) allotment, which is not included as part of this claim.

111.    The Secretary's actions violate NEPA and are arbitrary, capricious, an abuse of discretion, and not in accordance with law under the APA. 5 U.S.C. § 706.

## THIRD CLAIM FOR RELIEF
### (Violation of NHPA)

112.    Paragraphs 1-99 of this Complaint are incorporated herein, by reference.

113.    Before allowing livestock grazing in Glen Canyon, the Secretary must "take into account the effect of [livestock grazing] on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register" in accordance with Section 106 of the NHPA. 16 U.S.C. § 470f.

114.    The Secretary must "afford the Advisory Council on Historic Preservation . . . a reasonable opportunity to comment with regard to such undertaking." Id.

115.    The Secretary must consult with the State Historic Preservation Officer, any Indian tribes that may attach religious or cultural significance to the affected historic properties, and the public before engaging in any undertaking. 36 C.F.R. § 800.2.

21

116.    Also prior to engaging in any undertaking, the Secretary must: (1) identify the area of potential effects; (2) review existing information on historic properties within this area (including possible historic properties not yet identified); (3) seek information about historic properties from relevant parties, (4) evaluate the undertaking's potential effects on historic properties; and (5) develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties.  Id. §§ 800.3-800.7.

117.    The Secretary has authorized livestock grazing on the twenty-four allotments challenged in this Complaint without meeting these requirements.  The Secretary's actions violate the NHPA and are arbitrary, capricious, an abuse of discretion, and not in accordance with law under the APA.  5 U.S.C. § 706.

### FOURTH CLAIM FOR RELIEF
### (Violation of NEPA-Grazing Plan EA)

118.    Paragraphs 1-99 of this Complaint are incorporated herein, by reference.

119.    NEPA requires all federal agencies to undertake a thorough and public analysis of the environmental consequences of proposed federal actions, including a detailed EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

120.    The Secretary violated NEPA and its implementing regulations through issuance of the EA, FONSI, and Decision Notice for the Grazing Plan because she:  (1) failed to prepare an EIS addressing the significant environmental impacts of the proposed action and its alternatives; (2) failed to consider site-specific environmental impacts; (3) ignored scientific and factual information relevant to the impacts of livestock grazing, and (4) failed to consider the cumulative impacts of past, present, and future grazing as well as other activities.

121.    The Secretary's actions violate NEPA and are arbitrary, capricious, an abuse of discretion, and not in accordance with law under the APA.  5 U.S.C. § 706.

### REQUESTED RELIEF

Plaintiffs request that this Court enter judgment providing the following relief:

A.    Declaratory judgment that the Secretary is in violation of the Park Service Organic Act and Glen Canyon Enabling Act;

B.    Injunctive relief prohibiting livestock grazing within Glen Canyon on each allotment until the Secretary conducts a Values and Purposes Determination for the allotment and determines whether grazing is adversely impacting or impairing park resources and requiring the Secretary to take corrective action in areas where adverse impact or impairment is occurring;

C.    Declaratory judgment that the Secretary is in violation of NEPA because she has failed to prepare an EA or EIS on the impacts of authorized livestock grazing on the allotments challenged in this Complaint;

D.    Injunctive relief establishing a schedule for completion of NEPA for each individual allotment;

E.    Declaratory relief that the Secretary is in violation of the NHPA for failing to consult and take into account the impacts of livestock grazing on cultural resources for each allotment challenged in this Complaint within the meaning of Section 106;

F.    Injunctive relief prohibiting livestock grazing within Glen Canyon on each allotment until the Secretary completes NHPA Section 106 consultation for the allotment;

F.    An order awarding Plaintiffs their costs of litigation, including reasonable attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq., and all other applicable authorities; and

23

G.    Any other relief the Court deems just and proper.

Dated:  July 19, 2005.                              Respectfully submitted,

                                                    /s/ Matt Kenna
                                                    Matt Kenna  (CO0028)
                                                    Western Environmental Law Center
                                                    679 E. 2nd Ave., Suite 11B
                                                    Durango, CO  81301
                                                    Telephone: (970) 385-6941
                                                    Fax:    (970) 385-6804

Of counsel:

Robin Cooley
James J. Tutchton
Environmental Law Clinical Partnership
University of Denver Sturm College of Law
2255 E. Evans Ave, Rm. 365L
Denver, CO 80208
Telephone: (303) 871-6039
Fax: (303) 871-6991

Attorneys for the Center for Biological Diversity

Joro Walker
Western Resource Advocates
1473 South 1100 East, Suite F
Salt Lake City, UT 84109
Telephone:  (801) 487-9911
Fax: (801) 486-4233

Attorney for Great Old Broads for Wilderness