**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| Great Old Broads for Wilderness, <u>et al.</u>, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 01:05CV01433 (ESH) |
| | ) | |
| P. Lynn Scarlett, <u>et al.</u>,[1] | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGEMENT AND MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), P. Lynn Scarlett is automatically substituted as Defendant in place of Gale Norton.

i

## TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………………………………….. i

TABLE OF AUTHORITIES……………………………………………………………v

I.    THE SECRETARY IS VIOLATING THE ENABLING ACT
      AND ORGANIC ACT BY AUTHORIZING GRAZING IN
      GLEN CANYON WITHOUT CONSERVING OR PREVENTING
      IMPAIRMENT OF PARK RESOURCES…………………………………………… 1

      A.    The Park Service has not Analyzed Whether Grazing within
            Glen Canyon is Impairing the Recreation Area's Values or
            Purposes.…………………………………………………….……….... 4

            1.    The Park Service must conduct a values and purposes
                  determination before allowing grazing within Glen
                  Canyon…………………………………..……………….………… 4

            2.    Although BLM has authorized grazing within Glen
                  Canyon since 1972, the Park Service has never completed
                  values and purposes determinations…..………………………… 6

                  a.    The Park Service did not conduct values and
                        purposes determinations for current grazing permits…………….. 6

                  b.    The Park Service did not conduct a values and
                        purposes determination in its 1979 Glen Canyon
                        General Management Plan or 1999 Grazing
                        Management Plan……………………………………….…... 7

            3.    BLM's failure to comply with NEPA does not excuse the
                  Park Service from complying with the Organic
                  Act…………………………………………………………… 10

      B.    The Secretary is Authorizing Grazing within Glen Canyon
            that is Causing Adverse Impacts and Impairment of Park
            Resources.................................................................................. 10

            1.    The Park Service has identified adverse impacts and
                  impairment of Glen Canyon resources…..…………………………... 12

                  a.    The GSENM draft purposes and values
                        determination identifies adverse impacts and
                        impairment………………………………………………... 12

b.    The Park Service's cultural resources
assessments identify adverse impacts and
impairment……...………………………………………….. 13

c.    The 1999 Grazing Plan EA identifies adverse
impacts and impairment......…………………………………….. 15

2.    The Secretary has taken no action to correct the
adverse effects and impairment caused by
livestock grazing……………….....………………………………… 17

II.    THE SECRETARY IS VIOLATING NEPA BY AUTHORIZING
GRAZING WITHIN GLEN CANYON WITHOUT ANALYZING
ITS ENVIRONMENTAL IMPACTS…………………………………………….... 19

A.    The Secretary has never Considered the Site-Specific Impacts
of Livestock Grazing within Glen Canyon……….............................................. 20

1.    The Park Service authorized grazing in Glen Canyon
without analyzing site-specific impacts under NEPA………………….. 21

2.    BLM authorized grazing in Glen Canyon without
analyzing site-specific impacts under NEPA………………………….. 22

a.    BLM issued grazing permits on 24 Glen Canyon
allotments without preparing EAs or EISs………………......…22

b.    Congress did not excuse BLM from NEPA
compliance in the grazing riders………………………………... 24

B.    The Park Service is Violating NEPA Because the Grazing Plan will
have a Significant Effect on the Environment and the
Agency must Prepare an EIS.…………….……………………………………….. 29

1.    The Park Service must prepare an EIS because the impacts
of livestock grazing within Glen Canyon are highly uncertain………… 31

2.    The Park Service must prepare an EIS because livestock
grazing is causing significant impacts within a unit of the
national park system……………………………………………… 32

3.    The Park Service must prepare an EIS because livestock
grazing is causing irreparable damage to National Register
eligible cultural resources…………………………………………….......33

4.      The Park Service must prepare an EIS because there are cumulatively significant impacts as a result of livestock grazing and other activities……………………………………………...… 34

III.    THE SECRETARY IS VIOLATING THE NHPA BY AUTHORIZING GRAZING WITHIN GLEN CANYON WITHOUT TAKING INTO ACCOUNT THE IMPACTS ON CULTURAL RESOURCES…………………………35

A.      The Park Service did not Comply with the NHPA Prior to Developing the Grazing Plan.…………………………………………………38

B.      BLM did not Comply with Section 106 of the NHPA before authorizing Livestock Grazing within Glen Canyon............................................ 40

1.      BLM did nothing to comply with Section 106 before Issuing Grazing Permits on 21 Glen Canyon Allotments…………........... 41

2.      BLM's attempt to comply with NHPA on three Glen Canyon allotments was never finalized and is inadequate……………… 43

CONCLUSION…………………………………………………………………………..45

# TABLE OF AUTHORITIES

**FEDERAL CASES**

Atchinson v. Wichita Board of Trade, 412 U.S. 800 (1973) .............................................................4

Attakai v. United States, 746 F. Supp. 1395 (D. Az. 1990)...........................................................41

Blue Mountains Diversity Project v. Blackwood, 161 F.3d 1208 (9th Cir. 1998) .......................31

Branch v. Smith, 538 U.S. 254 (2003)...........................................................................................26

Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984)....................25

City of Tenakee Springs v. Block, 778 F.2d 1402 (9th Cir. 1985)................................................20

Colo. River Indian National v. Marsh, 605 F. Supp. 1425 (C.D. Ca. 1985)................................33

Commonwealth of Mass. v. Clark, 594 F. Supp. 1373 (D. Mass. 1984)......................................20

Corridor H Alternatives, Inc. v. Slater, 166 F.3d 368 (D.C. Cir.1999) ........................................41

Defenders of Wildlife v. Babbitt, 130 F. Supp. 2d 121 (D.D.C. 2001) ........................................35

Forest Guardians v. U.S. Forest Serv., No. 01-504 (D.N.M. Dec. 31, 2002)..............................26

Fund for Animals v. Norton, 281 F. Supp. 2d 209 (D.D.C. 2003) ................................................30

Fund for Animals v. Norton, 294 F. Supp. 2d 92 (D.D.C. 2003) .....................................2, 3, 4, 11

Grand Canyon Trust v. FAA, 290 F.3d 339 (D.C. Cir. 2002) ...............................................30, 34

Greater Yellowstone Coal. v. Bosworth, 209 F. Supp. 2d 156 (D.D.C. 2002)............................20

Karst Environmental Education & Prot., Inc. v. U.S. Environmental Prot. Agency,
403 F. Supp. 2d 74 (D.D.C. 2005) ...............................................................................................41

Marsh v. Or. Natural Resources Council, 490 U.S. 360 (1989) ...................................................19

Mid States Coalition for Progress v. Surface Transport Board, 345 F.3d 520 (8th Cir. 2003) .....38

Morton v. Mancari, 417 U.S. 535 (1974) .....................................................................................26

NRDC v. Andrus, 448 F. Supp. 802 (D.D.C. 1978) .....................................................................20

National Parks & Conservation Association ("NPCA") v. Babbitt,
241 F.3d 722 (9th Cir. 2001) ........................................................................30, 31, 32, 33

National Rifle Association of America v. Potter, 628 F. Supp. 903 (D.D.C. 1986)........................2

Natural Resources Defense Council v. Morton, 388 F. Supp. 829 (D.D.C. 1974)........................20

Ocean Advocates v. U.S. Army Corps of Engineers, 361 F.3d 1108 (9th Cir. 2004)...................30

Oregon Environmental Council v. Kunzman, 714 F.2d 901 (9th Cir. 1983) ...............................21

Or. Natural Desert Association v. U.S. Forest Serv.,
No. 03-213, 2005 WL. 1334459 (D. Or. Jun. 3, 2005)...................................................27

Or. Natural Desert Association v. U.S. Forest Serv.,
No. 03-381, 2005 WL. 1459328 (D. Or. Jun. 20, 2005)................................................27

Pueblo of Sandia v. United States, 50 F.3d 856 (10th Cir. 1995).....................................36, 38, 44

Robertson v. Methow Valley Citizens Council, 490 U.S. 332 (1989)..........................................19

S. Utah Wilderness Alliance v. Dabney, 222 F.3d 819 (10th Cir. 2000) .......................................2

S. Utah Wilderness Alliance v. National Park Serv., 387 F. Supp. 2d 1178 (D. Utah 2005)..2, 3, 4

S. Utah Wilderness Alliance v. Norton, 326 F. Supp. 2d 102 (D.D.C. 2004) ........................36, 38

Save our Ecosystems v. Clark, 747 F.2d 1240 (9th Cir. 1984).....................................................31

TVA v. Hill, 437 U.S. 153 (1978) ...............................................................................................26

Taxpayers of Michigan Against Casinos v. Norton, 433 F.3d 852 (D.C. Cir. 2006) .............19, 34

Telecomms. Research & Action Ctr. v. FCC, 800 F.2d 1181 (D.C. Cir. 1986) .............................4

Valdez v. Applegate, 616 F.2d 570 (10th Cir. 1980)....................................................................20

W. Watersheds Project v. Bennett, No. 04-181 (D. Id. June 4, 2004).........................................26

Wilderness Society v. Babbitt, 5 F.3d 383 (9th Cir. 1993)..............................................................4

Wilderness Society v. Norton, 434 F.3d 584 (D.C. Cir. 2006)........................................................4

**ADMINISTRATIVE DECISIONS**

Nat'l Wildlife Fed'n v. BLM, 140 IBLA 85 (1997) ........................................................20

S. Utah Wilderness Alliance v. BLM, 123 IBLA 302 (1992) .......................................21

**FEDERAL STATUTES**

5 U.S.C. § 706 ..............................................................................................................28

16 U.S.C. § 1 ..........................................................................1, 2, 4, 10, 17, 21

16 U.S.C. § 1a-1 ................................................................1, 2, 3, 4, 10, 21

16 U.S.C. § 1c ..............................................................................................2

16 U.S.C. § 470a(a) ..................................................................................36

16 U.S.C. § 470(b) ....................................................................................35

16 U.S.C. § 460dd..............................................................1, 2, 5, 11, 33

16 U.S.C. § 460dd-3 ...............................................................2, 12, 21

16 U.S.C. § 460dd-5 ...............................................................2, 12, 21

16 U.S.C. 470f .......................................................1, 14, 36, 41, 44

16 U.S.C. § 470w(7) ...............................................36, 38, 40, 44

42 U.S.C. § 4331(b)(4) ..............................................................33

42 U.S.C. § 4332.........................................................1, 5, 19, 30

42 U.S.C. § 4342..........................................................................19

42 U.S.C. § 4344..........................................................................19

43 U.S.C. § 1732............................................................................1

Department of the Interior and Related Agencies Appropriations Act,
Pub. L. No. 106-113, § 123, 113 Stat. 1501 (1999)....................................25

Pub. L. No. 106-291, § 116, 114 Stat. 922 (2000)......................................25

Pub. L. No. 107-63, § 114, 115 Stat. 414 (2001) ........................................................25

Pub. L. No. 108-7, § 328, 117 Stat. 11 (2003) ...................................................25, 26

Pub. L. No. 108-108, § 325, 117 Stat. 1241 (2003) .....................................25, 26, 29

**FEDERAL REGULATIONS**

36 C.F.R. § 800.1 ......................................................................................................41

36 C.F.R. § 800.2 ......................................................................................................38

36 C.F.R. § 800.3 ......................................................................................................37

36 C.F.R. § 800.4 .................................................................................................39, 44

36 C.F.R. § 800.5 .................................................................................................37, 39

36 C.F.R. §§ 800.6 ..............................................................................................37, 38

36 C.F.R. § 800.7 ......................................................................................................37

36 C.F.R. § 800.8 .......................................................................................37, 38, 40, 44

36 C.F.R. § 800.11 ....................................................................................................38

36 C.F.R. § 800.14 ...............................................................................................39, 41

36 C.F.R. § 800.16(l)(1) ...........................................................................................36

36 C.F.R. § 800.16(y) .......................................................................................36, 38, 41

40 C.F.R. § 1500.2(d) ...............................................................................................19

40 C.F.R. § 1501.4 ....................................................................................................19

40 C.F.R. § 1502.1 ....................................................................................................19

40 C.F.R. § 1502.22 .............................................................................................31, 32

40 C.F.R. § 1508.7 ....................................................................................................34

40 C.F.R. § 1508.8 ....................................................................................................35

