# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Great Old Broads for Wilderness, <u>et al.</u>, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 01:05CV01433 (ESH) |
| ) | |
| P. Lynn Scarlett, <u>et al.</u>,[1] ) | |
| ) | |
| Defendants. ) | |
| ) | |

## STATEMENT OF MATERIAL FACTS

## I.    GLEN CANYON NATIONAL RECREATION AREA

1.    Through the Glen Canyon Enabling Act ("Enabling Act"), Congress established the

Glen Canyon National Recreation Area ("Glen Canyon" or "recreation area") as a unit of the

national park system in 1972:

> to provide for public outdoor recreation use and enjoyment of Lake Powell and lands
> adjacent thereto in the States of Arizona and Utah and to preserve scenic, scientific, and
> historic features contributing to public enjoyment of the area.

16 U.S.C. § 460dd; National Park Service Administrative Record Document ("NPS Doc.") 29, at

278.[2]  The area is managed by the National Park Service ("Park Service").

2.    Glen Canyon is located in northern Arizona and southern Utah.  Complaint ¶ 45;

Answer ¶ 45.  The recreation area encompasses Lake Powell on the Colorado River, which formed

when the Glen Canyon Dam was closed in 1963.  Complaint ¶ 46; Answer ¶ 46.  The recreation

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), P. Lynn Scarlett is automatically substituted as Defendant
in place of Gale Norton.

[2] Page numbers refer to the page within the administrative record, not the page within the
document.

area also includes over a million acres of public lands that represent the richness and diversity of the Colorado and San Juan River ecosystems.  Complaint ¶ 47, Answer ¶ 47.

3.      Glen Canyon is an arid to semi-arid environment.  Complaint ¶ 48; Answer ¶ 48. Annual rainfall within the recreation area varies from four to twelve inches.  Complaint ¶ 48; Answer ¶ 48.  As a result, water resources are critically important to the area's flora and fauna. In addition to Lake Powell, Glen Canyon includes five major rivers (the Colorado, Dirty Devil, San Juan, Escalante and Paria), intermittent and perennial streams, and springs and seeps.  Side canyons off Lake Powell with permanent streams and springs contain extensive wetland and riparian communities.  Complaint ¶ 49; Answer ¶ 49.  Riparian areas constitute only a small amount of the surface area of Glen Canyon but are important biological resources that support complex and diverse biological communities that live in or migrate through Glen Canyon. Complaint ¶ 50; Answer ¶ 50.

4.      Glen Canyon is home to many wildlife species, including 285 species of birds, 35 species of reptiles and amphibians, and 75 species of mammals.  There are at least ten wildlife species living in Glen Canyon that are protected as threatened or endangered under state or federal law.  Complaint ¶ 51; Answer ¶ 51.

5.      Vegetation cover is sparse within Glen Canyon.  Above the canyons, there are tracts of shrublands, pinyon-juniper woodlands, and grasslands.  The grasslands, which are relatively rare, have been used for livestock grazing for more than 100 years.  Complaint ¶ 52; Answer ¶ 52.  Although vegetation is sparse, it is diverse.  Glen Canyon contains at least 780 plant species, including several species listed as rare or endangered by state or federal agencies. Complaint ¶ 53; Answer ¶ 53.

6.      Glen Canyon contains some of the "richest archeological deposits in the nation." NPS Doc. 319, at 137.  There are thousands of important cultural and archeological sites dating back to the Pre-Formative and Formative periods (AD 600 to 1300) of the Ancestral Puebloan and Fremont cultures, including prehistoric sites containing artifacts, dwellings, structures, and rock art within the recreation area.  Complaint ¶ 54; Answer ¶ 54.  The Park Service has documented at least 1750 cultural resource sites in the areas remaining after Lake Powell was flooded. Complaint ¶ 55; Answer ¶ 55.  However, only 2% of the 1.2 million acres within the recreation area has been surveyed for cultural resources since that time.  NPS Doc. 19, at 134. The Park Service estimates there may be more than 19,000 additional sites that it has not yet identified in areas that are currently subject to grazing. Complaint ¶ 55; Answer ¶ 55.

7.      Glen Canyon contains impressive scenic vistas, which include deep canyons, sheer cliffs, distant mountain ranges, and a unique collection of mesas, buttes, and spires. Complaint ¶ 56; Answer ¶ 56.  More than a million people visit Glen Canyon each year. Complaint ¶ 57; Answer ¶ 57.

8.      There are 34 livestock grazing allotments (designated areas where grazing is allowed) covering approximately 882,678 acres within Glen Canyon.  NPS Doc. 29, at 279. Currently, five of these allotments are not subject to livestock grazing.  Id. at 324 (Navajo Bench, Harvey's Fear, Spencer Bench), 331 (Slickrock, Flint Trail).  As a result, there are approximately 762,361 acres that are currently subject to grazing within Glen Canyon.  Id. at 279.  It is Plaintiffs understanding that the Bureau of Land Management ("BLM") has accepted voluntary relinquishment of the grazing permits or substantial reductions in numbers of permitted livestock or is in the process of negotiating such changes with conservation organizations on five other Glen

Canyon allotments:  Moody, Wagon Box Mesa, Last Chance, Big Bowns Bench, and Robbers Roost.

9.      Plaintiffs are challenging grazing management on the remaining twenty-four allotments:  Sewing Machine, Rockies, Waterpocket, Bullfrog, Indian Creek, White Canyon, Lake Canyon, Slickhorn, Perkins Brothers, Texas Muley, Upper Cattle, Lower Cattle, Forty Mile Ridge, Soda, Lake, Upper Warm Creek, Lower Warm Creek, Nipple Bench, Rock Creek-Mudholes, Wiregrass, Lee's Ferry (Soap Creek), Ferry Swale, Wahweap, and Bunting Well.

10.      Under the Secretary of the Interior, the Park Service and BLM share responsibility for managing livestock grazing on these allotments.  NPS Doc. 29, at 278-79, 84.  While the Park Service is responsible for management of Glen Canyon as a whole, BLM is responsible for "administering" grazing permits.  16 U.S.C. § 460dd-5.

## II.    THE PARK SERVICE'S LEGAL VIOLATIONS IN MANAGING LIVESTOCK GRAZING WITHIN GLEN CANYON.

### A.    The Park Service's Violation of the Organic Act and Enabling Act.

#### 1.    Park Service Standards and Actions

11.      The Park Service manages grazing within Glen Canyon based on the Enabling Act, 16 U.S.C. § 460dd, the Park Service Organic Act, 16 U.S.C. §§ 1, 1a-1, its own policies, agreements with BLM, and planning documents.  NPS Docs. 15, 21, 22, 29, 155.

##### a.    2001 Management Policies

12.      The Park Service has interpreted its obligations under the Organic Act to "conserve" and prevent "impairment" or "derogation" of the scenery, natural and historic objects, and wildlife of national park system units in its 2001 Management Policies ("Policies").  NPS Doc. 155.

13.      According to the Policies, "the mandate [to conserve park resources and values] is independent of the separate prohibition on impairment, and so applies all the time, with respect to

4

all park resources and values, even when there is no risk that any park resources or values may be impaired. [Park Service] managers must always seek ways to avoid, or to minimize to the greatest degree practicable, adverse impacts on park resources and values. However, the laws do give the Service the management discretion to allow impacts to park resources and values when necessary and appropriate to fulfill the purposes of a park, so long as the impact does not constitute impairment of the affected resources and values." Id. at 1855 (§ 1.4.3).

14.     The Policies treat the "impairment" and "derogation" standards of the Organic Act as one mandate to prevent impairment. Id. (§ 1.4.2). Under the Policies, "[b]efore approving a proposed action that could lead to an impairment of park resources and values, [the Park Service] must consider the impacts of the proposed action and determine, in writing, that the activity will not lead to an impairment of park resources and values. If there would be an impairment the action may not be approved." Id. at 1856 (§ 1.4.7) (emphasis added).

15.     The Policies define impairment as an impact that "would harm the integrity of park resources and values, including the opportunities that would otherwise be present for the enjoyment of those resources or values." Id. at 1855 (§ 1.4.5). In order to determine whether an activity will lead to impairment, the Park Service must consider the "severity, duration, and timing of the impact; the direct and indirect effects of the impact; and the cumulative effects of the impact in question and other impacts." Id.

16.     The Policies specifically address livestock grazing. "No livestock use or activity, regardless of how authorized, will be allowed that would cause unacceptable impacts to a park's resources, values, or purposes. In particular, livestock use that depletes or degrades non-renewable resources, or whose effects cannot be satisfactorily mitigated, will not be allowed." Id. at 1881 (§ 8.6.8.1).

17.    When the Park Service allows grazing it must use "'best management practices' that protect vegetation, and wildlife and its habitat; safeguard sensitive species; control proliferation of exotic species; conserve soil; protect riparian areas and groundwater; avoid toxic contamination; and preserve cultural sites." Id. (§ 8.6.8.2). "Park uses, including domestic and feral livestock, that may jeopardize the sustainability of a park's nature and cultural resources must be evaluated continuously. . . . Managers must regulate livestock so that ecosystem dynamics, and the composition, condition, and distribution of native plants and animal communities, are not significantly altered or otherwise threatened, and cultural values are protected. Conflicts with public use and enjoyment must be kept to a minimum." Id.

18.    In parks where another agency is charged with "administering" grazing, like Glen Canyon, the Park Service must "work closely with the other agency to manage the amounts and types of use, and to ensure that the best management practices are followed. Administration by another agency does not release the NPS from its responsibility to ensure that the activity is managed in compliance with the NPS mission and all applicable laws and policies." Id.

19.    Under its Policies, the Park Service must "prepare a livestock management plan designed to protect park resources and values. Restrictions will be placed on the amount and type of use to protect resources and values, and to minimize conflicts with visitors. Particular attention will be given to protecting wetland and riparian areas, sensitive species and their habitats, water quality, and cultural resources. Natural and cultural resource protection will be given first priority when determining livestock management priorities." Id. at 1882 (§ 8.6.8.3).

20.    The Park Service must comply with both NEPA and NHPA when developing grazing plans. Id. "A rigorous assessment is especially important for areas with unique natural and cultural resources, low precipitation, limited vegetation cover, water quality concerns, highly

erodable soils, or sensitive species. Areas that have been continuously grazed for long periods of time, or that are in poor ecological health, will require special emphasis in the plan." Id.

21.    Until it completes a grazing plan for a particular area, the Park Service must conduct "environmental impact analysis . . . when the permitting document is issued or renewed." Id.

