# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GREAT OLD BROADS FOR WILDERNESS )
and CENTER FOR BIOLOGICAL DIVERSITY, )

    Plaintiffs, )

    v. )        Case No. 1:05cv01433 (ESH)

GALE NORTON, in her official capacity as )
Secretary of the Interior; NATIONAL PARK )
SERVICE; and BUREAU OF LAND )
MANAGEMENT )

    Defendants. )

## FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Federal Defendants, by and through their undersigned counsel, hereby move, pursuant to

Federal Rule of Civil Procedure 56, for summary judgment on all claims in the Plaintiffs' Complaint.

In support thereof, Federal Defendants rely on the Complaint, Federal Defendants' Answer thereto,

the Administrative Record lodged with the Court on January 9, 2006 and supplemented on March

28, 2006, and the Memorandum of Points and Authorities In Support of Federal Defendants' Cross-

Motion for Summary Judgment, filed herewith.

//

//

//

For the reasons stated in the accompanying memorandum, Federal Defendants respectfully request that the Court grant their cross-motion for summary judgment of all the claims raised in Plaintiffs' Complaint.

June 9, 2006                                    Respectfully submitted,

                                                SUE ELLEN WOOLDRIDGE
                                                Assistant Attorney General
                                                Environment and Natural Resources Division

Of Counsel:                                     /s/_____
G. Kevin Jones                                  GUILLERMO A. MONTERO
Intermountain Office of the Solicitor           Trial Attorney
U.S. Department of the Interior                 United States Department of Justice
                                                Environment and Natural Resources Division
                                                Natural Resources Section
                                                P.O. Box 663
                                                Washington, D.C. 20044-0663
                                                (ph)(202) 305-0443/(fax)(202) 305-0274

TABLE OF CONTENTS

PAGE

I.      INTRODUCTION ....................................................... 1

II.     FACTUAL BACKGROUND ................................................ 2

        A.    History of the Glen Canyon National Recreation Area ..................... 2

        B.    1979 Glen Canyon General Management Plan .......................... 3

        C.    The 1999 Grazing Plan ............................................. 3

        D.    BLM's Backlog Elimination Efforts and Renewal of Grazing
              Permits Pursuant to Appropriations Riders ............................. 4

III.    LEGAL BACKGROUND ................................................. 6

        A.    National Environmental Policy Act ................................... 6

        B.    National Historic Preservation Act ................................... 7

        C.    The National Park Service Organic Act ............................... 8

        D.    BLM's Regulation of Grazing in the Glen Canyon NRA ................. 10

IV.     STANDARD OF REVIEW ............................................... 12

        A.    Standard of Review for Granting Summary Judgment ................... 12

        B.    Standard of Review under The Administrative Procedure Act ............. 12

V.      ARGUMENT ........................................................ 14

        A.    Plaintiffs' claim that BLM failed to comply with NEPA, NHPA, and
              the NPS Organic Act prior to renewing  grazing permits is without
              merit because the permits were renewed pursuant to Congressional
              appropriation riders (Counts 1, 2, 3) ............................... 15

              1.    Federal Defendants did not unlawfully withhold compliance
                    with NEPA, the NHPA, or the NPS Organic Act in issuing
                    grazing permits pursuant to the appropriations riders .............. 17

2.  Federal Defendants have not unreasonably delayed in their efforts to fully process the grazing permits that were renewed pursuant to appropriations riders . . . . . . . . . . . . . . . . . . . 23

B.  Plaintiffs' assertions that NPS failed to comply with the substantive requirements of the NPS Organic Act are without merit . . . . . . . . . . . . . . . . . . 26

C.  Plaintiffs' NEPA and NHPA challenges to the EA and FONSI/ decision document corresponding to the NPS' 1999 Grazing Plan are without merit (Count Four) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

1.  The EA and FONSI corresponding to the 1999 Grazing Management Plan were not arbitrary and capricious, and the preparation of an EIS was not required . . . . . . . . . . . . . . . . . . . . . . . 32

a.  No site specific analysis was required . . . . . . . . . . . . . . . . . . . . . 32

b.  NPS was not required to prepare an EIS . . . . . . . . . . . . . . . . . . . 35

2.  NPS complied with section 106 of the NHPA in developing the 1999 Grazing Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

VI.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

TABLE OF AUTHORITIES

FEDERAL CASES                                                                     PAGE

Atlantic States Legal Foundation v. E.P.A., 325 F.3d 281 (D.C. Cir. 2003) . . . . . . . . . . . . . . . 12

Baca v. King, 92 F.3d 1031 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87 (1983) . . . . . . . . . 13

Cabinet Mountains Wilderness v. Peterson, 685 F.2d 678 (D.C.Cir.1982) . . . . . . . . . . . . . . . 35

California v. Block, 690 F.2d 753 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971) . . . . . . . . . . . . . . . . . 13

Clarke v. United States, 915 F.2d 699 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Daingerfield Island Protective Soc'y v. Babbitt, 823 F. Supp. 950 (D.D.C. 1993) . . . . . . . . . . 30

Darby v. Cisneros, 509 U.S. 137 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Davis v. Latschar, 83 F. Supp.2d 1 (D.D.C. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Defunis v. Odegaard, 416 U.S. 312 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Environmental Defense Fund v. Andrus, 596 F.2d 848 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . 33

Friends of Yosemite Valley v. Norton, 348 F.3d 789 (9th Cir.2003) . . . . . . . . . . . . . . . . . . . . 34

Illinois Commerce Com'n v. I.C.C., 848 F.2d 1246 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . 8

Inland Empire Pub. Lands Council v. United States Forest Service, 88 F.3d 754
 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Marsh v. Or. Natural Res. Council, 490 U.S. 360 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Milk Train, Inc. v. Veneman, 310 F.3d 747 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Minn. Public Interest Research Group v. Butz, 541 F.2d 1292 (8th Cir. 1976), cert. denied, 430
U.S. 922 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

FEDERAL CASES                                                          PAGE

Morris County Trust for Historic Preservation v. Pierce, 714 F.2d 271 (3rd Cir. 1983) . . . . . . . . 8

National Ass'n of Home Builders v. U.S. Army Corps of Engineers, 417 F.3d 1272
(D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Nat'l Parks & Conservation Ass'n v. Babbitt, 241 F.3d 722 (9th Cir. 2001) . . . . . . . . . . . . . . 38

Nat'l Trust for Historic Pres. v. Blanck, 938 F.Supp. 908 (D.D.C. 1996) . . . . . . . . . . . . . . . . 12

Norton v. Southern Utah Wilderness Alliance ("SUWA II"), 542 U.S. 55 (2004) . . . . . 13,15,26
                                                                                            27,28,33

Robertson v. Methow Valley Citizens Council, 490 U.S. 332 (1989) . . . . . . . . . . . . . . . . . . . . 6,7

Sierra Club v. Andrus, 487 F.Supp. 443 (D.D.C. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

Sierra Club v. Mainella, No. Civ.A. 04-2012 JDB, 2005 WL 3276264,
(D.D.C. Sept. 1, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Sierra Club v. Peterson, 717 F.2d 1409 (D.C.Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33,35

Southern Utah Wilderness Alliance v. Dabney ("SUWA I"), 222 F.3d 819
(10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Southern Utah Wilderness Alliance v. Norton (SUWA III), 326 F. Supp.2d 102
(D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Town of Stratford, Conn. v. F.A.A., 285 F.3d 84 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . 12

Wilderness Soc'y v. Norton, 434 F.3d 584 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . 27 , 31

United States v. 162.20 Acres, 639 F.2d 299 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . 8

FEDERAL STATUTES AND REGULATIONS

5 U.S.C. § 701(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
5 U.S.C. § 706(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13,16,18
5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
5 U.S.C. §§ 701, 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

FEDERAL STATUTES AND REGULATIONS

PAGE

16 U.S.C. § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,8,30
16 U.S.C. § 1a1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9,30
16 U.S.C. § 1a7(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
16 U.S.C. § 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
16 U.S.C. § 460dd . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
16 U.S.C. § 460dd-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,15
16 U.S.C. § 470 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
16 U.S.C. § 470f . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
16 U.S.C. § 470s . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

28 U.S.C. § 2401(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

40 U.S.C. § 1508.27(b)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

National Environmental Policy Act of 1969 (42 U.S.C. 4321) . . . . . . . . . . . . . . . . . . . . . . . 2, 20
42 U.S.C. § 4332(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

43 U.S.C. § 1701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
43 U.S.C. § 1732(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
43 U.S.C. § 1752 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
43 U.S.C. § 1752(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
43 U.S.C. § 1782(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
43 U.S.C. § 1901 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
43 U.S.C. § 315 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
43 U.S.C. § 1701(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

36 C.F.R. § 800.3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
36 C.F.R. § 800.4(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40
36 C.F.R. § 800.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

40 C.F.R. § 1501.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6,7
40 C.F.R. § 1502.25(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22
40 C.F.R. § 1508.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
40 C.F.R. § 1508.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
40 C.F.R. § 1508.27(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35,38
40 C.F.R. § 1508.27(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
40 C.F.R. § 1508.27(b)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
40 C.F.R. § 1508.27(b)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
40 C.F.R. § 1508.27(b)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

FEDERAL STATUTES AND REGULATIONS

PAGE

43 C.F.R. Part 4100 ........................................................ 11,15

43 C.F.R. § 4100.08 ........................................................ 38

43 C.F.R. § 4110.3 ......................................................... 28

43 C.F.R. Subpart 4130 ..................................................... 15

43 C.F.R. § 4130.2(a) ...................................................... 37

43 C.F.R. § 4130.3 ......................................................... 11

43 C.F.R. § 4130.3-1 ....................................................... 12

43 C.F.R. § 4130.3-2 ....................................................... 12


Pub. L. No. 104-19 § 504 ................................................... 19,20

Pub. L. No. 104-19 § 504(a) ................................................ 24

Pub. L. No. 105-277 § 124 .................................................. 5


Public Law 106-113 ........................................................ 4

Pub. L. No. 106-113 § 123 .................................................. 5,17,20,29

Pub. L. No. 106-291 § 116 .................................................. 5,17,20,29


Pub. L. No. 107-63 §114 .................................................... 5,17,20, 29


Pub. L. No. 108-7 § 328 .................................................... 5,17,20,29

Pub. L. No. 108-108 § 325 .................................................. 5,17,20,29

CONGRESSIONAL RECORD

141 Cong. Rec. S471702 .................................................... 19


145 Cong. Rec. S10676 (daily ed. Sept. 9, 1999) ........................... 5

145 Cong. Rec. S10679 (daily ed. Sept. 9, 1999) ........................... 18, 29

145 Cong. Rec. S.10684 (daily ed. Sept. 9, 1999) .......................... 18

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| GREAT OLD BROADS FOR WILDERNESS and CENTER FOR BIOLOGICAL DIVERSITY, <br><br> Plaintiffs, <br><br> v. <br><br> GALE NORTON, in her official capacity as Secretary of the Interior; NATIONAL PARK SERVICE; and BUREAU OF LAND MANAGEMENT <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Case No. 1:05cv01433 (ESH)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION**

Federal Defendants respectfully submit the following memorandum of points and authorities in support of Defendants' cross-motion for summary judgment and in opposition to the Plaintiffs' motion for summary judgment.

