# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Great Old Broads for Wilderness, <u>et al.</u>,       ) | |
|                          ) | |
|           Plaintiffs,      ) | |
|                          ) | |
|          v.               ) | No. 01:05CV01433 (ESH) |
|                          ) | |
| Dirk Kempthorne, <u>et al.</u>,[1]      ) | |
|                          ) | |
|          Defendants.     ) | |
| _____) | |

## PLAINTIFFS' OPPOSITION TO FEDERAL DEFEDANTS' CROSS-MOTION FOR SUMMARY JUDGEMENT AND REPLY TO MOTION FOR SUMMARY JUDGEMENT

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Dirk Kempthorne is automatically substituted as Defendant in place of Gale Norton.

**TABLE OF CONTENTS**

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

I.    THE SECRETARY VIOLATED THE SUBSTANTIVE PROVISIONS
      OF THE ORGANIC ACT BY AUTHORIZING GRAZING THAT IS
      IMPAIRING AND ADVERSELY IMPACTING GLEN CANYON . . . . . . . . . . . . . . . 2

      A.    The Secretary Violated the Organic Act by Authorizing Grazing
            that Impairs Glen Canyon Resources. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

            1.    The Park Service identified impairment of Glen
                  Canyon resources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

            2.    The Park Service's discretion to protect Glen Canyon
                  under the Organic Act does not allow the Park Service
                  to ignore documented problems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      B.    The Secretary Violated the Organic Act by Authorizing Grazing
            that Adversely Impacts Glen Canyon Resources . . . . . . . . . . . . . . . . . . . . . . 10

II.   THE RIDERS DO NOT EXCUSE THE SECRETARY FROM
      COMPLIANCE WITH THE PROCEDURAL REQUIREMENTS
      OF THE ORGANIC ACT, NHPA, OR NEPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      A.    The Secretary's Interpretation of the Grazing Riders is Flawed . . . . . . . . . . . . .15

            1.    The Secretary is treating the riders as a repeal of the
                  Organic Act, NHPA, and NEPA within Glen Canyon. . . . . . . . . . . . . . 15

            2.    The grazing riders do not repeal any laws . . . . . . . . . . . . . . . . . . . . . . . 18

      B.    The Grazing Riders Only Impact the Relief Available. . . . . . . . . . . . . . . . . . . . 20

      C.    Even if this Court Accepts the Secretary's Arguments,
            the Rider does not Excuse the Secretary from Compliance
            with the Organic Act for Ten Permits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

III.  THE SECRETARY AUTHORIZED GRAZING THROUGH
      THE GRAZING PLAN WITHOUT COMPLYING WITH NEPA
      AND NHPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

## FEDERAL CASES

Abbott Labs. v. Gardner, 387 U.S. 136 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Atchinson v. Wichita Bd. of Trade, 412 U.S. 800 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

Bowen v. Georgetown Univ. Hosp., 488 U.S. 204 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Bowen v. Michigan Academy of Family Physicians, 476 U.S. 667 (1986). . . . . . . . . . . . . . . . 21

Branch v Smith, 538 U.S. 254 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

Daingerfield Island Protective Soc'y v. Babbitt, 823 F. Supp. 950 (D.D.C. 1993). . . . . . . . . . .8

David v. Latschar, 202 F.3d 359 (D.C. Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Ecology Center v. Austin, 430 F.3d 1057 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

Fund for Animals v. Norton, 294 F. Supp. 2d 92 (D.D.C. 2003). . . . . . . . . . . . . . . . . . . . . 11, 13

Greater Yellowstone Coalition v. Bosworth, 209 F. Supp. 2d 156 (D.D.C. 2000). . . . . . . . . . .11

Heckler v. Chaney, 470 U.S. 821 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

Morton v Mancari, 417 U.S. 535 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

Nat'l Rifle Ass'n of Am. v. Potter, 628 F. Supp. 903 (D.D.C. 1986). . . . . . . . . . . . . . . . . . . 11, 13

Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55 (2004). . . . . . . . . . . . . . . . . 11, 12, 20

Portland Audubon Soc. v. Hodel, 866 F.2d 302 (9th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . .18

Sierra Club v. Andrus, 487 F. Supp. 443 (D.D.C. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

Southern Utah Wilderness Alliance v. Dabney, 222 F.3d 819 (10th Cir. 2000). . . . . . . . . . .11, 13

Southern Utah Wilderness Alliance v. Nat'l Park Serv.,
387 F. Supp. 2d 1178 (D. Ut. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

Telecomms. Research & Action Ctr. v. FCC, 800 F.2d 1181 (D.C. Cir. 1986). . . . . . . . . . . . . 14

TVA v. Hill, 437 U.S. 153 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

<u>Williams Gas Processing-Gulf Coast Co. v. FERC,</u>
373 F.3d 1335 (D.C. Cir.2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**FEDERAL STATUTES**

5 U.S.C. § 551 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

5 U.S.C. § 551(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

5 U.S.C. § 551(13) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

5 U.S.C § 701(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

5 U.S.C § 706(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

5 U.S.C. § 706(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10, 11, 12, 20

5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 13, 14

16 U.S.C. § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 13

16 U.S.C. § 1a-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

16 U.S.C. §  460dd . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 13

16 U.S.C. § 470f. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

22 U.S.C. § 2201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

28 U.S.C. § 2401(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Department of the Interior and Related Agencies appropriations Act,
Pub. L. No. 106-113, § 123, 113 Stat. 1501 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

Pub. L. No. 108-108, § 325, 117 Stat. 1241 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**FEDERAL REGULATIONS**

43 C.F.R. § 4130.2(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**LEGISLATIVE MATERIALS**

145 Cong. Rec. S10675-84 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

S. Rep. No. 95-528, at 14 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

**ARGUMENT**

Congress designated Glen Canyon National Recreation Area ("Glen Canyon") as a unit of the national park system and charged Defendant, the Secretary of the Interior ("Secretary"), with protecting its valuable resources for future generations.  For the past 30 years, the Secretary has ignored his obligation to protect Glen Canyon from widespread damage caused by livestock grazing.  The Secretary is failing to comply with federal laws designed to protect Glen Canyon by refusing to analyze the site-specific impacts of grazing on the environment and irreplaceable archeological resources in order to determine whether grazing is "impairing" the resources Congress intended to protect.

In the face of mounting evidence that grazing is causing serious, irreparable damage to Glen Canyon's resources, the Secretary asks this Court to disregard his legal violations.  First, the Secretary argues that his authorization of grazing—which the Park Service concedes is causing "degradation," "obvious adverse effects," and "unacceptable impacts"—does not constitute a violation of the Park Service Organic Act's prohibition against "impairment."  This semantic word play does not hide the Secretary's blatant failure to protect Glen Canyon, which is a clear abuse of his discretion under the Act.