40 C.F.R. § 1508.9 ....................................................................................................19

40 C.F.R. § 1508.27(b) ...........................................................................................30, 33

40 C.F.R. § 1508.28 .....................................................................................................20

## LEGISLATIVE MATERIALS

145 Cong. Rec. S10675 ...............................................................................................25

145 Cong. Rec. S10676 ...............................................................................................24

145 Cong. Rec. S10678 ...............................................................................................25

145 Cong. Rec. S10679 ...............................................................................................26

H.R. Rep. No. 92-1446 (1971), reprinted in 1972 U.S.C.C.A.N. 4915, 4917 ................2

S. Rep. No. 95-528, at 14 (1977) ..................................................................................3

**ARGUMENT**

Congress set aside Glen Canyon National Recreation Area ("Glen Canyon") in 1972 to "provide for public outdoor recreation use and enjoyment of Lake Powell and lands adjacent thereto in the States of Arizona and Utah and to preserve scenic, scientific, and historic features contributing to public enjoyment of the area." 16 U.S.C. § 460dd. The Secretary of the Interior ("Secretary"), through the National Park Service ("Park Service") and the Bureau of Land Management ("BLM"), is charged with managing Glen Canyon for these purposes. However, the Secretary is failing with respect to management of livestock grazing with the recreation area. Indeed, she is authorizing livestock grazing in violation of the Glen Canyon Enabling Act ("Enabling Act"), 16 U.S.C. § 460dd, the Park Service Organic Act ("Organic Act"), 16 U.S.C. §§ 1, 1a-1, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332, and the National Historic Preservation Act ("NHPA"), 16 U.S.C. 470f.[2]

I.    **THE SECRETARY IS VIOLATING THE ENABLING ACT AND ORGANIC ACT BY AUTHORIZING GRAZING IN GLEN CANYON WITHOUT CONSERVING OR PREVENTING IMPAIRMENT OF PARK RESOURCES.**

In managing livestock grazing within Glen Canyon, the Secretary is not adhering to the highly protective standards that apply to units of the national park system. The Secretary has ignored the special status Congress granted the unique resources of Glen Canyon and treated the recreation area like average public lands managed by the Bureau of Land Management ("BLM") under the less protective directives of the Federal Land Policy Management Act ("FLPMA"), 43 U.S.C. § 1732. The Secretary's failure to protect Glen Canyon violates the Enabling Act, 16 U.S.C. § 460dd, and the Organic Act, Id. §§ 1, 1a-1.

---

[2] Plaintiffs have attached six Affidavits supporting their standing to pursue this action.

Congress directed the Park Service to manage Glen Canyon for two purposes:  (1) to provide public outdoor recreation and enjoyment, and (2) to preserve the scenery and scientific and historic resources that contribute to that enjoyment.  Id. § 460dd.  Congress did not include livestock grazing as a purpose of the recreation area.  Id.; see also H.R. Rep. No. 92-1446 (1971), reprinted in 1972 U.S.C.C.A.N. 4915, 4917; Statement of Material Facts ("SOF") ¶¶ 29, 36. Although Congress recognized the history of livestock grazing within Glen Canyon and placed BLM in charge of "administering" grazing permits, any authorized grazing is subject to section 460dd-3 of the Enabling Act.  16 U.S.C. § 460dd-5.  Section 460dd-3 requires the Secretary to "administer, protect, and develop the recreation area in accordance with the provisions of [the Park Service Organic Act]."  Id. § 460dd-3; see also 16 U.S.C. §§ 1a-1, 1c (stating the Organic Act applies national parks and to "natural, historic, and recreation areas").  Accordingly, the Secretary may allow livestock grazing within Glen Canyon only to the extent it is consistent with the Organic Act.

The Organic Act requires the Park Service to manage its lands for one "fundamental purpose . . . to conserve the scenery and the natural and historic objects and the wildlife therein and to provide for the enjoyment of the same in such a manner and by such means as will leave them unimpaired for the enjoyment of future generations."  16 U.S.C. § 1 (emphasis added); Nat'l Rifle Ass'n of Am. v. Potter, 628 F. Supp. 903, 909 (D.D.C. 1986) ("In the Organic Act Congress speaks of but a single purpose, namely, conservation."); see also S. Utah Wilderness Alliance v. Dabney, 222 F.3d 819, 826 (10th Cir. 2000); S. Utah Wilderness Alliance v. Nat'l Park Serv., 387 F. Supp. 2d 1178, 1191-92 (D. Utah 2005) (confirming conservation as the "predominant facet of the Organic Act").  This duty to conserve "trumps all other

considerations." <u>Fund for Animals v. Norton</u>, 294 F. Supp.2d 92, 105 (D.D.C. 2003), <u>relief modified</u>, 323 F. Supp. 2d 7 (D.D.C. 2004).

The Organic Act also forbids the Park Service from allowing any activity that will cause "<u>derogation of the values and purposes</u> for which [the area has] been established." 16 U.S.C. § 1a-1 (emphasis added). Under this section, the Park Service "is to afford the highest standard of protection and care to the natural resources within . . . the National Park System." S. Rep. No. 95-528, at 14 (1977); <u>see also</u> <u>S. Utah Wilderness Alliance v. Nat'l Park Serv.</u>, 387 F. Supp. 2d at 1191. In sum, the Organic Act requires the Park Service to "conserve" park resources and values and avoid all "impairment" or "derogation."

The Park Service's 2001 Management Policies ("Policies") interpret these standards. SOF ¶¶ 12-15. In order to "conserve," the Park Service "must always seek ways to avoid, or to minimize to the greatest degree practicable, adverse impacts on park resources and values." Policies § 1.4.3; <u>see also</u> <u>Fund for Animals</u>, 294 F. Supp. 2d at 103, 105. The Park Service treats the "impairment" and "derogation" standards of the Organic Act as a single mandate to prevent impairment. Policies § 1.4.2. Impairment includes any "harm [to] the integrity of park resources and values, including the opportunities that would otherwise be present for the enjoyment of those resources or values." <u>Id.</u> § 1.4.5. The no-impairment duty is the "cornerstone of the Organic Act" and the Park Service's "primary responsibility." <u>Id.</u> § 1.4.4.

The Park Service's conservation mandate and duty to prevent impairment include both procedural and substantive components. Procedurally, the Park Service must analyze authorized grazing within Glen Canyon to determine whether it is leading to impairment. Substantively, the Park Service must prevent any present or future impairment. The Park Service has failed in both respects.

**A.** **The Park Service has not Analyzed Whether Grazing within Glen Canyon is Impairing the Recreation Area's Values or Purposes.**

In order to conserve and prevent impairment under the Organic Act, 16 U.S.C. § 1, 1a-1, the Secretary must <u>determine</u> whether authorized grazing will lead to impairment. Policies § 1.4.7; <u>see also</u> <u>Wilderness Soc'y v. Babbitt</u>, 5 F.3d 383, 388-89 (9th Cir. 1993) (finding U.S. Fish and Wildlife Service had a "duty to investigate the compatibility of grazing with a [national wildlife refuge's] purposes prior to permitting grazing"). Indeed, the no-impairment mandate is meaningless unless the Secretary first determines whether proposed actions are compatible with Glen Canyon resources and values.

**1.** **The Park Service must conduct a values and purposes determination before allowing grazing within Glen Canyon.**

To implement this procedural duty, the Park Service must prepare a written "values and purposes" determination prior to authorizing any activity, including grazing, within Glen Canyon.

> Before approving a proposed action that could lead to an impairment of park resources and values, [the Park Service] must consider the impacts of the proposed action and determine, in writing, that the activity will not lead to an impairment of park resources and values. If there would be an impairment, the action may not be approved.

Policies § 1.4.7; SOF ¶14.[3]

---

[3] This Circuit recently held the Policies are not binding on the Park Service in a case where the plaintiff sought to enforce Policies that did not stem from a statutory mandate. <u>Wilderness Soc'y v. Norton</u>, 434 F.3d 584, 595-97 (D.C. Cir. 2006). In contrast, Plaintiffs in this case challenge the Park Service's failure to comply with the Organic Act. As evidence that the Service must provide some reasoned explanation for its failure to abide by its own policies. <u>Atchinson v. Wichita Bd. of Trade</u>, 412 U.S. 800, 808 (1973); <u>Telecomms. Research & Action Ctr. v. FCC</u>, 800 F.2d 1181, 1184 (D.C. Cir. 1986). The record contains no such explanation.

Both the Park Service and the BLM officially recognize the need to conduct values and purposes determinations prior to authorizing grazing within Glen Canyon.  SOF ¶¶ 23, 24, 28, 36.  Both agencies signed a 1984 Memorandum of Understanding ("MOU"), which requires BLM to obtain Park Service "clearance" before authorizing grazing in order to ensure it is consistent with the values and purposes of Glen Canyon.  SOF ¶ 23; see also Policies § 8.6.8.2 ("Administration [of grazing] by another agency does not release the NPS from its responsibility to ensure that the activity is managed in compliance with the NPS mission and all applicable laws and policies.").  Specifically, BLM "shall not act on any grazing authorizations . . . without first receiving a written determination from the NPS Regional Director regarding the potential effect of the proposed action upon the values and purposes of the area."  SOF ¶ 23.  The Park Service must also provide any grazing permit "terms and conditions" necessary to ensure compatibility with Glen Canyon's values and purposes.  Id.

The Park Service and BLM reconfirmed the need for values and purposes determinations in a 1993 Interagency Agreement ("IA").  Id. ¶ 24.  The IA requires the Park Service to conduct a values and purposes determination when "BLM initiates an action requiring an environmental assessment."  Id.  As discussed below, term grazing permits are actions requiring an environmental assessment ("EA") (or environmental impact statement ("EIS")) under NEPA.  42 U.S.C. § 4332.  Under the IA, the Park Service must also provide "any terms and conditions deemed necessary . . . to ensure that the activities are compatible with [Glen Canyon's] values and purposes."  SOF ¶ 24.

The "purposes" of Glen Canyon are recreation and protection of the scenic, scientific, and historic features of the area.  16 U.S.C. § 460dd; SOF ¶ 29.  The Park Service has defined the "values" of Glen Canyon as the "vegetation, soil, water quality, wildlife, archaeologic,

historic, paleontologic, scenic and recreation resources." SOF ¶ 29; see also Policies § 1.4.6

(defining park resources and values subject to the no-impairment standard).  To determine

whether an activity will lead to impairment of the purposes and values, the Park Service must

consider three factors:  (1) the severity, duration, and timing of the impact, (2) the direct and

indirect effects of the impact, and (3) the cumulative effects of the impact in question and other

impacts.  Policies § 1.4.7.

> **2.    Although BLM has authorized grazing within Glen Canyon since 1972, the Park Service has never completed values and purposes determinations.**

Although the Park Service and BLM have a clear process for conducting values and

purposes determinations and have detailed the factors to consider, the agencies have never

completed the process prior to authorizing grazing within Glen Canyon.

> **a.    The Park Service did not conduct values and purposes determinations for current grazing permits.**

BLM authorizes grazing by issuing grazing permits, usually for a term of ten years.  SOF

¶ 91.  For each of the 24 allotments challenged in Plaintiffs' Complaint, BLM recently issued at

least one and in many cases more than one ten-year permit.  Id. ¶¶ 98-101, 104-09, 112-121,

124-27.[4]  Yet, the record does not contain a final values and purposes determination for any of

these permits.  Id. ¶ 35.  The Park Service has never analyzed the severity of BLM authorized

grazing or the direct, indirect, or cumulative impacts on park resources.  Policies § 1.4.7.  Indeed,

the Secretary has authorized grazing for the next ten years on all 24 allotments without first

determining whether doing so will impair park resources or values in violation of the Organic

Act.

---

[4] Many of the allotments have more than one permittee who is authorized to graze cattle within the allotment, requiring multiple permits.

The Park Service has begun work on a draft values and purposes determination for the allotments that include areas within both Glen Canyon and the Grand-Staircase Escalante National Monument ("GSENM").  SOF ¶ 36.  The latest version in the record is dated August 15, 2005, one month after Plaintiffs filed their Complaint.  Id.  The agency has not finalized this draft.  Id.  Moreover, the draft document found impairment on almost every Glen Canyon/GSENM allotment challenged in this case.  Id. ¶¶ 38-41; see also infra Part I.B.1.a.  The fact the Park Service's preliminary inquiry found such serious impacts only emphasizes the need to finish the process immediately.