### b.    1984 Memorandum of Understanding and 1993 Interagency Agreement.

22.    In order to coordinate their overlapping roles in Glen Canyon, the Park Service and BLM signed a 1984 Memorandum of Understanding ("MOU") and 1993 Interagency Agreement ("IA"). NPS Docs. 15, 22. Under these agreements, BLM must consult with the Park Service to ensure authorized grazing does not conflict with the Glen Canyon Enabling Act, the Park Service Organic Act, or the General Management Plan for Glen Canyon. NPS Docs. 15, 22.

23.    The 1984 MOU recognizes the Park Service "has expertise in determining whether an activity is consistent with the value and purposes of Glen Canyon NRA." NPS Doc. 22, at 233. Section 2(b) of the MOU requires the Park Service to give "clearance" to BLM grazing decisions to ensure the values and purposes of Glen Canyon are protected. Id. at 234. Moreover, under section 2(c), "BLM shall not act on any grazing authorization . . . without first receiving a written determination from the [Park Service] Regional Director regarding the potential effect of the proposed action upon the values and purposes of the area. In addition, the [Park Service] Regional Director will provide to BLM any terms and conditions deemed necessary by [the Park Service] for inclusion in BLM's proposed action to ensure the activity's compatibility with the area's values and purposes." Id.

24.    The 1993 IA affirmed the roles of the Park Service and BLM in managing grazing within Glen Canyon. NPS Doc. 15. The parties reaffirmed the IA in 1998, but it expired in 2003.

Id. at 98.  Under section 3(a) of the IA, the Park Service must perform a values and purposes determination when "BLM initiates an action requiring an environmental assessment."  Id. at 102. The Superintendent must provide "any terms and conditions deemed necessary . . . to ensure that the activities are compatible with the NRA's values and purposes."  Id. at 102.

### c.    1979 General Management Plan

25.    The Park Service established a General Management Plan ("GMP") to govern all activities within Glen Canyon, including grazing, in 1979.  NPS Doc. 21.  The Park Service prepared an environmental impact statement ("EIS") under the National Environmental Policy Act, 42 U.S.C. § 4332, for the GMP.  NPS Doc. 170.  Neither the GMP nor the EIS analyze whether grazing is consistent with the values and purposes of Glen Canyon.

26.    The General Management Plan requires the Park Service to develop a site-specific Grazing Plan, including a "(1) detailed description of the condition of the range, and (2) recommendations for specific range improvement practices and devices, management activities, and maximum grazing intensities compatible with the purpose of the recreation area."  Id. at 180. The EIS states:

> The level and seasonality of grazing operations on particular allotments will be established by the grazing resources component of the proposed resources management plan, to be completed within 6 years.  The effects of grazing on particular allotments will be evaluated in preparing this plan.

NPS Doc. 170, at 70, 72, 74, 75[3]

### d.    1999 Grazing Plan

27.    Although the Park Service planned to complete the Grazing Plan within six years, it failed to do so for 20.  The Park Service completed an environmental assessment ("EA") for

---

[3] This document did not include administrative record page numbers so these citations are to the pages within the document.

the Grazing Plan on February 8, 1999; made a finding of no significant impact ("FONSI") on

July 22, 1999; and issued the final Grazing Plan in August of 1999.  Complaint ¶ 72; Answer ¶

72; NPS Docs. 19, 29.

28.     Although the GMP EIS indicated the Grazing Plan would consider the "effects of

grazing on particular allotments," NPS Doc. 170, at 70, it does not.  NPS Doc. 29.  Similarly,

although the Plan recognizes the Park Service must conduct a "values and purposes

determination" before authorizing activities within Glen Canyon, the document includes no such

analysis.  Id. at 278.  Instead, the Grazing Plan establishes a process for considering the site-

specific impacts of grazing and making values and purposes determinations in the future.  Id. at

278-80.

29.     The Grazing Plan states the purposes of Glen Canyon are "outdoor recreation use

and enjoyment" and "preserv[ing] the scenic, scientific, and historic features contributing to

public enjoyment of the area."  Id. at 279 (quoting Enabling Act).  The Plan identifies the values

of the recreation area as the "vegetation, soil, water quality, wildlife, archaeologic, historic,

paleontologic, scenic and recreation resources."  Id.

30.     For each of these values, the Grazing Plan establishes:  (1) goals, (2) objectives

designed to obtain the goals, and (3) specific actions necessary to achieve the objectives.  Id. at

287-88.  For example, the Grazing Plan states the goal for vegetation as "maintain[ing] naturally

diverse plant communities and species populations . . . [that] include a full complement of native

species, plant vigor and health, natural structure for wildlife habitat, dynamic changes,

reproductive success, and populational genetic and evolutionary responses."  Id. at 289.  To

achieve this goal, the Grazing Plan adopts an objective to "maintain in upland plant

communities, as natural a community as possible, including the full range of native species, a

viable seedbank, and minimal presence of increasing undesirable species." Id.  In order to obtain this objective, the Grazing Plan recommends the following actions:  (1) setting maximum non-spring utilizations levels at 45% for Indian ricegrass in all key areas, (2) setting spring utilization levels at 25%, (3) shortening grazing seasons, (4) establishing grazing exclosures to determine long term effects and recovery from grazing, and (5) adjusting stocking rates.  Id. at 290-92.  The Park Service established similar goals, objectives, and actions for each of the remaining values.  Id. at 294-304.

31.     The Park Service is to determine whether a proposed grazing action meets the goals and objectives of the Grazing Plan as part of a values and purposes determination.  Id. at 279-80.  In other words, the Grazing Plan is used to determine whether grazing actions are consistent with the values and purposes of the recreation area.  Id.

32.     The Grazing Plan is internally inconsistent regarding the actions necessary to trigger application of the Grazing Plan to a particular allotment (or a values and purposes determination).  On the one hand, the Park Service states that actions affected by the Grazing Plan include only (1) permit transfers (but only if the allotment does not have a current Allotment Management Plan ("AMP"), is in an Improve or Custodial category, or there is ongoing unacceptable degradation of recreation area resources), (2) changes in existing AMP's, and (3) proposed ground disturbing activities, or (4) other actions described in the 1993 IA.  Id. at 275, 280.  The "other actions" described in the 1993 IA include changes to grazing management, such as changes to a grazing permit, kind of livestock, season of use, or monitoring or evaluation efforts.  NPS Doc. 15, at 102.

33.     On the other hand, the Park Service prioritized five allotments for implementation of the Grazing Plan:  Lake Canyon, Sewing Machine, Lake, Soda, and Rock Creek-Mudholes.

NPS Doc. 29, at 277, 368.  The Service chose these allotments based on their size, management

status, and history of problems, and not on the fact the Park Service anticipated that one of the

qualifying changes is grazing management would occur.  Id. at 368.  These allotments include

around 50% of the grazed acres in Glen Canyon.  Id.

34.    A Park Service letter to Plaintiffs Great Old Broads indicates the Park Service

planned to apply the Grazing Plan to all Glen Canyon allotments during BLM's permit renewal

process.  NPS Doc. 94, at 1155-56.  Either way, under the Grazing Plan, until the Park Service

applies the Grazing Plan standards to a specific allotment, the Park Service will allow currently

authorized levels of grazing to continue.  The Park Service considered and rejected an alternative

that would require immediate compliance with the Grazing Plan standards.  NPS Doc. 19, at 115;

NPS Doc. 29, at 270-73.

## 2.    The Park Service's Failure to Conduct Values and Purposes Determinations.

35.    Although the Park Service's Policies, 1984 MOU, 1993 IA, and the Grazing Plan

all recognize the Park Service must conduct a values and purposes determination prior to

authorizing grazing within Glen Canyon, see supra ¶¶ 14, 23,24. 28, the administrative record

does not contain a single final values and purposes determination for any of the 24 challenged

allotments.  According to the Service, it is waiting for BLM to conduct site-specific

environmental analysis under NEPA before it will determine whether grazing is causing

impairment within Glen Canyon.  NPS Doc. 94, at 1155-56.

36.    The Park Service completed a draft values and purposes determination for the

allotments that include areas within both Glen Canyon and the Grand-Staircase Escalante

National Monument ("GSENM").  NPS Doc. 146.  This analysis includes ten of the challenged

allotments:  Upper Cattle, Lower Cattle, Forty Mile Ridge, Soda, Lake, Upper Warm Creek,

Lower Warm Creek, Nipple Bench, Rock Creek-Mudholes, and Wiregrass.  Id. at 1462. The latest version of this document is dated August 15, 2005.  Id.  The agency has not finalized this draft.  In the draft, the Park Service recognizes livestock grazing is not a "purpose" of the recreation area.  Id. at 1463.

37.     On November 5, 2001, the Park Service sent BLM a letter stating the Decision Record and EA for the White Canyon Allotment "is consistent with the Values and Purposes of Glen Canyon National Recreation Area."  NPS Doc. 89.  However, the Park Service did not apply the Grazing Plan to White Canyon prior to making this statement.  In fact, the Superintendent only found it was consistent with the values and purposes "given our understanding that the language in the Proposed Decision Record regarding the terms and conditions of the permit provides options to address resource concerns through the permit's lifetime.  Resource concerns might be identified through the application of Glen Canyon's NRA Grazing Management Plan or through addressing our ongoing concerns for the implementation of the Allotment Management Plan, the mitigation of livestock impacts to cultural resources, or addressing the potential conflicts reflected in the "Improvement" management status of the allotment."  Id.

>    3.    **The Park Service's identification of adverse impacts and impairment.**
>
>         a.    **GSENM Draft Values and Purposes Determination**

38.     In the GSENM draft values and purposes determination, the Park Service found:

Park resources have in fact been degraded across some of the 18 grazing allotments within the Glen Canyon NRA.  In some areas, forage has been over-utilized and is trending downward.  Rangeland health assessments are indicating poor biotic and abiotic conditions across certain vegetation and soil types.  Springs, seeps, and streams are experiencing extremes in soil erosion, dewatering, and consumption of riparian vegetation because of livestock activities.  Fragile and non-renewable cultural properties have been, and continued to be, negatively affected by livestock and are not meeting the requirements and obligations under the National Historic Preservation Act.  Finally, livestock practices are prohibiting Glen Canyon NRA from providing proper scenic and aesthetic enjoyment to every park visitor because some recreation conflicts exist, particularly in areas of high visitation combined with frequent livestock activity.

NPS Doc. 146, at 1461.