By way of this action, Plaintiffs bring a sweeping and generalized challenge to the U.S. Bureau of Land Management's ("BLM") and U.S. National Park Service's ("NPS") management of the public lands that comprise the Glen Canyon National Recreation Area ("Glen Canyon NRA"). Plaintiffs attempt to challenge the general management of grazing allotments partially contained

within the Glen Canyon NRA by asserting that BLM and NPS have unlawfully withheld or unreasonably delayed in their compliance with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, et seq., the National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470, et seq., and the National Park Service Organic Act ("NPS Organic Act" or "Organic Act"), 16 U.S.C. § 1, et seq. In this respect, their challenges are impermissibly programmatic and must be dismissed for lack of jurisdiction, or in the alternative, interpreted as challenges to BLM's individual permitting actions.

With respect to the individual grazing permits, Plaintiffs' claims fail because the challenged permits were renewed or transferred pursuant to Congressional appropriations riders which expressly allow the Secretary of the Interior, and by delegation the BLM and NPS, to defer compliance with all three environmental statutes at issue in this case. Plaintiffs also claim that the finding of no significant impact/decision document for the 1999 Glen Canyon NRA Grazing Management Plan violated NEPA and the NHPA, but these claims are without merit because NPS duly complied with the requirements of the NHPA prior to issuing the Grazing Management Plan, and because NPS's conclusion that the Plan would not have significant environmental impacts was not arbitrary and capricious. Because Plaintiffs' claims are without merit, summary judgment should be granted in favor of the United States and the Complaint should be dismissed with prejudice.

## II.    FACTUAL BACKGROUND

### A.    History of the Glen Canyon National Recreation Area

In 1972, Congress established the Glen Canyon NRA "to provide for public outdoor recreation use and enjoyment of Lake Powell and lands adjacent thereto . . . and to preserve the scenic, scientific, and historic features contributing to the public enjoyment of the area." NPS No. 21 at 168. The Glen Canyon NRA encompasses Lake Powell on the Colorado River, which was

created by the Glen Canyon Dam in 1964, and exists primarily for the purposes of river regulation, irrigation, flood control, and the generation of hydroelectric power. Id. The Glen Canyon NRA occupies approximately 1,255,000 acres, 95 percent of which is in southeastern Utah with the remainder in northern Arizona. Id.; see also NPS No. 21 at 183.

**B.    1979 Glen Canyon General Management Plan**

The NPS is directed by its Organic Act to develop general management plans for the preservation and use of each park unit. 16 U.S.C. § 1a-7(b). Accordingly, in 1979 the NPS prepared the Glen Canyon General Management Plan ("1979 General Plan"). NPS No. 21. The 1979 General Plan sets out a range of area-wide and specific objectives for the Glen Canyon NRA, as well as proposals for meeting those objectives. NPS No. 21 at 168; Table 1 at 173-174. Of relevance here, the 1979 General Plan recognizes that grazing is the most widespread use of the Glen Canyon NRA's land base, NPS No. 21 at 182, and proposes the development of a planning document that would (1) provide a "[d]etailed description of the condition of the range," and (2) provide "[r]ecommendations for specific range improvement practices and devices, management activities, and maximum grazing intensities compatible with the purpose of the recreation area." Id. at 180.

**C.    The 1999 Grazing Plan**

Consistent with the proposals in the 1979 General Plan, in 1999 the NPS issued the Glen Canyon NRA Grazing Management Plan ("1999 Grazing Plan" or "Grazing Plan") after the preparation of an environmental assessment ("EA") and finding of no significant impact ("FONSI") pursuant to the National Environmental Policy Act ("NEPA"). NPS No. 29. While the assessment, review and approval processes conducted by the Glen Canyon NRA staff were meant to insure that proposed grazing related actions did not conflict with the values and purposes of the Glen Canyon NRA, no established criteria existed to guide these "values and purposes determinations." NPS No.

- 3 -

19 at 112. Accordingly, the 1999 Grazing Plan identifies the processes to be used and the "values and purposes" to be weighed in the assessment of future proposed actions. Id. The Plan identifies and describes the "values" for each of the Glen Canyon NRA's natural resources (vegetation, soils, water quality, wildlife, cultural resources, paleontological and quaternary resources, scenic resources, and recreational resources), sets management goals for each resource, and identifies the objectives that must be maintained in order to ensure that each management goal is met. NPS No. 29 at 287; see also id. at 288-304. These goals and objectives are then used to analyze the potential impacts associated with a proposed action, such as the issuance, transfer or renewal of a grazing permit. NPS No. 29 at 287. Thus, while the 1999 Grazing Plan does not itself authorize grazing in the Glen Canyon NRA, it provides a framework for implementation of the Organic Act's conservation and non-impairment mandates in relation to future authorizations of grazing through permitting.

### D.    BLM's Backlog Elimination Efforts and Renewal of Grazing Permits Pursuant to Appropriations Riders

In 1997, the Interior Board of Land Appeals issued a decision holding that BLM could not rely solely on the environmental impact statements prepared for resource management plans but must instead prepare a site-specific environmental analysis prior to authorizing grazing on any particular allotment. See National Wildlife Federation v. BLM, 140 IBLA 85 (1997). This ruling required the issuance of considerable guidance and policies in 1999 and 2000 for the renewal of grazing permits, and resulted in a backlog of permit renewals in need of processing under NEPA. See BLM No. 307 at 3549. Contributing to this backlog was a "spike" in permit expirations which occurred in 1999 and 2000. BLM No. 307 at 3549. As recognized by Senator Durbin in a floor debate concerning his proposed amendment to the Senate version of the bill ultimately codified as Public Law 106-113, 113 Stat. 1501:

- 4 -

> The BLM typically issues grazing permits for a 10-year period of time. Many of the current grazing permits were issued in the late 1980s and now are starting to expire in large numbers during a 2- or 3- year period. These permits, numbering in the thousands, present the BLM with an unusually large and burdensome short-term renewal workload.

145 Cong. Rec. S10676 (daily ed. Sept. 9, 1999).

In 1998, Congress began legislating a means by which grazing could continue while the BLM addressed the permit renewal backlog described by Senator Durbin and completed the corresponding environmental analysis. BLM No. 307 at 3549. Congress first passed the Omnibus Consolidated and Emergency Supplemental Appropriations Act, which stated in an appropriations rider that any grazing permits expiring during FY 1999 would be renewed for the balance of the fiscal year with the same terms and conditions as contained in the expiring permits. Pub. L. No. 105-277 § 124, 112 Stat. 2681, 2681-261 (1998). From 1999 to 2003, Congress passed legislation containing more expansive appropriations riders, which directed BLM to renew permits that expire, are transferred, or waived in FY 2000 through FY 2008. Congress directed that the terms and conditions contained in these permits continue in effect until the BLM completely processes them in compliance with all applicable laws and regulations. See Consolidated Appropriations Act, 2000, Pub. L. No. 106-113 § 123, 113 Stat. 1501, 1501A-159 (1999); Department of the Interior and Related Agencies Appropriations Act, 2001, Pub. L. No. 106-291 § 116, 114 Stat. 922, 943 (2000); Department of the Interior and Related Agencies Appropriations Act, 2002, Pub. L. No. 107-63 §114, 115 Stat. 414, 438 (2001); Consolidated Appropriations Resolution, 2003, Pub. L. No. 108-7 § 328, 117 Stat. 11, 276 (2003); Department of the Interior and Related Agencies Appropriations Act, 2004, Pub. L. No. 108-108 § 325, 117 Stat. 1241, 1307 (2003).

This annual Congressional action allowed BLM to change its emphasis from processing permits based on administrative expiration dates to addressing resource issues in high priority watersheds and/or high priority allotments. BLM No. 307 at 3550. BLM developed ten-year schedules to direct its preparation of land health assessments on these areas, and updates the schedules annually as needed and provided for in BLM policy. BLM No. 307 at 3550. Of note, "[i]t has been and remains BLM policy that States are to complete land health standards evaluations on at least 10 percent of the livestock grazing lands under their jurisdiction each year until the assessments are complete." Id. By using these land health standards evaluations as a basis for its environmental compliance work, BLM intends to eliminate its backlog of unprocessed grazing permits renewals and transfers by the end of FY 2009. See IM 2003-071: Eliminating Grazing Permit Renewal Backlog, BLM No. 307 at 3550 ("[B]y the end of FY 2009, all carryover grazing permits shall be fully processed using the information from the land health standards evaluations as needed to complete environmental impact analysis.").

## III.    LEGAL BACKGROUND

### A.    National Environmental Policy Act

NEPA serves the dual purpose of, first, informing agency decisionmakers of the significant environmental effects of proposed major federal actions and, second, insuring that relevant information is made available to the public so that they "may also play a role in both the decisionmaking process and the implementation of that decision." See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989). To meet these dual purposes, NEPA requires that an agency prepare a comprehensive Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1501.3. However, not every federal action or proposal requires preparation of an EIS. Where the

- 6 -

environmental impacts of an action are less than "significant," an agency may comply with NEPA through preparation of an environmental assessment ("EA") and a finding of no significant impact ("FONSI"). See 40 C.F.R. §§ 1501.3; 1501.4(c), (e); 1508.9. The Council on Environmental Quality's ("CEQ") regulations implementing NEPA provide guidance as to the nature and content of an EA. See 40 C.F.R. § 1508.9.

NEPA, does not mandate particular results or impose substantive environmental obligations upon federal agencies. See Robertson, 490 U.S. at 350-51; Marsh v. Or. Natural Res. Council, 490 U.S. 360, 371 (1989). "NEPA's goal is satisfied once ... information is properly disclosed; thus, NEPA exists to ensure a process, not to ensure any result." Inland Empire Pub. Lands Council v. United States Forest Service, 88 F.3d 754, 758 (9th Cir. 1996) (emphasis in original); see also Minn. Public Interest Research Group v. Butz, 541 F.2d 1292, 1300 (8th Cir. 1976) ("The purpose of NEPA is not to require an objection free document, but rather to give Congress, the responsible agencies, and the public a useful decision-making tool."), cert. denied, 430 U.S. 922 (1977).