Second, the Secretary's argues Congress exempted him from compliance with all laws applicable to grazing within Glen Canyon, including the Organic Act, the National Historic Preservation Act ("NHPA"), and the National Environmental Policy Act ("NEPA").  Under the Secretary's interpretation, this exemption is indefinite.  Currently, there is no end in sight; the Secretary has not complied with these laws for any of the approximately 42 grazing permits challenged in this case since Congress passed the first grazing rider in 1999.  There is no support for the Secretary's extremely broad interpretation of the riders.  In fact, the riders' plain language

and legislative history show Congress intended only to protect ranchers from sudden interruption of their operations as a result of the Secretary's failure to comply with the law. However, this Court can both protect the permit holders and grant effective relief by setting a schedule for the Secretary to comply with the law.

Finally, the Secretary argues the Park Service's 1999 Grazing Plan has no impact whatsoever so it does not need to comply with NEPA or the NHPA. This is a gross understatement. The Grazing Plan authorizes grazing to continue on more than 750,000 acres within a park system unit. This is a significant impact the Secretary must consider under both NEPA and the NHPA.

In light of the Secretary's failure to protect Glen Canyon, Plaintiffs, Great Old Broads for Wilderness and the Center for Biological Diversity (collectively "Great Old Broads"), request this Court grant summary judgment in their favor and order the Secretary to promptly comply with the Organic Act, the NHPA, and NEPA.

## I. THE SECRETARY VIOLATED THE SUBSTANTIVE PROVISIONS OF THE ORGANIC ACT BY AUTHORIZING GRAZING THAT IS IMPAIRING AND ADVERSELY IMPACTING GLEN CANYON.

Although the Secretary argues he does not have to comply with the procedural requirements of the Organic Act ("purposes and values determinations") prior to authorizing grazing within Glen Canyon because of the grazing riders, he acknowledges he must comply with the substantive provisions of the Act. Federal Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment ("Cross-Motion"), at 26-31. Therefore, the Secretary concedes the Organic Act's impairment standard continues to apply to grazing within Glen Canyon.

The Secretary admits grazing has "adversely impacted" Glen Canyon resources. Cross-Motion, at 30. Moreover, the Secretary does not deny the Park Service has identified "degradation," "obvious adverse effects," and "unacceptable impacts" within Glen Canyon. These impacts are detailed in Great Old Broads' Motion for Summary Judgment, at 12-18. Instead, the Secretary contends he can continue authorizing grazing without preventing this damage. The Secretary breaks Great Old Broads' claim into alleged violations of two standards: (1) the impairment standard, and (2) the duty to prevent adverse impacts. First, the Secretary argues he has not violated the Organic Act's impairment standard despite his authorization of grazing that will continue to produce harm to Glen Canyon resources. Second, the Secretary argues he can authorize grazing that causes adverse impacts. Both arguments must fail.

**A.      The Secretary Violated the Organic Act by Authorizing Grazing that Impairs Glen Canyon Resources.**

The Secretary makes two arguments for why the Park Service has complied with the Organic Act's impairment standard. The Secretary first makes the circular argument that this Court cannot find the Park Service violated the Organic Act's impairment standard because it is the agency's prerogative to determine what constitutes impairment, and it has not yet made that determination. The Secretary further argues the Park Service has broad discretion to respond to impairment "however it sees fit," and this Court should not second-guess the agency. Neither argument is persuasive.

**1.      The Park Service identified impairment of Glen Canyon resources.**

First, the Secretary argues the Park Service has not violated the Organic Act because it has failed to make the "requisite 'determination' that impairment has occurred." Cross-Motion, at 30. In other words, the Park Service has never determined whether the extensive damage it

has documented is "acceptable" under the Organic Act, but it is the agency that must first make this determination and not this Court.  Id.  This excuse is simply a question of semantics.  Even if the Park Service has not used the specific word "impairment," the agency has clearly found impairment exists under the agency's own standards.

The Park Service defines impairment as an impact that "would harm the integrity of the park resources or values, including the opportunities that would otherwise be present for the enjoyment of those resources or values."  Policies § 1.4.5 (emphasis added).  An impact is more likely impairment if it affects a resource that is:

> (1)     Necessary to fulfill specific purposes identified in the establishing legislation or proclamation of the park;
>
> (2)     Key to the natural or cultural integrity of the park or to opportunities for enjoyment of the park; or
>
> (3)     Identified as a goal in the park's general management plan or other relevant NPS planning documents.

Id.  The Park Service has identified impacts that would "harm the integrity" of resources that meet each of these requirements.

Glen Canyon's "establishing legislation," the Enabling Act, defines the purposes of Glen Canyon as providing public outdoor recreation and enjoyment and preserving the scenery and scientific and historic resources that contribute to that enjoyment.  16 U.S.C. § 460dd.  In the Grazing Plan, which is a "relevant NPS planning document," the Park Service confirmed the purposes as recreation and protection of the scenic, scientific, and historic features of the area.  SOF ¶ 29.  The Park Service also defined the values of Glen Canyon as the "vegetation, soil, water quality, wildlife, archaeologic, historic, paleontologic, scenic and recreation resources."  SOF ¶ 29.  The Park Service chose these particular values because they are "key to the natural or cultural integrity of the park or to opportunities for enjoyment of the park."

The Park Service has documented "impairment" of these resources. Within ten allotments that span Glen Canyon and the Grand Staircase Escalante National Monument ("GSENM") the Park Service found:

> Park resources have in fact been underdegraded . . . within the Glen Canyon NRA. In some areas, forage has been over-utilized and is trending downward. Rangeland health assessments are indicating poor biotic and abiotic conditions across certain vegetation and soil types. Springs, seeps, and streams are experiencing extremes in soil erosion, dewatering, and consumption of riparian vegetation because of livestock activities. Fragile and non-renewable cultural properties have been, and continued to be, negatively affected by livestock and are not meeting the requirements and obligations under the National Historic Preservation Act. Finally, livestock practices are prohibiting Glen Canyon NRA from providing proper scenic and aesthetic enjoyment to every park visitor because some recreation conflicts exist, particularly in areas of high visitation combined with frequent livestock activity.

SOF ¶ 38 (emphasis added). The agency found current livestock grazing was "counter to" or "not compliant with" Glen Canyon values on at least nine allotments. Id. ¶ 40. On four of these allotments, the Park Service went on to find: "Maintaining current levels of active livestock use across the allotment will continue to produce unacceptable impacts to Glen Canyon NRA values and thus, current livestock activities are not in compliance with Glen Canyon NRA purposes." Id. ¶ 41 (emphasis added). In the Grazing Plan EA, the Park Service documented "severe overgrazing" on several allotments to the point where the vegetation may never recover. Id. ¶ 59. The Park Service concluded that "at least in some cases existing range condition is being degraded within Glen Canyon NRA." Id. (emphasis added).

The Park Service also concedes it is not meeting the standards of the NHPA. With respect to four allotments, the agency specifically found "[t]he integrity of sites determined eligible to the National Register . . . are being compromised, and obvious adverse effects are being allowed to continue without any mitigative measures taken." Id. ¶ 56 (emphasis added). In 2001, the Park Service found other sites had "been so badly damaged by grazing that the

resource will be significantly damaged or <u>irretrievably lost</u> if action is not taken within 2 years."
<u>Id.</u> ¶¶ 51-55 (emphasis added).