> b.    **The Park Service did not conduct a values and purposes determination in its 1979 Glen Canyon General Management Plan or 1999 Grazing Management Plan.**

The Park Service's failure to analyze the grazing impacts is longstanding.  For more than 30 years, the agency has delayed the required analysis.  The Park Service established a General Management Plan ("GMP") for Glen Canyon in 1979.  SOF ¶ 25.  Neither the GMP nor the associated EIS contains any analysis of whether grazing is consistent with the values and purposes of the recreation area.  Id.  Instead, the GMP required the Park Service to develop an allotment-specific Grazing Plan.  The Grazing Plan was to include: (1) a detailed description of the condition of the range, and (2) recommendations for specific management activities and maximum grazing intensities compatible with the purpose of the recreation area.  Id. ¶ 26.  According to the final EIS:

> The level and seasonality of grazing operations on particular allotments will be established by the grazing resources component of the proposed resources management plan, to be completed within 6 years.  The effects of grazing on particular allotments will be evaluated in preparing this plan.

Id. (emphasis added).  Therefore, the Park Service postponed its required analysis of the impacts of livestock grazing on the values and purposes of Glen Canyon for the site-specific Grazing Plan.

Although the Park Service planned to complete the Grazing Plan within six years, it missed this self-imposed deadline by 20 years, and finally issued the Grazing Plan in 1999.  Id. ¶ 27.  Even after 20 years, the Grazing Plan did not analyze whether on-going grazing is consistent with Glen Canyon's values and purposes.  Id. ¶ 28.  The EA for the Plan explores the impacts of livestock grazing generally; however, it does not analyze site-specific impacts on individual allotments.  Id.; see also infra Part II.A.1.  Nor is there any analysis of the cumulative impacts of grazing in combination with other activities, such as recreation, off-road vehicle use, or drought, as required by section 1.4.7 of the Policies.  SOF ¶¶ 80-82; see also infra Part II.B.4.

Once again, the Park Service postponed the required analysis.  Rather than making values and purposes determinations for each allotment, the Grazing Plan sets up a process for making these findings in the future.  The Grazing Plan EA establishes grazing is causing or has the potential to cause impairment of Glen Canyon resources.  SOF ¶¶ 57-64; see also infra Part I.B.1.c.  In order to address this damage, the Plan establishes management goals, objectives, and specific actions for each resource.  SOF ¶ 30.  When deciding whether to give "clearance" to BLM authorized grazing, the Park Service is to apply these goals and objectives and make a values and purposes determination.  Id. ¶ 31.  In short, the Park Service planned to use the Grazing Plan to determine whether grazing is impairing the resources of Glen Canyon in violation of the Organic Act.  The Park Service must then incorporate any necessary protections into the terms and conditions of the ten year grazing permits issued by BLM.  Id. ¶ 65.

The Park Service is not clear about what actions will trigger application of the Grazing Plan to a particular allotment; the Grazing Plan is internally inconsistent. On the one hand, the Park Service states it will implement the Plan when a qualifying <u>change</u> in grazing takes place, including a change in the amount of grazing or a transfer of the grazing permit. <u>Id.</u> ¶ 32. On the other hand, the Plan prioritizes five allotments for application of the Grazing Plan: Lake Canyon, Sewing Machine, Rock-Creek Mudholes, Lake, and Soda. <u>Id.</u> ¶ 33. The agency prioritized these allotments based on their size, management status, and history of problems—not on the fact the Park Service anticipated that one of the qualifying changes in grazing management would occur. <u>Id.</u> Furthermore, in other documents in the administrative record, the Park Service indicates it planned to apply the Grazing Plan to <u>all</u> allotments during BLM's permit renewal process. <u>Id.</u> ¶ 34.

In any event, regardless of how the Park Service chooses to implement the Grazing Plan, there is no question BLM authorized grazing will continue without adequate protection of Glen Canyon resources until the Park Service actually applies the Plan. The Park Service considered and rejected an alternative in the Grazing Plan EA that would have required immediate compliance with Grazing Plan standards. <u>Id.</u> Therefore, the Grazing Plan authorizes on-going grazing to continue. Indeed, in the six and a half years since the Park Service published the Plan, BLM has renewed permits on 23 of the challenged allotments, and the Park Service has never finalized a values and purposes determination. <u>Id.</u> ¶ 35.[5] With the exception of the draft document for the Glen Canyon/GSENM allotments, there is no evidence the Park Service has ever applied the Grazing Plan to any of the Glen Canyon allotments, including the five priority

---

[5] BLM renewed the Soap Creek permit prior to 1999, but the Park Service has still not conducted a values and purposes determination for the allotment. SOF ¶ 124.

allotments.  Not one of the current permits contains any mention of the Grazing Plan, much less any "terms and conditions" implementing the Plan.  Id. ¶ 65.

3.    **BLM's failure to comply with NEPA does not excuse the Park Service from complying with the Organic Act.**

The Park Service blames its failure to comply with the Organic Act on the BLM. According to the Service, it is waiting for BLM to conduct site-specific environmental analysis under NEPA before it will determine whether grazing is causing impairment within Glen Canyon.  Id. ¶ 35.  As discussed below, BLM has interpreted a number of "riders" Congress attached to the Department of the Interior's Appropriations Acts between 1999 and 2004 as an excuse not to comply with NEPA.

The Park Service has never explained how BLM's failure to comply with NEPA alleviates the Park Service's responsibility to comply with the Organic Act, nor could it.  The mandate of the Organic Act is absolute—the Park Service must prevent impairment.  16 U.S.C. § 1, 1a-1.  The Act does not allow the Park Service to prevent impairment if and when it gets around to it.  Moreover, BLM has a long history of failing to comply with NEPA in a timely manner.  See infra Part II.  Therefore, the Park Service cannot continue to abdicate its legal responsibilities until BLM complies with NEPA.

B.    **The Secretary is Authorizing Grazing within Glen Canyon that is Causing Adverse Impacts and Impairment of Park Resources.**

In addition to her failure to comply with the procedural requirements of the Organic Act, the Secretary has also failed to comply with the substance of the Act, the conservation mandate and the duty to prevent impairment.  16 U.S.C. §§ 1, 1a-1.  The Park Service interprets its mandate under the Organic Act to include two different standards, depending on whether the activity fulfills a purpose of the park or not.  As part of its duty to "conserve," the Park Service

"must always seek ways to avoid, or to minimize to the greatest degree practicable, adverse impacts on park resources and values."  Policies § 1.4.3; see also Fund for Animals, 294 F. Supp. 2d at 103, 105.  The only exception to this mandate is for activities necessary to "fulfill the purposes of a park."  Policies § 1.4.3.  This exception does not apply in this case because livestock grazing is not a purpose of Glen Canyon.  16 U.S.C. § 460dd; see also SOF ¶¶ 29, 36. Accordingly, the Park Service may not allow any grazing that causes adverse impacts to park resources.

The second mandate—the duty to prevent impairment—applies even to those activities that are necessary to fulfill the purposes of a park.  Policies § 1.4.3.  As a result, even if Congress had identified grazing as a purpose of Glen Canyon, the Secretary cannot authorize grazing that will lead to impairment.  Id. §§ 1.4.4, 1.4.7.  Impairment is any impact that "would harm the integrity of park resources and values, including the opportunities that would otherwise be present for the enjoyment of those resources or values."  Id. § 1.4.5.  If the Park Service is aware that "an ongoing activity might have led or might be leading to . . . impairment," the agency must investigate and take action to "eliminate the impairment as soon as reasonably possible."  Id. § 1.4.7.  The Park Service cannot avoid its Organic Act duties by taking no action.

The Park Service has also established specific standards for livestock grazing within national park system units.  When the Park Service allows grazing, it must be "evaluated continuously" to ensure grazing practices will "protect vegetation, and wildlife and its habitat . . . control proliferation of exotic species; conserve soil; protect riparian areas and groundwater . . . and preserve cultural sites."  Policies § 8.6.8.2; SOF ¶ 17.  Additionally, the Park Service must protect native plants and cultural values and minimize conflicts with public use and enjoyment. Policies § 8.6.8.2.

Both the Park Service and BLM must comply with these mandates within Glen Canyon.

16 U.S.C. § 460dd-3, -5. They have not. The Park Service has identified widespread adverse

impacts that are in some cases impairing park resources, but neither the Park Service nor BLM

has taken action to correct these problems.

> 1. **The Park Service has identified adverse impacts and impairment of Glen Canyon resources.**

Although the Park Service has never systematically analyzed whether livestock grazing is

impairing Glen Canyon resources through values and purposes determinations, there are

numerous documents in the administrative record showing serious damage is occurring.

> a. **The GSENM draft purposes and values determination identifies adverse impacts and impairment.**

The draft values and purposes determination for the Glen Canyon/GSENM analyzes ten

of the allotments Plaintiffs have challenged in this case. The Park Service summarized its

findings as follows:

> Park resources have in fact been degraded . . . within the Glen Canyon NRA. In
> some areas, forage has been over-utilized and is trending downward. Rangeland
> health assessments are indicating poor biotic and abiotic conditions across certain
> vegetation and soil types. Springs, seeps, and streams are experiencing extremes
> in soil erosion, dewatering, and consumption of riparian vegetation because of
> livestock activities. Fragile and non-renewable cultural properties have been, and
> continued to be, negatively affected by livestock and are not meeting the
> requirements and obligations under the National Historic Preservation Act.
> Finally, livestock practices are prohibiting Glen Canyon NRA from providing
> proper scenic and aesthetic enjoyment to every park visitor because some
> recreation conflicts exist, particularly in areas of high visitation combined with
> frequent livestock activity.

SOF ¶ 38. According to the determination, a two-year study of Glen Canyon revealed that 37%

of backcountry users reported negative or very negative experiences because of cattle grazing.

Id. ¶ 39. Participants complained about "livestock feces at trailheads, along trails, and at scenic

viewpoints . . . livestock trampling and/or contamination of water sources, flies, and simply

observing livestock in remote areas." Id.  Studies in GSENM showed 40% of hunters and 70% of hikers reported that "seeing cattle or evidence of cattle grazing detracted from their recreational experience." Id.

The Park Service also found current livestock grazing was "counter to" or "not compliant with" Glen Canyon values on the following allotments:  Upper Warm Creek (vegetation, soils, and cultural resources), Lower Warm Creek (vegetation, soils, cultural resources, and recreation), Last Chance (vegetation, riparian conditions, and cultural resources), Rock Creek-Mudholes (vegetation, soils, riparian conditions, and cultural resources), Lake (vegetation, soils, riparian conditions, wildlife, cultural resources, and recreation), Soda (vegetation, soils, riparian conditions, cultural resources, and recreation), Forty Mile Ridge (cultural resources, scenic and recreation), Lower Cattle (cultural resources, riparian condition, scenic, and recreation), Upper Cattle (soils and cultural resources). Id. ¶ 40.  Furthermore, for the Last Chance, Rock Creek-Mudholes, Lake, and Soda allotments, the Park Service found:  "Maintaining current levels of active livestock use across the allotment will continue to produce unacceptable impacts to Glen Canyon NRA values and thus, current livestock activities are not in compliance with Glen Canyon NRA purposes." Id. ¶ 41.  Thus, there is widespread adverse impact and impairment of the values and purpose of Glen Canyon throughout the GSENM allotments.

> **b.    The Park Service's cultural resources assessments identify adverse impacts and impairment.**

The Park Service concedes only a small fraction of the allotments within Glen Canyon have been surveyed for cultural resources. Id. ¶ 6.  In the surveyed areas, damage is severe. Prior to completing the GSENM draft values and purposes determination, the Park Service identified significant damage to cultural resources on a number of the GSENM/Glen Canyon allotments.

In 2003 assessment, the Park Service identified livestock grazing impacts to cultural resources that are eligible for the National Register of Historic Places ("National Register") under the National Historic Preservation Act, 16 U.S.C. § 470f.  SOF ¶¶ 42-50.  For example, 79% of the record sites within the Lake allotment are eligible for the National Register; 64% of the sites had documented livestock grazing impacts; and 30% were in poor condition.  Id. ¶ 43. The Park Service identified similar conditions on the Lake, Rock Creek-Mudholes, Forty Mile Ridge, Lower Cattle, Upper Cattle, Soda, and Upper Warm Creek allotments.  Id. ¶¶ 44-50.