39.    With respect to recreation, a two-year study of Glen Canyon revealed that 37% of backcountry users reported negative or very negative experiences because of cattle grazing.  Id. at 1467.  Participants complained about "livestock feces at trailheads, along trails, and at scenic viewpoints . . . livestock trampling and/or contamination of water sources, flies, and simply observing livestock in remote areas."  Id.  Studies in GSENM showed 40% of hunters and 70% of hikers reported that "seeing cattle or evidence of cattle grazing detracted from their recreational experience."  Id.  Although the study is specific to GSENM, many back country visitors hike both within GSENM and Glen Canyon and tend not to draw distinctions between the two.  Id.

40.    In the draft values and purposes determination, the Park Service specifically found current livestock grazing was "counter to" or "not compliant with" the following values on the following allotments:

| Upper Warm Creek | Vegetation, soils, and cultural resources (Id. at 1471-72) |
|---|---|
| Lower Warm Creek | Vegetation, soils, cultural resources, and recreation (Id. at 1473-74) |
| Last Chance | Vegetation, riparian conditions, and cultural resources (Id. at 1475-76) |
| Rock Creek Mudholes | Vegetation, soils, riparian conditions, |

|  | and cultural resources (Id. at 1477-78) |
|---|---|
| Lake | Vegetation, soils, riparian conditions, wildlife, cultural resources, and recreation (Id. at 1479-81) |
| Soda | Vegetation, soils, riparian conditions, cultural resources, and recreation (Id. 1482-84) |
| Forty Mile Ridge | Cultural resources, scenic and recreation (Id. at 1485-86) |
| Lower Cattle | Cultural resources, riparian condition, scenic, and recreation (Id. at 1487-88) |
| Upper Cattle | Soil conditions and cultural resources (Id. at 1489-90) |

41.    Furthermore, for the Last Chance, Rock Creek Mudholes, Lake, and Soda allotments, the Park Service found:  "Maintaining current levels of active livestock use across the allotment will continue to produce unacceptable impacts to Glen Canyon NRA values and thus, current livestock activities are not in compliance with Glen Canyon NRA purposes."  Id. at 1476, 78, 81, 84.

**b.    Cultural Resources Assessments**

42.    In preparation for the GSENM values and purposes determination, the Park Service compiled cultural recourse information on the Lake, Rock Creek-Mudholes, Forty Mile Ridge, Lower Cattle, Upper Cattle, Soda, and Upper Warm Creek allotments in a document dated April 19, 2003.  NPS Doc. 169.  The Park Service's analysis states the "primarily management objective for sites in the NRA is protection and preservation."  Id. at 2508.  This analysis shows that the Park Service has not surveyed the vast majority of land within Glen Canyon for cultural resources.  Id. at 2509-32.  However, in all of the areas the Park Service has surveyed, it has identified livestock grazing impacts.

43.    Archeologists have surveyed 1100 acres of the Lake allotment and recorded approximately 120 cultural resource sites.  Id. at 2509.  44% of these sites were in fair condition

and 30% were in poor condition.  64% percent of the sites had documented livestock grazing impacts.  79% percent are eligible for the National Register for Historic Places ("National Register").  Id. at 2510-11.  The Park Service concluded, "[c]learly prehistoric sties on the NRA portion of the Lake Allotment have high potential to contribute to our understanding of numerous questions related to prehistoric change and adaptation in this unique area."  Id. at 2512.

44.    The Park Service analyzed 53 sites within the Rock Creek-Mudholes allotment. Id. at 2512.  42% percent of these sites were in fair condition 8% percent were in poor condition. 40% of the sites had documented livestock grazing impacts.  81% are eligible for the National Register.  Id. at 2513-14.  The Park Service found the "high percentage of sites with subsurface remains, hearths and diagnostics suggest that additional study including subsurface testing and laboratory analyses has the potential to aid our understanding of Freemont-Anasazi settlement and interaction, and that sites in the allotment have an extremely high research potential."  Id. at 2514.

45.    The Park Service analyzed 41 sites within the Forty Mile Ridge allotment.  Id. at 2514.  30% of these sites were in fair condition and 21% were in poor condition.  21% of the sites had documented livestock grazing impacts.  67% are eligible for the National Register.  Id. at 2516.  The Park Service found "a high research value for recorded sites in the canyon areas of [the allotment] within the NRA, and a lack of information regarding upland site densities and attributes."  Id. at 2517.

46.    The Park Service analyzed 20 sites within the Lower Cattle allotment.  Id. at 2519.  38% percent of these sites were in fair condition and 10% were in poor condition.  38% of the sites had documented livestock grazing impacts.  81% percent are eligible for the National

Register.  Id. at 2516.  The Park Service found there is a "high research value for recorded sites in the canyon areas of [the allotment] within the NRA, and a lack of information regarding upland site densities and attributes."  Id. at 2517.

47.      The Park Service analyzed 70 sites within the Upper Cattle allotment.  Id. at 2524. 30% of these sites were in fair condition and 23% were in poor condition, and 4% were destroyed.  28% of the sites had documented livestock grazing impacts.  82% percent are eligible for the National Register.  Id. at 2516.  The Park Service found there is a "high research value for recorded sites in the canyon areas of [the allotment] within the NRA, and a lack of information regarding upland site densities and attributes."  Id. at 2526.

48.      The Park Service analyzed 81 sites within the Soda allotment.  Id. at 2526.  35% percent of these sites were in fair condition and 14% were in poor condition.  21% of the sites had documented livestock grazing impacts.  75% are eligible for the National Register.  Id. at 2527.  The Park Service found the area "has a high potential for providing evidence to fill in the long Archaic sequence that is currently only partially understood for the Glen Canyon area.  The exceptional preservation of organic materials subsistence remains in numerous dry shelters contributes to the extremely high research potential of these sites."  Id. at 2528.

49.      The Park Service analyzed 20 sites within the Upper Warm Creek allotment.  Id. at 2529.   60% of these sites were in fair condition and 10% were in poor condition.  40% of the sites had documented livestock grazing impacts.  Id. at 2530.

50.      The Park Service has documented 13 cultural resource sites on the Lower Warm Creek allotment.  NPS Doc. 168, at 2477.  31% were in fair condition and 15% were in poor condition.  8% had documented grazing impacts.  54% are eligible for the National Register.  Id.

51.     The Park Service also conducted an "Assessment of Grazing Activities on Cultural Resources" for the Lake, Soda, Rock Creek-Mudholes, and Sewing Machine allotments on December 18, 2001.  NPS Docs. 164, 165, 166, 167.  Each one states there are significant cultural resources within the relevant allotment spanning nearly the entire sequence of Southwestern prehistory from the Archaic period (8,000 years ago) through the end of the Fremont and Anasazi occupations (800 years ago).  NPD Doc. 164, at 2437; NPS Doc. 165, at 2440; NPS Doc. 166, at 2443; NPS Doc. 167, at 2446.

52.     Of the 5,283 acres of the Lake allotment located within Glen Canyon, only 1,300 acres have been surveyed for cultural resources.  NPS Doc. 164, at 2437.  Of the 139 documented sites, the Park Service identified 69 sites that are eligible for the National Register and have been impacted by livestock grazing.  Id. at 2438.  The impacts at 40 of the eligible sites are moderate and the impacts at 19 sites are severe.  Id. at 2438-39.  The assessment defines moderate impacts as those "that will result in irreparable damage to the integrity of the resources and the loss of information if action to correct the impact is not taken within five years."  Id. at 2438 (emphasis added).  It defines severe impacts as those where the "resource has been so badly damaged by grazing activities that the resource will be significantly damaged or irretrievably lost if action is not taken within 2 years."  Id.  (emphasis added).

53.     On the Soda Allotment, of the 57,645 acres located within Glen Canyon, only 351 acres have been surveyed for cultural resources.  NPS Doc. 166, at 2443.  Of the 77 sites that have been documented, the Park Service has identified 17 sites that are eligible for the National Register and have been impacted by livestock grazing.  Id. at 2444.  The impacts at 12 of these sites are moderate and one is severe.  Id. at 2444-45.

54.     The Rock Creek-Mudholes assessment is based on information collected from 52 sites within the Glen Canyon portions of the allotment.  NPS Doc. 165.  Of these 52 sites, the Park Service has identified 16 that are eligible for the National Register and have been impacted by livestock grazing.  Id. at 2441.  The impacts at 14 of these sites are moderate and one is severe.  Id. at 2441-42.

55.     The Sewing Machine assessment is based on information collected from 242 sites within the Glen Canyon portions of the allotment.  NPS Doc. 167, at 2446.  Of these 242 sites, the Park Service has identified 31 that are eligible for the National Register and have been impacted by livestock grazing.  Id. at 2447.  20 of these sites have moderate impacts.  Id. at 2448.

56.     For each of the allotments, the assessment concludes:

> [C]urrent grazing practices within the Glen Canyon NRA portion of the [Lake, Soda, Rock Creek-Mudholes, and Sewing Machine allotments] need to be reevaluated.  The integrity of sites determined eligible to the National Register of Historic Places are being compromised, and obvious adverse effects are being allowed to continue without any mitigative measures taken.  This is in direct violation to Section 106 regulations, which require federal agencies to identify alternatives to minimize or eliminate impacts to cultural resources under their jurisdiction.  A simple solution would be to remove all cattle from the Glen Canyon NRA portion of the allotment.  Short of that, a preservation plan should be developed and implemented by the BLM that includes recommendations and methods to mitigate the damage to archeological sites resulting from grazing activities.

NPS Doc. 164, at 2439; NPS Doc. 165, at 2442; NPS Doc. 166, at 2445; NPS Doc. 167, at 2448.

### c.     Grazing Plan EA

57.     The Grazing Plan EA identifies impairment, and the potential for impairment, of the purposes and values of Glen Canyon.  NPS Doc. 19.

58.     The Park Service identified vegetation as a value of Glen Canyon because it provides wildlife habitat, inhibits soil erosion, protects water quality, and increases the aesthetic

enjoyment of visitors.  NPS Doc. 19, at 116.  In the Grazing Plan EA, the Park Service found

livestock grazing in arid and semi-arid environments like Glen Canyon decreases desirable

native vegetation and increases undesirable exotics.  Id. at 116-17.  Cows tend to concentrate

near streams or other water sources, collapsing stream banks and increasing erosion.  Id. at 117.