### B.    National Historic Preservation Act

The NHPA is designed to identify potential conflicts between historic preservation and the needs of federal undertakings, and to provide a mechanism for resolving such conflicts in the public interest. Section 106 of the NHPA states that a federal agency "shall, prior to . . . the issuance of any license, . . . take into account the effect of the undertaking on any district, site, building, structure, or object that is included or eligible for inclusion in the National Register" of Historic Places. 16 U.S.C. § 470f. Pursuant to statutory authority, see 16 U.S.C. § 470s, the Advisory Council on Historic Preservation ("ACHP") has promulgated regulations to implement the broad procedural obligations imposed by Section 106 on federal agencies. Federal agencies are required by these implementing regulations to determine whether the proposed federal action is an "undertaking" (such

as to trigger the procedural requirements of the NHPA), 36 C.F.R. § 800.3(a), determine and document the undertaking's "area of potential effects," id. § 800.4(a)(1), "take the steps necessary to identify historic properties within the area of potential effects," id. § 800.4(b), and determine whether the identified properties are eligible for inclusion in the National Register of Historic Places, id. § 800.4(c). Assuming eligible historic properties are located within the undertaking's area of potential effects, the ACHP regulations set out procedures that agencies must follow to assess and attempt to resolve potential adverse effects. Id. §§ 800.5 – 800.7.

Like NEPA, the NHPA is strictly a procedural statute, requiring that agencies "stop, look and listen" before proceeding with an action. See Illinois Commerce Com'n v. I.C.C., 848 F.2d 1246, 1260-61 (D.C. Cir. 1988). The NHPA confers no substantive rights and does not under any circumstances dictate a particular outcome. Morris County Trust for Historic Preservation v. Pierce, 714 F.2d 271, 278 (3rd Cir. 1983); United States v. 162.20 Acres, 639 F.2d 299, 302 (5th Cir. 1981).

### C.    The National Park Service Organic Act

The Organic Act for the NPS provides that the Service is to "regulate the use" of national parks in such a way as to conform to the "fundamental purpose" of the parks. This fundamental purpose is defined in the Act as follows:

> [T]o conserve the scenery and natural historic objects and the wildlife therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

16 U.S.C. § 1 (emphasis added).[1/] While the Organic Act directs the NPS to regulate the parks

---

[1/]    In addition to the "non-impairment" standard, the Organic Act prohibits the NPS from authorizing activities that "derogate" park values. The non-derogation mandate is set out in the Organic Act as follows:

(continued...)

pursuant to this broad "non-impairment" standard, it is silent as to the specifics of park management. See Southern Utah Wilderness Alliance v. Dabney ("SUWA I"), 222 F.3d 819, 826 (10th Cir. 2000) ("It is unclear from the statute itself what constitutes impairment, and how both the duration and severity of the impairment are to be evaluated or weighed against the other value or public use of the park."). The Organic Act instead explicitly delegates to the NPS the authority to determine which actions best achieve the Organic Act's mandate. 16 U.S.C. § 3 (granting the NPS authority to make such rules as it deems "necessary or proper for the use and management of the parks"). Regulations promulgated under this authority are found in Title 36 of the Code of Federal Regulations. In addition to these regulations, the NPS uses a three-level "Directives System" to "provide NPS management and staff with clear and continuously updated information on NPS policy." NPS No. 155 at 1850-51 (Management Policies 2001 at 6). The first level of this Directives System, the "Management Policies," is a Service-wide policy document that is updated approximately every ten years. The second level is comprised of "Director's Orders" that supplement or amend the current Management Policies. The third level in the Directives System consists of handbooks and manuals issued by associate directors. Id.

The NPS has interpreted the non-impairment standard in the two most recent versions of its

---

[1]/(...continued)

> The authorization of activities shall be construed and the protection, management, and administration of these areas shall be conducted in light of the high public value and integrity of the National Park System and shall not be exercised in derogation of the values and purposes for which these areas have been established, except as may have been or shall be directly and specifically provided by Congress.

16 U.S.C. § 1a-1 (emphasis added). As is evident from the legislative history for the amendment that added the "derogation" standard to the NPS Organic Act, however, the derogation and impairment terms "define a single standard for the management of the national park system – not two separate standards." See NPS Management Policies 2001 § 1.4.2; NPS No. 155 at 1855.

Management Policies. The first, Management Policies 1988, makes clear that the question of whether any particular impact to park resources constitutes "impairment" is a determination to be made by NPS management:

> The word "unimpaired" plays an important role in the conservation of resources and providing for present-day enjoyment. Both physical resources, such as wildlife and geologic features, and intangible values, such as scenic vistas and solitude, may be impaired. Over the years, legislative and administrative actions have been taken that have brought some measure of change to these components of our national parks. <u>Such actions impact park resources, yet they are not necessarily deemed to have impaired resources for the enjoyment of future generations. Whether an individual action is or is not an "impairment" is a management determination.</u>

NPS No. 158 at 2249 (NPS Management Policies 1988 § 1:3) (emphasis added). In 2001, the NPS replaced Management Policies 1988 with new policies that inform and direct the management of park resources under the NPS Organic Act. Section 1.4 of Management Policies 2001, however, once again makes clear that impairment determinations are the province of the appointed NPS manager:

> The impairment that is prohibited by the Organic act . . . is an impact that, <u>in the professional judgment of the responsible NPS manager,</u> would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values.

NPS No. 155 at 1855 (NPS Management Policies 2001 § 1.4.5) (emphasis added).

### D.    BLM's Regulation of Grazing in the Glen Canyon NRA

The Glen Canyon NRA Enabling Act authorizes grazing within the Glen Canyon NRA and provides that mineral and grazing leases within the recreation area shall be administered by the BLM subject to the basic recreational objectives of the area. 16 U.S.C. § 460dd, <u>et seq.</u> The relevant provision states:

> The administration of mineral and grazing leases within the recreation
> area shall be by the Bureau of Land Management. The same policies
> followed by the Bureau of Land Management in issuing and
> administering mineral and grazing leases on other lands under its
> jurisdiction shall be followed in regard to the lands within the
> boundaries of the recreation area, subject to the provisions of sections
> 460dd-2(a) and 460dd-3 of this title.

16 U.S.C. § 460dd-5. Thus, the Secretary, and by delegation the BLM, is required to administer,

protect, and develop the Glen Canyon NRA in accordance with the BLM's grazing management

policies as well as the broad mandates of the NPS Organic Act. See id. § 460dd-3 (stating that "[t]he

Secretary shall administer, protect, and develop the recreation area in accordance with the provisions

of" the NPS Organic Act).

    The BLM's management of grazing on the public rangelands is guided and constrained

primarily by the Taylor Grazing Act of 1934 ("TGA"), 43 U.S.C. § 315, et seq., the Federal Land

Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. § 1701, et seq., the Public Rangelands

Improvement Act of 1978 ("PRIA"), 43 U.S.C. § 1901, et seq., and the regulations promulgated

thereunder, which are codified at 43 C.F.R. Part 4100. See NPS No. 29 at 284. Of relevance to this

matter, FLPMA provides for regulation of grazing permits and gives the Secretary of the Interior

broad discretion to modify the number of livestock grazing, set limits on seasonal use of grazing

lands, and impose other permit terms and conditions as the Secretary deems appropriate. 43 U.S.C.

§ 1752. In managing the public lands, BLM "shall, by regulation or otherwise, take any action

necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b).

    BLM administers all of the grazing allotments in the Glen Canyon NRA through the

preparation of land use plans ("LUPs") and the issuance of livestock grazing permits. NPS No. 19

at 111; 43 C.F.R. § 4130.2(a). BLM determines in LUPs whether lands under its management are

available for grazing, see 43 C.F.R. § 4130.2(a), and authorizes grazing on those lands by issuing

grazing permits. These permits contain terms and conditions to achieve BLM's management and resource condition objectives for the public lands. 43 C.F.R. § 4130.3. Mandatory terms and conditions include the number and kind of livestock allowed, the period of use, the allotments to be used, and the amount of use permitted. 43 C.F.R. § 4130.3-1. Except where prohibited by the appropriation riders, the BLM may also apply supplemental terms and conditions to grazing permits to assist in achieving management objectives, such as the ones set out in the 1999 Grazing Plan. 43 C.F.R. § 4130.3-2; see also NPS No. 29 at 287-88. All permits and leases are subject to cancellation, suspension, or modification for any violation of the regulations or the term or condition of a permit or lease. Id.

## IV.   STANDARD OF REVIEW

### A.   Standard of Review for Granting Summary Judgment

Summary judgment is appropriate where there are no genuine issues of material fact. Fed. R. Civ. P. 56(c). In Administrative Procedure Act (APA) actions, the Court reviews the agency's administrative record, and may not "find" underlying facts. The only issues presented are issues of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also National Ass'n of Home Builders v. U.S. Army Corps of Engineers, 417 F.3d 1272, 1282 (D.C. Cir. 2005) ("'[C]laims that an agency's action is arbitrary and capricious or contrary to law present purely legal issues.'") (quoting Atlantic States Legal Foundation v. E.P.A., 325 F.3d 281, 284 (D.C. Cir. 2003)).

### B.   Standard of Review under The Administrative Procedure Act

Challenges to agency actions taken pursuant to NEPA, the NPS Organic Act, and NHPA are subject to the review provisions of the Administrative Procedure Act. See Town of Stratford, Conn. v. F.A.A., 285 F.3d 84, 88 (D.C. Cir. 2002) (NEPA); Nat'l Trust for Historic Pres. v. Blanck, 938 F.Supp. 908, 915 (D.D.C. 1996) (NHPA); Sierra Club v. Mainella, No. Civ.A. 04-2012 JDB, 2005

WL 3276264, at *8 n.6 (D.D.C. Sept. 1, 2005) (Organic Act). The APA allows review of "agency action," dictating the type of agency action that is judicially reviewable, when agency action is judicially reviewable, the scope of review permitted, and the standard to be applied by a reviewing court. 5 U.S.C. §§ 701-706; Darby v. Cisneros, 509 U.S. 137, 146 (1993). In evaluating the legal sufficiency of informal agency actions, the Court must apply the "arbitrary and capricious" standard of the APA, 5 U.S.C. § 706(2)(A). This standard is a narrow one whereby "[t]he court is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L. Ed. 2d 36 (1971). Rather, a court's role is to decide whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Id.; see also Marsh, 490 U.S. at 378; Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L. Ed. 2d 437 (1983). Deference to a federal agency's decision is especially appropriate when courts review the agency's technical analysis and judgments involving the evaluation of complex scientific data within the agency's technical expertise. See Marsh, 490 U.S. at 377.

The APA also waives sovereign immunity to allow parties to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Pursuant to this provision, federal courts have authority to require a federal agency to take certain actions that the agency has failed to take. The action that the federal agency allegedly failed to take, however, must be based on a mandatory, well-defined nondiscretionary duty, and the action to be compelled must be a discrete agency action that would be subject to judicial review as a "final agency action" under the APA's arbitrary and capricious standard once taken. Norton v. Southern Utah Wilderness Alliance ("SUWA II"), 542 U.S. 55, 63-64 (2004).