These are the Park Service's own records, and the Secretary does not dispute the findings. Furthermore, the Secretary never explains how the Park Service's findings of "degradation," "obvious adverse effects," "unacceptable impacts," and "irretrievably loss," are not determinations of impairment.  It does not take a degree in biology or archeology to conclude these impacts are "harming the integrity" of park resources that meet the three requirements quoted above.  Policies § 1.4.5.  Therefore, the Secretary's claim that the Park Service has failed to make impairment determinations is a semantic evasion of the obvious.

Unfortunately, these findings are only the tip of the iceberg.  As these findings and the Grazing Plan EA demonstrate, grazing has tremendous potential to impair resources, particularly because Glen Canyon is a desert-like environment.  Motion for Summary Judgment, at 15-17. Because the Secretary has refused to complete values and purposes determinations for all of the allotments within Glen Canyon, the Secretary would have been correct in stating the Park Service has made no <u>systematic</u> assessment of impairment.  However, the Secretary cannot use the Park Service's failure to comply with the Organic Act's procedural requirements (duty to prepare values and purposes determinations) as an excuse for its failure to comply with the Act's substantive requirements (duty to prevent impairment), particularly in the face of documented impairment.

Moreover, the only reason the Park Service has not made these determinations is because it has chosen not to.  The Secretary concedes the 2001 Policies require the Park Serve to make an impairment determination "prior to, and in association with, each of BLM's permitting actions." <u>Id.</u> at 21; <u>see also</u> Policies § 1.4.5.  The Secretary also recognizes this determination is required

under a 1984 Memorandum of Understanding ("MOU") and a 1993 Interagency Agreement ("IA") between the Park Service and BLM.  Cross-Motion, at 36; see also SOF ¶ 23, 24.  Yet, the Park Service continues to allow BLM to issue and reissuing grazing permits within Glen Canyon without making any determinations.

Although the Secretary tries to focus this case solely on current permits and disregards the Park Service's historical failure to comply with the Organic Act, this history is important. See.,e.g., Cross-Motion, at 15.  It demonstrates the Park Service had numerous opportunities to comply with the Organic Act, but chose not to.  Although the Secretary has authorized grazing within Glen Canyon since Congress set the area aside in 1972, the Park Service has not completed a single final values and purposes determination.  Motion for Summary Judgment, at 6-10.  Furthermore, the Park Service engaged in at least two generalized planning processes— one for the 1979 General Management Plan and one for the 1999 Grazing Plan—but chose not to determine whether authorized grazing was impairing resources in either.  SOF ¶ 25-28.  The Park Service cannot rely on this long history of not complying with the law as an excuse to take no action in the face of serious impairment.

> **2.    The Park Service's discretion to protect Glen Canyon under the Organic Act does not allow the Park Service to ignore documented problems.**

The Secretary also argues the Park Service has not violated the Organic Act's impairment standard because the agency has discretion to determine how to protect Glen Canyon resources "however it sees fit."  Cross-Motion, at 28, 31.  There is a big difference, however, between the Park Service deciding what specific actions it will take to protect Glen Canyon and the Park Service allowing grazing it knows is causing harm.

Congress expressly limited the Park Service's discretion by prohibiting the agency from allowing any activities that impair or derogate resources.  16 U.S.C. §§ 1, 1a-1; Daingerfield Island Protective Soc'y v. Babbitt, 823 F. Supp. 950, 955-56 (D.D.C. 1993) (finding Secretary has broad, but not unlimited discretion under the Organic Act); Sierra Club v. Andrus, 487 F. Supp. 443, 448-49 (D.D.C. 1980) (same).  According to Congress, the Park Service "has an absolute duty, which is not to be compromised, to fulfill the mandate of the [Organic Act] to take whatever actions and seek whatever relief as will safeguard the units of the National Park System."  S. Rep. No. 95-528, at 14 (1977); see also Sierra Club v. Andrus, 487 F. Supp. at 448 ("Thus, it seems clear that in the event of a real and immediate . . . threat to the scenic, natural, historic or biotic resource values of the Glen Canyon National Recreation Area . . . the Secretary must take appropriate action.").  According to the Policies, if the Park Service is aware that "an ongoing activity might have led or might be leading to . . . impairment," the agency must investigate and take action to "eliminate the impairment as soon as reasonably possible."  Policies § 1.4.7.  Therefore, while the Park Service has discretion to determine how to comply with the Organic Act, it cannot sit by and take no action at all in the face of impairment.  Yet, that is exactly what the agency is doing here.

The Secretary claims he chose to address impairment by adjusting grazing management on an annual basis.  Cross-Motion, at 28.  However, the Secretary can only point to four of twenty-four allotments where BLM has taken any action whatsoever to modify grazing.  Moreover, only two of these, Lake and Soda, are allotments where the Park Service's own documents identify serious problems.  Therefore, the Secretary has not addressed the vast majority of the problems identified by Great Old Broads in its Motion for Summary Judgment, at 12-18.  For example, Great Old Broads cited documents showing severe impacts to cultural

8

resources on numerous Glen Canyon allotments.  The Secretary has not provided evidence of a single action by BLM or the Park Service to protect these resources.

Furthermore, the actions the Secretary relied on are extremely limited and have not fixed the problems.  According to the Secretary, BLM "temporarily" removed cows from the Soda and Lake allotments.  Cross-Motion, at 28 (citing NPS Doc. 94, at 1156).  The record indicates BLM agreed to take cows off the Soda and Lake allotments in 2000 "until NPS resource objectives and goals [could] be met."  SOF ¶ 69.  However, BLM allowed cows back on the allotment in 2003, and there is no evidence BLM ever consulted with the Park Service to ensure their goals and objectives were met.  Id.  Moreover, this temporary removal did nothing to fix the problems on these allotments.  The Park Service's 2005 draft values and purposes determination found current grazing practices on Soda and Lake "will continue to produce unacceptable impacts to Glen Canyon NRA values and . . . are not in compliance with Glen Canyon NRA purposes."  Id. ¶ 41 (emphasis added).  Therefore, the Secretary has not demonstrated any action to prevent impairment on these allotments.

The Secretary also points out BLM decreased grazing on the Rockies allotment for one season in 2004 and on the Bullfrog allotment for one season in 2000 and one season in 2003.  Cross-Motion, at 28 (citing BLM Docs. 31, 57, 61).  BLM made these limited reductions in response to drought, and has since allowed full use of the allotments.  The Secretary also points to a 1992 agreement whereby the permittee on the Indian Creek allotment agreed to exclude grazing from two "Areas of Critical Environmental Concern," which were not grazed anyway.  Id. (citing BLM Doc. 68).  The Secretary also points to the Grazing Plan, which states "BLM will use resource goals and objectives [established in the 1999 Grazing Plan] in determining annual use levels to adjust the season of use of the number of animals as applicable."  Id.

(quoting NPS Doc. 39 at 287). The Secretary's reliance on this document is baffling considering there is not a document in the entire administrative record showing the Park Service has applied the Grazing Plan to a single Glen Canyon allotment.