In December 2001, the Park Service also documented a significant number of archeological sites on Lake, Soda, Rock Creek-Mudholes, and Sewing Machine allotments that are both eligible for the National Register and negatively impacted by livestock grazing—69 on Lake, 17 on Soda, 16 on Rock Creek-Mudholes, and 31 on Sewing Machine.  Id. ¶¶ 51-55.  Each of the first three allotments had at least one site with severe impacts, meaning the site had "been so badly damaged by grazing activities that the resource will be significantly damaged or irretrievably lost if action is not taken within 2 years."  Id.  All of the allotments had multiple sites where the damage was moderate, which the Service defines as "irreparable damage to the integrity of the resources and the loss of information if action to correct the impact is not taken within five years."  Id.  For each of these allotments, the Park Service concluded:

> [C]urrent grazing practices . . . need to be reevaluated.  The integrity of sites determined eligible to the National Register . . . are being compromised, and obvious adverse effects are being allowed to continue without any mitigative measures taken.  This is in direct violation to Section 106 regulations, which require federal agencies to identify alternatives to minimize or eliminate impacts to cultural resources under their jurisdiction.  A simple solution would be to remove all cattle from the Glen Canyon NRA portion of the allotment.  Short of that, a preservation plan should be developed and implemented by the BLM that includes recommendations and methods to mitigate the damage to archeological sites resulting from grazing activities.

Id. ¶ 56.

         **c.**     **The 1999 Grazing Plan EA identifies adverse impacts and impairment.**

Although the Park Service's 1999 Grazing Plan EA did not fully discuss site-specific impacts on particular allotments, it did identify some areas where grazing has caused adverse impacts or impairment.  More generally, however, the Grazing Plan EA showed livestock grazing has tremendous potential to impair of each of the identified values of Glen Canyon— vegetation, soil, water quality, wildlife, cultural resources, scenery, and recreation.

For example, in the Grazing Plan EA, the Park Service found livestock grazing in arid and semi-arid environments like Glen Canyon decreases desirable native vegetation and increases undesirable exotic plant species.  Id. ¶ 58.  Cows tend to concentrate near streams or other water sources causing collapsed stream banks and increased erosion.  Id.  Although BLM has set utilization levels at 50 to 60% percent, meaning the cattle can eat fifty to sixty percent of the grasses in a pasture before the permittee must move them, grazing has occurred at much higher levels.  Id. ¶ 59.  The Park Service documented "severe overgrazing" on the Forty-Mile Ridge, Upper Cattle, and Soda allotments.  Id.  On Forty-Mile Ridge, the Service found:

> [S]evere overgrazing occurred in the Red Wells area of the Forty-Mile Ridge allotment in the 1993-94 season, with utilization of key grass species at 78-88%. Many plants were killed outright, with their roots pulled out of the ground.  Other plants were so severely cropped that it is unlikely that they will survive given future drought conditions.

Id. ("[B]enches in Coyote Gulch have been overgrazed to the extent that perennial grasses are not present in many areas.").  On the Upper Cattle allotment, cows ate 85%, 86%, and 95% of the key species in certain pastures.  Id.  Similarly, within David Gulch on the Soda allotment, cows ate as much as 95% of the forage, with a mean of 82%; "[m]any plants of all ages had been killed or severely damaged."  Id.  At these levels, vegetation will take decades to recover if it recovers at all.  Id.  Based on these examples, the Park Service concluded that "at least in some

cases existing range condition is being degraded within Glen Canyon NRA, and that better control of actual utilization values is necessary." Id.

In its overview of soil conditions, the Park Service found "some high use areas being impacted by grazing activities." Id. ¶ 60. The Service noted a "reduction in desirable vegetative cover occurs under increasing grazing pressure in arid environments." Id. The agency expects long term impacts to soils to continue under current grazing practices. Id. The Park Service also found damage to critical riparian areas, including "some springs . . . such as those on the Kaiparowits Plateau, [that] have been severely damaged by livestock trampling, with in some cases almost total elimination of riparian vegetation." Id. ¶ 61.

The EA also provides a basis for the Park Service's later cultural resource assessments, discussed above. According to the EA, livestock grazing has adversely impacted cultural resources within Glen Canyon since the 1880's. Id. ¶ 63. Livestock topple prehistoric buildings, trample artifacts, and erode rock art by rubbing against walls. Id. The Park Service found:

> Cultural resources damage caused by livestock is well documented. Of the 130 sites regularly assessed . . . cattle have impacted 33 sites or 25 percent of the total assessment sample. It is common to find sites where structures are visible only as chunks of mortar scattered among the dung, with perhaps a tell-tale stain of clay along an alcove back wall to indicate that a structure once stood there. Wherever livestock have access, surface artifacts are rare. The integrity of artifact concentrations is lost, and the artifacts themselves are not visible unless subsurface testing is done.

Id. Studies conducted by Northern Arizona University show livestock grazing damaged archeological sites within three unnamed riparian canyon systems, the Andy Miller Flats/Red Benches area, and the benchlands above Wahweap and Warm Creeks. Id.

Finally, the EA states grazing can ruin the recreational experience of Glen Canyon visitors, particularly backcountry users, because the presence of cattle, roads related to cattle operations, water developments, and stock trails spoil the natural beauty of the area. Id. ¶ 64.

Backcountry users complain more about the impacts of grazing on the recreation area's resources than anything else when they share comments with the Park Service.  Id.

The administrative record is filled with evidence showing cows are causing serious, widespread problems within Glen Canyon.  Grazing is adversely impacting the area's purposes and values in violation of the conservation mandate.  16 U.S.C. § 1; Policies 1.4.3.  Indeed, the Park Service identified some areas where livestock grazing is "harming the integrity of park resources," the very definition of impairment.  Policies § 1.4.5.  At a minimum, the Park Service has identified potential impairment warranting further action by the agency.

> **2.    The Secretary has taken no action to correct the adverse effects and impairment caused by livestock grazing.**

The Secretary has taken no action to fix the adverse effects and impairment caused by livestock grazing.  There is no evidence in the record that the Secretary ever modified a grazing permit in response to any of the impacts the Park Service identified.  SOF ¶ 65.  In fact, BLM recently renewed term grazing permits for each of the challenged allotments with exactly the same terms and conditions as the prior permit.  Neither the Park Service nor BLM included a single condition in any of these permits limiting or otherwise mitigating livestock grazing in damaged areas.  Id.  The Park Service anticipated correcting the problems identified by implementing the Grazing Plan during the permit renewal process and incorporating protective terms and conditions into the ten year permits.  Id.  Yet, in the six and a half years since it developed the Grazing Plan, the Park Service has not applied the Plan to any one of the 23 challenged allotments where BLM has renewed grazing permits.  Id. ¶ 66.  The only other permit, for the Soap Creek allotment, was renewed prior to 1999 when the Park Service adopted the Grazing Plan.  Id. ¶ 124.

The few situations where BLM attempted to address grazing impacts have been unsuccessful. In 1997, BLM completed an EA and FONSI to modify the grazing permit on the Forty Mile Ridge allotment. Id. ¶ 67. The EA proposed grazing reductions in order to improve vegetation in riparian areas, enhance wilderness values, and improve allotment conditions. Id. On January 27, 1998, Plaintiff Great Old Broads filed a protest of BLM's grazing decision for Forty Mile Ridge because the changes were insufficient to protect the allotment. Id. ¶ 68. For the past eight years, BLM has not resolved the protest or implemented the decision. Id. As a result, BLM never modified the grazing permit to improve conditions on the allotment. Id.

Similarly, in 2003, the Park Service claimed BLM agreed to take cows off the Soda and Lake allotments "until NPS resource objectives and goals can be met." Id. ¶ 69. Draft Park Service documents indicate BLM removed the cows from both allotments from 2000 to 2002 because of problems with trespass, but let cows back on in 2003. Id. These records show BLM is currently authorizing as much grazing as was authorized prior to 2000 on Lake, and will be authorizing the same amount on Soda by 2007. Id. ¶ 70. There is no evidence BLM consulted the Park Service to ensure their goals and objectives were met prior to returning cows to the allotment. Id. ¶ 69. In fact, the Park Service's 2005 draft values and purposes determination found current grazing practices on Soda and Lake "will continue to produce unacceptable impacts to Glen Canyon NRA values and . . . are not in compliance with Glen Canyon NRA purposes." Id. ¶ 41.

As the record demonstrates, the Secretary continues to authorize grazing at the same levels within Glen Canyon year after year despite the fact that she has identified adverse impacts, sometimes rising to the level of impairment, of the values and purposes of the recreation area. In

doing so, the Secretary has violated her conservation and non-impairment duties under the

Organic Act.

**II.     THE SECRETARY IS VIOLATING NEPA BY AUTHORIZING GRAZING WITHIN GLEN CANYON WITHOUT ANALYZING ITS ENVIRONMENTAL IMPACTS.**

NEPA requires all federal agencies to take a "hard look" at the potential environmental

consequences of their actions.  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350

(1989); Marsh v. Or. Natural Res. Council, 490 U.S. 360, 374 (1989); Taxpayers of Michigan

Against Casinos v. Norton, 433 F.3d 852, 861 (D.C. Cir. 2006).  Federal agencies must engage in

environmental analysis before they take action to ensure "the agency will not act on incomplete

information, only to regret its decision after it is too late to correct."  Marsh, 490 U.S. at 371.

NEPA also guarantees the public the right to participate in the environmental analysis and

decision making.  Robertson, 490 U.S. at 349; see also 40 C.F.R. § 1500.2(d).[6]

Before taking any "major Federal actions significantly affecting the quality of the human

environment," a federal agency must prepare an environmental impact statement ("EIS").  42

U.S.C. § 4332(2)(C).  The EIS must include a detailed statement of the environmental impact of

the proposed action and any alternatives to the proposed action that would avoid or minimize any

adverse impacts.  Id.; 40 C.F.R. § 1502.1.  In order to determine whether an action is

"significant" and requires an EIS, an agency may prepare a less extensive environmental

assessment ("EA").  40 C.F.R. §§ 1501.4(b), 1508.9.  If the EA finds the action is not significant,

the agency may prepare a finding of no significant impact ("FONSI").  Id. § 1501.4(e).

---

[6] NEPA created the Council on Environmental Quality, an agency within the Executive Office of the President charged with promulgating regulations under NEPA.  42 U.S.C. §§ 4342, 4344. These regulations, found in 40 C.F.R. Part 1500, are binding on all federal agencies.  Robertson, 490 U.S. at 354.

A.    **The Secretary has never Considered the Site-Specific Impacts of Livestock Grazing within Glen Canyon.**

There is no question the Secretary must comply with NEPA prior to authorizing grazing on public lands. Natural Res. Def. Council ("NRDC") v. Morton, 388 F. Supp. 829, 834 (D.D.C. 1974), aff'd without opinion, 527 F.2d 1386 (D.C. Cir. 1976); see also Valdez v. Applegate, 616 F.2d 570, 571 (10th Cir. 1980); Greater Yellowstone Coal. v. Bosworth, 209 F. Supp. 2d 156, 158-59 (D.D.C. 2002); NRDC v. Andrus, 448 F. Supp. 802, 803-04 (D.D.C. 1978). In 1976, this Court held the Secretary's "grazing permit program produces significant impacts on individual locales." NRDC v. Morton, 388 F. Supp. at 834 (emphasis added). Accordingly, this Court required the Secretary to comply with NEPA prior to issuing permits. Id. at 838-41.

This Court emphasized the need to consider the site-specific impacts of grazing, including a "detailed analysis of local geographic conditions necessary . . . to determine what course of action is appropriate under the circumstances." Id. at 838-39; see also City of Tenakee Springs v. Block, 778 F.2d 1402, 1407 (9th Cir. 1985); Commonwealth of Mass. v. Clark, 594 F. Supp. 1373, 1383 (D. Mass. 1984); Nat'l Wildlife Fed'n ("NWF") v. BLM, 140 IBLA 85, 93-98 (1997). It is "crucial" for the Secretary to analyze "specific environmental effects of the permits issued, and to be issued, in each [BLM] district." NRDC v. Morton, 388 F. Supp. at 841. The Secretary has discretion to determine whether to prepare a separate NEPA document for each allotment or to analyze multiple allotments together in a larger NEPA document, but at some point she must analyze the impacts on individual allotments. Id.