59.    Although BLM has set utilization levels at 50 to 60% percent, meaning the cattle

can eat fifty to sixty percent of the grasses in a pasture before the permittee must move them,

grazing has occurred at much higher levels.  The Park Service documented "severe overgrazing"

on the Forty-Mile Ridge, Upper Cattle, and Soda allotments.  Id. at 117.  On Forty-Mile Ridge,

the Service found:

> [S]evere overgrazing occurred in the Red Wells area of the Forty-Mile Ridge
> allotment in the 1993-94 season, with utilization of key grass species at 78-88%.
> Many plants were killed outright, with their roots pulled out of the ground.  Other
> plants were so severely cropped that it is unlikely that they will survive given
> future drought conditions.

Id.; see also NPS Doc 79 ("[B]enches in Coyote Cultch have been overgrazed to the extent that

perennial grasses are not present in many areas.").  On Upper Cattle, cows ate 85%, 86%, and

95% of the key species in certain pastures.  NPS Doc. 19, at 117.  Similarly, within David Gulch

on the Soda Allotment, the cows ate as much as 95% of the forage, with a mean of 82%.  The

Park Service found "[m]any plants of all ages had been killed or severely damaged."  Id.  At

these levels, vegetation will take decades to recover if it recovers at all.  Id.  Based on these

examples, the Park Service concluded that "at least in some cases existing range condition is

being degraded within Glen Canyon NRA, and that better control of actual utilization values is

necessary."  Id.  The Park Service found that "riparian zones are often also heavily utilized."  Id.

60.    The Park Service also identified adverse impacts to soils, which it recognized as

"critical to the protection of the scientific processes and the scenic values within Glen Canyon

NRA." Id. at 120.  In its overview of soil conditions, the agency found "some high use areas being impacted by grazing activities." Id. at 122.  The Service noted a "reduction in desirable vegetative cover occurs under increasing grazing pressure in arid environments." Id.  The Park Service expects long term impacts to soils to continue under current grazing practices. Id. at 125.

61.     The EA identifies water resources as "essential to support complex and diverse biological communities, riparian vegetation, fish and wildlife, which are often isolated by vast expanses of desert." Id. at 125.  Recreationists, such as backcountry hikers, depend on the streams and seeps for drinking water. Id.  The Park Service found "some springs on the Glen Canyon NRA, such as those on the Kaiparowits Plateau, [within the Lake Allotment] have been severely damaged by livestock trampling, with in some cases almost total elimination of riparian vegetation." Id. at 127.

62.     The wildlife resources of the recreation area are "an integral part of the desert ecosystem to be experienced and enjoyed by visitors." Id. at 130.  Yet, the Park Service found bighorn sheep numbers within the recreation area have declined significantly from historical levels, and the biggest cause of this decline is livestock grazing. Id.

63.     The Park Service has identified cultural artifacts as "irreplaceable and non-renewable resources with scientific, cultural, educational, and interpretive value." Id. at 134. Livestock grazing has adversely impacted cultural resources within Glen Canyon since the 1880's.  Livestock topple prehistoric buildings, trample artifacts, and erode rock art by rubbing against walls. Id. at 135-36.  The Park Service found:

> Cultural resources damage caused by livestock is well documented.  Of the 130 sites regularly assessed . . . cattle have impacted 33 sites or 25 percent of the total assessment sample.  It is common to find sites where structures are visible only as chunks of mortar scattered among the dung, with perhaps a tell-tale stain of clay along an alcove back wall to indicate that a structure once stood there.  Wherever livestock have access, surface artifacts are rare.  The integrity of artifact concentrations is lost, and the artifacts themselves are not visible unless subsurface testing is done.  Midden deposits containing perishable items, hearths, ceramics, and macrobotanical remains are actually torn up or churned by livestock.

Id. at 136-37.  Studies conducted by Northern Arizona University showed livestock grazing has damaged archeological sites within three unidentified riparian canyon systems.  Id. at 137.  The Park Service documented even more serious impacts in the Andy Miller Flats/Red Benches area and the benchlands above Wahweap and Warm Creeks.  Id.

64.    Finally, the EA also states grazing can ruin the recreational experience of Glen Canyon visitors, particularly backcountry users, because the presence of cattle, roads related to cattle operations, water developments, and stock trails spoil the natural beauty of the area.  Id. at 143-45.  Backcountry users complain more about the impacts of grazing on the recreation area's resources than anything else when they share comments with the Park Service.  Id. at 147.

### 3.    The Park Service's Failure to Protect Glen Canyon Values and Purposes.

65.    According to the Grazing Plan, the Park Service was to incorporate protections for Glen Canyon values and purposes into the terms and conditions for the ten year grazing permits issued by BLM.  Id. at 284.  None of the current permits have any terms and conditions implementing Grazing Plan standards.  See infra ¶¶ 98-101, 104-09, 112-21, 124-27.

66.    There is no evidence in the administrative record to show that in the six and a half years since it developed the Grazing Plan, the Park Service has applied the Plan to any one of the 23 challenged allotments where BLM has renewed grazing permits.

67.     In 1997, BLM completed an EA and FONSI to modify the grazing permit on the

Forty Mile Ridge allotment.  BLM Doc. 173.  The EA proposed reducing the active grazing

preference from 4155 AUMs to 2,363 AUMs[4] and reducing the allowable use of key species in

the Dry Fork of the Coyote and Forty Mile Gulch from 60% to 35% of the current year's growth.

Id. at 953.  BLM proposed these changes in order to improve vegetation in riparian areas,

enhance wilderness values, and improve allotment conditions.  Id. at 954.

68.     On January 27, 1998, Plaintiff Great Old Broads filed a protest of BLM's grazing

decision for Forty Mile Ridge because the changes were insufficient to protect the allotment.

NPS Doc. 77.  For the past eight years, BLM has not resolved the protest or implemented the

decision.  As a result, BLM has not finalized the EA for Forty Mile Ridge.  BLM continues to

authorize more than 4,000 AUMs on Forty Mile Ridge.  BLM Doc. 177.

69.     In 2003, the Park Service claimed BLM agreed to take cows off the Soda and

Lake allotments "until NPS resource objectives and goals can be met."  NPS Doc. 94, at 1156.

Draft documents in the Park Service's record indicate BLM removed the cows from both

allotments from 2000 to 2002 because of problems with trespass, but let cows back on in 2003.

NPS Doc. 132, at 1436; NPS Doc. 133, at 1437.  There is no evidence in the record that BLM

consulted the Park Service to ensure their goals and objectives were met prior to returning cows

to the allotment.

70.     According to the Park Service's documents, BLM authorized 1,308 AUMs on the

Lake allotment prior to 2000 and authorized the exact same amount in 2006.  NPS Doc. 132, at

1436.  Therefore, BLM is currently authorizing as much grazing as was authorized prior to 2000,

---

[4] An "Animal Unit Month" or "AUM" is the amount of forage BLM anticipates will be required
by one "animal unit" for one month.  An animal unit includes one cow with a calf.  One AUM
includes consumption of approximately 26 pounds of dry matter per day.  BLM Doc. 242, at
1455.

when it removed the cows.  On the Soda allotment, BLM authorized 2,755 AUMs prior to 2000 and 1,500 AUMs in 2006, and will ramp back up to 2,755 AUMs in 2007.  NPS doc. 133, at 1437.  As such, by next year, BLM will be authorizing as much grazing on the Soda allotment as it did prior to 2000.

71.    BLM reduced grazing on the Rockies allotment in 2003 and 2004 as a result of drought.  BLM Doc. 31.  However, BLM did not make changes to the ten year permits to reflect these reductions.  BLM Docs. 19, 20, 34, 35.

**B.    The Park Service's Violations of NEPA in the Grazing Plan EA.**

**1.    The Park Service's Failure to Analyze Site-Specific Impacts.**

72.    The Grazing Plan EA states that it provides an "overview of grazing conditions within Glen Canyon NRA [and] a brief description of BLM grazing management . . . on allotments within the recreation area."  NPS Doc. 19, at 112 (emphasis added).

73.    The EA contains a description of the "resource condition" for each of the Glen Canyon values.  Id. at 116-51.  However, none of these descriptions include assessments of individual allotments.  Id.  The only place where the EA identifies conditions on individual allotments is when it finds "severe overgrazing" on the Forty-Mile Ridge, Upper Cattle, and Soda allotments.  Id. at 117.  The EA does contain some site-specific information on grazing impacts to cultural resources, but does not indicate which allotments contain the damaged resources.  Id. at 137.  The rest of the Park Service's analysis is limited to general statements applicable to the entire recreation area.

**2.    The Park Service's Failure to Prepare an EIS.**

74.    In the Decision Notice and FONSI for the Grazing Plan, the Park Service concludes:

> The proposal does not constitute an action that normally requires preparation of an EIS. The proposal will not have a significant effect on the human environment. Negative environmental impacts that could occur are minor and temporary in effect. <u>There are no unmitigated adverse impacts on . . . sites or districts listed in, or eligible for listing the National Register of Historic Places; known ethnographic resources; or other unique characteristics of the region.</u> . . .
>
> <u>No high uncertain or controversial impacts, unique or unknown risks, cumulative effects, or elements of precedence were identified.</u> . . .
>
> Based on the foregoing, it has been determined that an EIS is not required for this project and thus, will not be prepared.

NPS Doc. 29, at 273 (emphasis added).

75.     In the Grazing Plan EA, the Park Service repeatedly acknowledged it did not have the data it needed to analyze the environmental consequences of authorizing grazing through the Grazing Plan on the vegetation, soil, water, riparian areas, wildlife, and cultural resources of Glen Canyon. NPS Doc. 19, at 116-18, 121-22, 127-31, 133-34, 140.

76.     For example, the Grazing Plan EA states studies show livestock grazing in arid areas like Glen Canyon harms vegetation, but "relatively little is known about the status and trend of vegetation that is subject to livestock grazing" in Glen Canyon. NPS Doc. 19, at 116-118. Similarly, the Park Service found the "interaction of drought and grazing can destabilize arid and semiarid plant communities by reducing cover, destroying [soil] crusts, and increasing erosion," but essential information on these interactions is not available. <u>Id.</u> at 116.

77.     Recognizing "water quality depends on the condition of the watershed," the Park Service determined the "current condition of most watersheds . . . and a majority of riparian and spring water sources is unknown and without proper studies an ad hoc or reactive approach to management could continue to be detrimental to water quality." <u>Id.</u> at 129.

78.     Elsewhere, the Park Service acknowledges it knows "very little about the ecology and status of most wildlife in Glen Canyon," but studies of other areas have linked grazing to declines in native wildlife.  Id. at 133.