## V.    ARGUMENT

By way of this action, Plaintiffs bring a sweeping and generalized challenge to the U.S. Bureau of Land Management's ("BLM") and U.S. National Park Service's ("NPS") management of public lands that comprise the Glen Canyon National Recreation Area ("Glen Canyon NRA"). Plaintiffs invoke two sections of the APA in support of their claims. First, Plaintiffs invoke section 706(1) of the APA as the basis for their claims that: (1) BLM unlawfully withheld or unreasonably delayed its preparation of EAs or EISs concerning the grant or renewal of grazing permits in the Glen Canyon NRA; (2) BLM unlawfully withheld or unreasonably delayed its compliance with the NHPA concerning the grant or renewal of grazing permits in the Glen Canyon NRA; and (3) NPS unlawfully withheld or unreasonably delayed a determination of whether the renewal or transfer of grazing permits will impair the resources of the Glen Canyon NRA. Compl. at ¶¶ 108-111 (2nd Claim for Relief), 112-117 (3rd Claim for Relief), 100-107 (1st Claim for Relief). Second, Plaintiffs rely upon section 706(2) of the APA for their claim that the EA and FONSI/decision document for the 1999 Grazing Plan violated NEPA and the NHPA. Compl. ¶¶ 112-121 (3rd and 4th Claims for Relief). As Federal Defendants establish below, the Plaintiffs' 706(1) claims fail because the challenged grazing permits were issued pursuant to Congressional appropriation riders which expressly allowed the Secretary, and by delegation the BLM and NPS, to defer compliance with all three environmental statutes at issue in this case. Further, Plaintiffs' 706(2) claims concerning the 1999 Grazing Plan EA and corresponding FONSI/decision document are without merit because NPS duly complied with the requirements of the NHPA and because NPS's conclusion in the FONSI, that the 1999 Grazing Plan would not have significant environmental impacts, was not arbitrary or capricious.

**A.**    **Plaintiffs' claim that BLM failed to comply with NEPA, NHPA, and the NPS Organic Act prior to renewing grazing permits is without merit because the permits were renewed pursuant to Congressional appropriation riders (Counts 1, 2, 3).**

The Plaintiffs' main argument in this case is that the NPS and BLM are "authorizing" grazing in the Glen Canyon NRA without first complying with the procedural requirements imposed by NEPA, the NHPA, and the NPS Organic Act. As noted above, the Secretary of the Interior authorizes grazing in the Glen Canyon NRA pursuant to the BLM's grazing policies as set out in the TGA, FLPMA, PRIA, and the regulations promulgated thereunder, which are codified in 43 C.F.R. Part 4100. See 16 U.S.C. § 460dd-5. These statutes and regulations direct BLM to administer grazing through the issuance and renewal of term grazing permits. See 43 U.S.C. § 1752(a), (c); 43 C.F.R. Subpart 4130; see also NPS No. 29 at 284 ("The BLM's primary instrument for authorizing use is a Grazing Permit.").

Accordingly, Plaintiffs' challenges to the Secretary's authorization of grazing in the Glen Canyon NRA must be construed as a challenge to BLM's permitting actions within the recreation area, and not on any generalized grievances that the Plaintiffs may have expressed concerning the manner in which these allotments have historically been managed. Thus, the first three claims for relief do not concern the issuance of the 1999 Grazing Plan or the 1979 Glen Canyon General Management Plan, because neither of those Plans "authorizes" grazing within the Glen Canyon NRA. Nor do these claims challenge the general "management" of grazing in any particular allotment, because that would constitute an improper programmatic challenge. See SUWA II, 542 U.S. 55, 64 (2004). As the Supreme Court has made clear, the Plaintiffs may not seek wholesale improvement of a program by court decree rather than in the offices of the Department or the halls of Congress, and in any case this Court lacks jurisdiction to hear such a challenge because the United

States has only waived its sovereign immunity with respect to lawsuits directed at discrete and final agency actions within the meaning of the APA. Id. Finally, Plaintiffs may not seek judicial review of permits that are expired or otherwise moot because this Court's jurisdiction is limited to the review of agency actions that present an active case or controversy within the meaning of Article III.[2/]

Accordingly, Federal Defendants will only address Plaintiffs' arguments insofar as they concern grazing permits that are currently active, i.e., that have not been mooted by expiration or by a subsequent renewal action. [3/]

With respect to these permits, the Plaintiffs' claims that NPS and BLM failed to comply with NEPA, the NHPA, and the NPS Organic Act are without merit because each of the permits were issued pursuant to an appropriations rider in which Congress directed the Secretary of the Interior to renew grazing permits regardless of whether the permit applications had been fully processed. As explained below, these riders provide an unqualified defense against the Plaintiffs' claims that

---

[2/] Under Article III of the Constitution, federal courts may only decide an actual "case or controversy." See, e.g., Defunis v. Odegaard, 416 U.S. 312, 319 (1974). "Even where litigation poses a live controversy when filed, the doctrine requires a federal court to refrain from deciding it if 'events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.'" Clarke v. United States, 915 F.2d 699, 701 (D.C. Cir. 1990) (quoting Transwestern Pipeline Co. v. FERC, 897 F.2d 570, 575 (D.C. Cir. 1990)).

[3/] The administrative record in this case lists a total of 107 grazing permits in the form of permit renewals or transfers. Of these, only 42 are currently active and justiciable (represented herein by document number in the administrative record): BLM Nos. 13, 14, 15, 34, 35, 42, 51, 52, 53, 60, 63, 64, 83, 109, 119, 126, 137, 138, 147, 155, 162, 165, 166(c), 177, 181, 185, 186, 188, 192, 195, 197, 202, 209, 215, 218, 223(b), 231, 244, 264, 270, 277, and 338. The permit identified in the BLM record as document number 39 is not justiciable because it was issued more than six years prior to the filing of the Complaint in this case and is therefore time-barred. See 28 U.S.C. § 2401(a). The remaining permits are not justiciable because they have been mooted by expiration or by a subsequent renewal action or transfer: BLM Nos. 1, 2, 3, 10, 18, 19, 20, 21, 22, 33, 37, 38, 40, 41, 55, 56, 58, 62, 66, 76, 77, 85, 89, 110, 117, 120, 128, 135, 139, 144, 150, 151, 153, 158, 159, 160, 163, 166(a), 174, 175, 180, 182, 183, 191, 193, 194, 200, 206, 207, 214, 217, 223, 227, 229, 235, 241, 258, 260, 261, 268, 275, 337, 339, and 340.

the NPS and BLM have "unlawfully withheld" their compliance with the above-mentioned environmental statutes, see 5 U.S.C. § 706(1). These riders also defeat Plaintiffs' arguments that NPS and BLM have "unreasonably delayed" in their compliance with the above-mentioned statutes, see id.

      1.     **Federal Defendants did not unlawfully withhold compliance with NEPA, the NHPA, or the NPS Organic Act in issuing grazing permits pursuant to the appropriations riders**

Plaintiffs' claims, that NPS and BLM unlawfully withheld compliance with NEPA, the NHPA, and the NPS Organic Act when renewing the challenged permits, is without merit because each of the challenged permits were issued under an appropriations rider which (1) mandated that the permits be renewed with the same terms and conditions as the expiring permit and (2) authorized the Secretary of the Interior to defer compliance with all three environmental statutes.

Section 123 of Public Law 106-113 states that "a grazing permit or lease that expires (or is transferred) during fiscal year 2000 shall be renewed under section 402 of the Federal Land Policy and Management Act of 1976 (FLPMA), as amended . . . ." See Pub. L. No. 106-113 § 123, 113 Stat. 1501, 1501A-159 (1999). This section also states that "the terms and conditions contained in expiring permits shall continue in effect under the new permit or lease until such time as the Secretary of the Interior completes processing of such permit or lease in compliance with all applicable laws and regulations. . . ." Id. Identical provisions appear in appropriations riders concerning fiscal years 2001 and 2002, and a virtually identical provision appears in appropriation riders concerning fiscal years 2003 through 2008 – the only difference is that riders concerning fiscal years 2003 through 2008 apply to permits that have been "waived" in addition to applying to permits that expire or are transferred. See Pub. L. No. 106-291 § 116, 114 Stat. 922, 943 (concerning FY 2001); Pub. L. No. 107-63 §114, 115 Stat. 414, 438 (concerning FY 2002); Pub. L. No. 108-7 § 328,

117 Stat. 11, 276 (concerning FY 2003); Pub. L. No. 108-108 § 325, 117 Stat. 1241, 1307 (concerning FY 2004 - FY 2008). Accordingly, with respect to any grazing permits renewed or transferred in fiscal years 2000 through 2002, and renewed, transferred or waived in fiscal years 2003 through 2008, Congress instructed the Secretary of the Interior to issue the permits despite the Secretary's inability to fully process the permit applications as otherwise required by the relevant environmental statutes. See, e.g., 145 Cong. Rec. S10679 (daily ed. Sept. 9, 1999) ("[The rider] addresses [the backlog] problem by allowing the BLM more time to complete the renewal process . . . .").

Plaintiffs concede that these appropriations riders authorize the Secretary of the Interior to issue grazing permits without first meeting the procedural requirements of NEPA. Plaintiffs merely point out that the Secretary must comply with NEPA eventually, and complain that this compliance has been unreasonably delayed. GOB Br. at 28. These arguments are addressed in Section IV.A.2, infra. Plaintiffs, however, apparently dispute that the appropriations riders apply to any environmental statutes other than NEPA. Plaintiffs argue that NPS is required by its Organic Act to make an impairment determination, and that both NPS and BLM are required by the NHPA to meet certain procedural requirements before renewing or transferring grazing permits, notwithstanding the riders. GOB Br. at 10, 41. In their theory of the case, NPS's and BLM's failure to do these things before renewing or transferring a permit constitutes action "unlawfully withheld" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(1). This argument is without merit.

As discussed in Section II.D, supra, a "spike" in permit expirations occurred in 1999 and 2000, presenting the BLM with an unusually large and burdensome renewal workload. See BLM No 307 at 3549. Congress, concerned that BLM was unable to process these permits renewals in

- 18 -

a timely manner, issued a series of appropriation riders to ensure that (1) BLM was afforded more time to complete the renewal process, and (2) no unwarranted hardship was imposed on ranchers or farmers that utilize the public lands. See 145 Cong. Rec. S.10684 (daily ed. Sept. 9, 1999).