The fact the Secretary could only point to these very limited efforts to protect resources within all of Glen Canyon only serves to emphasize his complete failure to deal with the problems. The Secretary's decision to authorize grazing without protecting Glen Canyon resources violates the Organic Act.

**B.    The Secretary Violated the Organic Act by Authorizing Grazing that Adversely Impacts Glen Canyon Resources.**

Although the Secretary concedes grazing is adversely impacting Glen Canyon resources, he argues this Court cannot force him to address the problem. The Secretary supports his argument by mischaracterizing Great Old Broads' claim as a "failure to act" claim under § 706(1) of the Administrative Procedure Act ("APA"), rather than challenges to a series of completed agency actions under § 706(2)(A). Under § 706(2)(A), the Secretary's decision to continue authorizing grazing that adversely impacts Glen Canyon resources is arbitrary and capricious and contrary to law. 5 U.S.C. § 706(2)(A).

Under the APA, courts may review two types of "agency actions": (1) completed agency actions, and (2) an agency's failure to act. 5 U.S.C. § 551(13). The distinction between the two is important because different standards of review apply. When a court reviews a completed agency action, it must determine whether the agency's action is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law under § 706(2)(A). 5 U.S.C. § 706(2)(A). In contrast, when a court reviews an agency's failure to act, it must determine if the agency has "unlawfully withheld or unreasonably delayed" taking action under § 706(1). Id. § 706(1).

This case presents a challenge to completed agency actions under § 706(2)(A), not a challenge to a failure to act as the Secretary argues. Great Old Broads is challenging the Secretary's issuance of grazing permits within Glen Canyon that violate the Organic Act. The APA specifically defines issuance of a permit as a final agency action subject to review under § 706(2)(A). 5 U.S.C. §§ 551(8), (13), 701(b)(2); see also Greater Yellowstone Coal. v. Bosworth, 209 F. Supp. 2d 156, 160 (D.D.C. 2002) (reviewing challenge to grazing permit under 706(2)(A)).

Indeed, federal courts in the D.C. Circuit have routinely considered whether a discrete action by the Park Service violates the standards of the Organic Act under section 706(2)(A). David v. Latschar, 202 F.3d 359, 364 (D.C. Cir. 2000) (reviewing Organic Act challenge to a Park Service program allowing killing of deer under 706(2)(A)); (Fund for Animals v. Norton, 294 F. Supp.2d 92, 104 (D.D.C. 2003), relief modified, 323 F. Supp. 2d 7 (D.D.C. 2004) (reviewing Organic Act challenge to a Park Service rule allowing snowmobiling in Yellowstone National Park under 706(2)(A)); Nat'l Rifle Ass'n of Am. v. Potter, 628 F. Supp. 903, 904 (D.D.C. 1986) (reviewing Organic Act challenge to a Park Service rule prohibiting hunting in national parks under 706(2)(A)); see also S. Utah Wilderness Alliance ("SUWA") v. Dabney, 222 F.3d 819, 824 (10th Cir. 2000) (reviewing Organic Act challenge to a Park Service backcountry management plan under 706(2)(A)); SUWA v. Nat'l Park Serv., 387 F. Supp. 2d 1178, 1185 (D. Utah 2005) (same). Therefore, this Court must determine whether the Secretary's decision to grant permits that will lead to adverse impacts is arbitrary and capricious, an abuse of discretion, or not in compliance with law. 5 U.S.C. § 706(2)(A).

The Secretary incorrectly claims this Court should review Great Old Broads' claim under § 706(1). Relying on Norton v. SUWA, 542 U.S. 55, 64 (2004), the Secretary argues he is not in

violation of the Organic Act because he has not failed to take any "discrete action" that he is "required to take." Cross-Motion, at 26-27. In the Secretary's view, the duty to prevent adverse impacts stems solely from the Policies, which are not enforceable. Id. at 27 (quoting Policies as requiring the Park Service to "always seek ways to avoid, or to minimize to the greatest degree practicable, adverse impacts on park resources and values"). Accordingly, Secretary argues there is no claim under § 706(1) because he has not failed to take an action that was legally required.

However, Norton v. SUWA is limited solely to cases under § 706(1) and has no application here. Plaintiffs in Norton v. SUWA did not challenge a discrete action of a federal agency. Instead, they sought an order from the court compelling BLM to comply with the Federal Land Policy and Management Act ("FLPMA") when managing ORV use. 542 U.S. at 65-67. BLM had not issued any specific permits or taken a discrete action. As such, the Court considered it a case to compel agency action unlawfully withheld or unreasonably delayed and found that it could not simply order BLM to take unspecified action to comply with the law. Id.

This case is distinguishable because Great Old Broads is challenging discrete, identifiable grazing permits. Great Old Broads is not asking for a general order requiring the Secretary to take action under the Organic Act. Instead, Great Old Broads is seeking an order finding the Secretary violated the Organic Act (and NHPA and NEPA) when he issued specific grazing permits. Indeed, the Supreme Court in Norton v. SUWA recognized issuance of a "permit . . . or other form of permission" as the exact sort of "discrete agency action" that may be challenged under the APA. 542 U.S. at 62 (quoting 5 U.S.C. § 551). Therefore, the Secretary's reliance on Norton v. SUWA and § 706(1) is misplaced.

Furthermore, the Secretary has violated the standards of § 706(2)(A).  The Organic Act requires the Park Service to manage its lands for one "fundamental purpose . . . to <u>conserve</u> the scenery and the natural and historic objects and the wildlife therein and to provide for the enjoyment of the same in such a manner and by such means as will leave them unimpaired for the enjoyment of future generations."  16 U.S.C. § 1 (emphasis added).  The duty to conserve "trumps all other considerations."  <u>Fund for Animals v. Norton</u>, 294 F. Supp.2d 92, 105 (D.D.C. 2003), <u>relief modified</u>, 323 F. Supp. 2d 7 (D.D.C. 2004); <u>see also</u> <u>S. Utah Wilderness Alliance v. Dabney</u>, 222 F.3d 819, 826 (10th Cir. 2000); <u>S. Utah Wilderness Alliance v. Nat'l Park Serv.</u>, 387 F. Supp. 2d 1178, 1191-92 (D. Utah 2005); <u>Nat'l Rifle Ass'n of Am. v. Potter</u>, 628 F. Supp. 903, 909 (D.D.C. 1986).

The Park Service has interpreted the duty to conserve as "independent of the separate prohibition on impairment, and so [it] applies all the time . . . even when there is no risk that any park resources or values may be impaired."  Policies § 1.4.3.  As part of its duty to conserve, the Park Service must "seek ways to avoid, or to minimize to the greatest degree practicable, adverse impacts on park resources and values."  <u>Id.</u>  The only exception to this mandate is for activities necessary to "fulfill the purposes of a park."  <u>Id.</u>  This exception does not apply in this case because livestock grazing is not a purpose of Glen Canyon.  16 U.S.C. § 460dd; <u>see also</u> SOF ¶¶ 29, 36.  Accordingly, in order to conserve resources under the Organic Act, the Park Service may not allow adverse impacts.