NEPA allows the Secretary to "tier" NEPA documents, meaning she can prepare a more general EIS for a planning document, and then incorporate information from the EIS into site-specific EAs at the project level. 40 C.F.R. § 1508.28. However, at some point, the agency must consider site-specific impacts. See, e.g., City of Tenakee Springs, 778 F.2d at 1407 ("Where

there are large-scale plans for regional development, NEPA requires both a programmatic and a site-specific EIS."); Oregon Envtl. Council v. Kunzman, 714 F.2d 901, 904-06 (9th Cir. 1983); NWF, 140 IBLA at 94-95; S. Utah Wilderness Alliance v. BLM, 123 IBLA 302, 309.  In other words, while the Secretary has discretion to determine how she will comply with NEPA, she does not have discretion to ignore the site-specific impacts of her actions. Yet, that is exactly what the Secretary has done in this case.

### 1.    The Park Service authorized grazing in Glen Canyon without analyzing site-specific impacts under NEPA.

The Park Service plays a crucial role in authorizing grazing within Glen Canyon.  BLM's ability to authorize grazing is constrained by the Park Service's duty to "protect . . . the recreation area in accordance with the NPS Organic Act."  16 U.S.C. § 460dd-3.  The Park Service must prohibit any grazing that will impair the values and purposes of the area.  16 U.S.C. §§ 1, 1a-1; see supra Part I.  Accordingly, BLM must obtain the Park Service's approval, through a values and purposes determination, before authorizing grazing within Glen Canyon.  Policies § 1.4.7; SOF ¶¶ 14, 23, 24, 28, 36.

As part of its Organic Act duties, the Park Service prepared the 1999 Grazing Plan. According to the Park Service, the Grazing Plan was to include analysis of the "effects of grazing on particular allotments."  SOF ¶ 26.  However, the Grazing Plan EA, which is where the Park Service analyzed the impacts of the Grazing Plan, contains no such analysis.  The document does not include a description of the current conditions on any allotments, or any analysis of the effects of grazing authorized by individual permits.  The EA provides only an "overview of grazing conditions within Glen Canyon NRA [and] a brief description of BLM grazing management . . . on allotments within the recreation area."  Id. ¶ 72 (emphasis added).  Although the EA contains a brief description of the "resource condition" for each of the Glen Canyon

values, these descriptions are not allotment specific.  Id. ¶ 73.  In fact, the Park Service only mentions individual allotments once in the entire EA when it identifies "severe overgrazing" on the Forty-Mile Ridge, Upper Cattle, and Soda allotments.  Id.  The Park Service also identifies specific areas with damaged cultural resources, but does not specify the allotments.  Id.  The rest of the analysis is limited to general statements applicable to the entire recreation area.

Glen Canyon includes more than 750,000 acres of grazed lands that vary widely in terms of the specific resources found within particular allotments and the condition of those resources.  See, e.g., id. ¶¶ 2-8.  Furthermore, BLM authorizes varying amounts of grazing during different times of the year ("season of use") on each allotment.  See, e.g., id. ¶¶ 98-101, 104-09, 112-21, 124-27.  The Park Service's failure to analyze these site-specific differences violates NEPA.

> **2.    BLM authorized grazing in Glen Canyon without analyzing site-specific impacts under NEPA.**

BLM must also consider site-specific impacts during the permit renewal process.  Yet, BLM has issued and renewed grazing permits within Glen Canyon since Congress protected the area in 1972 without doing so.  BLM is relying on several riders Congress attached to the Department of the Interior Appropriations Act as justification for its failure to comply with NEPA.  However, these riders do not justify BLM's failure to comply with the law.

> **a.    BLM issued grazing permits on 24 Glen Canyon allotments without preparing EAs or EISs.**

BLM authorizes grazing throughout Glen Canyon by issuing permits that are generally valid for ten years.  Id. ¶ 91.  The agency recently renewed ten-year permits for each of the 24

allotments that are the subject of this litigation, each time failing to conduct a final analysis of site-specific grazing impacts.[7]

Indeed, like the Park Service, BLM's history of grazing management within Glen Canyon is one of continued delay. Four separate BLM field offices manage the 24 challenged allotments: Henry Mountain, Monticello, Grand Staircase-Escalante National Monument ("GSENM"), and Arizona Strip. Id. ¶ 92. Although Lower Warm Creek and Wahweap are wholly contained within Glen Canyon, each of the other allotments contains a portion that lies within Glen Canyon and a portion that lies outside of the recreation area on other BLM lands. Id. Although different standards apply depending on whether the land is inside or outside the recreation area, BLM has never completed a NEPA document that analyzes grazing impacts under the Organic Act's no impairment standard. Id. ¶ 128.

Although they are now obsolete, BLM completed regional grazing assessments that applied to the Glen Canyon allotments managed by Arizona Strip in 1979, GSENM in 1981, Henry Mountain in 1983, and Monticello in 1991. Id. ¶¶ 129, 132, 140, 148. Although these assessments identified the need for further site-specific analysis of individual allotments, BLM has never conducted that analysis. Id. ¶¶ 129-30, 134-36, 141-46, 151. BLM concedes these regional analyses are "outdated" and must be updated in order to comply with the law. Id. ¶¶ 131, 140, 150. Yet, the agency continues to renew permit after permit within Glen Canyon with no current NEPA analysis.

---

[7] Although Plaintiffs excluded Soap Creek from this count in their Complaint because they believed BLM had finalized an EA for the allotment, the administrative record reveals this is not the case. Although BLM completed an EA, Plaintiffs protested, and BLM never issued a final decision. SOF ¶ 151. Fed. R. Civ. P. 15(b) allows amendment of a pleading in order to conform to the evidence. Thus, Plaintiffs request that this Court allow amendment of Plaintiffs' Complaint to allow a NEPA challenge to the Soap Creek allotment.

Even in those few instances where BLM started to comply with NEPA, the agency failed to follow through. BLM started work on a Grazing EIS for GSENM in 2000 that was to analyze the impacts of grazing on ten of the allotments challenged in this case. Six and a half years later, BLM has not even published a draft. Id. ¶¶ 145-46. BLM completed an EA for the Forty Mile Ridge allotment in 1997 that proposed cutting the level of grazing nearly in half to improve allotments conditions. Id. ¶ 147. Great Old Broads protested the EA; and, for the past eight years, BLM has not made a decision on the protest or implemented its decision to reduce grazing. SOF. The same is true for both White Canyon and Soap Creek. BLM prepared an EA for White Canyon in 2001 and Soap Creek in 2000. Id. ¶¶ 137, 151. In both cases, Plaintiffs protested the decisions, and BLM has never ruled on the protests. Id. BLM also started an EA for Rockies and Sewing Machine in 2000, but never finished it. Id. ¶ 131. Therefore, BLM has not finalized a single site-specific NEPA analysis for any of the 24 Glen Canyon allotments.

> **b.    Congress did not excuse BLM from NEPA compliance in the grazing riders.**

BLM incorrectly relies on a series of riders attached to the Department of the Interior Appropriations Act for fiscal years ("FY") 2000-2004 as justification for not complying with NEPA.[8] In 1999, BLM faced a tremendous backlog of grazing permits up for renewal throughout the West for which the agency had not completed site-specific NEPA analysis. 145 Cong. Rec. S10676 (daily ed. Sept. 9, 1999). Recognizing it would be unfair to penalize ranchers for BLM's failure to comply with the law, Congress enacted a legislative fix as part of the 1999 Department of the Interior Appropriations Act. The "rider" stated:

---

[8] BLM issued current permits on the Rockies, Waterpocket, Lower Cattle, Soap Creek, and Bunting Well allotments prior to FY 2000, when the riders went into effect. SOF ¶¶ 99, 100, 113, 124, 127. Therefore, BLM cannot claim the riders as an excuse for not complying with NEPA for these allotments.

> A grazing permit or lease that expires (or is transferred) during fiscal year 2000 shall be renewed under [applicable law]. The terms and conditions contained in the expiring permit or lease shall continue in effect under the new permit or lease until such time as the Secretary of the Interior completes processing of such permit or lease in compliance with all applicable laws and regulations, at which time such permit or lease may be canceled, suspended or modified, in whole or in part, to meet the requirements of such applicable laws and regulations. Nothing in this section shall be deemed to alter the Secretary's statutory authority.

Department of the Interior and Related Agencies Appropriations Act, 2000, Pub. L. No. 106-113, § 123, 113 Stat. 1501 (1999). Congress' purpose in enacting the rider was to protect the livelihood of ranchers utilizing the public lands. As Senator Thomas indicated:

> So here we are, almost at the end of September, with people who have leases that . . . will be taken off the land at the end of the month. [The rider] addresses this problem by allowing the BLM more time to complete the renewal process without causing unwarranted hardship on the rancher or farmer who utilizes the public lands to make a living.

145 Cong. Rec. S10678. Over the past 7 years, BLM has not fixed its backlog. As a result, Congress has been compelled to temporarily protect ranchers through riders in each of the Department of the Interior Appropriations Acts since 1999. Each rider contains language substantially similar to that of the first rider. Pub. L. No. 108-108, § 325, 117 Stat. 1241, 1307-08 (2003); Pub. L. No. 108-7, § 328, 117 Stat. 11, 276-77 (2003); Pub. L. No. 107-63, § 114, 115 Stat. 414, 438-39 (2001); Pub. L. No. 106-291, § 116, 114 Stat. 922, 943 (2000). Prior to FY 2004, each rider lasted only one year. In FY 2004, Congress stated the rider would apply to all permits issued between FY 2004 and 2008. This rider is still in effect.

This Court must give effect to the plain language of, and Congressional intent behind, the rider. Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 843 (1984). Faced with BLM's large backlog in 1999, Congress' primary purpose was to protect the ranchers. 145 Cong. Rec. S10675. It did so by requiring BLM to reissue permits with the same terms and conditions until the agency complied with NEPA. Congress also wanted to ensure BLM

complied with NEPA. Each rider explicitly states BLM must "complete processing of [the] permit or lease <u>in compliance with all applicable laws and regulations</u>." <u>See, e.g.</u>, Pub. L. No. 108-108, § 325, 117 Stat. at 1307-08; Pub. L. No. 108-7, § 328, 117 Stat. at 276-77. As Senator Enzi indicated, "BLM must still comply with all Federal environmental laws and the BLM must still complete all of its environmental reviews. The cost of delays, however, will be borne by the agency and not by individual ranchers." 145 Cong. Rec. S10679. Thus, while Congress granted BLM more time, it did not excuse the agency from NEPA compliance.

Absent a clear expression of Congressional intent, this Court should not read the riders to suspend NEPA within Glen Canyon. It is a "cardinal rule" that repeal by implication is disfavored. <u>Morton v. Mancari</u>, 417 U.S. 535, 549 (1974); <u>see also</u> <u>Branch v. Smith</u>, 538 U.S. 254, 273 (2003); <u>TVA v. Hill</u>, 437 U.S. 153, 189 (1978). This cardinal rule applies with special force when the act in question is an Appropriations Act, which has the "limited and specific purpose of providing funds for authorized programs." <u>TVA</u>, 437 U.S. at 190.

Interpreting a similar U.S. Forest Service grazing rider, the District of New Mexico held, "[c]onstruing the [rider] as a complete exemption from the requirements of [NEPA and the National Forest Management Act] would be contrary to the principle that 'repeals (or suspensions) of legislation by implication are disfavored, especially 'when the claimed repeal rests solely on an Appropriations Act.'" <u>Forest Guardians v. U.S. Forest Serv.</u>, No. 01-504 (D.N.M. Dec. 31, 2002) (order granting in part and denying in part Plaintiff's Motion for Review of Agency Action) (quoting <u>Forest Guardians v. Babbitt</u>, 174 F.3d 1178, 1192 (10th Cir. 1999) and <u>TVA</u>, 437 U.S. at 190). The District of Idaho also rejected BLM's attempt to argue a similar rider, which applied only to the Jarbridge Resource Area in Idaho, suspended NEPA within the area. <u>W. Watersheds Project v. Bennett</u>, No. 04-181, at 5 (D. Id. June 4, 2004) (order granting

Plaintiff's Motion for Temporary Restraining Order) ("[T]he rider says nothing about suspending environmental laws, and repeals by implication are not favored.") (internal quotations omitted). The applicable riders in this case are no different; they contain no language to suggest Congress intended to suspend NEPA within Glen Canyon.  In fact, the opposite is true; each rider explicitly states BLM must still comply with NEPA.[9]  Therefore, BLM must complete site-specific NEPA for each of the 24 Glen Canyon allotments.