79.     Finally, the Park Service recognizes that only 2% of the 1.2 million acres within Glen canyon have been surveyed for cultural resources.  Id. at 134.  There are potentially more than 19,000 sites that have yet to even be identified in areas where BLM has authorized grazing.  Id.

80.     The Grazing Plan EA does not analyze the cumulative impacts of livestock grazing in combination with other reasonably foreseeable actions.

81.     The EA acknowledges that cumulative impacts do exist, stating:

> [I]t is understood that other impacts occur to the vegetation of Glen Canyon NRA, including drought and recreational activity.  These impacts will not be analyzed in this section.  However, it is recognized that impacts of recreational activities, such as accidental fires and trampling, as well as drought, can have <u>substantial effects</u> on vegetation in some areas.

NPS Doc. 19, at 119 (emphasis added).  Additionally, the "general field overview of the current condition of the soils within Glen Canyon NRA indicates some high use areas being impacted by grazing activities, and to a lesser extent from unauthorized off-road vehicle use, and backcountry recreation."  NPS Doc. 19, at 122.  Indeed, the Park Service states:

> It is understood that other outdoor recreation uses also negatively impact soil development and productivity.  These recreational uses, like hiking, horseback riding, off-road vehicles, camping, etc., will not be analyzed in this section.  However, the impacts to the backcountry soil resources from recreational uses are recognized as a contributing factor to long-term rangeland impacts.

Id. at 124.  The Grazing Plan goes on to acknowledge that natural process and recreation not related to livestock grazing also causes erosion that affects water quality in some areas.  Id. at 128-29.

82.     Even the sections of the EA labeled "cumulative impacts" do not consider any impacts other than those caused by livestock grazing.  Id. at 120, 125, 129, 134, 140, 142, 146, 151.

### C.    The Park Service's Violation of NHPA for the Grazing Plan.

83.     In 1995, the Park Service negotiated a "Programmatic Agreement" with the Advisory Council on Historic Preservation to govern compliance with section 106 of the NHPA for actions within units of the national park system.  Programmatic Agreement Among the National Park Service (U.S. Dept. of the Interior), the Advisory Council on Historic Preservation, and the National Conference of State Historic Preservation Officers (visited April 27, 2006) <http://www.achp.gov/npspa1.html>.  This document was not provided as part of the administrative record.  Under the Programmatic Agreement, the Park Service may review certain undertakings under section 106 with no further SHPO or Advisory Council Review where they will have no adverse effects on National Register eligible cultural resources.  Id. Part IV.A.  The list of undertakings does not include land use plans, such as the Grazing Plan, or authorization of grazing activities.  Id. Part IV.B.  For these activities, the Park Service must comply with the Advisory Council regulations.  Id. Part V.A.

84.     The Grazing Plan EA does not identify National Register eligible cultural resources throughout the recreation area that may be impacted by grazing.  NPS Doc. 19, at 134-40.  As a result, the Grazing Plan does not determine whether on-going grazing will have adverse effects on these resources or seek ways to avoid or mitigate the impacts of on-going grazing.  Id.

85.     As discussed above, the Grazing Plan EA identifies adverse impacts only within limited areas of Glen Canyon.  Id. at 137; see supra ¶ 63.  The EA includes no discussion of whether the impacted sites are eligible for the National Register.  NPS Doc. 19, at 134-40.

86.    The Grazing Plan does not mitigate adverse impacts to cultural resources the Park Service has identified.  Although the Grazing Plan sets up a process for mitigating impacts for "new grazing proposals" and "changes in current grazing practices," there is no binding commitment to implement these actions.  Id. at 139.  The EA states, "[w]here possible, grazing-related impacts to cultural resources will be mitigated through fencing or other methods of avoidance."  Id. (emphasis added).

87.    The Park Service does not commit to any mitigation measures in the Grazing Plan Decision Notice and FONSI.  NPS Doc. 29, at 269-273.  The FONSI states only that the Park Service "will work with BLM to get [Park Service] priorities into the BLM priorities for range assessment and monitoring and AMP development."  NPS Doc. 29, at 277.  The Park Service specifically rejected an alternative in the Grazing Plan EA that would have required immediate consideration of the adverse impacts of livestock grazing and implementation of mitigation measures.  NPS Doc. 19, at 140; NPS Doc. 29, at 270-73.

88.    There is no evidence in the administrative record showing the Park Service has ever required BLM to implement measures to protect cultural resources within Glen Canyon.

89.    There is no evidence in the administrative record showing the Park Service consulted with Advisory Council under section 106 of NHPA on the impacts of the Grazing Plan.

## III.    THE BUREAU OF LAND MANAGEMENT'S LEGAL VIOLATIONS IN MANAGING LIVESTOCK GRAZING WITHIN GLEN CANYON.

90.    The Glen Canyon Enabling Act places BLM in charge of "administering" livestock grazing permits within Glen Canyon, subject to the Organic Act.  16 U.S.C. §§ 460dd-3, -5.

91.    BLM authorizes grazing within the Glen Canyon allotments by issuing term permits, generally for a period of ten years.  In addition, each year BLM approves grazing

applications or issues grazing bills authorizing use of the allotment for that year.  Complaint ¶ 65; Answer ¶ 65.

92.    The 24 challenged allotments fall under the direction of four separate BLM field offices:  Henry Mountain Field Station (which is part of the Richfield Field Office), Monticello (formerly known as the San Juan Resource Area), Grand Staircase-Escalante National Monument, and Arizona Strip.  Complaint ¶ 60; Answer ¶ 60.  With the exception of the Lower Warm Creek and Wahweap allotments, each of the twenty-four challenged allotments contains some land within Glen Canyon and some land within BLM managed areas outside of the recreation area.  NPS Doc. 29, at 327, 334, 340, 345, 349.  Lower Warm Creek and Wahweap are wholly contained within Glen Canyon.  Id. at 340, 349.

93.    BLM's administration of grazing is subject to different standards based on whether or not the land is inside the Glen Canyon.  Inside the recreation area, BLM is subject to the standards of the Organic Act in addition to the typical statutes and regulations governing grazing on public lands.  16 U.S.C. §§ 460dd-3, -5; NPS Doc. 29, at 284.

94.    Outside Glen Canyon, BLM is subject only to the relevant legal authorities for BLM managed public lands, including the Taylor Grazing Act, 43 U.S.C. §§ 315 et seq., and the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701 et seq.  NPS Doc. 29, at 284.

95.    Under FLPMA and regulations adopted by the Secretary in 1995, BLM monitors and evaluates allotments to determine whether they are complying with the "Standards for Rangeland Health" and "Guidelines for Grazing Management" (collectively "Standards and Guidelines").  NPS Doc. 29, at 285; see also BLM Doc. 291 (Utah's Standards for Rangeland Health); BLM Doc. 292 (Arizona's Standards for Rangeland Health).  The administrative record indicates BLM has completed this analysis for many of the challenged allotments and is working

on it for others.  BLM Docs. 16, 36, 54, 65, 82, 106, 116, 125, 157, 167, 178, 189, 198, 203, 210, 219, 224, 232, 254, 2654, 271, and 278.

    **A.**      **Livestock Grazing Permits Within Glen Canyon**

          **1.**    **Henry Mountain Field Station**

96.    The Henry Mountain Field Station manages grazing on the Sewing Machine, Rockies, Waterpocket, and Bullfrog allotments.  Complaint ¶ 61; Answer ¶ 61.  These allotments will be referred to collectively as the Henry Mountain/Glen Canyon allotments.

97.    The following charts display the grazing permit information for the Henry Mountain/Glen Canyon allotments found in the administrative record.

98.    Sewing Machine:

| Permittee Number | Date | Status | Cattle | Season of Use | AUMs* | BLM A.R. Doc. |
|---|---|---|---|---|---|---|
| 4300421 | 07/01/04 – 06/30/14 | Current | 46 | Nov.-April 15 | 250 | 15 |
| 4305711 (Four Sale Cattle) | 10/30/03 – 10/29/13 | Current | 185 | Nov.-April 15 | 1010 | 13 |
| | 03/01/99 – 10/31/03 | Expired | 139 | Nov.-April 15 | | 2 |
| 4305712 (Wells) | 03/01/03 – 02/28/13 | Current | 45 | Nov.-April 15 | 247 | 10 |
| | 03/01/93 – 02/28/03 | Expired | 45 | Nov.-April 15 | | 3 |
| 4305904 (Wells) | 03/01/01 – 02/28/10 | Current | 56 | Nov.-April | 335 | 14 |
| | 03/01/91 – 02/28/01 | Expired | 56 | Nov.-April | 335 | 1 |

99.    Rockies:

| Permittee Number | Date | Status | Cattle | Season of Use | AUMs | BLM A.R. Doc. |
|---|---|---|---|---|---|---|
| 4305914 (Williams) | 10/1/04- 9/30/14 | Current | 111 | Nov.-May | 770 | 34 |

| | | | 1 | Nov.-March | 5 | 34 |
|---|---|---|---|---|---|---|
| | 3/01/97-2/28/00 | Expired | 55 | Nov.-May | 383 | 22 |
| 4305890 (Taylor) | 3/01/98-2/28/08 | Current | 225 | Nov.-May | 1568 | 35 |
| 4305912 (Williams) | 3/01/96-2/28/06 | Current | 56 | Nov.-Feb | 223 | 19 |
| | | | 56 | March-May | 168 | 19 |
| 4305867 (Security Ranches) | 3/01/96-2/28/06 | Current | 476 | Nov.-May | 3251 | 20 |

100.    Waterpocket:

| Permittee Number | Date | Status | Cattle | Season of Use | AUMs | BLM A.R. Doc. |
|---|---|---|---|---|---|---|
| 4305710 (Boone) | 03/01/05 – 02/28/15 | Current | 86 | Oct. 15-Apr. 15 | 517 | 51 |
| | 10/01/97 – 02/28/05 | Expired | 86 | Oct. 15-Apr. 15 | | 38 |
| 4305872 (Taft) | 3/01/02-2/28/12 | Current | 83 | Nov.-Apr. 15 | 453 | 42 |
| | 03/01/94 – 02/28/02 | Expired | 83 | Nov.-Apr. 15 | 453 | 41 |
| 4305886 (Taylor) | 11/09/01 – 11/08/11 | Current | 58 | Oct. 16-Feb. | 259 | 53 |
| | 03/01/93 – 02/28/03 | Superseded | 58 | Oct. 16-Feb. | 259 | 37 |
| 4305897 (Tercero) | 03/01/03 – 02/28/13 | Current | 227 | Nov.-Apr. 15 | 1239 | 52 |
| | 09/01/97 – 02/28/03 | Expired | 227 | Nov.-Apr. 15 | 1239 | 40 |
| 4305898 (Taylor) | 10/01/98 – 02/28/08 | Current | 86 | Oct. 15-Apr. 15 | 517 | 39 |