The same desire to prevent ranchers from suffering due to an agency's inability to complete environmental analysis on permitting actions is evident in the legislative history of the Rescissions Act of 1995. See Emergency Supplemental Appropriations for Additional Disaster Assistance, for Anti-Terrorism Initiatives, for Assistance in the Recovery From the Tragedy That Occurred at Oklahoma City, and Rescissions Act 1995 ("Rescissions Act"), Pub. L. No. 104-19 § 504, 109 Stat. 194 (1995). In the Rescissions Act, Congress recognized that term grazing permits on a vast number of allotments on National Forest lands had not been analyzed pursuant to NEPA, and that the U.S. Forest Service ("USFS") did not have the resources to conduct the appropriate NEPA and other analysis before existing permits expired. In introducing a bill similar to the bill that became the Rescissions Act, Senator Daschle stated that "[p]enalizing ranchers for a failure of the Federal Government to perform the necessary NEPA analysis is neither fair nor defensible." 141 Cong. Rec. S4717-02, S4724 (daily ed. March 28, 1995). To address these concerns, Congress passed Section 504 of the Rescissions Act, which in relevant part states that the USFS must reissue a term livestock grazing permit under the same terms and conditions as the expiring permit if the USFS is unable to complete the necessary NEPA analysis prior to the expiration of the permit. Pub. L. No. 104-19 § 504, 109 Stat. 194, 212.

As with the Rescissions Act, Congress' intent with respect to the aforementioned appropriation riders was to provide relief to ranchers who depended on the public lands for their livelihood. Unlike the Rescissions Act, however, which by its own terms suspended only the

- 19 -

Department's obligations under NEPA,[4] the appropriations riders concerning fiscal years 2000

through 2008 suspend "all applicable laws and regulations," including the NHPA and NPS Organic

Act. See Pub. L. No. 106-113 § 123, 113 Stat. 1501, 1501A-159; Pub. L. No. 106-291 § 116, 114

Stat. 922, 943; Pub. L. No. 107-63 §114, 115 Stat. 414, 438; Pub. L. No. 108-7 § 328, 117 Stat. 11,

276; Pub. L. No. 108-108 § 325, 117 Stat. 1241, 1308. The appropriations riders do not draw any

distinctions between NEPA, on the one hand, and the NPS Organic Act or NHPA on the other, nor

do Plaintiffs offer any explanation for why they believe the riders apply exclusively to NEPA.

Indeed, Congress had good reason to apply the appropriations riders to all three

environmental statutes, because BLM's preparation of environmental documents pursuant to NEPA

---

[4] Section 504 of the Rescissions Act specifically provides:

> (a) SCHEDULE FOR NEPA COMPLIANCE - Each National Forest System unit shall establish and adhere to a schedule for the completion of National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) analysis and decisions on all allotments with the National Forest System unit for which NEPA analysis is needed. The schedule shall provide that not more than 20 percent of the allotments shall undergo NEPA analysis and decisions through fiscal year 1996.

> (b) REISSUANCE PENDING NEPA COMPLIANCE –Notwithstanding any other law, term grazing permits which expire or are waived before the NEPA analysis and decision pursuant to the schedule developed by individual Forest Service system units, shall be issued on the same terms and conditions and for the full term of the expired or waived permit. Upon completion of the scheduled NEPA analysis and decision for the allotment, the terms and conditions of existing grazing permits may be modified or re-issued, if necessary to conform to such NEPA analysis.

> (c) EXPIRED PERMITS –This section shall only apply if a new term grazing permit has not been issued to replace an expired or waived term grazing permit solely because the analysis required by NEPA and other applicable laws has not been completed and also shall include permits that expired or were waived in 1994 and 1995 before the date of enactment of this Act.

Pub. L. No. 104-19 § 504, 109 Stat. 194, 212 (1995).

forms an integral part of the two agencies' NHPA and NPS Organic Act compliance procedures. The timing of NPS's impairment determinations is set out by the 2001 Management Policies, as well as by Director's Order No. 12 (Jan. 8, 2001). The 2001 Management Policies state that, "[b]efore approving a proposed action that could lead to an impairment of park resources and values, an NPS decision-maker must consider the impacts of the proposed action and determine, in writing, that the activity will not lead to an impairment of park resources and values." NPS No. 155 at 1856 (Management Policies 2001 § 1.4.7). In this case, the only "proposed actions that could lead to an impairment of park resources and values" are the BLM's issuance, renewal, or transfer of grazing permits, because those are the only agency actions that authorize grazing within the Glen Canyon NRA. Accordingly, the 2001 Management Policies direct NPS to prepare impairment determinations prior to, and in association with, each of BLM's permitting actions.

Director's Order No. 12 and the accompanying Handbook, which set forth the policy and procedures by which the NPS carries out its responsibilities under NEPA, clarifies that "impairment" determinations should be included in the FONSI (in cases where an EA has been prepared) or in the Record of Decision ("ROD") (in cases where an EIS has been prepared). See NPS Director's Order 12 Handbook at 79, 81 (hereinafter DO-12 Handbook), available at http://www.nps.gov/policy/DOrders/RM12.pdf. After a review of the impacts and the analysis presented in the EA or EIS (in this case, BLM's EA or EIS), and summarized in the FONSI or ROD (in this case, the BLM's FONSI or ROD), the NPS decisionmaker must indicate in the corresponding decision document that the alternative selected for implementation will not impair park resources or values. Id. In this sense, NPS's impairment determination is intertwined with BLM's preparation of NEPA documents for grazing permits. That is, in making management decisions concerning Glen Canyon NRA resources, NPS relies in part on the information and analysis produced by BLM

- 21 -

through its NEPA process. DO-12 Handbook at 4.

Similarly with respect to the NHPA, both the CEQ and ACHP have directed that NHPA compliance is to be coordinated with NEPA compliance. See 40 C.F.R. § 1502.25(a) ("To the fullest extent possible, agencies shall prepare draft environmental impact statements concurrently with and integrated with impacts analysis and related surveys and studies required by . . . the National Historic Preservation Act of 1966 . . . ."); 36 C.F.R. § 800.8 ("Federal agencies are encouraged to coordinate compliance with section 106 and the procedures in this part with any steps taken to meet the requirements of the National Environmental Policy Act."). Aside from its obvious conflict with the plain language of the appropriations riders, therefore, Plaintiffs' overly constrictive reading of the riders must be rejected because it simply would not make sense for Congress to suspend obligations under NEPA but not the NPS Organic Act or the NHPA given that the agencies' duties under the three statutes are tightly coordinated.

In this case, the permits identified as "currently active and justiciable" in footnote 3, supra were all issued in fiscal years 2000 through 2006.[5] Accordingly, the Secretary of the Interior was authorized (indeed required) by the appropriations riders to issue these permits despite the agencies' inability to fully process the permits in compliance with NEPA, the NHPA, and the NPS Organic

---

[5] The permits indicated at BLM Nos. 162, 244, and 338 pertain to FY 2000 and were renewed or transferred pursuant to the appropriations rider set out in Section 123 of Public Law 106-113. The permit indicated at BLM Nos. 14 pertains to FY 2001 and was renewed pursuant to Section 116 of Public Law 106-291. The permits indicated at BLM Nos. 42, 83, 126, 147, 264, and 277 pertain to FY 2002 and were renewed or transferred pursuant to Section 114 of Public Law 107-63. The permits indicated at BLM Nos. 63, 64, 165, and 270 pertain to FY 2003 and were renewed or transferred pursuant to Section 328 of Public Law 108-07. Finally, the permits indicated at BLM Nos. 13, 15, 34, 35, 51, 52, 53, 60, 109, 119, 137, 138, 155, 166(c), 177, 181, 185, 186, 188, 192, 195, 197, 202, 209, 215, 218, 223(b), and 231 pertain to fiscal years 2004 through 2006, and were renewed, transferred or waived pursuant to the appropriations rider set out in Section 325 of Public Law 108-108.

Act. Plaintiffs' claims that the NPS and BLM unlawfully withheld compliance with these three

statutes prior to authorizing grazing in the Glen Canyon NRA are therefore without merit and must

be denied.

> **2.    Federal Defendants have not unreasonably delayed in their efforts to fully process the grazing permits that were renewed pursuant to appropriations riders**

Plaintiffs' argument that the BLM and NPS have "unreasonably delayed" in complying with

the three environmental statutes with respect to permits renewed or transferred in FY 2000 through

FY 2006 is also without merit for a number of reasons. First, Congress has explicitly committed the

scheduling of the environmental analysis of grazing allotments to the "sole discretion" of the

Secretary of Interior. As explained in Section 325 of Public Law No. 108-108:

> [N]otwithstanding section 504 of the Rescissions Act (109 Stat. 212),
> the Secretaries in their sole discretion determine the priority and
> timing for completing required environmental analysis of grazing
> allotments based on the environmental significance of the allotments
> and funding available to the Secretaries for this purpose.

Pub. L. No. 108-108, 117 Stat. 1241, 1308 (2003) (emphasis added). By its own terms, the APA

does not confer jurisdiction to review agency actions that are "committed to agency discretion by

law." 5 U.S.C. § 701(a)(2). Although section 701(a)(2) is to be interpreted narrowly, there can be

no doubt that by committing the timing of analysis to the "sole discretion" of the agency Congress

has placed those actions within the 701(a)(2) exception to judicial review. See Milk Train, Inc. v.

Veneman, 310 F.3d 747, 751 (D.C. Cir. 2002) (holding that the district court lacked jurisdiction to

review plaintiffs' challenge to the implementation of a subsidy program because Congress has left

to the Secretary's sole judgment the determination of the manner for providing assistance to dairy

farmers). Thus, by explicitly committing the scheduling of this environmental analysis to the sole

discretion of the BLM and NPS, Congress has divested the federal courts of jurisdiction to grant the

remedy Plaintiffs seek, i.e., an enforceable schedule for NEPA, NHPA, and Organic Act compliance.

See GOB Br. at 28.

Moreover, Congress has taken an active role in monitoring the speed with which NPS and

BLM process the permits renewed or transferred under the appropriations riders. Section 325 of

Public Law 108-108 states that:

> [B]eginning in November 2004, and every year thereafter, the
> Secretaries of the Interior and Agriculture shall report to Congress the
> extent to which they are completing analysis required under
> applicable laws prior to the expiration of grazing permits, and
> beginning in May 2004, and every two years thereafter, the
> Secretaries shall provide Congress recommendations for legislative
> provisions necessary to ensure all permit renewals are completed in
> a timely manner.

Pub. L. No. 108-108, 117 Stat. 1241, 1308 (2003). Section 325 evidences a strong intent on the part

of Congress to undertake direct oversight of the Department of the Interior's completion of

environmental analysis on grazing permits. It is up to Congress, therefore, and not the Plaintiffs or

this Court, to determine whether the Secretary of the Interior has unreasonably delayed in fully

processing backlogged permits pursuant to the three statutes. Congress is fully capable of overseeing

the manner in which the Secretary exercises her discretion, and Congress may determine for itself

whether circumstances require that it issue another rider, appropriate more funds to assist the

agencies in their compliance efforts, or set a schedule for compliance as occurred in the Rescissions

Act of 1995.[9]  At least in this case, therefore, Plaintiffs err in their assertion that "it is up to the

courts to determine when the delay becomes unreasonable under the Administrative Procedure Act."