The Park Service's failure to comply with the Policies is evidence the Park Service has failed to comply with the Organic Act's conservation mandate.  Indeed, the Policies are specifically designed to implement this mandate.  Furthermore, the Policies are the Park Service's official interpretation of the Organic Act's standards and entitled to deference as the

Secretary concedes.  Cross-Motion, at 31 n.8.  At a minimum, the Park Service must provide

some reasoned explanation for its failure to abide by its own Policies.  Atchinson v. Wichita Bd.

of Trade, 412 U.S. 800, 808 (1973); Telecomms. Research & Action Ctr. v. FCC, 800 F.2d 1181,

1184 (D.C. Cir. 1986).  Indeed, the Park Service's failure to comply with its Policies without

such an explanation is arbitrary and capricious.  Ecology Center v. Austin, 430 F.3d 1057, 1069-

70 (9th Cir. 2005) (finding agency's failure to explain its refusal to comply with a policy was

arbitrary and capricious because the policy was intended to ensure compliance with the law).

        Although the Secretary concedes grazing is adversely impacting Glen Canyon resources,

Cross-Motion at 30, he provides no explanation for his failure to comply with the conservation

mandate Organic Act.  The Secretary does attempt to argue he has prevented adverse impacts

through annual adjustments.  As discussed above, however, that is not the case.  Accordingly, the

Secretary's decision to authorize grazing that is causing adverse impacts is arbitrary and

capricious and contrary to law under § 706(2)(A).

## II.    THE RIDERS DO NOT EXCUSE THE SECRETARY FROM COMPLIANCE WITH THE PROCEDURAL REQUIREMENTS OF THE ORGANIC ACT, NHPA, OR NEPA.

        The Secretary concedes he has not complied with the Organic Act, NHPA, or NEPA

prior to issuing, renewing, or transferring all current challenged permits within Glen Canyon.

Cross-Motion, at 22 (referencing BLM's and NPS's "inability to fully process the permits in

compliance with NEPA, the NHPA, and the NPS Organic Act").  Instead, the Secretary argues

the grazing riders have "suspended" the application of these statutes and all other "applicable

laws and regulations."  Id. at 20.  Although the Secretary says the riders only "suspend"

compliance with the law, there is no apparent time limit to this suspension in the Secretary's

mind (other than the length of an individual permit, which is ten years).  Accordingly, despite the

evidence of serious degradation presented in this case, the Secretary could avoid these laws altogether by allowing the entire ten-year term to expire for each of the 42 permits in question without ever considering the environmental and cultural impacts. Indeed, that is exactly what the Secretary is doing. Motion for Summary Judgment, at 28-29.[2]

There is no support for the Secretary's exceedingly broad interpretation of the rider. Congress did not repeal any laws with the riders. Rather, Congress sought to protect ranchers from the Secretary's failure to comply with the law. Accordingly, this Court should read the rider to impact only the relief available to Great Old Broads. Furthermore, even if this Court accepts the Secretary's interpretation, there are at least ten permits that are subject to the procedural requirements of the Organic Act because their terms and conditions incorporate the Act.

**A.    The Secretary's Interpretation of the Riders is Flawed.**

As discussed above, under the Secretary's interpretation of the rider, the Secretary could wait the entire length of the permit without ever complying with the Organic Act, NHPA, and NEPA, effectively repealing the law with respect to those permits. This is exactly what is happening in Glen Canyon.

**1.    The Secretary is treating the riders as a repeal of the Organic Act, NHPA, and NEPA within Glen Canyon.**

As Great Old Broads demonstrated it its Motion for Summary Judgment, at 22-24, BLM has issued and renewed permits within Glen Canyon since Congress protected the area in 1972 without ever completing the legally required site-specific analysis of grazing. BLM has not

---

[2] In contrast, Great Old Broads ability to challenge the permits is more limited due to the six year statute of limitations for challenges to federal agency action. 28 U.S.C. § 2401(a). Therefore, for the last four years of the ten-year cycle, the Secretary's action would not even be subject to judicial review.

completed a final, site-specific NEPA document for any of the 24 allotments challenged in this case. BLM has been working on a grazing EIS for the Grand Staircase Escalante National Monument ("GSENM") for the last six and half years with no tangible results. SOF ¶¶ 145-46. Even in those situations where BLM has completed the vast majority of the work, it has still failed to complete the process. There are at least three EA's in the record where BLM has finalized the document, and simply failed to rule on pending protests for years. SOF ¶¶ 137, 147, 151. In the case of the Forty-Mile Ridge allotment, it has been more than eight years.

Similarly, the Park Service has long failed to consider whether grazing is impairing park resources in violation of the Organic Act despite numerous opportunities to do so. Motion for Summary Judgment, at 6-10. Although the Park Service has documented severe environmental degradation within Glen Canyon, it has so far refused to make values and purposes determinations on an allotment specific basis. Neither agency has completed any site-specific analysis of grazing permits under the NHPA. Therefore, the Secretary has abdicated his responsibilities under these statutes within Glen Canyon.

The Secretary argues he has not unreasonably delayed compliance with the Organic Act, NHPA, and NEPA because BLM set a goal of processing all the permits by the end of FY 2009, and it is within the Park Service's discretion not to take any action to determine whether grazing is impairing Glen Canyon resources until BLM complies with NEPA. Cross-Motion, at 6, 26. This is a remarkable statement considering the Secretary cannot point to a single final EA or EIS or a values and purposes determination for any of the grazing permits challenged in this case. The Secretary provides no explanation for his complete failure in this regard. Moreover, after 30 years of delay, it is hard to believe the Secretary will comply with this goal.

The Secretary attempts to justify BLM's failure to rule on pending protests by arguing BLM changed its emphasis from "processing permits based on administrative expiration dates to addressing resource issue in high priority watersheds and/or high priority allotments."  Cross-Motion, at 6, 26.  This argument might be persuasive if BLM could point to any permits it <u>has</u> processed within high priority areas.  In the 1999 Grazing Plan, the Park Service established the Lake Canyon, Sewing Machine, Rock-Creek Mudholes, Lake, and Soda allotments as high priority allotments.  SOF ¶ 33.  It has been more than six years, and BLM has not complied with NEPA, nor has the Park Service conducted a values and purposes determination for any of these allotments.  However, BLM has renewed the permits on all of these allotments.

The Secretary also argues he expects to eliminate the backlog by using the land health standards evaluations required under the Federal Land Policy and Management Act ("FLMPA"), which BLM is preparing in accordance with 10-year schedules.  Cross-Motion, at 25.  Although these schedules are in the record, there is no evidence to suggest BLM is actually complying with them or that they have helped to eliminate the NEPA backlog.  In fact, Great Old Broads specifically requested BLM include copies of all the land health assessments completed for the Glen Canyon allotments in the record, but the agency refused.  Accordingly, without some evidence the agency is actually meeting any of its goals, BLM's claim it will process all 42 permits within Glen Canyon in the next three years is nothing more than an empty promise.  Accordingly, the record shows the Secretary is treating the riders as a repeal of these statutes within Glen Canyon.