Plaintiffs seek an order requiring just that—an enforceable schedule for BLM to complete site-specific NEPA.  In this case, there are two relevant sets of permits:  (1) those BLM renewed under one of the FY 2000-2003 riders, which are virtually identical; and (2) those BLM renewed under the FY 2004-2008 rider, which includes language giving the Secretary increased discretion with respect to timing.  BLM has renewed 23 of the 24 allotments challenged in this case under these riders.[10]

---

[9] Contrary unreported decisions in the District of Oregon are not persuasive.  Or. Natural Desert Ass'n v. U.S. Forest Serv., No. 03-381, 2005 WL 1459328, at *8-10 (D. Or. Jun. 20, 2005) ("ONDA II") (applying FY 2003 and FY 2004-2008 riders to the Forest Service's grazing program); Or. Natural Desert Ass'n v. U.S. Forest Serv., No. 03-213, 2005 WL 1334459, at *11-12 (D. Or. Jun. 3, 2005) ("ONDA I") (same).  The district court ignored Supreme Court precedent requiring express language in order to repeal or suspend a statute, and the heightened scrutiny with respect to Appropriation Acts.  The court also failed to distinguish between the FY 2003 and FY 2004-2008 riders, and applied the language of the FY 2004-2008 rider to both.  Indeed, in both cases the court got it right at the preliminary injunction phase, where it found that although it did not have authority to modify the grazing permits, it could declare BLM had not complied with NEPA and set a schedule for compliance.  ONDA II, 2004 WL 1592606, at *10 (D. Or. Jul. 15, 2004) (order granting Plaintiffs Motion for Preliminary Injunction); ONDA I, 2004 WL 1293909, at *8-9 (D. Or. Jun. 10, 2004).

[10] Although BLM issued current permits on the Rockies, Waterpocket, Lower Cattle, Soap Creek, and Bunting Well allotments prior to FY 2000 when the riders went into effect, each of these allotments except Soap Creek has multiple permitees, and BLM also renewed a permit under the riders.  SOF ¶¶ 99, 100, 113, 124, 127.  Because there is only one permit on Soap Creek and BLM issued it prior to FY 2000, it is the only allotment where the riders have no application.

For all permits BLM renewed in FY 2000-2003, Congress did not specify how much additional time it was giving BLM to comply with NEPA.  Therefore, it is up to the courts to determine when the delay becomes unreasonable under the Administrative Procedure Act.  5 U.S.C. § 706.  In this case, there is no question BLM's continued delay is unreasonable.

Under the FY 2000-2003 version of the rider, BLM renewed permits on nineteen of the twenty-four allotments challenged in this case.[11]  In FY 2000, the GSENM Office renewed permits for nine of the ten Glen Canyon/GSENM allotments challenged in this case.  SOF ¶¶ 112-16, 118-21.  It has now been six years, and BLM still has not complied with NEPA.  When BLM issued the permits in 2000, the agency determined it needed three years to complete the GSENM Grazing EIS and issued the permits for three year terms.[12]  Id. ¶ 146.  When BLM did not even complete a draft EIS within three years, it simply renewed the permits again, this time for ten-years.  Id.  In FY 2001, the Henry Mountain Field Station renewed permits for two allotments.  Id. ¶¶ 98, 100.  In FY 2002, the Monticello Field Office renewed permits on four allotments, and the Arizona Strip Office renewed permits on two allotments.  Id. ¶¶ 104, 107-09, 125-27.  In FY 2003, the Henry Mountain Field Office and the Arizona Strip Office each renewed a permit.  Id. ¶¶ 101, 126.  It has now been between three and five years, and BLM still has not complied with NEPA for any of these permits.

Under the FY 2004-2008 rider, Congress gave the Secretary discretion to determine the "priority and timing for completing required environmental analysis of grazing allotments based

---

[11] Most of the allotments have multiple permittees; therefore, BLM issued current permits for some allotments under both the FY 2000-2003 version of the rider and the FY 2004-2008 version.  In this discussion, Plaintiffs will focus on the earliest current permit BLM issued for each allotment since that authorization started the clock running for NEPA purposes.

[12] One exception is the Lower Cattle allotment where BLM issued a six year permit that expired on April 15, 2006.  SOF ¶ 113.

on the environmental significance of the allotments and funding available for this purpose." Pub. L. No. 108-108, § 325, 117 Stat. at 1308. Therefore, for all permits BLM issued or will issue between FY 2004 and 2008, the Secretary must determine the appropriate time line. She has not done so. Excluding permits issued under the FY 2000-2003 and then renewed again under the FY 2004-2008 rider, BLM renewed permits on four of the twenty-four allotments challenged in this case under the FY 2004-2008 rider. SOF ¶¶ 99, 105-06, 117.[13] One to two years later, BLM has not complied with NEPA.

Although Congress granted BLM additional time to alleviate it NEPA backlog, BLM has not completed a final site-specific NEPA document for any one of the 24 challenged allotments. In effect, BLM has interpreted the riders as a repeal of NEPA within Glen Canyon. This interpretation is inconsistent with the text and purpose of the riders. To avoid this result, Plaintiffs seek a declaratory judgment that BLM has not complied with NEPA on the 24 Glen Canyon allotments. For all permits BLM issued between FY 2000-2003, Plaintiffs seek an order setting a schedule for NEPA compliance. For all permits BLM issued in FY 2004 and after, Plaintiffs seek an order requiring the Secretary to set an enforceable schedule for NEPA compliance. Plaintiffs do not seek any relief under this claim that would impact the terms and conditions of the grazing permits prior to BLM's compliance with NEPA.

**B.    The Park Service is Violating NEPA Because the Grazing Plan will have a Significant Effect on the Environment and the Agency must Prepare an EIS.**

The Park Service violated NEPA by failing to prepare an EIS for the Grazing Plan. NEPA requires an agency to prepare an EIS for any "major Federal actions significantly

---

[13] BLM renewed each of the nine GSENM permits discussed above in FY 2004 as well. However, this Court should consider those permits under the FY 2000 rider because the only reason they fell within the FY 2004 rider is BLM failed to achieve its goal of completing the GSENM Grazing EIS within three years. This Court should not reward BLM for its continued failure to act.

affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). There is no question

a Grazing Plan governing livestock grazing on more than 750,000 acres of a Congressionally

protected unit of the national park system is a major federal action significantly affecting the

quality of the human environment that requires an EIS. The Grazing Plan allows thousands of

cattle to continue grazing on sensitive, arid lands. The Park Service's own Policies state

"rigorous assessment [under NEPA] is especially important for areas with unique natural and

cultural resources, low precipitation, limited vegetation cover, water quality concerns, highly

erodable soils, or sensitive species." Policies § 8.6.8.3. All of these conditions are present in

Glen Canyon. Therefore, the Park Service should have completed an EIS rather than an EA.

Moreover, the Park Service completely ignored the "significance factors" it is required to

consider under the CEQ regulations. In order to determine whether an action is significant and

requires an EIS, the Park Service must consider up to ten different factors. 40 C.F.R. §

1508.27(b); Grand Canyon Trust v. FAA, 290 F.3d 339, 341 (D.C. Cir. 2002) (applying one of

the significance factors). In this case, at least four significance factors require the Park Service

to prepare an EIS, including (1) uncertain or unknown risks, (2) unique characteristics of the

geographic area, (3) irreparable damage to cultural resource sites that are eligible for the

National Register of Historic Places, and (4) cumulatively significant impacts. 40 C.F.R. §

1508.27(b)(3), (5), (7), (8). Each of these factors alone is sufficient to require the Park Service to

prepare an EIS. Fund for Animals v. Norton, 281 F. Supp. 2d 209, 218-19 (D.D.C. 2003); see

also Ocean Advocates v. U.S. Army Corps of Engineers, 361 F.3d 1108, 1125 (9th Cir. 2004);

Nat'l Parks & Conservation Ass'n ("NPCA") v. Babbitt, 241 F.3d 722, 731 (9th Cir. 2001). In

this case, all four are present. Accordingly, the evidence is overwhelming that the Park Service

violated NEPA by failing to prepare an EIS for the Grazing Plan.

### 1.    The Park Service must prepare an EIS because the impacts of livestock grazing within Glen Canyon are highly uncertain.

The Park Service must prepare an EIS "if the environmental effects of a proposed action are highly uncertain."  NPCA, 241 F.3d at 731-32; see also Blue Mountains Diversity Project v. Blackwood, 161 F.3d 1208, 1213 (9th Cir. 1998); 40 C.F.R. § 1508.27(b)(5).  Under circumstances similar to this case, the Ninth Circuit determined the Park Service had to prepare an EIS for a plan to allow an increase in the number of cruise ships entries into Glacier Bay National Park.  NPCA, 241 F.3d at 731-36.  In NPCA, the Park Service identified numerous negative environmental impacts that would occur under the plan; however, in each case, the Park Service found the degree of the impacts was "unknown."  Id. at 728-29, 732.  The court held the Park Service's "lack of knowledge does not excuse the preparation of an EIS."  Id. at 733.  Indeed, the court found the "unknown" information was "precisely the information and understanding that is required before a decision that may have a significant adverse impact on the environment is made, and precisely why an EIS must be prepared."  Id.  As such, the court required the Park Service to prepare the necessary studies or obtain the information through other means before approving the plan.  Id.[14]

The same situation is present in this case.  Throughout the Grazing Plan EA, the Park Service acknowledged grazing will lead to negative environmental impacts, while at the same time insisting the actual impacts were "unknown."  For example, the Grazing Plan EA states that studies show livestock grazing in arid areas like Glen Canyon harms vegetation, but "relatively

---

[14] NEPA requires federal agencies to consider all "reasonably foreseeable significant adverse impacts. . . essential to a reasoned choice among alternatives."  40 C.F.R. § 1502.22(a). Where the necessary information is "incomplete" or "unavailable," the agency must fill in the gaps, unless the costs of doing so are "exorbitant."  Id.; Save our Ecosystems v. Clark, 747 F.2d 1240, 1249 (9th Cir. 1984).  If the costs are exorbitant, the agency must provide a statement saying so, as well as the agency's best analysis of the existing evidence.  40 C.F.R. § 1502.22(b).

little is known about the status and trend of vegetation that is subject to livestock grazing." SOF ¶ 76. Similarly, the Park Service found the "interaction of drought and grazing can destabilize arid and semiarid plant communities," but essential information on these interactions is not available. Id. Recognizing "water quality depends on the condition of the watershed," the Park Service determined the "current condition of most watersheds . . . and a majority of riparian and spring water sources is unknown and without proper studies an ad hoc or reactive approach to management could continue to be detrimental to water quality." Id. ¶ 77. Elsewhere, the Park Service acknowledges it knows "very little about the ecology and status of most wildlife in Glen Canyon," but that studies of other areas have linked grazing to declines in native wildlife. Id. ¶ 78. Finally, the Park Service recognizes that only 2% of the 1.2 million acres within Glen canyon have been surveyed for cultural resources. Id. ¶ 79. As a result, the impact of livestock grazing on cultural resources in the other 98% of Glen Canyon is highly uncertain.

Considering this evidence, the Park Service's statement that "[n]o highly uncertain or . . . unique or unknown risks were identified" is clearly flawed. Id. ¶ 74. Indeed, the missing information is essential for determining proper management of livestock grazing within Glen Canyon and making a reasoned choice among alternatives. 40 C.F.R. § 1502.22. Therefore, as in NPCA, the Park Service's "lack of knowledge does excuse the preparation of an EIS; rather it requires the Park Service to do the necessary work to obtain it." NPCA, 241 F.3d at 733.

### 2. The Park Service must prepare an EIS because livestock grazing is causing significant impacts within a unit of the national park system.