101.    Bullfrog:

| Permittee Number | Date | Status | Cattle | Season of Use | AUMs | BLM A.R. Doc. |
|---|---|---|---|---|---|---|
| 4300316 Brinkerhoff | 06/01/03 – 05/31/13 | Current | 84 | Oct. 15-May 14 | 581 | 64 |
| 4305734 Brinkerhoff | 06/01/03 – 05/31/13 | Current | 330 | Oct. 15-May 14 | 2311 | 63 |
| | 03/01/98 – | Superseded | 408 | Oct. 15-May 14 | 2857 | 58 |

| | 02/28/08 | | | | | |
|---|---|---|---|---|---|---|
| 4305707 Brinkerhoff | 03/01/03 – 02/28/13 | Current | 43 | Nov. 6-Feb. | 143 | 60 |
| | | | 43 | Mar.-May | 114 | 60 |
| | 03/01/93 – 02/28/03 | Expired | 43 | Nov. 6-Feb. | 143 | 56 |
| | | | 43 | Mar.-May | 114 | 56 |

### 2. Monticello Field Office

102.    The Monticello Field Office (formerly known as the San Juan Resource Area) manages grazing the Indian Creek, White Canyon, Lake Canyon, Slickhorn, Perkins Brothers, and Texas Muley allotments.  Complaint ¶¶ 60, 62; Answer ¶¶ 60, 62. These allotments will be referred to collectively as the Monticello/Glen Canyon allotments.

103.    The following charts display the grazing permit information for the Monticello/Glen Canyon allotments found in the administrative record.

104.    Indian Creek:

| Permittee Number | Date | Status | Cattle | Season of Use | AUMs | BLM A.R. Doc. |
|---|---|---|---|---|---|---|
| 436710 | 03/02/02 – 02/28/12 | Current | 1004 | Mar. – Jun. | 3532 | 83 |
| | | Current | 1004 | Oct. – Feb. | 4984 | 83 |
| | 03/01/01 – 02/28/02 | Expired | 1004 | Mar. – Jun. | 3532 | 80 |
| | | Expired | 1004 | Oct. – Feb. | 4984 | 80 |
| | 10/15/97 – 02/28/01 | Expired | 1004 | Mar. – Jun. | 3532 | 76 |
| | | Expired | 1004 | Oct. – Feb. | 4984 | 76 |
| | 03/01/91 – 02/28/01 | Superseded | 1004 | Mar. – Jun. | 3532 | 66 |
| | | Superseded | 1004 | Oct. – Feb. | 4984 | 66 |

105.    White Canyon:

| Permittee Number | Date | Status | Cattle | Season of Use | AUMs | BLM A.R. Doc. |
|---|---|---|---|---|---|---|
| 4306622 (White Canyon Cattle) | 3/01/05 | Current | 456 (12 horses) | Year round | 5616 | 109 |
| | 3/01/00-2/28/10 | Superseded | 450 (12 horses) | Year round | 5544 | 89 |
| | 3/01/89-2/28/99 | Superseded | 450 (12 horses) | Year round | 5544 | 85 |

106.    Lake Canyon:

| Permittee Number | Date | Status | Cattle | Season of Use | AUMs | BLM A.R. Doc. |
|---|---|---|---|---|---|---|
| 4306639 | 03/01/05 - 02/28/15 | Current | 615 (12 horses) | Mar. – Jun. | 1999 | 119 |
| | | | | Oct. – Feb. | 3010 | 119 |
| | 03/01/02 – 02/28/12 | Superseded | 624 (12 horses) | Mar. – Jun. | 1951 | 117 |
| | | | | Oct. – Feb. | 2938 | 117 |
| | 03/01/01 – 02/28/02 | Expired | 624 (12 horses) | Mar. – Jun. | 2028 | 113 |
| | | | | Oct. – Feb. | 3051 | 113 |
| | 03/01/91 – 02/28/01 | Expired | 624 (12 horses) | Mar. – Jun. | 1951 | 110 |
| | | | | Oct. – Feb. | 2938 | 110 |

107.    Slickhorn:

| Permittee Number | Date | Status | Cattle | Season of Use | AUMs | BLM A.R. Doc. |
|---|---|---|---|---|---|---|
| 4306626 | 03/01/02 – 02/28/12 | Current | 225 | Mar. – Jun. | 792 | 126 |
| | | | 225 | Oct. – Feb. | 1006 | 126 |
| | 03/01/01 – 02/28/02 | Expired | 225 | Mar. – Jun. | 792 | 123 |
| | | | 225 | Oct. – Feb. | 1006 | 123 |
| | 03/01/89 – 02/28/99 | Expired | 206 (5 horses) | Mar. – Jun. | 743 | 120 |
| | | | 206 (5 | Oct. – Feb. | 1048 | 120 |

| | | | horses) | | | |
|---|---|---|---|---|---|---|

108.    Perkins Brothers:

| Permittee Number | Date | Status | Cattle | Season of Use | AUMs | BLM A.R. Doc. |
|---|---|---|---|---|---|---|
| 4300470 | 03/01/05 - 02/28/15 | Current | 570 (9 horses) | Mar. – May | 1751 | 137 |
| | | | 570 (9 horses) | Oct. – Feb. | 2875 | 137 |
| 4300680 | 10/01/05 – 10/01/15 | Current | 340 | Oct. – May | 2716 | 138 |
| 4306631 | 03/01/02 – 02/28/12 | Current | 905 (15 horses) | Mar. – May | 2782 | 135 |
| | | Current | 905 (15 horses) | Oct. – Feb. | 4567 | 135 |
| | 03/01/01 – 02/28/02 | Expired | 905 (15 horses) | Mar. – May | 2782 | 131 |
| | | Expired | 905 (15 horses) | Oct. – Feb. | 4567 | 131 |
| | 03/01/91 – 02/28/01 | Expired | 877 (15 horses) | Mar. – May | | 128 |
| | | Expired | 877 (15 horses) | Oct. – Feb. | | 128 |

109.    Texas Muley:

| Permittee Number | Date | Status | Cattle | Season of Use | AUMs | BLM A.R. Doc. |
|---|---|---|---|---|---|---|
| 4306625 | 03/01/02 – 02/28/12 | Current | 297 (4 horses) | Mar. - May | | 147 |
| | | Current | 297 (4 horses) | Nov. – Feb. | | 147 |
| 4306625 | 03/01/91 – 02/28/01 | Expired | 297 (4 horses) | Mar. – May | | 139 |
| | | Expired | 297 (4 horses) | Nov. – Feb. | | 139 |

### 3.    Grand Staircase-Escalante National Monument Office

110.    On September 18, 1996, President Clinton set aside the Grand Staircase Escalante

National Monument ("GSENM").  CD—Exhibit E, at iii.  BLM's GSENM Field Office manages

livestock grazing on the following allotments:  Upper Cattle, Lower Cattle, Forty Mile Ridge,

Soda, Lake, Upper Warm Creek, Lower Warm Creek, Nipple Bench, Rock Creek-Mudholes, and

Wiregrass.  Complaint ¶ 63; Answer ¶ 63.  These allotments will be referred to collectively as

the GSENM/Glen Canyon allotments.

111.    The following charts display the grazing permit information for the GSENM/Glen

Canyon allotments found in the administrative record.

112.    Upper Cattle:

| Permittee Number | Date | Status | Cattle | Season of Use | AUMs | BLM A.R. Doc. |
|---|---|---|---|---|---|---|
| 4300664 | 01/01/04 – 12/31/13 | Current | 1033 | Nov. – Jun. | 7709 | 155 |
|  | 06/14/00 – 02/28/03 | Superseded | 791 | Nov. – Jun. | 5903 | 175 |
|  | 03/01/98 – 02/28/08 | Superseded | 700 | Nov. – Jun. | 5224 | 153 |
| 4300665 | 04/15/02 – 01/31/06 | Expired | 60 | Nov. – Jun. | 450 | 151 |
|  | 11/07/95 – 11/06/05 | Expired | 60 | Nov. – Jun. |  | 150 |

113.    Lower Cattle:

| Permittee Number | Date | Status | Cattle | Season of Use | AUMs | BLM A.R. Doc. |
|---|---|---|---|---|---|---|
| 4300605 | 12/13/99 – 02/28/09 | Current | 265 | Oct. – Apr. | 1725 | 162 |
|  | 11/01/91 – 09/01/9? | Expired | 245 | Oct. – Apr. | 1595 | 160 |
| 4300616 | 07/01/03 – 02/28/12 | Current | 628 | Oct. – Apr. | 4067 | 165 |
|  | 01/09/97 – 02/28/06 | Superseded | 628 | Oct. – Apr. | 4067 | 163 |
| 4300642 | 06/14/00 – 04/15/06 | Current | 77 | Oct. – Apr. | 482 | 159 |
|  | 03/01/96 – 02/28/06 | Superseded | 74 | Oct. – Apr. | 501 | 158 |
| 4300667 | 10/24/96 – | Expired | 199 | Oct. – Apr. |  | 166 |

| | 02/28/05 | | | | | |
|---|---|---|---|---|---|---|

114.    Forty Mile Ridge:

| Permittee Number | Date | Status | Cattle | Season of Use | AUMs | A.R. Doc. |
|---|---|---|---|---|---|---|
| 4300664 (Sorenson) | 1/01/04-12/31/13 | Current | 570 | Oct. 15-May | 4291 | 177 |
| | 6/14/00-2/28/03 | Expired | 571 | Nov.-June 15 | 4280 | 175 |
| | 3/01/98-2/28/08 | Superseded | 554 | Nov.-June 15 | 4153 | 174 |