---

[9] The Rescissions Act temporarily deferred the Forest Service's NEPA compliance obligations
but also directed each National Forest to establish and "adhere to" a schedule for conducting
NEPA reviews with respect to grazing allotments in need of NEPA analysis. Pub. L. No. 104-19
§ 504(a), 109 Stat. 194, 212 (1995).

Id. at 28.

Moreover, even if Congress had not committed the scheduling of this environmental analysis to the "sole discretion" of the Secretary, and even if Congress had not undertaken direct oversight of the Secretary's exercise of this discretion, the record does not support the Plaintiffs' assertions that BLM or the NPS have unreasonably delayed in this task. Rather, BLM and NPS have endeavored to complete the processing of permits that have been renewed or transferred pursuant to the appropriation riders.

BLM has emphasized the processing of expired grazing permits upon the completion of land health standards evaluations, which are themselves prepared in accordance with the 10-year schedules established by each BLM State office. BLM No. 307 at 3550. BLM's policy is that "States are to complete land health standards evaluations on at least 10 percent of the livestock grazing lands under their jurisdiction each year until the assessments are complete." BLM No. 307 at 3550. By using these land health standards evaluations as a basis for its environmental compliance work, BLM expects to eliminate its backlog of unprocessed grazing permit renewals and transfers by the end of FY 2009. See BLM No. 307 at 3550 ("Even though permits and leases have been renewed for 10 years in accordance with appropriations language, full processing will not be deferred to the end of that 10-year period, but will be completed by the end of FY 2009"). The administrative record, therefore, does not support Plaintiffs' assertion that BLM has unreasonably delayed in its efforts to fully process grazing permits issued under the appropriation riders, [7] and it

---

[7] Plaintiffs' claims of unreasonable delay are based in part on BLM's development of a number of EAs which, despite being commenced several years ago, have not yet been completed. See GOB Br. at 24 (discussing BLM's preparation of EAs for the Forty Mile Ridge, White Canyon, Soap Creek, Rockies, and Sewing Machine allotments). However, the delay in preparing EAs on many such allotments is attributable to the fact that BLM has changed its emphasis from

(continued...)

certainly does not support Plaintiffs' assertion that "BLM has interpreted the riders as a repeal of NEPA within Glen Canyon." GOB Br. at 29.

Plaintiffs' assertion that NPS has unreasonably delayed in conducting impairment determinations is similarly without merit. As explained in Section IV.A.1, supra, NPS's impairment determination is tightly coordinated with the BLM's preparation of NEPA documents for the issuance of grazing permits. That is, NPS considers the information and analysis produced in BLM's NEPA documents when making its determinations. DO-12 Handbook at 4. This delay is not unreasonable, as NPS's decision to defer impairment determinations until BLM initiates NEPA work is well within the scope of NPS's discretion.

**B.    Plaintiffs' assertions that NPS failed to comply with the substantive requirements of the NPS Organic Act are without merit**

In addition to the assertion that NPS failed to comply with the procedural requirements of the Organic Act, Plaintiffs argue that NPS has violated the Act's substantive requirements. GOB Br. at 10. Specifically, Plaintiffs argue that the NPS has violated the Organic Act by failing to prevent both adverse impacts and the impairment of park resources. This argument fails, in large part because Plaintiffs impermissibly seek for the Court to enter a general order compelling compliance with broad statutory mandates or with unenforceable policy statements. As the Supreme Court made clear in SUWA II, "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." 542 U.S. at 64

---

[2]/(...continued)
processing permits based on administrative expiration dates to addressing resource issues in high priority watersheds and/or high priority allotments, and is therefore reasonable. See BLM No. 307 at 3549-50; see e.g., BLM No. 106 at 494 (explaining with respect to the White Canyon EA that "[s]ubsequent changes in our workload priorities have delayed the development of a Final Decision").

(emphasis in original).

Plaintiffs argue generally that the NPS is required by its 2001 Management Policies to "always seek ways to avoid, or to minimize to the greatest degree practicable, adverse impacts on park resources and values." GOB Br. at 10-11 (quoting NPS No. 155 at 1855; 2001 Management Policies § 1.4.3). The Plaintiffs, however, offer no standard for compliance with this broad policy statement. Instead, Plaintiffs point to documents in the administrative record that identify instances in which grazing has adversely affected one of the Glen Canyon NRA's resources. See GOB Br. at 12-17. With respect to these impacts, Plaintiffs conclude that NPS has taken no action to correct or minimize the adverse effects caused by livestock grazing – in violation of its Organic Act duties – because it has not modified the terms of conditions of the various active grazing permits. This argument is flawed on several levels.

First and most fundamentally, this Circuit has already established that the 2001 Management Policies are not enforceable against the NPS. In The Wilderness Soc'y v. Norton, the D.C. Circuit concluded that:

> the Management Polices is a nonbinding, internal agency manual intended to guide and inform Park Service managers and staff. There is no indication that the agency meant for these internal directives to be judicially enforceable at the behest of members of the public who question the agency's management. For us to hold otherwise on this record would not only be contrary to our case law, but it would chill efforts by top agency officials to gain control over their bureaucratic charges through internal directives. In sum, the Management Policies is exactly what it appears to be, a guidance manual for NPS managers and staff that does not create enforceable regulations or modify existing legal rights.

434 F.3d 584, 596-597 (D.C. Cir. 2006). Accordingly, Plaintiffs' attempts to enforce the provisions of the 2001 Management Policies fail because "the only agency action that can be compelled under the APA is action legally required." SUWA II, 542 U.S. at 63.

Second, while the NPS has interpreted the Organic Act's "conservation" mandate as requiring that NPS "avoid or minimize" adverse impacts "to the greatest degree practicable," <u>see</u> 2001 Policies, NPS No. 155 at 1855, Plaintiffs ignore that NPS retains broad discretion in deciding how to meet that mandate. A similar situation arose in <u>SUWA II</u>, where the plaintiffs argued that, by permitting off-road vehicle use in certain wilderness study areas ("WSAs"), BLM had violated its mandate under 43 U.S.C. § 1782(c) to "continue to manage [WSAs] . . . in a manner so as not to impair the suitability of such areas for preservation as wilderness." <u>SUWA II</u>, 542 U.S. at 65. The plaintiffs sought a general order compelling compliance with this non-impairment mandate, but the Court refused, recognizing that while "[s]ection 1782(c) is mandatory as to the object to be achieved, . . . it leaves a great deal of discretion in deciding how to achieve it." <u>Id.</u> at 66. Similarly in the present case, NPS retains discretion to achieve the Organic Act's conservation objectives however it sees fit, and the agencies have done so in this case by taking management actions to avoid adverse impacts and potential impairment. <u>See</u>, <u>e.g.</u>, BLM Nos. 31, 57, 61, 68 (reducing or eliminating grazing); NPS No. 94 at 1156 (indicating that livestock were temporarily removed from the Soda and Lake allotments due to livestock trespass and for the protection of resource conditions). Even under the authority of the riders, grazing management is adjusted on an annual basis in accordance with proper management as provided for in the grazing regulations. <u>See</u> 43 C.F.R. §§ 4110.3, 4110.3-2; <u>see also</u> NPS No. 29 at 287 ("BLM will use resource goals and objectives [established in 1999 Grazing Plan] in determining annual use levels to adjust the season of use or the number of animals as applicable."). Indeed, the same legislative history that Plaintiffs cite in support of their characterization of the appropriations riders directly responds to Plaintiffs' concerns. As Senator Domenici expressed in discussing the Senate version of the bill that became Section 123 of Public Law No. 106-113:

> The BLM does not find malfeasance on the part of ranchers only when they renew the lease every 10 years. As a matter of fact, they have total authority to enter upon the premise, inspect, and periodically recommend changes in the use that the rancher should make. They don't wait around until a drought year or until the 10-year period has expired to go in and change the usage of the lessee.

145 Cong. Rec. S10679 (daily ed. Sept. 9, 1999).

At bottom, Plaintiffs' merely complain that the corrective actions which NPS and BLM have taken to avoid or minimize adverse impacts did not take the form of new terms or conditions in the renewed grazing permits. GOB Br. at 17 ("There is no evidence in the record that the Secretary ever modified a grazing permit in response to any of the impacts the Park Service identified."). The short answer here is that the BLM and NPS are prohibited from taking this approach by the appropriations riders because the relevant riders direct that grazing permits expiring in corresponding years "shall be renewed" with the same terms and conditions contained in the expiring permit "until such time as the Secretary of the Interior completes processing of such permit in compliance with all applicable laws and regulations. . ." See Pub. L. No. 106-113 § 123, 113 Stat. 1501, 1501A-159; Pub. L. No. 106-291 § 116, 114 Stat. 922, 943; Pub. L. No. 107-63 §114, 115 Stat. 414, 438; Pub. L. No. 108-7 § 328, 117 Stat. 11, 276; Pub. L. No. 108-108 § 325, 117 Stat. 1241, 1307. This language means that the Secretary of the Interior (and by delegation the NPS and BLM) has no authority or discretion to alter the terms of the renewed permit unless and until the BLM and NPS are able to prepare impairment determinations and environmental assessments pursuant to the Organic Act and NEPA. As was explained above, BLM intends to complete this process by 2009. BLM No. 307 at 3550.

More to the point, however, is that the Plaintiffs' displeasure with NPS's style of management is simply not justiciable. Even if the agencies were not constrained by the terms of the riders, the agencies' implementation of the Organic Act's conservation mandate through annual

adjustments or other management actions in lieu of altering permit terms and conditions remains well within the scope of the agencies' discretion. See Sierra Club v. Andrus, 487 F.Supp. 443, 448 (D.D.C. 1980) ("[N]owhere in either 16 U.S.C. §§ 1 or 1a-1 is there a specific direction as to how the protection of Park resources and their federal administration is to be effected. Certainly the Secretary is not restricted in the protection and administration of Park resources to any single means."); see also Daingerfield Island Protective Soc'y v. Babbitt, 823 F. Supp. 950, 955 (D.D.C. 1993) (recognizing that "Congress did not . . . spell out any specific direction as to how this duty must be undertaken").

Plaintiffs' arguments under the Organic Act's impairment standard also fail.  In contrast to "adverse impacts," which are not defined in the Organic Act or by the NPS's policies, the term "impairment" is defined as "an impact that, in the professional judgment of the responsible NPS manager, would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values." See 2001 Management Policies § 1.4.5; NPS No. 155 at 1855.  While Plaintiffs quote extensively from record documents indicating that grazing has in several cases adversely impacted Glen Canyon NRA resources, see GOB Br. at 12-18, not every adverse impact constitutes impairment, and none of these record documents contain the requisite "determination" that impairment has occurred.  As the 1988 Management Policies explain:

> legislative and administrative actions have been taken that have brought some measure of change to [to the physical resources and intangible values of] our national parks.  Such actions impact park resources, yet they are not necessarily deemed to have impaired resources for he enjoyment of future generations.  Whether an individual action is or is not an 'impairment' is a management determination.