### 2.    The grazing riders do not repeal any laws.

There is no evidence Congress intended the grazing riders to repeal any laws.  The riders

in place from Fiscal Year ("FY") 2000 to 2003 each state:

> A grazing permit or lease that expires (or is transferred) during fiscal year 2000
> shall be renewed under section 402 of the Federal Land Policy and Management
> Act of 1976 . . . . The terms and conditions contained in the expiring permit or
> lease shall continue in effect under the new permit or lease until such time as the
> Secretary of the Interior completes processing of such permit or lease in
> compliance with all applicable laws and regulations, at which time such permit or
> lease may be canceled, suspended or modified, in whole or in part, to meet the
> requirements of such applicable laws and regulations. Nothing in this section shall
> be deemed to alter the Secretary's statutory authority.

See, e.g., Department of the Interior and Related Agencies Appropriations Act, 2000, Pub. L.

No. 106-113, § 123, 113 Stat. 1501 (1999).  This language does not include an express repeal of

any statutes.  Portland Audubon Soc. v. Hodel, 866 F.2d 302, 307 (9th Cir. 1989) ("Obviously

there can be no express repeal without reference to the 'repealed' statute.").  In fact, a plain

reading of the language suggests the opposite.  Congress required the Secretary to reissue

grazing permits with the same terms and conditions until the Secretary completed processing of

the permits in compliance with all applicable laws and regulations.  Therefore, under the plain

language Congress expected the Secretary to comply with law.

Even if the plain language of the riders was not clear, principles of statutory construction

and the legislative history do not support the Secretary's broad interpretation.  The Supreme

Court has established as a "cardinal rule" that repeal by implication is disfavored.  Morton v.

Mancari, 417 U.S. 535, 549 (1974); see also Branch v. Smith, 538 U.S. 254, 273 (2003); TVA v.

Hill, 437 U.S. 153, 189 (1978).  This cardinal rule applies with special force when the act in

question is an Appropriations Act.  TVA, 437 U.S. at 190.  Accordingly, the Secretary must

provide convincing evidence Congress intended to repeal these statutes in order to support his argument. He cannot.

In fact, the legislative history shows Congress had no intention of repealing any laws applicable to grazing and certainly not the Organic Act or NHPA. Supporters of the riders repeatedly focused on protecting ranchers from sudden disruption of their operations as a result of the agency's failure to comply with the law. The debate on the FY 2000 rider is replete with references to ranchers' inability to get loans and other financial hardships that would occur if the Secretary did not renew their permits. See, e.g., 145 Cong. Rec. S10679-82 (statements of Sens. Thomas and Domenici). There are no references to repealing laws. In fact, the opposite is true. As Senator Enzi indicated, "BLM must still comply with all Federal environmental laws and the BLM must still complete all of its environmental reviews. The cost of delays, however, will be borne by the agency and not by individual ranchers." 145 Cong. Rec. S10684. Senator Thomas from Wyoming also indicated the public could still force the Secretary to comply with those laws. 145 Cong. Rec. S10678 ("BLM cannot and will not ignore its environmental obligations due to the threat of litigation, of course.").

Although Congress discussed BLM's permitting process and the need to comply with NEPA, Great Old Broads is not aware of a single reference to the Organic Act or the NHPA in the legislative history. See, e.g., 145 Cong. Rec. S10675-84. The failure to even mention these laws further indicates Congress had no intention of repealing these statutes. Therefore, based on the plain language, principles of statutory construction, and legislative history, this Court cannot interpret the FY 2000 through 2003 riders as a repeal of any laws within Glen Canyon.

**B.      The Grazing Riders Only Impact the Relief Available.**

Congress' expressed intent in passing the riders was to protect ranchers from the Secretary's failure to comply with the law.  Indeed, prior to FY 2004, the riders did only two things:  (1) required the Secretary to reissue the grazing permits with the same terms and conditions, and (2) prohibited the Secretary from modifying those permits until it complied with the law.  This Court can give effect to that intent by limiting the relief to a declaratory judgment that the Secretary failed to comply with the Organic Act, NHPA, and NEPA, which the Secretary concedes,[3] and ordering a schedule for this compliance by the Secretary, but not ordering cows off Glen Canyon for grazing without a valid permit.  This interpretation is consistent with the riders and Congress' intent.

Although Congress still did not express any intention to repeal all applicable laws, the FY 2004 rider further limited the relief available by giving the Secretary the "sole discretion to determine the priority and timing for completing required environmental analysis of grazing allotments based on the environmental significance of the allotments and funding available for this purpose."  Pub. L. No. 108-108, § 325, 117 Stat. 1241, 1307-08 (2003).  Accordingly, for

---

[3] The Court could find a legal violation in either of two ways.  The Court could find the Secretary was in violation of the law immediately upon issuing the permit without conducting the proper procedures.  In the alternative, the Court could find the riders allowed the Secretary "more time" to comply with the law, but the Secretary's failure to make any progress in the last six years within Glen Canyon violates the rider and Congress' intent that the extension was only temporary.  Great Old Broads focused on the second approach in its opening brief; however, the first approach is equally justified.  The second approach does raise some puzzling questions with respect to the appropriate standard of review and may be the reason the Secretary framed Great Old Broads' claims as failure to act claims.  Cross-Motion, at 14-26.  There is still no "omission of an [agency] action" that would give rise to a failure to act claim because the Secretary has issued grazing permits.  Norton v. SUWA, 542 U.S. at 62-63.  However, determining when the agency's failure to complete processing of the permits becomes unlawful starts to look like a determination of unreasonable delay under § 706(1).  This distinction is largely immaterial because the Secretary's complete abdication of the law within Glen Canyon for 30 years is both arbitrary and capricious and constitutes unreasonable delay.

any permits renewed from FY 2004 through the present, the Court can issue declaratory relief finding the Secretary has violated the law and order the Secretary to determine the priority and timing of the environmental analysis. It just cannot dictate the outcome of that determination.

The Secretary argues this provision precludes this Court from granting Great Old Broads' requested relief because the "scheduling" of any analysis is committed to agency discretion by law under APA section 701(a)(2). Cross-Motion, at 23.[4] However, even if this provision commits the timing and priority of the decision to the Secretary's discretion, there is no language in the rider that precludes judicial review of the agency's failure to comply with the law or prevents this Court from ordering the Secretary to exercise his discretion and set a schedule. There is a strong presumption Congress intends to allow judicial review of administrative action. Bowen v. Michigan Academy of Family Physicians, 476 U.S. 667, 670 (1986); Abbott Laboratories v. Gardner, 387 U.S. 136, 140 (1967). An action is committed to agency discretion by law only when there is "no meaningful standard against which to judge the agency's exercise of discretion." Heckler v. Chaney, 470 U.S. 821, 830 (1985). Here there are meaningful standards to apply. This Court can determine whether the Secretary violated the Organic Act, NHPA, and NEPA prior to issuing a grazing permit based on the standards articulated in these statutes. Furthermore, the Court can grant effective relief by grating a declaratory judgment, 22 U.S.C. § 2201, and by ordering the Secretary to set a schedule.