In addition to uncertainty, the Park Service must consider the "unique characteristics of the geographic area such as proximity to . . . park lands" to determine whether an EIS is necessary. 40 C.F.R. § 1508.27(b)(3). Livestock grazing in Glen Canyon is more than just proximate to park lands; it occurs inside a national park system unit. Congress set aside Glen

Canyon for specific purposes—to provide recreational opportunities and to protect the important

scenic, scientific, and historic features that make a visit to Glen Canyon an exceptional

experience.  16 U.S.C. § 460dd.  The Park Service must consider these "unique characteristics"

when considering whether to prepare an EIS.  See, e.g., NPCA, 241 F.3d at 739 ("Glacier Bay

Park is too precious an ecosystem for the Park Service to ignore significant risks to its diverse

inhabitants and its fragile atmosphere.").  Because grazing is impairing the exceptional resources

of Glen Canyon, the Park Service must prepare an EIS.

### 3.    The Park Service must prepare an EIS because livestock grazing is causing irreparable damage to National Register eligible cultural resources.

One of the goals of NEPA is to "preserve important . . . cultural aspects of our national

heritage."  42 U.S.C. § 4331(b)(4).  Therefore, another "unique characteristic" of Glen Canyon

the Park Service must consider is the presence of historic and cultural resources.  40 C.F.R. §

1508.27(b)(3).  The Service must evaluate "the degree to which the action may adversely affect

districts, sites, highways, structures, or objects listed in or eligible for listing in the National

Register . . . or may cause loss or destruction of significant scientific, cultural, or historical

resources" in order to determine whether an EIS is necessary.  Id. § 1508.27(b)(8); see also Colo.

River Indian Nat'l v. Marsh, 605 F. Supp. 1425, 1430 n.3 (C.D. Ca. 1985) (finding impacts to

cultural resources standing alone may necessitate preparation of an EIS).

Glen Canyon contains some of the "richest archeological deposits in the nation."  SOF ¶

6.  As discussed above, the Park Service's own analysis shows that grazing is causing

"irreparable damage" to cultural resource sites that are eligible for the National Register.

Although the Grazing Plan EA acknowledges these impacts, the Decision Notice and FONSI

inexplicably concludes "[t]here are no unmitigated adverse impacts on . . . sites or districts listed

in, or eligible for listing the National Register." Id. ¶ 74. This conclusion has no support in the administrative record. Because the record identifies impairment of the unique cultural resources of Glen Canyon, the Park Service must prepare an EIS for the Grazing Plan.

### 4. The Park Service must prepare an EIS because there are cumulatively significant impacts as a result of livestock grazing and other activities.

Finally, the Park Service must examine the cumulative impacts of the Grazing Plan. 40 C.F.R. § 1508.25(c). A "cumulative impact" is the "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7; Taxpayers of Michigan Against Casinos ("TOMAC") v. Norton, 433 F.3d 852, 854 (D.C. Cir. 2006). A cumulative impacts analysis must identify:

> (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions --past, present, and proposed, and reasonably foreseeable--that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.

TOMAC, 433 F.3d at 864 (quoting Grand Canyon Trust, 290 F.3d at 345). Both EAs and EISs must include a cumulative impacts analysis. Grand Canyon Trust, 290 F.3d at 342. Indeed, in order to determine whether an EIS is necessary, an agency must consider "whether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7).

The Park Service has not analyzed the cumulative impacts of livestock grazing combined with other reasonably foreseeable actions. The Park Service concedes other activities including recreation, off-road vehicle use, and drought, negatively impact the vegetation, soil, water quality, and cultural resources of Glen Canyon. The EA acknowledges drought and recreational

activity can have "substantial effects" on vegetation.  SOF ¶ 81.  Furthermore, unauthorized off-road vehicles, backcountry recreationists, and other activities are negatively impacting soils.  Id. The Park Service concluded:

> [O]ther outdoor recreation uses also negatively impact soil development and productivity.  These recreational uses, like hiking, horseback riding, off-road vehicles, camping, etc., will not be analyzed in this section.  However, the impacts to the backcountry soil resources from recreational uses are recognized as a contributing factor to long-term rangeland impacts.

Id.  The Grazing Plan also finds recreation is affecting water quality.  Id.

Despite these findings, the Park Service refused to consider these impacts.  Id. ¶¶ 80, 82. Even the sections labeled "cumulative impacts" do not consider any impacts other than those caused by livestock grazing.  Id. ¶ 82.  Thus, the Park Service violated NEPA by ignoring the impact of on-going grazing and other past, present, and reasonably foreseeable activities.[15] Because these impacts are significant, the agency should have prepared an EIS.

## III.    THE SECRETARY IS VIOLATING THE NHPA BY AUTHORIZING GRAZING WITHIN GLEN CANYON WITHOUT TAKING INTO ACCOUNT THE IMPACTS ON CULTURAL RESOURCES.

In 1966, Congress recognized "historic properties significant to the Nation's heritage [were] being lost or substantially altered, often inadvertently, with increasing frequency."  16 U.S.C. § 470(b)(3).  In order to prevent the loss of this "irreplaceable heritage," Congress enacted the NHPA.  Id. § 470(b)(4).  Under Section 106 of the Act, a federal agency "shall, prior to the approval of . . . any license . . . take into account the effect of the undertaking on any

---

[15] The Park Service may argue it does not have to consider cumulative impacts because the total impact of the Grazing Plan is "beneficial."  Defenders of Wildlife v. Babbitt, 130 F. Supp. 2d 121, 137 (D.D.C. 2001) (J. Huvelle).  However, Defendants of Wildlife is distinguishable because the on-going grazing authorized by the Grazing Plan in this case is detrimental, not beneficial.  Moreover, the CEQ regulations require the Park Service to consider impacts "from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial."  40 C.F.R. § 1508.8.

district, site, building, structure, or object that is included in or eligible for inclusion in the National Register." Id. § 470f.[16] Section 106 also requires the agency to afford the Advisory Council on Historic Preservation ("Advisory Council") "a reasonable opportunity to comment" on the undertaking. Id. The Advisory Council is an "independent agency" of the federal government charged with advising the President and Congress on historic preservation issues and promulgating regulations regarding implementation of Section 106 that are binding on federal agencies. Id. §§ 470h-2(a)(2)(E), 470j(a)(1), 470s. These regulations are found at 36 C.F.R. Part 800.

The Advisory Council's regulations set up a detailed procedure that all federal agencies must comply with prior to engaging in any "undertaking." An undertaking is any "project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including . . . those requiring a federal permit, license or approval." 16 U.S.C. § 470w(7); 36 C.F.R. § 800.16(y).

First, the agency must identify any historic properties that may be affected by the undertaking. 36 C.F.R. § 800.4(b); see also Pueblo of Sandia v. United States, 50 F.3d 856, 859 (10th Cir. 1995); S. Utah Wilderness Alliance v. Norton, 326 F. Supp. 2d 102, 108-09 (D.D.C. 2004). Historic properties include "any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register." 36 C.F.R. § 800.16(l)(1). The agency must determine whether the affected properties are eligible for the National Register based on whether they are associated with significant historical events or people or have

---

[16] "National Register" refers to the National Register of Historic Places maintained by the Secretary of the Interior. The National Register includes "districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, engineering, and culture," including sites with religious and cultural importance to Indian tribes. 16 U.S.C. § 470a(a); 36 C.F.R. § 800.16(l)(1).

produced or may be likely to produce important historical information.  36 C.F.R. § 800.4(c); see also id. § 60.4.

Second, the agency must determine whether the undertaking will have adverse effects on any eligible historic properties.  36 C.F.R. §§ 800.4(d), 800.5.  "An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register."  Id. § 800.5(a)(1) (emphasis added).  Adverse effects include "physical destruction or damage" to the site or any "change in the charter of the property's use or physical features."  Id. § 800.5(a)(2).

Third, if the agency finds potential adverse effects as a result of the undertaking, it must seek ways to avoid or mitigate these impacts.  Id. § 800.6(a).  The agency must consult with the relevant State Historic Preservation Officer ("SHPO"),[17] any Indian tribes that might attach religious or cultural importance to the resources, and interested members of the public during this process.  Id.; see also § 800.3(e), (f).  In addition, the agency must notify the Advisory Council and determine whether the Council will participate in resolving the adverse effects.  Id. § 800.6(a)(1).  If the consulting parties can agree on how to resolve the adverse effects, they can execute a Memorandum of Agreement detailing how the resources will be protected.  Id. § 800.6(b)(1)(iv), (2).  If the consulting parties are unable to resolve the adverse effects of the undertaking, the agency must obtain comments from the Advisory Council and take these comments into account before approving the undertaking.  Id. § 800.7.

The Advisory Council encourages agencies to incorporate Section 106 compliance with environmental analysis under NEPA.  Id. § 800.8.  If the agency identifies adverse effects when preparing an EA or EIS, it must develop mitigation measures in the EA or EIS to avoid or

_____

[17] The SHPO is designated by the Governor and has the responsibility for administering the State's Historic Preservation Program under the NHPA.  16 U.S.C. § 470a(b).

mitigate these effects.  Id. § 800.8(c)(4).  Before approving the action, the agency must either

include a "binding commitment" to implement the mitigation measures or obtain and consider

the comments of the Advisory Council.  Id.; see also Mid States Coalition for Progress v. Surface

Transp. Bd., 345 F.3d 520, 554 (8th Cir. 2003) ("[Section] 800.8 . . . requires that an agency

develop measures to 'avoid, minimize, or mitigate' adverse effects and then bind itself to these

measures in a record of decision.").

        Throughout each step of the Section 106 process, the agency must consult with the

relevant SHPO, affected tribes, and members of the public.  Id. § 800.2; S. Utah Wilderness

Alliance v. Norton, 326 F. Supp. 2d. at 108.  The agency must "seek public comment and input,"

id. § 800.2(d)(2), and "provide an opportunity for members of the public to express their views

on resolving adverse effects of the undertaking."  Id. § 800.6(a)(4).  Finally, the agency must

document compliance with the Section 106 process.  Id. § 800.11.  Neither the Park Service nor

BLM have complied with these procedures prior to authorizing grazing within Glen Canyon.

### A.    The Park Service did not Comply with the NHPA Prior to Developing the Grazing Plan.

        The Park Service's Grazing Plan governs livestock grazing within Glen Canyon.  As

such, it is an "undertaking" under the NHPA because it is a "program funded in whole or in part

under the direct . . . jurisdiction" of the Park Service.  16 U.S.C. § 470w(7); 36 C.F.R. §

800.16(y); Pueblo of Sandia, 50 F.3d at 857-58 (applying NHPA to Forest Service management

plan for a canyon within the national forest); Policies § 8.6.8.3 (requiring compliance with the

NHPA for grazing plans).  However, the Park Service did not engage in the Section 106 process under the NHPA prior to developing the Grazing Plan.[18]

The major flaw with the Park Service's NHPA analysis for the Grazing Plan is that the agency never considered the impacts of on-going grazing authorized by the Plan.  The Park Service ignores the fact that under the Plan grazing will continue at current levels authorized by BLM until the agencies apply the Plan to a specific allotment and determine what protective measures are necessary to protect park values and purposes.  SOF ¶ 34.  As a result, the Park Service never analyzed on-going grazing under the NHPA.

The Park Service did not identify National Register eligible cultural resources that may be affected by on-going grazing, 36 C.F.R. § 800.4(b); determine whether on-going grazing will have adverse effects on these resources, id. §§ 800.4(d), 800.5; or seek ways to avoid or mitigate the impacts of on-going grazing, id. § 800.6(a).  SOF ¶ 84.  The Grazing Plan EA takes the first step toward Section 106 compliance by identifying adverse impacts within limited areas of Glen Canyon as discussed above.  Id. ¶ 85; see supra Part I.B.1.C.  However, this analysis is insufficient.  The EA includes no discussion of whether the impacted sites are eligible for the National Register.  SOF ¶ 85.  Additionally, the EA does not include any assessment of the impacts on cultural resources in the vast majority of the grazed areas within Glen Canyon that are outside the areas mentioned.  Id. ¶  84.