115.    Soda:

| Permittee Number | Date | Status | Cattle | Season of Use | AUMs | A.R. Doc. |
|---|---|---|---|---|---|---|
| 4300426 (Westhoff) | 06/01/04 – 12/31/13 | Current | 5 | Oct.-May | 40 | 188 |
| 4300664 (Sorenson) | 1/01/04-12/31/13 | Current | 297 | Oct.-May | 2383 | 186 |
| 4300670 (Griffin) | 01/01/04 – 12/31/13 | Current | 71 | Oct.-May | 567 | 185 |
| | 08/01/00 – 12/31/03 | Expired | 182 | Oct.-May | 1454 | 183 |
| | 03/01/98 – 02/28/08 | Superseded | 91 | Oct.-May | | 182 |
| 4300618 (Griffin) | 01/01/04 – 12/31/13 | Current | 23 | Oct.-May | 184 | 181 |
| | 03/01/96 – 02/28/06 | Superseded | 162 | Oct.-May | 1294 | 180 |

116.    Lake:

| Permittee Number | Date | Status | Cattle | Season of Use | AUMs | A.R. Doc. |
|---|---|---|---|---|---|---|
| 4300426 (Westhoff) | 6/01/04-12/31/13 | Current | 50 | June-Sept. | 201 | 197 |
| 4300670 (Griffin) | 1/01/04-12/31/13 | Current | 170 | June-Sept. | 482 | 195 |
| | 8/01/00-12/31/03 | Expired | 170 | June-Sept. | 682 | 194 |
| | 3/01/98-2/28/08 | Superseded | 85 | June-Sept. | | 193 |
| 4300618 (Griffin and | 1/01/04-12/31/13 | Current | 157 | June-Sept. | 630 | 192 |

| Dee) | | | | | | |
|---|---|---|---|---|---|---|
| | 3/01/96-2/28/06 | Superseded | 157 | June-Sept. | 630 | 191 |

117. Upper Warm Creek:

| Permittee Number | Date | Status | Cattle | Season of Use | AUMs | BLM A.R. Doc. |
|---|---|---|---|---|---|---|
| 4300506 | 01/01/04 – 12/31/13 | Current | 235 | Nov. - May | 1638 | 202 |

118. Lower Warm Creek:

| Permittee Number | Date | Status | Cattle | Season of Use | AUMs | BLM A.R. Doc. |
|---|---|---|---|---|---|---|
| 4300508 | 01/01/04 – 12/31/13 | Current | 40 (5 horses) | Nov. – Mar. | 224 | 209 |
| 4300508 | 08/01/00 – 12/31/03 | Expired | 40 (5 horses) | Nov. – Mar. | 224 | 206 |

119. Nipple Bench:

| Permittee Number | Date | Status | Cattle | Season of Use | AUMs | BLM A.R. Doc. |
|---|---|---|---|---|---|---|
| 4300105 | 01/01/04 – 12/31/13 | Current | 99 | Dec. – Apr. | 491 | 215 |
| | 08/01/00 – 12/31/03 | Expired | 97 | Dec. – Apr. | 482 | 214 |
| 4300315 | 01/01/04 – 12/31/13 | Current | 95 | Dec. – Apr. | 462 | 218 |
| | 08/01/00 – 12/31/03 | Expired | 95 | Dec. – Feb. | 275 | 217 |
| | | Expired | 95 | Mar. – Apr. | 187 | 217 |

120. Rock Creek-Mudholes:

| Permittee Number | Date | Status | Cattle | Season of Use | AUMs | A.R. Doc. |
|---|---|---|---|---|---|---|
| 430037 | 03/01/04 – 04/30/09 | Current | 175 | Mar. – Feb. | 2100 | 223 |
| | 08/01/00 – 12/31/03 | Expired | 221 | Mar. – Feb. | 2652 | 221 |

121. Wiregrass:

| Permittee Number | Date | Status | Cattle | Season of Use | AUMs | BLM A.R. Doc. |
|---|---|---|---|---|---|---|
| 4300508 | 01/01/04 – 12/31/13 | Current | 20 | Nov. – Mar. | 99 | 231 |
| | 08/01/00 – 12/31/03 | Expired | 20 | Nov. – Mar. | 99 | 229 |
| | 08/01/00 – 12/31/03 | Expired | 120 | Nov. – Mar. | 596 | 227 |

### 4.    Arizona Strip Field Office

122.    The Arizona Strip Field Office manages grazing on the Lee's Ferry (Soap Creek),

Ferry Swale, Wahweap, and Bunting Well allotments.  Complaint ¶ 65; Answer ¶ 65.  These

allotments will be referred to collectively as the AZ Strip/Glen Canyon allotments.

123.    The following charts display the grazing permit information for the Arizona

Strip/Glen Canyon allotments.

124. Lee's Ferry (Soap Creek):

| Permittee Number | Date | Status | Cattle | Season of Use | AUMs | BLM A.R. Doc. |
|---|---|---|---|---|---|---|
| 21642 | 08/07/97 – 08/06/07 | Current | 981 | Oct. – Feb. | 4153 | 235 |
| | | Current | 981 | Mar. - May | 2789 | 235 |

125. Ferry Swale:

| Permittee Number | Date | Status | Cattle | Season of Use | AUMs | BLM A.R. Doc. |
|---|---|---|---|---|---|---|
| 21618 | 03/01/02 – 02/28/12 | Current | 353 | Nov. – Feb. | 1212 | 264 |
| | | Current | 353 | Mar. – Apr. | 464 | 264 |
| | 10/07/92 – 10/06/02 | Expired | | Nov. – Feb. | 1314 | 260 |
| | | Expired | | Mar. – Apr. | 504 | 260 |

126.    Wahweap:

| Permittee Number | Date | Status | Cattle | Season of Use | AUMs | BLM A.R. Doc. |
|---|---|---|---|---|---|---|
| 201608 | 09/01/03 – 08/31/13 | Current | 20 (3 horses) | Mar. – Feb. | 276 | 270 |

127.    Bunting Well:

| Permittee Number | Date | Status | Cattle | Season of Use | AUMs | BLM A.R. Doc. |
|---|---|---|---|---|---|---|
| 21548 | 05/01/99 – 04/30/09 | Current | 380 | Mar. – Feb. | 1320 | 275 |
| 200030 | 05/21/02 – 04/30/09 | Current | 380 | Mar. – Feb. | 1322 | 277 |

**B.    BLM's Violation of NEPA by Failing to Consider Site-Specific Impacts.**

128.    There is no final NEPA document in the administrative record where BLM

analyzes grazing impacts on the 24 challenged allotments in light of the Organic Act no

impairment standard.

**1. Henry Mountain Field Station's Failure to Comply with NEPA.**

129.    In May 1983, BLM completed a regional assessment of grazing within the Henry

Mountain Planning Area in the Final Henry Mountain Grazing Environmental Impact Statement

("EIS").  BLM Doc. 279.  BLM intended to implement the grazing program by developing site-

specific Allotment Management Plans ("AMPs") for each allotment within the planning area.  Id.

at 1895.  BLM was to include the "livestock grazing levels and recommended patterns of use" in

the AMPs.  Id.  The EIS states, "[d]etails of the selected alternative(s) will be further refined and

specifically matched to resource conditions during preparation of AMPs."  Id.

130.    After publishing the EIS, BLM never prepared AMPs for any of the Henry Mountain/Glen Canyon allotments.  BLM Doc. 30.  Similarly, since 1983, BLM has not completed NEPA on any of the permit renewals for these allotments.  BLM Doc. 30.

131.    BLM recognized the need to prepare site-specific NEPA on the permit renewals and claims it is working on EAs for Sewing Machine, Rockies, and Waterpocket.  BLM Doc. 30.  BLM completed a draft EA for Rockies and Sewing Machine either in 2000 or sometime prior.  NPS Doc. 80 (EA is undated).  The agency issued another draft for Rockies only in July 2001.  BLM Doc. 26.  The 2000 Rockies and Sewing Machine draft states, "[t]his EA contributes the necessary supplemental site-specific environmental data and analysis that, when tiered to the Henry Mountain Grazing Management EIS, provides sufficient data to make an informed decision regarding the renewal of term grazing permits in the Rockies and Sewing Machine Allotments."  NPS Doc. 80, at 607.  Similarly, in the July 2001 draft for Rockies, BLM indicated the EA "would contribute necessary supplemental site-specific environmental data and analysis that, when tiered to the Henry Mountain Grazing Management EIS, would provide sufficient data to implement current management decisions."  BLM Doc. 26, at 139.  BLM has not finalized either EA.

## 2.    Monticello Field Office's Failure to Comply with NEPA.

132.    In March 1991, BLM completed the "Resource Management Plan, Record of Decision, and Rangeland Program Summary for the San Juan Resource Area, Moab District, Utah."  CD—Exhibit H.  The Rangeland Program Summary ("RPS") addressed grazing on the Monticello/Glen Canyon allotments.  Id. at 46-73.

133.    BLM classified each of the Monticello/Glen Canyon allotments in the "Improve" category.  Id. at 50-56.  BLM classifies allotments in the Improve category when it determines it needs to "improve current unsatisfactory conditions."  NPS Doc. 29, at 285.

134.    The RPS identifies the need to develop or update site-specific Allotment Management Plans ("AMPs") for each of the Monticello/Glen Canyon allotments.  BLM was to "modify or revise and implement" AMPs for the Lake Canyon, Indian Creek, and White Canyon allotments.  Id. at 67 (Table 14), 73 (Decision 11).  In addition, BLM was to "develop and implement" AMPs on the Perkins Brothers, Slickhorn, and Texas-Muley allotments.  Id. at 67 (Table 15), 73 (Decision 12).

135.    The AMPs were to include the site-specific details regarding grazing on these allotments, including the "management objectives, grazing system to be used (such as deferred rotation or rest-rotation, and range improvements to be constructed."  Id. at 46.  BLM recognized it must comply with NEPA when developing the AMPs.  Id. at 20.  BLM stated:  "Compliance with NEPA requires compliance with EA, EIS, or categorical exclusion stipulations; watching for cumulative impacts; mitigation of projected impacts; determining whether RMP stipulations and special conditions are necessary to meet objectives; analyzing impacts to operators; and assessing the resource condition."  Id. at 25 (footnote a).

136.    BLM has not completed or revised AMPs for any of the Monticello/Glen Canyon allotments since it issued the RPS.  See BLM Docs. 66-148 (including all documents for these allotments and no AMPs).  Nor has BLM issued a final NEPA document for any of the Monticello/Glen Canyon allotments since it issued the RPS.  BLM Doc. 82, at 362; see also BLM Docs. 66-148 (including all documents for these allotments and no final NEPA documents).