NPS No. 158 at 2249.

In any case, as with NPS's duty to conserve park resources and prevent or minimize adverse impacts, NPS's implementation of the Organic Act's non-impairment mandate through annual adjustments or other management actions – in lieu of changes to permit terms and conditions – does not mean that NPS has abdicated its duties under the Organic Act. NPS's approach is well within the scope of its discretion.[9]  See Sierra Club v. Andrus, 487 F.Supp. at 448 (concluding that the Secretary has "broad discretion in determining what actions are best calculated to protect Park resources, including Glen Canyon National Recreation Area and Grand Canyon National Park"); Davis v. Latschar, 83 F. Supp.2d 1, 5 (D.D.C. 1998) (finding that "[b]ecause the Organic Act is silent as to the specifics of park management, the Secretary has especially broad discretion as to how to implement his statutory mandate"). Moreover, this approach is consistent with Congress' mandate that grazing permits be renewed under the appropriation riders with the same terms and conditions as the expiring permit. Plaintiffs' assertions that NPS has violated its substantive conservation and non-impairment duties under the Organic Act are therefore without merit.

### C.    Plaintiffs' NEPA and NHPA challenges to the EA and FONSI/decision document corresponding to the NPS' 1999 Grazing Plan are without merit (Count Four)

Nearly six years after the date of its issuance, Plaintiffs now challenge the 1999 Grazing Plan and associated EA on the grounds that NPS improperly prepared an EA in lieu of an EIS and failed to comply with Section 106 of the NHPA. Both arguments fail because they are premised on Plaintiffs' unsupported assertion that the Grazing Plan itself authorizes grazing in the Glen Canyon NRA. In fact, the Grazing Plan is merely a statement of policy considerations that will not result in

---

[9] Plaintiffs assert, and NPS does not contest, that the 2001 Management Policies are entitled to deference insofar as they define the Organic Act's impairment standard. GOB Br. at 4 n.3. This does not mean, however, that the procedures set out by the Policies for meeting that standard are themselves enforceable. See The Wilderness Soc'y v. Norton, 434 F.3d at 596-597.

any environmental impacts, let alone significant impacts. Moreover, Plaintiffs' NHPA claim fails because NPS properly used a phased approach to Section 106 compliance in its decision-making process for the Grazing Plan.

      1.      **The EA and FONSI corresponding to the 1999 Grazing Management Plan were not arbitrary and capricious, and the preparation of an EIS was not required**

      a.      **No site specific analysis was required**

Plaintiffs complain that the 1999 Grazing Plan EA by its own terms provides only an "overview of grazing conditions within Glen Canyon NRA [and] a brief description of BLM grazing management . . . on allotments within the recreation area." GOB Br. at 21 (quoting NPS No. 19 at 112). Plaintiffs point out that the EA does not analyze the effects of the grazing authorized by individual permits, and argue that the Park Service's failure to analyze potential site-specific impacts as well as the condition of specific resources found within particular allotments violates NEPA. GOB Br. at 21-22. This argument fails because NEPA does not require that an agency conduct such site-specific analysis unless and until the agency proposes to make an irreversible and irretrievable commitment of the availability of resources to a particular site. See Sierra Club v. Peterson, 717 F.2d 1409 (D.C.Cir. 1983). [9]

---

[9] Plaintiffs also point out that the 1999 Grazing Plan does not contain an analysis of the effects of grazing on particular allotments, even though the 1979 General Management Plan set this out as one of the objectives for the Grazing Plan. GOB Br. at 8, 21. This observation is irrelevant to the Plaintiffs' NEPA claim, and in any case Plaintiffs have not challenged the adequacy of the 1999 Grazing Plan under the NPS Organic Act, nor could they. NPS's representations in the 1979 General Management Plan as to what would be accomplished in the Grazing Plan are not enforceable, and therefore could not be compelled in an action brought under APA § 706(1):

    Quite unlike a specific statutory command requiring an agency to promulgate regulations by a certain date, a land use plan is generally a statement of priorities; it guides and constrains actions, but does not (at least in the usual case) prescribe

                                                                (continued...)

In Sierra Club v. Peterson, the court held that a FONSI was arbitrary and capricious because, by issuing oil and gas leases without "no surface occupancy" stipulations, the USFS had made a commitment to allow surface disturbing activities without first assessing the possible environmental impacts. 717 F.2d at 1414-15. The court reasoned that the appropriate time to prepare a NEPA document is "prior to a decision, when the decisionmaker retains a maximum range of options." Id. at 1414 (citing Environmental Defense Fund v. Andrus, 596 F.2d 848, 852-53 (9th Cir. 1979) (emphasis in original)). The court recognized, however, that an agency "may delay preparation of an [EA or] EIS provided that it reserves both the authority to preclude all activities pending submission of site-specific proposals and the authority to prevent proposed activities if the environmental consequences are unacceptable." Id. at 1415 (emphasis omitted). That is precisely what occurred in this case, in that the 1999 Grazing Plan did not itself authorize grazing but instead provides a framework for implementation of the Organic Act's conservation and non-impairment mandates in relation to future authorizations of grazing through permitting. Notwithstanding the NPS's issuance of the Grazing Plan, the Secretary retained full discretion to approve or deny the renewal or transfer of grazing permits pending BLM's analysis of the proposed action's environmental impacts in an EA or EIS. See Baca v. King, 92 F.3d 1031, 1037 (10th Cir. 1996) ("No court has the power to order the BLM or the Department of Interior to grant Mr. Baca another

---

9/(...continued)

them. It would be unreasonable to think that either Congress or the agency intended otherwise, since land use plans nationwide would commit the agency to actions far in the future, for which funds have not yet been appropriated. . . . A statement by BLM about what it plans to do, at some point, provided it has the funds and there are not more pressing priorities, cannot be plucked out of context and made a basis for suit under § 706(1).

SUWA II, 542 U.S. at 71.

grazing lease, because the very determination of whether to renew grazing permits and whether public lands should even be designated for grazing purposes are matters completely within the Secretary of Interior's discretion."). While the Secretary's discretion in this respect was later constrained by the appropriations riders, the fact remains that the 1999 Grazing Plan itself did not trigger the obligation to analyze site-specific impacts.

Indeed, no such analysis would have been possible given that the operative provisions in the 1999 Grazing Plan are fully prospective. See NPS No. 19 at 114 (explaining that management goals and objectives developed in the 1999 Grazing Plan "are to be applied when changes in grazing activity or ground disturbing actions, associated with grazing, occur"). In Friends of Yosemite Valley v. Norton, 348 F.3d 789 (9th Cir.2003), the Ninth Circuit recognized that "[a]lthough NEPA requires that [an agency] evaluate the consequences of its action at an early stage in the project's planning process, that requirement is tempered by . . . 'the preference to defer detailed analysis until a concrete development proposal crystallizes the dimensions of a project's probable environmental consequences.'" Id. at 800 (quoting California v. Block, 690 F.2d 753, 761 (9th Cir. 1982)). Thus, "NEPA requires a full evaluation of site-specific impacts only when . . . 'the agency proposes to make an irreversible and irretrievable commitment of the availability of resources to [the] project at a particular site.'" Id. at 801 (quoting Block, 690 F.2d at 761). In the present case, the 1999 Grazing Plan merely identifies resource values, sets management goals, and identifies the objectives that should be used to analyze the potential impacts associated with the future transfer or renewal of grazing permits. NPS No. 29 at 287. The Plan, therefore, does not trigger the need for site-specific analysis because it does not constitute a concrete development proposal nor does it irreversibly and irretrievably commit resources within the meaning of Friends of Yosemite Valley. Rather, this analysis takes place in the context of a grant, renewal, or transfer of a grazing permit.

- 34 -

**b.    NPS was not required to prepare an EIS**

Plaintiffs also complain that the NPS's finding of no significant impact was arbitrary and capricious and that the preparation of an EIS was required because, by authorizing grazing within the Glen Canyon NRA, the 1999 Grazing Plan causes impacts that may be significant when analyzed under the "intensity" factors set out in 40 C.F.R. § 1508.27(b). [10] This argument fails. An EIS need only be prepared when "significant" environmental impacts will result from the proposed agency action. Id. (quoting Sierra Club v. Peterson, 717 F.2d 1409, 1415 (D.C.Cir.1983)); Cabinet Mountains Wilderness v. Peterson, 685 F.2d 678, 682 (D.C.Cir.1982). "An agency decision that an EIS is not required is afforded deference, and may be overturned 'only if it was arbitrary, capricious or an abuse of discretion.'" Southern Utah Wilderness Alliance v. Norton (SUWA III), 326 F. Supp.2d 102, 118 (D.D.C. 2004) (quoting Sierra Club v. United States Dep't of Transp., 753 F.2d 120, 126 (D.C.Cir.1985)). In this case, NPS expressly determined that the proposed Grazing Plan "will not have a significant effect on the human environment," and that determination is entitled to deference. [11]

---

[10] Section 1508.27(b) states that the following four factors should be considered (*inter alia*) in evaluating whether an action "significantly affects" the environment and thus triggers the requirement for an EIS: (1) "[u]nique characteristics of the geographic area such as proximity to . . . park lands"; (2) "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks"; (3) "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts"; and (4) "[t]he degree to which the action may adversely affect . . . sites, . . . structures, or objects listed or eligible for listing in the National Register of Historic Places . . . ." See 40 C.F.R. § 1508.27(b)(3), (5), (7), (8).

[11] The FONSI states that "[t]here are no unmitigated adverse impacts on public health or safety; threatened or endangered species; sites or districts listed in, or eligible for listing in the National register of Historic Places; known ethnographic resources; or other unique characteristics of the region." Moreover, "[n]o highly uncertain or uncontroversial impacts, unique or unknown risks, cumulative effects, or elements of precedence were identified." NPS No. 29 at 273.

The Plaintiffs' arguments to the contrary fail because they rely on the erroneous assumption that the Grazing Plan authorizes grazing in the Glen Canyon NRA. For example, Plaintiffs generally state that "a Grazing Plan governing livestock grazing on more than 750,000 acres of a Congressionally protected unit of the national park system is a major federal action significantly affecting the quality of the human environment," and therefore requires preparation of an EIS. In support of this conclusory assertion, however, Plaintiffs can do no better than to assert that "[t]he Grazing Plan allows thousands of cattle to continue grazing on sensitive, arid lands." GOB Br. at 30. A review of the Grazing Plan's historical backdrop and development shows that this is not the case.