Finally, even if the FY 2004 rider precludes this Court from reviewing the Secretary's actions, it does not apply to any permits issued under the FY 2000-2003 riders. As the Secretary

---

[4] The Secretary also argues the fact Congress has taken an interest in BLM's compliance with the law means this Court has been divested of jurisdiction; however, he provides no legal support for this argument. Cross-Motion at 24-25. Just because Congress required the Secretary to report to Congress about this issue does not mean there is no room for judicial review.

concedes, there are at least fourteen permits BLM renewed prior to FY 2004.[5] The riders in effect at that time did not contain the sole discretion language. In fact, if this Court adopts the Secretary's interpretation of the FY 2004 rider, it only bolsters Great Old Broads' argument that this Court has the authority to set a schedule under the FY 200-2003 riders because Congress felt it was necessary to add the "sole discretion" language in order to prevent courts from setting enforceable schedules. Therefore, this Court is free to review those permits and set a schedule for compliance with the Organic Act, NHPA, and NEPA.

### C.    Even if this Court Accepts the Secretary's Arguments, the Rider does not Excuse the Secretary from Compliance with the Organic Act for Ten Permits.

Every version of the rider applicable from FY 2000 to FY 2004 states: "The terms and conditions contained in the expiring permit or lease shall continue in effect under the new permit or lease until such time as the Secretary of the Interior completes processing of such permit or lease in compliance with all applicable laws and regulations." See, e.g., Pub. L. No. 106-113, § 123, 113 Stat. 1501 (1999); Pub. L. No. 108-108, § 325, 117 Stat. 1241, 1307-08 (2003). In other words, Congress did not protect ranchers from any terms and conditions that were already in their permits. Therefore, regardless of the riders, BLM, the Park Service, and the permittee must comply with any permit terms and conditions.

---

[5] In addition to the fourteen permits the Secretary identifies, Cross-Motion at 22 n.5, Great Old Broads contends this Court should consider nine other permit renewals on the GSENM allotments pursuant to the pre-FY 2004 riders. SOF ¶¶ 112-116, 118-21. As explained in Great Old Broads' Motion for Summary Judgment, BLM initially issued these permits for a three-year period under one of the FY 2000-2003 riders in order to give the agency time to complete a Grazing EIS for the GSENM. However, when it failed to complete the EIS, the agency renewed the permits under the FY 2004 rider for an additional 10 years. This Court should review these permits under the initial riders and not the FY 2004 rider because BLM must issue permits for ten years unless it has a sound reason to justify a shorter term. 43 C.F.R. § 4130.2(d). In this case, there was no justification for issuing a three-year permit other than to provide time to comply with NEPA, which BLM did not do.

There are ten permits the Secretary concedes are active and judiciable that state, "[t]his permit does not exempt the holder from compliance with all laws, regulations and management plans governing the public use and administration of Glen Canyon National Recreation Area." BLM Docs. 83, 109, 119, 126, 137, 138, 147, 202, 209, 231.  The permits govern grazing on the following allotments:  Indian Creek, White Canyon, Lake Canyon, Slickhorn, Perkins Brothers (2 permits), Texas Muley, Upper Warm Creek, Lower Warm Creek, and Wiregrass.  Because the Organic Act and the Park Service's regulations, Policies, and management plans are the "laws, regulations and management plans governing the public use and administration of Glen Canyon," they continue to apply to these allotments regardless of the rider.

In order to meet the Organic Act's mandate to prevent impairment, the Park Service must conduct values and purposes determinations prior to authorizing grazing.  Motion for Summary Judgment, 4-10.  The Secretary concedes values and purposes determinations are required "prior to, and in association with, each of BLM's permitting decisions" under the 2001 Policies.  Cross-Motion, at 21; see also Policies § 1.4.5; SOF ¶¶ 23, 24 (1984 MOU and 1993 IA).  Moreover, the Park Service established process for making these determinations in the 1999 Grazing Plan.  SOF ¶¶ 28-31.  Yet, the Park Service has not finalized values and purposes determinations for any of the ten allotments.  The Park Service's only excuse for this failure is that the rider exempts them from this process.  Because this is not a valid argument for these ten permits, this Court should order the Park Service to complete values and purposes determinations on these allotments immediately.

III.   **THE SECRETARY AUTHORIZED GRAZING THROUGH THE GRAZING
       PLAN WITHOUT COMPLYING WITH NEPA AND NHPA.**

The Secretary's only defense to Great Old Broads' challenge to the Grazing Plan as

violating NEPA and the NHPA is that the Grazing Plan actually has no impact within Glen

Canyon.  According to the Secretary, "it makes no decision in and of itself, site-specific or

otherwise."  Cross-Motion, at 39.  The Secretary's attempt to downplay the Grazing Plan and the

Park Service's considerable effort to develop the Plan is troubling.  Moreover, a close

examination of the Grazing Plan and its historical context shows the Plan has significant impacts

because it authorizes grazing to continue on all of the allotments within Glen Canyon unless the

Park Service decides to apply the Plan to make changes based on a values and purposes

determination.

As the Secretary recognizes, Congress authorized grazing to continue within Glen

Canyon only to the extent it is consistent with the Organic Act.  Cross-Motion, at 36.  Implicit in

this authorization is the need for the Park Service to actually determine whether grazing is

consistent with the Organic Act.  Furthermore, as the Secretary concedes, Park Service Policies,

the 1984 MOU, and 1993 IA require this determination.  Cross-Motion, at 21, 36.[6]  The 1979

General Management Plan for Glen Canyon was a natural place for this determination.  SOF ¶

25.  However, rather than address the issue at that time, the Park Service decided to develop a

Grazing Plan for the entire recreation area.  According to the GMP, the grazing Plan was include:

(1) a detailed description of the condition of the range, and (2) recommendations for specific

---

[6] The Secretary describes the values and purposes determinations as if he routinely made them
for grazing within Glen Canyon.  Cross-Motion, at 36-37 ("The values and purposes
determinations showed that the Superintendent had assessed the potential effects of a proposed
action, and that the action did not conflict with the values and purposes of the Glen Canyon
NRA.").  However, the record does not include a single final values and purposes determination
within Glen Canyon.

management activities and maximum grazing intensities compatible with the purpose of the recreation area. Id. ¶ 26. The GMP EIS stated, "[t]he effects of grazing on particular allotments will be evaluated in preparing this plan." Id.

This observation is hardly "irrelevant to the Plaintiffs' NEPA claim" as the Secretary claims. Cross-Motion, at 32 n.9. Indeed, the first sentence of the purpose and need section of the Grazing Plan EA states the purpose of the Plan is defined by the GMP. NPS Doc. 19, at 112. Therefore, the fact the Park Service defined the purpose and need of the Grazing Plan as providing a detailed description of the range and evaluating the effects of grazing on particular allotments is highly relevant to what the Grazing Plan actually does on the ground.