---

[18] The Park Service negotiated a "programmatic agreement" with the Advisory Council in 1995 to govern compliance with section 106 for actions within units of the national park system.  SOF ¶ 83.  A federal agency may use a programmatic agreement in situations where the "effects on historic properties are similar and repetitive or are multi-State or regional in scope."  36 C.F.R. § 800.14(b)(1)(i).  However, all programmatic agreements must be consistent with the Advisory Council regulations.  Id. § 800.4(a).  The Park Service's programmatic agreement confirms the agency must comply with the Advisory Council regulations prior to developing land use plans or authorizing livestock grazing.  SOF ¶ 83.

Furthermore, the Park Service has not mitigated the admitted impacts to cultural resources or, in the alternative, obtained and considered the comments of the Advisory Council. 36 C.F.R. §§ 800.6; 800.8(c)(4). Although the Grazing Plan sets up a process for mitigating impacts for "new grazing proposals" and "changes in current grazing practices," there is no binding commitment to implement these actions as required under 36 C.F.R. § 800.8(c)(4)(i). SOF ¶ 86. The Park Service states it will mitigate by fencing or other methods of avoidance only "where possible" and does not commit to any mitigation measures in the Grazing Plan Decision Notice and FONSI. Id. ¶ 86-87. The FONSI states only the Park Service "will work with BLM to get [Park Service] priorities into the BLM priorities for range assessment and monitoring and AMP development." Id. ¶ 87. This has not happened. Over the last six and a half years, the Park Service has produced even more evidence of cultural resources impairment within the 24 challenged allotments, but it has never applied the Grazing Plan on these allotments or required BLM to implement any mitigation measures designed to protect cultural resources. Id. ¶ 65-66, 88.

Because the Park Service did not commit to any mitigation measures, it was required to obtain and consider the comments of the Advisory Council. 36 C.F.R. § 800.8(c)(4). However, the agency never did so. SOF ¶ 89. Accordingly, the Park Service has violated the NHPA.

**B.**    **BLM did not Comply with Section 106 of the NHPA before authorizing Livestock Grazing within Glen Canyon.**

BLM has also failed to comply with the NHPA before permitting livestock grazing on the Glen Canyon allotments. Initially, there is no question BLM's issuance of a term grazing permit is an undertaking subject to Section 106 because it is a "federal permit." 16 U.S.C. § 470w(7);

36 C.F.R. § 800.16(y).[19]  There is also no doubt BLM must comply with Section 106 <u>prior</u> to

issuing a grazing permit.  16 U.S.C. § 470f; 36 C.F.R. § 800.1(c); <u>Corridor H Alternatives, Inc.</u>

<u>v. Slater</u>, 166 F.3d 368, 370 (D.C. Cir.1999).  Yet, the administrative record shows BLM has

issued term grazing permits on all 24 challenged allotments without complying with Section

106.[20]  For 21 of challenged allotments, BLM has never even attempted to comply with the

NHPA.  For the 3 allotments where BLM completed a draft NEPA document, the agency has

attempted, but failed, to comply with the NHPA.

> **1.    BLM did nothing to comply with Section 106 before Issuing Grazing Permits on 21 Glen Canyon Allotments.**

For all of the challenged allotments, with the exception of Forty Mile Ridge, White

Canyon, and Soap Creek, BLM has not conducted <u>any</u> Section 106 analysis prior to issuing

permits.  For these 21 allotments, BLM has not identified cultural and archeological resources

that may be affected by permitted grazing, evaluated their National Register eligibility,

determined whether grazing is causing adverse effects, or sought ways to avoid or mitigate any

adverse effects.  SOF ¶ 154.  The Park Service is gathering some of this information as part of

the Grazing EIS for GSENM; however, none of this information has been released to the public.

_____

[19] As established above, BLM must comply with NEPA prior to authorizing livestock grazing because it is a major federal action that may significantly affect the environment.  Because NEPA and the NHPA operate in similar ways, this Court treats undertakings under the NHPA as "closely analogous" to major federal actions under NEPA.  <u>Karst Envtl. Educ. & Prot., Inc. v. U.S. Envtl. Prot. Agency</u>, 403 F. Supp. 2d 74, 78-79 (D.D.C. 2005).  Therefore, section 106 compliance is also required.  <u>See also</u> <u>Attakai v. United States</u>, 746 F. Supp. 1395, 1405-08 (D. Az. 1990) (requiring NHPA compliance for range management actions including construction of fences and pipelines).

[20] Like the Park Service, BLM has a Programmatic Agreement that governs section 106 compliance for all BLM undertakings.  SOF ¶ 152.  This 1997 Programmatic Agreement is implemented through more site-specific state protocols.  <u>Id.</u> ¶ 153.  BLM has established state protocols for both Utah and Arizona.  <u>Id.</u>  The protocols track the Advisory Council regulations.  <u>Id.</u>  To the extent the programmatic agreement or the State protocols conflict with the Advisory Council regulations, the regulations control.  36 C.F.R. § 800.14(a).

Id. ¶¶ 38, 40, 42-56.  Likewise, BLM has not consulted with the Arizona and Utah SHPOs,

affected tribes, or the Advisory Council.  Id. ¶ 154.

NHPA compliance is clearly warranted on the challenged allotments.  As discussed

above, Glen Canyon is full of nationally significant cultural resources that provide critical links

to the early inhabitants of the Colorado Plateau.  Yet, the Park Service continues to document

irreparable damage to these sites as a result of livestock grazing.  The record reveals these

adverse effects are not isolated occurrences.  Indeed, they are prevalent and widespread—

whenever and wherever the agencies and archeologists have looked, they have uniformly found

livestock grazing is damaging prehistoric artifacts and structures eligible for the National

Register.  Id. ¶¶ 38, 40, 42-56, 63.

Furthermore, the Park Service's own documents confirm BLM and the Service are not

complying with the NHPA.  Within the GSENM/Glen Canyon allotments, the Park Service

found "[f]ragile and non-renewable cultural properties have been, and continued to be,

negatively affected by livestock and are not meeting the requirements and obligations under the

[NHPA]."  Id. ¶ 38 (emphasis added).  For the Lake, Soda, Rock Creek-Mudholes, and Sewing

Machine allotments, the Park Service concluded:

> The integrity of sites determined eligible to the National Register . . . are being
> compromised, and obvious adverse effects are being allowed to continue without
> any mitigative measures taken.  This is in direct violation to Section 106
> regulations, which require federal agencies to identify alternatives to minimize or
> eliminate impacts to cultural resources under their jurisdiction.

Id. ¶ 56 (emphasis added).  Thus, even though the agencies have long recognized that BLM is

not complying with the NHPA within Glen Canyon, they have done nothing to fix the problem.

Moreover, these assessments cover only a small fraction of the grazed areas within Glen Canyon.

Id. ¶ 6.  Therefore, there are likely thousands of other eligible sites suffering irreparable damage

as a result of livestock grazing. This lack of information only underscores the need for BLM to comply with Section 106 for each grazing permit.

> **2.    BLM's attempt to comply with NHPA on three Glen Canyon allotments was never finalized and is inadequate.**

On three allotments where BLM prepared draft site-specific NEPA documents, Forty Mile Ridge, White Canyon, and Soap Creek, BLM did engage in the Section 106 process. However, as discussed above, BLM never finalized the EAs. Even if BLM is finished with the Section 106 process, however, it was inadequate in all three cases.

In the draft EA for the Forty Mile Ridge allotment, dated June 27, 1997, BLM concluded livestock grazing within the allotment has "no effect" on cultural resources. Id. ¶155. BLM made this conclusion without engaging in the Section 106 process. Id. As a result, it is flawed. Indeed, Park Service records developed after BLM completed the EA show it is inconceivable BLM could come to this conclusion. The Park Service provided BLM with comments on the draft EA in September 1999 identifying seven eligible archeological sites with grazing impacts within the allotment. Id. In 2005, the Park Service affirmed this conclusion, finding grazing impacts on the Forty Mile Ridge allotment were "counter to" the Glen Canyon values and purposes. Id. ¶ 40. Therefore, BLM's no adverse effect determination for the Forty Mile Ridge allotment is wholly unsupported and arbitrary and capricious.

In the draft EA for White Canyon, BLM does not consider the impacts of the ten-year permit on cultural resources because "grazing for the past century is part of the landscape, and therefore, the status quo." Id. ¶ 156.[21] As a result, BLM concluded the permit has "no effect" on

---

[21] According to the Park Service, BLM's position on all public lands is that "all grazing impacts have taken place in the past and unless some ground disturbing activity such as a fence or road is proposed, grazing has no impact on cultural resources. The [Park Service] does not accept this rationale but believes that ongoing damage does occur from livestock." SOF ¶ 156.

cultural resources.  Id. ¶ 157.  Apparently BLM planned to mitigate any future impacts through

application of BLM and Park Service Programmatic Agreements.  Id.  BLM never explains why

the fact that grazing is on-going alleviates the agency from its duty to comply with the NHPA.

Id. ¶ 156.  Nowhere in the NHPA is there an exception for on-going activities.  To the contrary,

all "undertakings" are subject to Section 106, and the issuance of a federal permit is explicitly

defined as an undertaking.  16 U.S.C. § 470f; 470w(7).

Furthermore, BLM's no effect determination for White Canyon is incorrect as a factual

matter.  In fact, BLM's own statements in the very same document contradict this finding.  BLM

states there are at least six eligible archeological sites with documented grazing impacts.  SOF ¶

158.  Three of these eligible sites are subject to grazing impacts that "will result in irreparable

damage to the integrity of the resource and the loss of information if action to correct the impact

is not taken within five years."  Id. (emphasis in original).  Therefore, BLM's own analysis

confirms there are adverse effects to eligible cultural resources within the White Canyon

allotment.

Even the analysis admitting adverse effects is flawed.  First, BLM recognizes most of the

allotment within Glen Canyon has never been surveyed for cultural resources.  Id.  As such,

BLM has not met its obligation to "identify historic properties."  36 C.F.R. § 800.4(b).  Second,

although BLM recognizes there are at least 15 documented archeological sites within Glen

Canyon, neither the Park Service nor BLM have determined the eligibility of 8 of these sites.

SOF ¶ 158.  Therefore, BLM has not complied with 36 C.F.R. § 800.4(c).  Pueblo of Sandia, 50

F.3d at 859.  Finally, BLM does not bind itself to mitigation measures or, in the alternative,

obtain and consider the comments of the Advisory Council.  36 C.F.R. § 800.8(c)(4).  Although

BLM identifies "possible" mitigation measures such as fencing, the agency will develop

"mitigation plans [only] as data and funding becomes available." SOF ¶ 158. There is no binding commitment. Alternatively, BLM did not consult with the Advisory Council. Id. ¶ 159.

In May 2000, BLM completed the Kane Ranch Allotment Management Environmental Assessment, which includes analysis of the livestock grazing permit for the Soap Creek allotment managed by BLM's Arizona Strip Office. Id. ¶ 160. The EA does not include any assessment of cultural resource sites within this allotment. Id. BLM states it has initiated consultation with the SHPO and will not implement the plan until consultation is complete, but there is no evidence in the record to show this consultation ever occurred. Id. Therefore, BLM's limited Section 106 analysis for the Forty Mile Ridge, White Canyon, and Soap Creek allotments is insufficient to comply with the NHPA.

## CONCLUSION

In conclusion, the record establishes livestock grazing is adversely affecting and impairing the values and purposes of Glen Canyon, including irreplaceable cultural resources. Yet, the Secretary has failed to conduct values and purposes determinations or take action to prevent impairment in violation of the Organic Act; failed to engage in site-specific environmental analysis in violation of NEPA; and failed analyze the impacts to and prevent destruction of eligible archeological sites in violation of the NHPA.


Dated:  April 28, 2006                    Respectfully Submitted,

                                          /s/ Robin Cooley
                                          Robin Cooley (CO0040)
                                          Environmental Law Clinical Partnership
                                          2255 E. Evans Avenue, Room 365G
                                          Denver, CO 80208
                                          Phone: 303-871-6039
                                          Fax: 303-871-6991

Matt Kenna  (CO0028)
Western Environmental Law Center
679 E. 2nd Ave., Suite 11B
Durango, CO  81301
Telephone: 970-385-6941
Fax: 970-385-6804

Joro Walker
Western Resource Advocates
1473 South 1100 East, Suite F
Salt Lake City, UT 84109
Telephone: 801-487-9911
Fax: 801-486-4233