137.    Although BLM prepared a draft EA for White Canyon, it was never finalized. BLM Doc. 82, at 362.  BLM completed the draft EA on August 21, 2001.  BLM Doc. 98.  The agency published the EA and draft FONSI and invited comments and protests.  BLM Doc. 101, at 469.  BLM indicated it would make a final decision after consideration of any comments or protests.  Id.  On October 24, 2001, Plaintiff Great Old Broads filed a timely protest.  BLM Doc. 104.  The permittees also protested the decision.  BLM Doc. 103.  BLM has not issued a decision on the protests.  Nor has BLM finalized the EA and FONSI.  Yet, BLM renewed the permit in 2005.  BLM Doc. 109.  BLM even increased the AUMs and number of livestock because of a change in allotment boundaries.  Id.

138.    As of October 31, 2005, BLM anticipated that it would not complete NEPA for any of the Monticello/Glen Canyon anytime in the next two to three years.  Id.  BLM indicated when it gets around to complying with NEPA its first priority would be to "finalize the decision for White Canyon and then move on to the Lake Canyon allotment.  Beyond that, we have not established a priority for working on the other allotments."  Id.

**3.    GSENM Office's Failure to Comply with NEPA.**

139.    Prior to the creation of GSENM, the GSENM/Glen Canyon allotments were managed as part of two separate BLM resource areas, the Escalante Resource Area and the Kanab Resource Area.  NPS Doc. 29, at 324-30, 338-43.

140.    In 1981, BLM issued the Escalante Management Framework Plan and the Paria Management Framework Plan, which governed livestock grazing on the GSENM/Glen Canyon allotments.  CD—Exhibits C, G.  They are now more than 20 years old.  BLM concedes these plans are "outdated" and "need alteration to reflect changes in resource conditions, revisions to

grazing regulations, updates and/or amendments to allotment management plans, and the

requirements of legal proceedings and court rulings."  NPS Doc. 153, at 1611.

141.    In November 1999, BLM finalized a GSENM Management Plan.  CD—Exhibit

E.  The Plan became effective in February 2000.  Id. at ii.

142.    The GSENM Management Plan identified a three-step Grazing Management

Process for BLM to follow.  Step one was for BLM to assess conditions on individual allotments

including "rangeland health . . . watershed functioning condition, water quality condition, special

status species, and wildlife habitat conditions."  Id. at 41.  Step two was for BLM to "determine

rangeland health for each allotment according to the [relevant standards under FLPMA]."  Id.

Step three was for BLM to develop AMPs for each allotment to determine the "compatibility of

grazing with other land uses."  Id.  Under the Plan, "AMPs may be developed on an individual

basis, or may be developed for a group of allotments where similar ecosystems or land uses

exist."  Id.

143.    The Management Plan also established a schedule for compliance with the three

step process.  BLM stated the process "and all associated NEPA documents, shall be completed

within the 3 years commencing on the first July 1 following the approval of the Monument

Management Plan," or July 1, 2000.  Id. at 43.

144.    BLM has not completed an updated AMP for any of the GSENM/Glen Canyon

allotments.  See, e.g., BLM Docs. 149, 168, 179, 190, 211, 220, 225.

145.    BLM has not completed updated NEPA documents for the GSENM/ Glen

Canyon allotments either.  BLM started work on a Rangeland Health EIS for GSENM in 2000.

NPS Docs. 101, 102.  The EIS is to analyze the "impacts of renewing grazing permits on 76

allotments managed by the Monument," including those containing lands within Glen Canyon. NPS Doc. 102.

146.    In 2000, BLM issued permits on the Glen Canyon/GSENM allotments for a period of three years rather than ten to give itself time to complete the Rangeland Health EIS. BLM Docs. 175, 183, 194. 206, 214, 217, 221, 229.  To date, BLM has not completed a draft EIS or released it for public comment.  Even though BLM did not comply with NEPA during the three year period, however, the agency renewed each of the permits for ten years when they expired.  BLM Docs. 155, 177, 185, 195, 209, 215, 218, 223, 231.

147.    As discussed above, in 1997, BLM completed an EA and FONSI to modify the grazing permit on the Forty Mile Ridge allotment.  BLM Doc. 173; see supra ¶¶ 67-68.  BLM proposed a substantial reduction in grazing to improve allotment conditions.  BLM Doc. 173, at 953.  Although Plaintiff Great Old Broads protested the decision more than eight years ago, BLM has not resolved the protest or finalized the EA.  NPS Doc. 77.  Nor has BLM reduced grazing on the allotment.  BLM Doc. 177.

**4.    AZ Strip Filed Office's Failure to Comply with NEPA.**

148.    In 1979, BLM completed the Vermillion Proposed Grazing Management Final Environmental Statement, which addressed grazing on the Lee's Ferry (Soap Creek), Ferry Swale, and Wahweap allotments.  CD—Exhibits B, D.  Although it has been more than 25 years, this document has not been updated.

149.    In 1991, BLM completed the Arizona Strip Resource Management Plan and Final Environmental Impact Statement ("RMP").  CD—Exhibit A.  The RMP did not address range management because BLM had previously resolved these issues in the 1979 Vermillion Grazing EIS.  Id. at I-1.

150.    In 1981, BLM completed the Paria Management Framework Plan, which governed livestock grazing on the Bunting Well allotment.  CD—Exhibit G (Table 1).  BLM concedes this plan is "outdated" and "need[s] alteration to reflect changes in resource conditions, revisions to grazing regulations, updates and/or amendments to allotment management plans, and the requirements of legal proceedings and court rulings."  NPS Doc. 153, at 1611.

151.    BLM's Arizona Strip Office has not completed a final site-specific NEPA document for any Glen Canyon allotments.  BLM's Arizona Strip Office completed the Kane Ranch Allotment Management Environmental Assessment in May 2000.  BLM Doc. 242.  The EA includes livestock grazing on the Lee's Ferry allotment, which includes portions of Glen Canyon.  Id.  The Lee's Ferry allotment was later incorporated into the Soap Creek allotment. BLM Doc. 244.  On May 9, 2002, BLM approved the Decision Record and FONSI for the Kane Ranch AMP.  BLM Doc. 247.  The Decision Record states:  "In the absence of a protest, the proposed decision will become the final decision of the authorized officer without further notice."  Id. at 1559.  Plaintiff, the Center for Biological Diversity, filed a protest of the decision on June 3, 2002.  BLM Doc. 250.  The administrative record does not contain a final decision on the protest.

C.    **BLM's Violation of the NHPA.**

152.    BLM has negotiated a Programmatic Agreement with the Advisory Council to govern section 106 compliance for BLM undertakings.  Programmatic Agreement Among the Bureau of Land Management, the Advisory Council on Historic Preservation, and the National Conference of State Historic Preservation Officers Regarding the Manner in which BLM will meet its Responsibilities under the National Historic Preservation Act, (visited Apr. 27, 2006)

<http://www.blm.gov/heritage/docum/finalPA.pdf>.  BLM did not include this document in the administrative record.

153.    The 1997 Programmatic Agreement is implemented through more site-specific state protocols.  Programmatic Agreement § 5(b).  BLM established state protocols for both Utah and Arizona.  BLM did not include the protocols in the administrative record.  Utah's Protocol is available at <http://www.ut.blm.gov/Cultural/Archaeology/Handbook%208120.pdf>. The protocols track the Advisory Council regulations and require inventory, evaluation, and assessment of adverse effects for BLM undertakings, and BLM consultation with the SHPO and Advisory Council under certain circumstances.

154.    With the exception of the Forty Mile Ridge, White Canyon, and Soap Creek allotments, there is no evidence in the administrative record showing BLM has completed section 106 consultation under the NHPA prior to authorizing the most recent grazing permits for the challenged allotments.

155.    In the draft EA for the Forty Mile Ridge allotment, dated June 27, 1997, BLM concluded livestock grazing within the allotment has "no effect" on cultural resources.  BLM Doc. 173, at 954.  There is no evidence that BLM identified cultural resources within the allotment, determined whether they are eligible for the National Register, assessed whether grazing was causing adverse effects, or took any action to mitigate these effects as required by NHPA prior to making this finding.  BLM Doc. 173.  The Park Service provided BLM with comments on the draft EA in September 1999 identifying seven eligible archeological sites with grazing impacts within the allotment.  NPS Doc. 78, at 601.

156.    In the draft EA for White Canyon, BLM does not consider the impacts of the grazing authorized under the ten-year permit on cultural resources within the allotment because

"grazing for the past century is part of the landscape, and therefore, the status quo." BLM Doc.

98, at 405. According to the Park Service:

> On Public Lands, the position taken by BLM is that all grazing impacts have
> taken place in the past and unless some ground disturbing activity such as a fence
> or road is proposed, grazing has no impact on cultural resources. The [Park
> Service] does not accept this rationale, but believes that ongoing damage does
> occur from livestock. The permit renewal process was to be the management tool
> to address loss of cultural resources on recreation area lands. Mitigation of
> livestock impacts by the permittee might include no grazing, fencing cultural
> sites, excavation and data recovery, or having a drover with the cattle to keep
> them out of cultural sites.

NPS Doc. 94, at 1157. There is nothing in the record to explain why BLM believes on-going

grazing is not subject to the NHPA.

157.     In the White Canyon EA, BLM also concluded the grazing permit has "no

effect" on cultural resources. NPS Doc. 173, at 406. BLM stated it would mitigate any future

impacts through application of the BLM and Park Service Programmatic Agreements. Id.

158.     Later in the EA, BLM finds that although much of the White Canyon allotment

within Glen Canyon has not been surveyed, there are 15 documented cultural resources sites.

BLM Doc. 98, at 410. Of these 15 sites, 6 are eligible for the National Register and 8 have not

been analyzed. Id. Of the 6 sites that are eligible, three have "moderate" impacts from grazing,

meaning the impacts "will result in irreparable damage to the integrity of the resource and the

loss of information if action to correct the impact is not taken within five years." Id. at 410-411.

Although BLM identifies "possible" mitigation measures such as fencing, however, the agency

will develop "mitigation plans [only] as data and funding becomes available." Id. at 411.

159.     BLM did not consult with the Advisory Council on the White Canyon EA.

160.     In May 2000, BLM completed the Kane Ranch Allotment Management EA,

which includes analysis of the livestock grazing permit for the Soap Creek allotment managed by

BLM's Arizona Strip Office.  BLM Doc. 242.  The EA does not include any assessment of cultural resource sites within the Soap Creek allotment.  <u>See, e.g.</u>, <u>id.</u> at 1408, 1433.  BLM states it has initiated consultation with the SHPO and will not implement the plan until consultation is complete.  <u>Id.</u> at 1433.  There is no evidence in the record to show this consultation ever occurred.