The lands at issue in this case were first used for livestock grazing 100 years prior to the establishment of the Glen Canyon NRA, see NPS No. 19 at 111, and Congress allowed this grazing to continue when it established the Glen Canyon NRA in 1972, see NPS No. 29 at 278 ("Grazing within the Glen Canyon NRA is authorized by the recreation area's enabling legislation."). Congress, however, subjected BLM's administration of grazing to the broad non-impairment and conservation mandate set out in the NPS Organic Act. See id. § 460dd-5 ("The administration of . . . grazing leases within the recreation area shall be by the Bureau of Land Management. . . . subject to the provisions of sections . . . 460dd-3 of this title"). In furtherance of these non-impairment and conservation mandates, BLM and NPS entered into an agreement whereby BLM received a "values and purposes determination" from the Superintendent of the Glen Canyon NRA prior to approving or implementing a change in a grazing permit. NPS No. 19 at 111; see also NPS No. 29 at 283 (describing the 1984 MOU for grazing administration as well as the 1993 Interagency Agreement). The values and purposes determinations showed that the Superintendent had assessed the potential effects of a proposed action, and that the action did not conflict with the values and purposes of the

Glen Canyon NRA. NPS No. 19 at 111-112. However, no established criteria existed to guide these determinations. Id. at 112. The 1999 Grazing Plan merely filled that gap by identifying the processes to be used and the values and purposes to be weighed in the assessment of proposed changes of grazing activity (or ground disturbing actions associated with grazing). Id. at 112, 114. Thus, as explained in Section II.C supra, the 1999 Grazing Plan does not itself authorize grazing in the Glen Canyon NRA but instead "identifies the process[] and the values and purposes used in the assessment of future actions on the part of the permittees, the BLM, and the Glen Canyon NRA management staff." Id. at 112.

Plaintiffs insistence on its characterization of the Grazing Plan as allowing grazing is also directly at odds with the fact that the "authorization" or "allowance" of grazing is not listed in the corresponding EA's statement of purpose and need for the Plan. See NPS No. 19 at 112. The EA recognizes that the continuation of historical grazing practices in lands comprising the Glen Canyon NRA was authorized by Congress in the NRA's enabling legislation – not by the Grazing Plan, see NPS No. 19 at 111; No. 29 at 278 – and that future grazing will be authorized through the issuance of term grazing permits by the BLM, see NPS No. 19 at 111; No. 29 at 284. Moreover, BLM determines whether lands under its management are available for grazing through the preparation of land use plans ("LUP"). See 43 C.F.R. § 4130.2(a) ("Grazing permits and leases shall be issued . . . to authorize use on the public lands and other lands . . . that are designated as available through land use plans") (emphasis added). These LUPs, many of which appear in the administrative record at BLM CD Exhibit A-H and also at BLM Nos. 279-289, are prepared pursuant to the authority set out in 43 U.S.C. §§ 1701(a)(2), 1712, and establish the allowable resource uses, areas of public lands to be used, and levels of use to be maintained. 43 C.F.R. § 4100.0-8. It is these LUPs, and not the Grazing Plan, that have designated the allotments within the Glen Canyon NRA as available for

grazing. See, e.g., BLM No. 279 at 1886-1893 (Sewing Machine, Rockies, Waterpocket, and Bullfrog allotments); BLM No. 280 at 2209-2210 (same); BLM No. 281 at 2222, 2225-2227 (same); BLM CD Exhibit F at 287, 289-290 (same). Unlike these LUPs, the Grazing Plan is not a prerequisite to the authorization of grazing activities in the Glen Canyon NRA, nor does the Grazing Plan designate any particular allotments as "available" for grazing. Plaintiffs' assertion that the Grazing Plan causes significant environmental impacts because it "authorizes" or "allows" grazing is therefore without merit.

Plaintiffs' specific arguments under the four "significance" factors set out in 40 C.F.R. § 1508.27(b) fail for the same reason. For example, Plaintiffs argue that NPS must prepare an EIS because the impacts of livestock grazing within the Glen Canyon NRA are "highly uncertain" within the meaning of 40 C.F.R. § 1508.27(b)(5). GOB Br. at 31. In support of this argument, Plaintiffs rely on Nat'l Parks & Conservation Ass'n v. Babbitt, 241 F.3d 722, 731 (9th Cir. 2001), where the Ninth Circuit directed the defendant agency to prepare an EIS for a plan to allow an increase in the number of cruise ships entering the Glacier Bay National Park. See GOB Br. at 31. The court in Nat'l Parks & Conservation Ass'n noted that the degree of the impacts identified in the EA was unknown, and accordingly directed that the agency prepare studies or obtain the necessary information through other means before approving the proposed plan. 241 F.3d at 733, 736. As applied to the present case, Plaintiffs argue that the Grazing Plan EA is flawed because it does not contain information concerning "the status and trend of vegetation that is subject to livestock grazing," the "interaction of drought and grazing," the "current condition of most watersheds," and the "ecology and status of most wildlife in Glen Canyon." GOB Br. at 32-32 (citing NPS No. 19 at 116-118, 129, 133). The present case, however, is clearly distinguishable from Nat'l Parks & Conservation Ass'n in that, unlike a plan to allow higher volumes of cruise ship traffic in Glacier

Bay, the 1999 Grazing Plan does not "allow" or in any way authorize grazing. It is BLM's LUPs, and not the Grazing Plan, that have designated particular allotments as being open for grazing. Moreover, only BLM may authorize grazing through site-specific permitting actions and, at a minimum, the above referenced environmental data will be obtained as necessary on an allotment specific basis during BLM's processing of those individual grazing permits pursuant to the NPS Organic Act, NEPA, and the NHPA.

Similarly, Plaintiffs' argument – that an EIS is required pursuant to 40 U.S.C. § 1508.27(b)(7) because livestock grazing in combination with other activities results in cumulatively significant impacts – fails because Plaintiffs ignore that the Grazing Plan has no impacts of its own. By its own terms, the purpose of section 1508.27(b)(7) is to ensure that a finding of "significance" is not avoided in an EA by breaking a proposed action down into small component parts. That is, agencies should analyze whether the impacts of a proposed action, though small and incremental, will add up to a significant impact when added to other past, present, and foreseeable future actions. See 40 C.F.R. § 1508.7. In this case, however, the EA demonstrates that the Grazing Plan, which is intended only to ameliorate the adverse impacts of grazing in the Glen Canyon NRA, has no impacts of its own. Therefore, whatever the potential impacts of the allegedly related actions described in Plaintiffs' brief, see GOB Br. at 34-35, the Grazing Plan will not add to the sum total of impacts. Put simply, zero plus X still equals only X.

In sum, the 1999 Grazing Plan itself does not in any way cause significant environmental impacts within a unit of the National Park System, does not cause irreparable damage, or indeed any damage at all, to cultural resources eligible for listing in the National Register of Historic Places, and does not result in cumulatively significant impacts. The Grazing Plan, unlike an LUP, is merely a statement of policy considerations. It makes no decisions in and of itself, site-specific or otherwise.

Moreover, any necessary site-specific environmental or cultural data not obtained on a area-wide basis will at a minimum be obtained as part of the site-specific permitting process. Plaintiffs' assertions that the NPS was required to prepare an EIS in lieu of an EA are therefore without merit and must be rejected.

> **2.    NPS complied with section 106 of the NHPA in developing the 1999 Grazing Plan**

Plaintiffs' final argument, that the NPS did not comply with the NHPA prior to developing the 1999 Grazing Plan, is also without merit. As discussed above, the 1999 Grazing Plan did not itself authorize grazing but instead provides a framework for implementation of the Organic Act's conservation and non-impairment mandates in relation to future permitting actions. As such, the Grazing Plan is merely a generalized document that will not result in adverse impacts to any of the Glen Canyon NRA's resources – historic or otherwise. Given the circumstances, NPS properly used a phased approach to Section 106 compliance in its decision-making process for the Grazing Plan.

The NHPA's implementing regulations authorize federal agencies to meet their Section 106 consultation requirements through a phased approach where, as here, a federal agency first conducts general planning in advance of a site-specific decision. See 36 C.F.R. § 800.4(b)(2). Specifically, the relevant regulation states that "[w]here alternatives under consideration consist of corridors or large land areas . . . the agency official may use a phased process to conduct identification and evaluation efforts." Id. Thus, rather than require that the Secretary identify each cultural and historical property in the Glen Canyon NRA prior to issuance of the Grazing Plan, the regulation provides that "[a]s specific aspects or locations of an alternative are refined . . . the agency official shall proceed with the identification and evaluation of historic properties. . . ." Id.

The NPS's issuance of the Grazing Plan in the instant case plainly falls within the scope of this regulation because the total surface area that had been made open to grazing by BLM's LUPs as of the date of issuance of the Grazing Plan – 852,500 acres – meets the "large land area" criterium. NPS No. 29 at 297. The phased approach contemplated by this regulation is more than reasonable under the circumstances because final identification and evaluation of all cultural and historic properties prior to adoption of the Grazing Plan would have been impractical and, in all likelihood, impossible. See NPS No. 29 at 297 (estimating that, at an average of 14 sites per square mile, the Glen Canyon NRA grazing allotments likely contained in excess of 19,000 sites that have yet to be identified and recorded). Such an effort would also have been unnecessary, because the Grazing Plan itself does not impact any cultural sites and because the Plan made clear that as site-specific grazing related actions were formulated, NPS or BLM officials would proceed with the identification and evaluation of historic properties to the extent required by Section 106. See NPS No. 29 at 297-300. Indeed, the Cultural Resources Value Statement confirmed that "the NPS will not take or allow any action that reduces the research potential of cultural resources without an appropriate level of research and documented data recovery." Id. at 297. The Grazing Plan was submitted for review to the State Historic Preservation Office ("SHPO"), and on February 12, 1998 the SHPO confirmed that it concurred in the Grazing Plan's value statement, general statement of resource condition, and statement of resource goals and listed objectives. NPS No. 14 at 97.

Once again, Plaintiffs' real concern here is that BLM renewed or transferred permits after the date of the Grazing Plan without first fully processing those renewals or transfers in accordance with Section 106. As explained in Section IV.B. supra, however, renewal or transfer under these circumstances was required by the appropriation riders. To the extent Plaintiffs seek to enforce BLM's NHPA duties with respect to these permits, they must do so subject to Congress' intent.

- 41 -

Plaintiffs' assertion that the Grazing Plan was issued in violation of the NHPA is without merit.

## VI.    CONCLUSION

For the foregoing reasons, the United States' motion for summary judgment should be granted, the Plaintiffs' motion for summary judgment should be denied, and the Plaintiffs' complaint should be dismissed in its entirety with prejudice.

June 9, 2006                                 Respectfully submitted,

                                            SUE ELLEN WOOLDRIDGE
                                            Assistant Attorney General
                                            Environment and Natural Resources Division

Of Counsel:                                 /s/_____
G. Kevin Jones                              GUILLERMO A. MONTERO
Intermountain Office of the Solicitor       Trial Attorney
U.S. Department of the Interior             United States Department of Justice
                                            Environment and Natural Resources Division
                                            Natural Resources Section
                                            P.O. Box 663
                                            Washington, D.C. 20044-0663
                                            (ph)(202) 305-0443/(fax)(202) 305-0274