The Secretary is correct that the Grazing Plan "identifies resources values, sets management goals, and identifies the objectives that should be used to analyze the potential impacts associated with the future transfer or renewal or grazing permits." Cross-Motion, at 34. However, this is not all it does. Until the Park Service actually applies these goals and objectives to specific grazing permit, which it has never done, the Grazing Plan authorizes grazing to continue. SOF ¶ 34.

As shown by its consideration of alternatives, the Park Service made a conscience choice in the Plan to allow grazing to continue even in the face of considerable degradation. The Park Service considered an alternative that would have required "immediate compliance" with the Grazing Plan. Id. Under this alternative, the Park Service conceded it would have to "halt grazing" temporarily until it could assess the impacts on Glen Canyon resources. NPS Doc. 19, at 120, 129, 133, 140. For example, under the immediate compliance alternative, "all ground disturbing activities related to livestock grazing would cease until a full assessment of adverse effects on prehistoric, historic, and traditional cultural properties could be accomplished and

mitigative measures taken." Id. at 140.  Rather than choosing this alternative, the Park Service

chose to allow grazing to continue at current levels and to implement the Grazing Plan standards

sometime in the future.  Allowing grazing to continue on more than 750,000 acres of a national

park system unit is certainly the "significant impact" and "irreversible commitment of resources"

the Secretary alleges is missing in this case.  Cross-Motion, at 32, 35.  Moreover, the Park

Service made the decision despite the evidence of impairment and potential for impairment it

identified in the Grazing Plan EA.  SOF ¶¶ 57-64.[7]

The Secretary argues the Grazing Plan cannot authorize grazing because BLM has

already determined which lands within Glen Canyon are available for grazing through its land

use plans.  Cross-Motion, at 37-38.  In fact, the Secretary argues, with no support, that "only

BLM may authorize grazing" within Glen Canyon.  Id. at 39.  In doing so, the Secretary

completely ignores the significant difference that is supposed to exist between BLM lands and

Glen Canyon—namely the Organic Act's extra layer of protection and the Park Service's duty to

ensure compliance with the Act.

The four BLM regions that include lands within Glen Canyon did prepare land use plans

in 1979, 1981, 1983, and 1991; however, BLM concedes these plans are "outdated" and must be

updated to comply with the law.  SOF ¶¶ 129, 131, 132, 140, 148, 150.  Moreover not one of

these plans includes the site-specific analysis of environmental impact as required by NEPA or

the site-specific analysis of impacts to cultural sites required by the NHPA.  Indeed, each of the

plans identified the need for BLM to conduct more site-specific analysis.  Id. ¶¶ 129-30, 134-36,

141-46, 151.  Furthermore, none of the plans analyzed the impacts of grazing under the Organic

---

[7] The Park Service's concession that it would take an immediate halt to grazing in order ensure
the agency met the goals and objectives of the Grazing Plan shows that by failing to take this
action in the Grazing Plan, the Park Service is not meeting its obligations under the Organic Act.

Act's impairment standard or considered whether grazing was leading to impairment.  Id. ¶ 128.
Therefore, even if these plan purported to authorize grazing within Glen Canyon, BLM skipped a
crucial step—approval of the Park Service.  Under the Policies, MOU, and IA, it is the Park
Service, and not the BLM, that is to determine whether grazing is consistent with the Organic
Act.  Accordingly, there was a need for the Park Service to establish the Grazing Plan.

    Indeed, this Court cannot ignore the Secretary's 30 year failure to prepare site-specific
environmental analyses and determine whether grazing was causing impairment of resources in
determining what should have been in the Grazing Plan.  This Court established the need for site-
specific analysis in 1976 in NRDC v. Morton, 388 F. Supp. 829, 834 (D.D.C. 1974), aff'd
without opinion, 527 F.2d 1386 (D.C. Cir. 1976).  By the time the Park Service prepared the
Grazing Plan in 1999, it was obvious the BLM had not engaged in the required analysis on an
allotment specific basis.  In addition, the Park Service was well aware it had never conducted the
necessary values and purposes determinations.  Furthermore, neither agency had ever considered
the impacts on cultural resources under NHPA.  Since 1999, neither the Park Service nor BLM
have remedied these violations.  Although the Secretary tries to argue that under the Grazing
Plan it would not allow any action to harm cultural resources without complying with NHPA, the
Park Service's own record of serious damage to these irreplaceable resources tells a different
story.  Accordingly, the Park Service should have considered site-specific impacts in the Grazing
Plan.

    Finally, the Secretary's claim the Grazing Plan "has no impacts of its own" is undercut by
the fact the Park Service did an EA in the first place.  Cross-Motion, at 39.  If the Grazing Plan
truly has no impacts, there was no need for the Park Service to comply with NEPA.  Indeed, the

EA purports to analyze the impacts of grazing within Glen Canyon; it just fails to do so adequately.

The Grazing Plan's failure to authorize grazing is the Secretary's only defense to Great Old Broads' NEPA and NHPA claims. Because the Grazing Plan authorizes grazing to continue on more than 750,000 acres, which has "significant" impacts under NEPA and constitutes and "undertaking" under the NHPA,[8] the Secretary has no defense and Great Old Broads must prevail on these claims as set out in the Motion for Summary Judgment, at 20-22, 29-45.

## CONCLUSION

In Conclusion, this Court must find the Secretary violated the Organic Act, the NHPA, and NEPA by authorizing grazing within Glen Canyon without protecting its valuable resources and by failing to consider the impacts of his actions. The Secretary cannot credibly argue the extensive damage identified by the Park Service does not rise to the level of impairment under the Organic Act. Furthermore, the grazing riders do not prevent this Court from ordering the Secretary's compliance with the Organic Act, the NHPA, and NEPA. Finally, because the Grazing Plan authorizes grazing to continue, the Secretary must consider these impacts under both NEPA and the NHPA.

---

[8] The Secretary also incorrectly argues a "phased approach" was appropriate under 36 C.F.R. § 800.4(b)(2). Id. at 40. First, the argument is an impermissible post hoc rationalization. Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 212 (1988); Williams Gas Processing-Gulf Coast Co. v. FERC, 373 F.3d 1335, 1345 (D.C. Cir.2004). Nowhere in the Grazing Plan or the EA does the Secretary indicate he is taking a phased approach to NHPA compliance. Furthermore, the NHPA specifically requires compliance "prior" to any undertaking. 16 U.S.C. § 470f. Because the Grazing Plan authorizes grazing, which is an undertaking, the Secretary had to comply with the NHPA prior to issuing the Grazing Plan.

Dated:  June 30, 2006                        Respectfully Submitted,


                                             /s/ Robin Cooley
                                             Robin Cooley (CO0040)
                                             Environmental Law Clinical Partnership
                                             2255 E. Evans Avenue, Room 365G
                                             Denver, CO 80208
                                             Phone: 303-871-6039
                                             Fax: 303-871-6991

                                             Joro Walker
                                             Western Resource Advocates
                                             1473 South 1100 East, Suite F
                                             Salt Lake City, UT 84109
                                             Telephone: 801-487-9911
                                             Fax: 801-486-4233

                                             Attorneys for Plaintiffs