# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GREAT OLD BROADS FOR WILDERNESS and CENTER FOR BIOLOGICAL DIVERSITY, ) ) ) ) Plaintiffs, ) ) v. ) ) DIRK KEMPTHORNE,[1/] in his official capacity as ) Secretary of the Interior; NATIONAL PARK ) SERVICE; and BUREAU OF LAND ) MANAGEMENT ) ) Defendants. ) ) | Case No. 1:05cv01433 (ESH) |

## REPLY IN SUPPORT OF FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

[1/]    Pursuant to Fed. R. Civ. P. 25(d)(1), Dirk Kempthorne is automatically substituted as a Defendant in this action in place of Gail Norton.

TABLE OF CONTENTS

PAGE

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Plaintiffs' Challenges To Individual Grazing Permits Ignore The Plain Meaning
          And Effect Of The Appropriations Riders . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        1.    Plaintiffs' APA Section 706(2)(A) claims must be rejected because the
              challenged final agency actions in this case were mandated by
              Congressional appropriation riders . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        2.    The riders apply to all of the grazing permits at issue in this case,
              regardless of terms and conditions contained in those permits . . . . . . . . 4

        3.    Plaintiffs' claims for relief from agency action "unlawfully
              withheld or unreasonably delayed" pursuant to APA
              Section 706(1) must be denied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

            a.    Plaintiffs' claims are outside the Court's jurisdiction
                  because the United States has not waived its sovereign immunity
                  for challenges to agency actions that are
                  committed to agency discretion by law . . . . . . . . . . . . . . . . . . . 6

            b.    Plaintiffs' arguments lack merit . . . . . . . . . . . . . . . . . . . . . . . . . 8

            c.    This Court may not grant the injunctive relief that
                  Plaintiffs seek . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    B.    Plaintiffs' Generalized Claims Under The Park Service Organic Act Are
          Without Merit And Must Be Dismissed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        1.    Plaintiffs' claims seeking to enforce the conservation and
              non-impairment mandates of the Organic Act are improperly
              programmatic and must be dismissed . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        2.    Plaintiffs misinterpret the Organic Act's conservation
              mandate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

PAGE

3. The Secretary has taken all necessary actions to conserve Glen Canyon NRA resources and prevent adverse impacts . . . . . . . . . . . . . . . . . . . . . 17

4. Grazing has not "impaired" resources within the Glen Canyon NRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

C. The Secretary Need Not Analyze Site-Specific Impacts In Its NEPA Analysis For A Planning Level Document Such As The 1999 Grazing Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

D. Plaintiffs' challenge to the 1999 Grazing Plan under the NPHA has no merit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

TABLE OF AUTHORITIES

FEDERAL CASES                                                          PAGE

Auer v. Robbins, 519 U.S. 452 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Bar MK Ranches v. Yuetter, 994 F.2d 735 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . 19

Bicycle Trails Council v. Babbitt, 82 F.3d 1445 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . 21

Bowen v. Georgetown Univ. Hosp., 488 U.S. 204 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . 25

California v. Block, 690 F.2d 753 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984) . . . . . 16,21,26

Davis v. Latschar, 83 F. Supp.2d 1 (D.D.C. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16,22

Friends of Yosemite Valley v. Norton, 348 F.3d 789 (9th Cir. 2003) . . . . . . . . . . . . . . . . . 24,25

Fund for Animals v. Williams, 245 F. Supp.2d 49 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . 19

Heckler v. Chaney, 470 U.S. 821 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Milk Train, Inc. v. Veneman, 310 F.3d 747 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 6

Norton v. Southern Utah Wilderness Society ("SUWA II"), 542 U.S. 55 (2004) . 13,14,15,19,24

OSG Bulk Ships, Inc. v. United States, 132 F.3d 808 (D.C.Cir. 1998) . . . . . . . . . . . . . . . . . . 16

Sierra Club v. Andrus, 487 F. Supp. 443 (D.D.C. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Sierra Club v. Babbitt, 69 F. Supp.2d 1202 (E.D.Cal. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 21

Southern Utah Wilderness Alliance v. Dabney ("SUWA I"), 222 F.3d 819 (10th Cir. 2000)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Southern Utah Wilderness Alliance v. National Park Service ("SUWA III"), 387 F. Supp.2d
1178 (D. Utah 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Watt v. Energy Action Education Foundation, 454 U.S. 151 (1981) . . . . . . . . . . . . . . . . . . . . 12

FEDERAL STATUTES                                              PAGE

5 U.S.C. §§ 551 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

5 U.S.C. § 701(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

5 U.S.C. § 706(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

5 U.S.C. § 706(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

16 U.S.C. § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,16

16 U.S.C. §§ 470 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

16 U.S.C. 470s . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

16 U.S.C. § 470f . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

42 U.S.C. §§ 4321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Pub. L. No. 106-113 § 123 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Pub. L. No. 106-291 § 116 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Pub. L. No. 107-63 §114 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Pub. L. No. 108-7 § 328 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Pub. L. No. 108-108 § 325 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,6,11,12,18

145 Cong. Rec. S10679 (daily ed. Sept. 9, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

FEDERAL REGULATIONS

36 C.F.R. § 800.4(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

36 C.F.R. § 800.8(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

40 C.F.R. § 1502.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

40 C.F.R. § 1503.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

43 C.F.R. § 4130.2(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## I.      INTRODUCTION

Federal Defendants hereby submit this memorandum in reply to the Plaintiffs' Great Old Broads for Wilderness, et al.'s ("Plaintiffs") opposition to the Federal Defendants' cross-motion for summary judgment.  In their cross-motion, Federal Defendants demonstrated that the Plaintiffs' challenges to the Bureau of Land Management's ("BLM") renewal of grazing permits within the Glen Canyon National Recreation Area ("Glen Canyon NRA") fail because the renewal of those permits had been mandated by Congressional appropriations riders.  Defendants explained that the riders specifically direct the Secretary of the Interior ("Secretary") to renew any grazing permits expiring in fiscal years 2000 through 2008 regardless of whether he has complied with all applicable laws and regulations, including the National Park Service Organic Act ("Organic Act"), 16 U.S.C. § 1, et seq., the National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470, et seq., and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, et seq.  Defendants also explained that the riders bar any claim that the Secretary has unreasonably delayed in completing required environmental analysis, because the riders permit the Secretary in his sole discretion to determine the priority and timing for completing that analysis.

In their opposition, Plaintiffs concede that the appropriations riders directed the Secretary to renew the grazing permits at issue in this case even if it was not possible to first comply with the procedural mandates of the Organic Act, NHPA, and NEPA.  Nonetheless, Plaintiffs argue that by complying with the riders the Secretary violated all three environmental statutes, and they seek a declaratory judgment to that effect as well as a Court-imposed schedule for compliance.  Plaintiffs also argue that the Secretary has abdicated his duty to conserve and prevent impairment to the resources and values of the Glen Canyon NRA, and that he failed to conduct a site-specific analysis

of the impacts of ongoing grazing within the Glen Canyon NRA in the 1999 Glen Canyon Grazing Management Plan ("Grazing Plan").

As we now explain, Plaintiffs' challenges to the Secretary's authorization and management of grazing within the Glen Canyon NRA are entirely without merit. Moreover, Plaintiffs cannot articulate a form of relief that would be practical or consistent with the appropriations riders. Plaintiffs cannot seek to enjoin the permits because that would be contrary to the express will of Congress, and they cannot seek a mandated schedule for when the Secretary will fully process all of the permits renewed under the appropriations riders because the discretion to determine this schedule is reserved to the Secretary. Accordingly, this Court should grant summary judgment in favor of the Federal Defendants.

## II.    ARGUMENT

### A.    Plaintiffs' Challenges To Individual Grazing Permits Ignore The Plain Meaning And Effect Of The Appropriations Riders

#### 1.    Plaintiffs' APA Section 706(2)(A) claims must be rejected because the challenged final agency actions in this case were mandated by Congressional appropriation riders

As in their opening brief, Plaintiffs argue that the Secretary's renewal of grazing permits within the Glen Canyon NRA was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law pursuant to section 706(2)(A) of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 et seq. The Plaintiffs, however, once again ignore the plain meaning and implications of the five appropriations riders issued by Congress in 1999, 2000, 2001, and 2003. See Consolidated Appropriations Act, 2000, Pub. L. No. 106-113 § 123, 113 Stat. 1501, 1501A-159 (1999); Department of the Interior and Related Agencies Appropriations Act, 2001, Pub. L. No. 106-291 § 116, 114 Stat. 922, 943 (2000); Department of the Interior and Related Agencies

Appropriations Act, 2002, Pub. L. No. 107-63 §114, 115 Stat. 414, 438 (2001); Consolidated

Appropriations Resolution, 2003, Pub. L. No. 108-7 § 328, 117 Stat. 11, 276 (2003); Department

of the Interior and Related Agencies Appropriations Act, 2004, Pub. L. No. 108-108 § 325, 117 Stat.

1241, 1307 (2003).  With these riders, Congress specifically directed the Secretary to renew any

grazing permit expiring during fiscal years 2000 through 2008, regardless of whether the Secretary

was able to fully process those permit renewals pursuant to the Organic Act, NHPA, or NEPA.  See

Federal Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for

Summary Judgment at 18, 22-23 (hereinafter Fed. Br. ___). The appropriation riders, therefore, act

as an unqualified defense to Plaintiffs' APA Section 706(2)(A) claims.

Notwithstanding Congress' clear mandate in the riders, Plaintiffs seek a declaratory

judgment that the Secretary failed to comply with the Organic Act, NHPA, or NEPA prior to

renewing the grazing permits at issue in this case.  See Plaintiffs' Opposition to Federal Defendants'

Cross-Motion for Summary Judgment and Reply to Motion for Summary Judgment at 20

(hereinafter GOB Reply at ___).  In support, Plaintiffs argue that the appropriations riders merely

prohibit the issuance of an injunction that would bar grazing in the Glen Canyon NRA, but that they

did not defer the Secretary's obligations to comply with the three environmental statutes.  Under

Plaintiffs' theory of the case, therefore, Congress in effect ordered the Secretary to violate the law

by renewing permits without first completing the analysis required by the three statutes, and

Plaintiffs now ask that this Court issue an order declaring that the Secretary did just that.  Compare

GOB Reply at 20 ("[T]he riders . . . required the Secretary to reissue the grazing permits . . . .") with

id. at 20 n.3 ("The Court could find that the Secretary was in violation of the law immediately upon

issuing the permit without considering the proper procedures.").

The Plaintiffs' interpretation of the riders is flawed for two reasons.  First, it makes little sense.  Congress could not have intended to put the Secretary in the position of necessarily violating either its mandate in the riders or the three environmental statutes at issue in this case.  Second, the legislative history of the riders confirms that Congress intended not only to mandate the renewal of permits but also to grant the Secretary more time to complete his environmental analysis.  See 145 Cong. Rec. S10679 (daily ed. Sept. 9, 1999) ("[T]he rider addresses [the backlog] problem by allowing BLM more time to complete the renewal process . . . .") (emphasis added).  Indeed, Plaintiffs concede that the riders deferred the Secretary's obligation to comply with the procedural requirements of NEPA.  See Plaintiffs' Motion for Summary Judgment and Memorandum of Point and Authorities in Support of Plaintiffs' Motion for Summary Judgment at 29 (hereinafter GOB Br. at ___) (recognizing that "Congress granted BLM additional time to alleviate its NEPA backlog").  Therefore, Plaintiffs' argument that the agencies violated the Organic Act, NHPA, and NEPA upon renewing the grazing permits at issue in this case must be rejected.

## 2. The riders apply to all of the grazing permits at issue in this case, regardless of terms and conditions contained in those permits

Plaintiffs also argue that, even if their interpretation of the riders is in error, the riders nonetheless do not apply to ten of the grazing permits at issue because the terms and conditions in those permits contain clauses that require the permit holder to comply with "all laws, regulations and management plans governing the public use and administration of" the Glen Canyon NRA.  See GOB Reply at 23 (citing BLM Nos. 83, 109, 119, 126, 137, 138, 147, 202, 209, 231).  Presumably, Plaintiffs read these clauses as requiring the Secretary to fully process permit applications under the Organic Act prior to renewing a permit,  despite Congress' clear instructions that the Secretary was to, in effect, "renew now, process later."

The Plaintiffs' reliance on these clauses is misplaced, however, because the clauses by their own terms apply to the permit "holder," as opposed to the Secretary of the Interior. See BLM Nos. 83, 109, 119, 126, 137, 138, 147, 202, 209, 231 ("This permit does not exempt the holder from compliance with all laws . . .") (emphasis added). Those permittees are not a party to the instant lawsuit, and in any case nothing in the Organic Act requires that a permittee complete the "values and purposes determinations" that Plaintiffs desire. Rather, this duty, if and where it exists, applies only to the Secretary and his delegates – subject, of course, to the limitations set out in the appropriations riders.

Moreover, even if the Court were to interpret the abovementioned clauses as applying to the Secretary, it is beyond question that the terms and conditions attached to a permit by BLM may not preempt the express intent of Congress. In this case, Congress intended that the Secretary renew any permits expiring in fiscal years 2000 through 2008, even if it was not possible to comply first with the procedural requirements of the Organic Act, NHPA, or NEPA. Nothing in the terms and conditions of the renewed permits may override this explicit Congressional mandate.

### 3. Plaintiffs' claims for relief from agency action "unlawfully withheld or unreasonably delayed" pursuant to APA Section 706(1) must be denied

Next, Plaintiffs argue that even if the agencies were not required to comply with the Organic Act, NHPA, and NEPA at the time of permit renewal, they have nonetheless unreasonably delayed compliance since issuing the renewals. Put another way, Plaintiffs assert that the Secretary has interpreted the appropriation riders as a "repeal" of the three statutes within the Glen Canyon NRA because he allegedly has not made any progress towards the goal of eliminating the backlog of unprocessed permits by 2009. See GOB Reply at 16-17.[2/] These claims lack merit, are outside the

---

[2/]    Remarkably, Plaintiffs expressly disavow that they seek judicial review of agency actions
(continued...)

scope of the Court's jurisdiction, and do not entitle the Plaintiffs to the injunctive relief that they seek.

>    **a.    Plaintiffs' claims are outside the Court's jurisdiction because the United States has not waived its sovereign immunity for challenges to agency actions that are committed to agency discretion by law**

As part of the relief sought in this case, Plaintiffs ask that the Court impose a schedule by which the Secretary must finish his compliance with NEPA (and presumably the Organic Act and NHPA as well) for each of the permits at issue in this case. See Complaint at 23, ¶D. As explained in Federal Defendants' opening brief, however, see Fed Br. at 23-26, Congress has explicitly committed the scheduling of environmental analysis for grazing allotments to the "sole discretion" of the Secretary. See Pub. L. No. 108-108, 117 Stat. 1241, 1308 (2003) ("The Secretaries in their sole discretion determine the priority and timing for completing required environmental analysis of grazing allotments based on the environmental significance of the allotments and funding available to the Secretaries for this purpose.") (emphasis added). Congress, therefore, has divested the courts of jurisdiction to review the Plaintiffs' claims that the Secretary has unreasonably delayed in complying with the three statutes at issue, because the APA by its own terms does not confer jurisdiction to review agency actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); see Milk Train, Inc. v. Veneman, 310 F.3d 747, 751 (D.C. Cir. 2002).

---

2/(...continued)
"unlawfully withheld or unreasonably delayed" pursuant to APA Section 706(1). See GOB Reply at 10-11 ("This case presents a challenge to completed agency actions under § 706(2)(A), not a challenge to a failure to act as the Secretary argues."). If this disavowal is accepted on its face, however, Plaintiffs' claims in their entirety must be rejected on the basis of the appropriations riders alone, because the renewal of the permits that Plaintiffs challenge was sanctioned by those riders.

In response, Plaintiffs point out that an agency action is only committed to agency discretion by law in cases where there is "no meaningful standard against which to judge the agency's exercise of discretion." GOB Reply at 21 (quoting <u>Heckler v. Chaney</u>, 470 U.S. 821, 830 (1985)). Plaintiffs disagree that Section 701(a)(2) bars judicial review, and instead argue that the circumstances in this case do not meet the standard articulated in <u>Heckler v Chaney</u> because the Organic Act, NHPA, and NEPA themselves provide meaningful standards for this Court to apply. <u>Id.</u> This argument misses the point.

The Secretary renewed each of the permits at issue in this case before completing the procedural requirements of the Organic Act, NHPA, or NEPA. This was done as directed by the appropriations riders. Accordingly, applying the general standards set out in those three statutes would be a meaningless exercise. Rather, what is at issue in this case is whether the Secretary, having renewed the permits pursuant to the appropriations riders – and without first complying with the three environmental statutes – has now unreasonably delayed in fully processing these rider permits. The issue, therefore, is one of timing, and on this matter the statutes and their implementing regulations do not provide any guidance of relevance here. All three statutes indicate that the Secretary must ordinarily complete his environmental analysis <u>prior</u> to taking a "proposed action" or "undertaking" – in this case, the renewal of a grazing permit.[3] The appropriations riders,

_____

[3]    For example, the implementing regulations for NEPA state that an environmental impact statement "shall be prepared early enough so that it . . . will not be used to rationalize or justify decisions already made." 40 C.F.R. § 1502.5. The NHPA states that federal agencies shall take into account the effect of an undertaking on any site eligible for inclusion in the National Register "<u>prior</u> to the issuance of any license . . . ." 16 U.S.C. § 470f (emphasis added); <u>see</u> <u>also</u> 36 C.F.R. § 800.8(a)(1) ("Agencies should consider their section 106 responsibilities as early as possible in the NEPA process . . . ."). Finally, the 2001 Management Policies, which interpret the Organic Act, state that "[b]efore approving a proposed action that could lead to an impairment of park resources and values, an NPS decision-maker must consider the impacts of the proposed action . . . ." NPS No. 155 at 1856.

however, override these provisions by deferring the Secretary's obligations under the three statutes until after the permits have been renewed, and neither the riders nor the three statutes or their implementing regulations provide any alternative guidance with respect to timing. Instead, Public Law No. 108-108 expressly reserves this decision to the sole discretion of the Secretary. Accordingly, Plaintiffs' assertion that meaningful standards exist against which to judge the agency's exercise of discretion is without merit. This Court is therefore barred from reviewing Plaintiffs "unreasonably delayed" claims because Congress has committed the matter "to agency discretion by law" within the meaning of APA Section 701(a)(2).

### b.    Plaintiffs' arguments lack merit

Even if the Court were to find that its review of the Plaintiffs' claims is not barred by APA Section 701(a)(2), Plaintiffs' claim that the Secretary has unreasonably delayed in fully processing the backlog of carryover grazing permits is without merit. First, Plaintiffs' assertion that the Secretary has interpreted the riders as a "repeal" of the three environmental statutes – instead of interpreting them as merely deferring obligations contained in the statutes – is flatly contradicted by record evidence. The Secretary's position on the matter is expressed in Instruction Memorandum No. 2003-071 ("IM 2003-071), See BLM No. 307. This Instruction Memorandum clearly directs BLM to complete its processing of the permits pursuant to all relevant environmental statutes by the end of FY 2009. See id. at 3550 ("Even though permits and leases have been renewed for 10 years in accordance with appropriations language, full processing will not be deferred to the end of that 10-year period, but will be completed by the end of FY 2009."). Therefore, the record demonstrates that the Secretary has not interpreted the riders as a "repeal" of any environmental laws.

Second, as Federal Defendants explained in their opening brief, and as demonstrated in the supplemental administrative record materials lodged with the Court concurrently with this brief, the

- 8 -

agencies have endeavored to complete the processing of permits that have been renewed or transferred pursuant to the appropriation riders.  Contrary to Plaintiffs' assertions, BLM has fully processed a great number of permits within high priority watersheds and high priority allotments. Compare GOB Reply at 17 (arguing that the Federal Defendants' arguments "might be more persuasive if BLM could point to any permits it has processed within high priority areas.") (emphasis in original), with BLM Nos. 342, 343, 344, 345 (representative sample of decision documents indicating that the Richfield Field Office – which contains the Henry Mountains Field Station – has fully processed many of the permits that it had initially renewed without first complying with "all applicable laws and regulations" pursuant to the appropriations riders ); BLM Nos. 346, 347, 348 (same with respect to the Monticello Field Office); BLM Nos. 349, 350, 351, 352 (same with respect to the Arizona Strip Field Office); BLM Nos. 353, 354, 355, 356, 357, 358, 359, 360, 361, 362, 363, 364, 365, 366, 367 (same with respect to other miscellaneous BLM Utah Field Offices).

These fully processed permits do not correspond to allotments within the Glen Canyon NRA, but the significant fact is that BLM in Utah manages over 1,500 grazing allotments statewide, and the Richfield, Monticello, and Arizona Strip Field Offices manage grazing allotments other than those contained within or overlapping with the Glen Canyon NRA.  Plaintiffs' assertion that there is no visible progress within the Glen Canyon NRA ignores that the BLM field offices have made significant progress in processing the permits under their authority, and they will continue working towards the goal of completing their environmental compliance duties for the rider permits by the end of FY 2009.

Similarly, the fact that no rider permits have been fully processed within the Grand Staircase Escalante National Monument ("GSENM") is reasonable in light of BLM's determination that the

objectives of NEPA are best served with respect to the allotments under the authority of the GSENM Office by the preparation of a region-wide grazing EIS instead of permit-specific EAs. BLM is currently preparing this EIS as part of its efforts to amend the GSENM Management Plan ("GSENM MP"). This EIS, amendment, and subsequent permit renewal decisions will fully process the backlogged grazing permit renewals and will implement the 1999 Grazing Plan.

To this end, the GSENM Office conducted Rangeland Health assessments on more than 2 million acres of GSENM land and other lands administered by that Office (including 10 of the 24 allotments included in this litigation). This information, together with the analysis and evaluation of utilization, trend, and climate data, is being used for the analysis of grazing management alternatives in the EIS. Furthermore, as part of this process BLM is completing (and with respect to some allotments has already completed) consultation under section 106 of the NHPA and the Endangered Species Act. See BLM No. 383 at 5322. After finalization of the EIS, the GSENM Office will have completed its responsibilities under the three statutes at issue in this case, and will be able to fully process all of its grazing permits, including 15 of the permits involved in this litigation. Thus, while Plaintiffs complain that the Draft GSENM EIS has not yet been finalized despite BLM having begun the public scoping process for this EIS in 2000, see GOB Br. at 24, BLM is progressing methodically and has not unreasonably delayed in completing the required environmental analysis.

Moreover, the supplemental administrative record shows that the BLM Utah State Office has already initiated the process for publishing the Notice of Availability of the Draft EIS so that it may be made available for public comment. See BLM No. 384 at 5323. As indicated in NEPA's implementing regulations, requesting and obtaining comments from the public on a draft EIS is one of the final steps an agency must take before issuing a Final EIS and Record of Decision ("ROD").

- 10 -

See 40 C.F.R. § 1503.1(a) (requiring that an agency obtain comments on a draft EIS prior to preparing a final EIS); id. § 1506.10 (describing the timing of the notice of availability vis-a-vis the timing for issuance of a ROD). Plaintiffs' claim that the Henry Mountains, Monticello, GSENM, and Arizona Strip Field Offices have unreasonably delayed in fully processing the rider permits under their authority is therefore without merit.

> **c.    This Court may not grant the injunctive relief that Plaintiffs seek**

Plaintiffs' "unreasonably delayed" claim must also be dismissed because this Court has been divested of any authority to grant the relief that Plaintiffs seek. In light of Congress' express intent to protect the livelihood of ranchers, Plaintiffs concur that grazing should not be enjoined under any circumstances, regardless of this Court's decision on the merits of their claims. See GOB Reply at 20. Instead, Plaintiffs merely request that the Court impose a schedule for compliance. As discussed in Section II.A.3.a, supra, however, Congress has reserved these determinations of priority and timing for completing required environmental analysis of grazing allotments to the "sole discretion" of the Secretary. See Pub. L. No. 108-108, 117 Stat. 1241, 1308 (2003). This Court is therefore without authority to grant the relief Plaintiffs seek.

Indeed, Plaintiffs concede that this Court may not impose a schedule of its own making on the Secretary for the permits renewed pursuant to Public Law No. 108-108, but nonetheless argue that the Court may instruct the Secretary to set a schedule, thus forcing the Secretary to "exercise" his discretion. GOB Reply at 21. In this context, the Court need look no further than IM 2003-071. In that memorandum, the Secretary instructed BLM to completely process the backlogged grazing permits by the end of FY 2009. BLM No. 307 at 3549-50. Thus, while Plaintiffs can provide no legal basis for ordering the Secretary to "exercise" his discretion as Plaintiffs suggest, the Court need

not even reach that issue because record evidence demonstrates that the Secretary has already exercised his discretion by issuing IM 2003-071.[4]

Finally, this Court should abstain from setting a schedule for compliance in this matter because Congress has clearly chosen to play an active role in the oversight of BLM's compliance efforts.  Congress receives annual reports from the Secretary detailing the extent to which the agencies are completing the required analysis under all applicable laws and regulations.  See Pub. L. No. 108-108, 117 Stat. 1241, 1308 (2003).  Congress also receives biennial recommendations from the Secretary for legislative provisions necessary to ensure that all permit renewals are completed in a timely manner.  Id.  Congress, therefore, is the appropriate body for overseeing the manner and speed with which the Secretary must process its backlog of carryover rider permits.  See Watt v. Energy Action Education Foundation, 454 U.S. 151, 168-69 (1981) (recognizing that the Outer Continental Shelf Lands Act Amendments of 1978 required the Secretary to submit frequent reports to Congress on the operation of bidding systems, the Court concluded that "[i]t is not for us, or for the Court of Appeals, to decide whether the Secretary of the Interior is well advised to forgo . . . non-cash-bonus alternatives.  That question is for Congress alone to answer in the exercise of its oversight powers.").

---

[4]    Plaintiffs also argue that while the Court's choice of remedies is restricted with respect to permits that were renewed in fiscal years 2004 through 2006, it is not similarly restricted with respect to permits renewed in fiscal years 2000 through 2003.  GOB Reply at 21-22.  This argument fairs no better.  The rider in Public Law No. 108-108 does not by its own terms limit the very broad discretion granted to the Secretary, nor have the Plaintiffs pointed to any legislative history to support their theory.  Nonetheless, even if the Court were to determine that Congress' grant of discretion to the Secretary concerns only the 28 permits renewed in fiscal years 2004 through 2006, the Court must at least deny the Plaintiffs' claims insofar as they are directed at those 28 permits.  Those permits appear in the record at BLM No. 13, 15, 34, 35, 51, 52, 53, 60, 109, 119, 137, 138, 155, 166(c), 177, 181, 185, 186, 188, 192, 195, 197, 202, 209, 215, 218, 223(b), and 231.  See Fed Br. at 22 n.5.

Moreover, it is properly within the Secretary's discretion (as recognized by Congress in Public Law No. 108-108) to establish the time-line for compliance because it is the Secretary, and not the Plaintiffs or this Court, who is in the best position to know which allotments should be prioritized and how much can be accomplished given BLM's resources and competing obligations. The Secretary, and BLM by delegation, has exercised that discretion by fully processing a large number of carryover grazing permits, as indicated by the representative sample provided at BLM Nos. 342-367. Were the Court to impose its own schedule for compliance within the Glen Canyon NRA, that ruling would have the effect of directing the expenditure of funds and other resources in accordance with the Court's and the Plaintiffs' own priorities instead of those of the Secretary – a task for which neither this Court nor the Plaintiffs are well suited. Accordingly, the Court should deny Plaintiffs' request that the Court impose a schedule on the Secretary for the processing of permits renewed pursuant to the appropriations riders.

    **B.**    **Plaintiffs' Generalized Claims Under The Park Service Organic Act Are Without Merit And Must Be Dismissed**

          **1.**    **Plaintiffs' claims seeking to enforce the conservation and non-impairment mandates of the Organic Act are improperly programmatic and must be dismissed**

In their opening brief, Federal Defendants cautioned that Plaintiffs' challenges to the Secretary's authorization of grazing in the Glen Canyon NRA must be construed as challenges to the BLM's discrete and final permit renewal actions, because a challenge to the general "management" of grazing in the NRA, divorced of any particular agency action, would be improperly programmatic. Fed. Br. at 15. It is now evident, however, that at least some of the Plaintiffs' arguments raise programmatic claims that must be dismissed.

In <u>Norton v. Southern Utah Wilderness Society ("SUWA II")</u>, 542 U.S. 55 (2004), the Supreme Court clarified the limits on judicial review of APA claims. <u>SUWA II</u> primarily concerned the scope of a federal court's authority under the APA to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The plaintiffs in <u>SUWA II</u> alleged, among other things, that the BLM failed to act to protect public lands from damage, caused by off-road vehicle use, in violation of a statutory duty to manage certain wilderness study areas "in a manner so as not to impair the suitability of such areas for preservation as wilderness." 542 U.S. at 60-61.

Observing that "[f]ailures to act are sometimes remediable under the APA, but not always," <u>Id.</u> at 61, the Supreme Court held that "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a <u>discrete</u> agency action that it is required to take." <u>Id.</u> at 64. (emphasis in original). Applying this principle, the Court rejected the plaintiffs' argument that BLM's alleged failure to protect wilderness study areas from impairment was a cognizable claim under the APA. The Court reasoned that the non-impairment standard, although mandatory, was too broad of a statutory requirement to form the basis for a "failure to act" claim under the APA. <u>Id.</u> at 66-67. The Court reasoned that "[s]ection 1782(c) is mandatory as to the object to be achieved, but it leaves BLM a great deal of discretion in deciding how to achieve it." <u>Id.</u> at 66. The Court concluded that "[t]he prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA." <u>Id.</u> at 67.

Similarly in the present case, Plaintiffs assert that the Secretary has allowed adverse impacts to occur within the Glen Canyon NRA in violation of the Organic Act's conservation and non-impairment mandates, but this claim must be dismissed because these mandates are simply too broad of a statutory requirement to form the basis for the Plaintiffs' "failure to act" or "unreasonably

delayed" claims. Further, Plaintiffs fail to identify any "discrete agency action" that the Secretary is "required to take" under the Organic Act. See id. at 64. Indeed, any doubt as to the impermissibly programmatic nature of the Plaintiffs' Organic Act claim is eliminated by the Plaintiffs' sweeping request for relief. Plaintiffs ask that the Secretary be ordered simply to "comply with the law." As noted by the Supreme Court, this is precisely the kind of "general order[] compelling compliance with broad statutory mandates" that the Court is not empowered to issue. SUWA II, 542 U.S. at 66-67.[5] The enforcement of such an order would improperly "inject[] the [Court] into day-to-day management" of the Secretary's oversight of grazing within the Glen Canyon NRA. Id. at 67. As noted above, this "prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with . . . congressional directives is not contemplated by the APA." Id. Therefore, Plaintiffs' claim that the Secretary has unlawfully withheld or unreasonably delayed his compliance with the Organic Act's conservation and non-impairment mandates must be dismissed.

## 2.    Plaintiffs misinterpret the Organic Act's conservation mandate

Even if the Plaintiffs' Organic Act claims were cognizable under the APA, however, they are nonetheless without merit. Plaintiffs argue that the Secretary has failed to carry out his duty to conserve the Glen Canyon NRA's resources and values because the administrative record, as

---

[5]      In response to Defendants' assertion that Plaintiffs' Organic Act claim is improperly programmatic, the Plaintiffs in their Reply Brief deny that they are seeking a "general order" requiring the Secretary to take action under the Organic Act. Instead, Plaintiffs assert that they are only "seeking an order finding the Secretary violated the Organic Act (and NHPA and NEPA) when he issued specific grazing permits." See GOB Reply at 12 (emphasis added). As explained in footnote 2 supra, however, the renewal of the permits that Plaintiffs challenge was mandated by the Congressional appropriations riders. Accordingly, any challenge to the renewal of those permits under 5 U.S.C. § 706(2) must be rejected on the merits. Therefore, the Plaintiffs' attempts to characterize their Organic Act claim as a challenge to discrete and final agency action as opposed to agency action "unlawfully withheld or unreasonably delayed" does nothing to bolster the Plaintiffs' claim.

originally lodged with this Court on January 9, 2006, does not contain evidence of management actions taken by the agencies to "fix" each of the adverse impacts identified by Plaintiffs in their opening brief. GOB Reply at 8-9. This argument, however, misunderstands both the Organic Act and the 2001 Management Policies.

The Organic Act requires that the NPS manage the units within the National Park System in such as way as "to conserve the scenery and the natural and historic objects and the wildlife therein . . . ." 16 U.S.C. § 1. The NPS has interpreted this conservation mandate in its Management Policies as requiring that the NPS "seek ways to avoid, or minimize to the greatest degree practicable, adverse impacts on park resources and values," and its interpretation in this regard is entitled to deference. NPS No. 155 at 1855 (2001 Management Policies § 1.4.3 ); see also Davis v. Latschar, 83 F. Supp.2d 1, 5 (D.D.C. 1998) ("The Court must defer to the agency's interpretation of a statute that it implements 'so long as it is reasonable, consistent with the statutory purpose, and not in conflict with the statute's plain language.'") (quoting OSG Bulk Ships, Inc. v. United States, 132 F.3d 808, 814 (D.C.Cir. 1998); Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 845 (1984). Of note, section 1.4.3 of the 2001 Management Policies does not require that all adverse impacts be eliminated entirely. Rather, the Policies recognize that the Organic Act's conservation mandate may be met if an agency minimizes adverse impacts "to the greatest degree practicable." See NPS No. 155 at 1855 (emphasis added). Therefore, that Plaintiffs can identify evidence of some adverse impacts in the administrative record does not mean that the NPS has violated the Organic Act's conservation mandate, especially in light of the Secretary's ongoing and extensive efforts to "minimize" adverse impacts, as set out in more detail immediately below.

3.    **The Secretary has taken all necessary actions to conserve Glen Canyon NRA resources and prevent adverse impacts**

Plaintiffs argue that examples in the administrative record support their conclusion that Glen Canyon NRA resources have been adversely impacted, but these arguments lack merit.  GOB Reply at 5.  For example, Plaintiffs indicate that BLM removed cattle from the Soda and Lake allotments in 2000 "until NPS resource objectives and goals [could] be met," but point out that BLM allowed grazing to resume in 2003.  The Plaintiffs conclude on this basis that the Secretary is allowing adverse impacts in violation of the Organic Act's conservation mandate, presumably because they believe that removing the allotments from use for three years was an insufficient remedy.  GOB Reply at 9, 13 ("The actions the Secretary relied on are extremely limited and have not fixed the problems.").  What Plaintiffs fail to appreciate, however, is that the permanent removal of cattle from an allotment is not the only action NPS may take in response to a finding of adverse impacts or even impairment.  Sierra Club v. Andrus, 487 F. Supp. 443, 448 (D.D.C. 1980) (noting that "nowhere in either [16 U.S.C. § 1 or 1-a 1] is there a specific direction as to how the protection of Park resources and their federal administration is to be effected.").  It is wholly within the Secretary's discretion to reduce or suspend grazing to allow NRA resources to recover from impacts instead of eliminating grazing altogether.[9]

_____

[9]    Plaintiffs also offer an incomplete characterization of the record evidence here. Plaintiffs fail to point out for the Court that, while the BLM allowed grazing to resume on the Lake allotment in 2003, it has not allowed grazing to resume on the Navajo Point pasture, which is the only portion of the Lake allotment situated within the Glen Canyon NRA.  See NPS No. 132 at 1436 (indicating that livestock grazing would be phased in incrementally from 2003 to 2006 on the Steer Point, Lake, and Spencer Point pastures of the Lake allotment, but that no grazing would occur on the Navajo Point pasture).  Plaintiffs also fail to point out that BLM's reintroduction of grazing on the Soda allotment after three years of non-use was incremental, such that grazing did not return to its pre-2000 level on that allotment until seven years later. NPS No. 133 at 1437.

Plaintiffs' reliance on the impacts identified in the Draft Values and Purposes Determination ("Draft VPD") which appears at NPS No. 146 is also misplaced. NPS prepared the Draft VPD in support of BLM's preparation of a Draft EIS addressing the GSENM planning area. See NPS No. 146 at 1459. That Draft VPD (and the impacts identified therein) was forwarded to the BLM on August 7, 2005. On December 15, 2005, the BLM Utah State Office initiated the process for publishing a Notice of Availability of the Draft EIS. As explained above, the publication of a "notice of availability" is one of the last steps required by NEPA's implementing regulations before the Secretary may issue a Final EIS and ROD. Once that Final EIS and ROD have issued, BLM will cancel, suspend, or modify relevant grazing permits within the GSENM, in whole or in part, if and to the extent necessary to meet the requirements of the Organic Act and all other applicable laws and regulations. See, e.g., Pub. L. No. 108-108, 117 Stat. 1241, 1308 (2003). These actions would address each of the impacts identified by the NPS in its final Values and Purposes Determination for the GSENM EIS. Therefore, Plaintiffs' claim that NPS has unreasonably delayed in remedying the past or potential impacts identified in the Draft Values and Purposes Determination, and their request for an order to remedy those impacts, is premature.

Finally, Plaintiffs argue that the record simply does not contain enough evidence of protective management actions for this Court to accept that NPS is complying with its conservation mandate. That is, Plaintiffs recognize that the Secretary has discretion to determine how to implement the conservation standard, see GOB Reply at 8, but assert that the Secretary has taken no action at all to ameliorate documented adverse impacts. See GOB Reply at 8 ("The Secretary claims he chose to address impairment by adjusting grazing management on an annual basis. However, the Secretary can only point to four of twenty-four allotments where BLM has taken any action whatsoever to modify grazing."); Id. at 10 ("The fact that the Secretary could only point to

these very limited efforts to protect resources within all of Glen Canyon only serves to emphasize his complete failure to deal with the problems."). <u>Id.</u> at 14 ("The Secretary . . . attempt[s] to argue he has prevented adverse impacts through annual adjustments. As discussed above . . . that is not the case.").

In so arguing, Plaintiffs fail to appreciate the limited scope of the administrative record as it was lodged on January 9, 2006 (Docket No. 15). That administrative record was compiled in response to the allegations – raised in the Plaintiffs' Complaint – that the Secretary had illegally authorized grazing within the Glen Canyon NRA. Therefore, the record contains only the documents and materials considered directly or indirectly by the Secretary with respect to the decision to renew the grazing permits that Plaintiffs allege are at issue in this case. <u>See</u> <u>Fund for Animals v. Williams</u>, 245 F. Supp.2d 49, 55 (D.D.C. 2003) (recognizing that the administrative record provided to the court "must include all documents and materials that the agency 'directly or indirectly considered'") (quoting <u>Bar MK Ranches v. Yuetter</u>, 994 F.2d 735, 739 (10th Cir.1993)). Because of Plaintiffs' initial characterization of their claims, the record as originally lodged did not contain extensive evidence of the management actions that the Secretary has taken in response to the adverse impacts caused or potentially caused by ongoing grazing in the Glen Canyon NRA. Of course, such evidence is not necessary for effective judicial review because, as explained above, the Plaintiffs' claim in this context is improperly programmatic and should be dismissed outright. <u>See</u> <u>SUWA II</u>, 542 U.S. at 64.

Nonetheless, in direct response to the Plaintiffs' claim that NPS has failed to meet its conservation mandate – a claim that developed over the course of Plaintiffs briefs and the scope of which was not immediately apparent in Plaintiffs' Complaint – Federal Defendants have produced a supplemental administrative record with a representative sampling of documents showing that the

Secretary routinely takes management actions, both formal and informal, to prevent or minimize adverse impacts to park resources. The supplemental record materials lodged with the Court and served on the parties concurrently with this brief, therefore, show that the Secretary has taken the very management actions that Plaintiffs complain are missing.

As indicated by the supplemental record materials, BLM plays an active role in monitoring forage utilization levels and rangeland health. See BLM at 5157, 5271-74, 5285. When conditions indicate that a reduction in grazing levels may be necessary to prevent damage to the rangeland resource, BLM requires that permittees reduce their planned forage use levels, see BLM at 5154, 5160, 5164, 5167, 5225, 5227, 5267, 5314, 5319, or even that permittees not use their permitted allotment altogether during a given grazing season, see BLM at 5152, 5158, 5267, 5278, 5279, 5280. The supplemental record materials also indicate that BLM has denied permit renewal requests or closed allotments to grazing altogether in order to protect resource conditions, see BLM at 5178, 5288, 5296, 5302, 5329, and that it has enforced decisions to close allotments to grazing by issuing trespass notices and by impounding unauthorized cattle, see BLM at 5268, 5288, 5302. Finally, the supplemental record materials indicate that BLM has taken management actions, such as the installation of fences and cattleguards, when necessary to protect the integrity of Glen Canyon NRA resources such as riparian areas. See BLM Nos. 371, 372, 375, 376. Plaintiffs' claim that the Secretary has failed to prevent or minimize adverse impacts in violation of the Organic Act is therefore without merit.

### 4. Grazing has not "impaired" resources within the Glen Canyon NRA

Plaintiffs insist that grazing within the Glen Canyon NRA has resulted in the impairment of NRA resources, and chide the Defendants for pointing out that the discretion to determine whether an adverse impact rises to the level of impairment is reserved to the agency. GOB Reply at 3.

Plaintiffs flatly assert that "[i]t does not take a degree in biology or archeology" to determine whether the impacts Plaintiffs identify in the record are "harming the integrity" of park resources, and conclude for themselves that these impacts qualify as "impairment" within the meaning of the Organic Act and the NPS's 2001 Management Policies. In short, Plaintiffs accuse the NPS of arbitrariness for not reaching the same conclusion that the Plaintiffs themselves have reached with respect to the effects of grazing within the Glen Canyon NRA. This argument fails, however, because it ignores that NPS's decisions with respect to impairment are entitled to the Court's deference.

The mere fact that an activity has an adverse impact does not mean that it rises to the level of "impairment." Rather, courts have recognized that "[t]he Organic Act commits the NPS to the protection and furtherance of two fundamentally competing values; the preservation of natural and cultural resources and the facilitation of public use and enjoyment." Sierra Club v. Babbitt, 69 F. Supp.2d 1202, 1246-47 (E.D.Cal. 1999); see also Southern Utah Wilderness Alliance v. Dabney ("SUWA I"), 222 F.3d 819, 826 (10th Cir. 2000); Bicycle Trails Council v. Babbitt, 82 F.3d 1445, 1468 (9th Cir. 1996). The test for whether the NPS has balanced these competing values properly is "whether the resulting action leaves the resources 'unimpaired for the enjoyment of future generations.'" SUWA I, 222 F.3d at 827.

"Neither the word 'unimpaired' nor the phrase 'unimpaired for the enjoyment of future generations' is defined in the [Organic] Act." Id. at 819. Moreover, "[i]t is unclear from the statute itself what constitutes impairment, and how both the duration and severity of the impairment are to be evaluated or weighed against the other value of public use of the park." Id. Accordingly, this Court's inquiry must be guided by the NPS's interpretation of the no-impairment standard in its 2001 Management Policies. See Southern Utah Wilderness Alliance v. National Park Service

("SUWA III"), 387 F. Supp.2d 1178, 1192 (D. Utah 2005) (holding that the interpretation of the "no-impairment" mandate of the Organic Act set out in section 1.4 of the 2001 Management Policies is entitled to deference under Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984)).   The 2001 Management Policies define "impairment" as "an impact that, in the professional judgment of the responsible NPS manager, would harm the integrity of park resources or values, including the opportunities that would be present for the enjoyment of those resources or values."  NPS No. 155 at 1855 (emphasis added).  Thus, the Policies make clear that whether a particular impact rises to the level of impairment is a determination reserved to the discretion of the responsible NPS manger.  Id.

Notwithstanding the Policies, Plaintiffs argue that the Secretary's decision to not label certain adverse impacts as "impairment" is simply "a semantic evasion of the obvious" because they believe that these impacts "harm the integrity" of the Glen Canyon NRA's resources within the meaning of the 2001 Management Policies.  However, while the Policies offer some guidance to assist NPS managers in determining what may or may not constitute an impairment, that guidance is itself not definitive and instead relies on managerial discretion and expertise.  For example, the Policies do not explain what it means to "harm the integrity" of park resources or values, and they do not illustrate how it is that an "impairment" harms the integrity of park resources while a simple "adverse impact" does not.  Moreover, while the Policies offer three guidelines for distinguishing between mere impacts and impairment,[7] these guidelines are generalized – the presence of one or

---

[7]    The 2001 Management Policies state that "[a]n impact is more likely to constitute an impairment to the extent that it affects a resource or value whose conservation is: [1] [n]ecessary to fulfill specific purposes identified in the establishing legislation or proclamation of the park; or [2] [k]ey to the natural or cultural integrity of the park or to opportunities for enjoyment of the park; or [3] [i]dentified as a goal in the park's general management plan or other relevant NPS planning documents."

more of the guidelines merely makes it "more likely" that an adverse impact will constitute impairment, but by no means requires such a result. See NPS No. 155 at 1855. It is precisely for this reason that the Secretary reserved discretion to make impairment determinations and delegated those determinations to the responsible NPS manager. See Davis v. Latschar, 83 F. Supp.2d 1, 5 (D.D.C. 1998) ("'[P]rovided it does not violate the Constitution or a federal statute, an agency's interpretation of its own regulations "will prevail unless it is 'plainly erroneous or inconsistent' with the plain terms of the disputed regulations.'") (quoting Auer v. Robbins, 519 U.S. 452 (1997)). Accordingly, the NPS's determination that no impairment existed despite identifying adverse impacts in the Draft VPD and 1999 Grazing EA is entitled to deference.

### C. The Secretary Need Not Analyze Site-Specific Impacts In Its NEPA Analysis For A Planning Level Document Such As The 1999 Grazing Plan

In their opening brief, Plaintiffs argued that the NPS's issuance of the 1999 Grazing Plan violated NEPA because the NPS prepared an EA instead of an EIS, and because the NPS allegedly should have analyzed the site-specific impacts of ongoing grazing within the Glen Canyon NRA. Federal Defendants in their cross-motion for summary judgment explained why NPS was not required to prepare an EIS instead of an EA, and the Plaintiffs have declined to respond in their Reply brief.

With respect to the surviving portion of their claim, that NPS should have prepared a site-specific analysis, Plaintiffs make two arguments: (1) the Secretary should have prepared a site-specific analysis in the 1999 Grazing Plan because that is what the 1979 General Management Plan contemplated, and (2) the Secretary should have prepared a site-specific analysis in the 1999 Grazing Plan because grazing was already ongoing within the Glen Canyon NRA and the 1999 Grazing Plan somehow "authorizes" it to continue. These arguments do nothing more than rehash

- 23 -

the arguments made in the Plaintiffs opening brief, and they fail for the same reasons set out in Federal Defendants' cross-motion for summary judgment.

First, the Plaintiffs insist that the 1999 Grazing Plan itself is deficient. Plaintiffs point out that the 1979 General Management Plan indicated that the 1999 Grazing Plan would contain an analysis of the "effects of grazing on particular allotments," and complain that no such analysis is present in the 1999 Grazing Plan. Plaintiffs, however, have only challenged the 1999 Grazing Plan EA pursuant to NEPA. They have not brought a claim challenging the Grazing Plan itself or seeking to enforce the 1979 General Management Plan. Indeed, such a claim would be prohibited by SUWA II, 542 U.S. at 71 ("A statement . . . [in a land use plan] about what [an agency] plans to do, at some point, provided it has funds and there are not more pressing priorities, cannot be plucked out of context and made a basis for suit under [APA] § 706(1)."). Accordingly, Plaintiffs' references to the 1979 General Management Plan are irrelevant to the NEPA claim that they raise in this lawsuit.

Second, Plaintiffs' argument that the 1999 Grazing Plan "authorizes" grazing within the Glen Canyon NRA is simply wrong. BLM determines in its land use plans ("LUPs") whether lands under its management are available for grazing. See 43 C.F.R. § 4130.2(a). BLM then authorizes grazing on those lands through the issuance of livestock grazing permits. Id. ("Grazing permits or leases shall be issued to qualified applicants to authorize use on the public lands and other lands under the administration of the Bureau of Land Management that are designated as available for livestock grazing through land use plans"); see also NPS No. 19 at 111. Unlike the LUPs, the 1999 Grazing Plan is not a prerequisite to the authorization of grazing activities on allotments administered by the BLM. Moreover, unlike grazing permits, the 1999 Grazing Plan does not in any way authorize grazing. The Plaintiffs' real grievance here is with Congress. The site-specific analysis that generally takes place when BLM issues or renews a grazing permit has not yet taken place in this

case because the Congressional appropriations riders deferred the Secretary's duty to comply with the procedural requirements of NEPA. Nonetheless, that does not change the fact that no site-specific analysis was required in the 1999 Grazing Plan EA because the Grazing Plan did not in any way authorize grazing within the Glen Canyon NRA with respect to any particular allotment. See Friends of Yosemite Valley v. Norton, 348 F.3d 789, 801 (9th Cir. 2003) ("NEPA requires a full evaluation of site-specific impacts only when . . . 'the agency proposes to make an irreversible and irretrievable commitment of availability of resources to [the] project at a particular site.'") (quoting California v. Block, 690 F.2d 753, 761 (9th Cir. 1982)). Plaintiffs' claim must be denied.

**D.    Plaintiffs' challenge to the 1999 Grazing Plan under the NHPA has no merit**

Plaintiffs make two brief arguments in support of their challenge to the 1999 Grazing Plan under the NHPA. First, relying on Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 212 (1988), Plaintiffs urge that the Federal Defendants' argument that it used a phased approach for its compliance with the NHPA should be rejected as an impermissible post-hoc rationalization. GOB Reply at 28 n.8. In Bowen, however, the Supreme Court merely stated that it has never granted deference to "agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice." Id. The present case is quite different. The approach chosen by the NPS is fully consistent with 36 C.F.R. § 800.4(b)(2). Moreover, nothing in section 800.4(b)(2) requires that the Secretary make a written finding memorializing his use of a phased approach to NHPA compliance under the circumstances present in this case. Therefore this argument fails.

Second, Plaintiffs point out that the NHPA requires compliance "prior" to any undertaking. GOB Reply at 28 n.8. On this point, 36 C.F.R. § 800.4(b)(2) provides a clear response. That is, "where alternatives under consideration consist of corridors or large land areas, . . . the agency official may use a phased process to conduct identification and evaluation efforts." Id. While

Plaintiffs may disagree that this regulation is consistent with the mandates of the NHPA, they have not even attempted to explain why this Court should overrule the Advisory Council on Historic Preservation's ("ACHP") interpretation of the NHPA in 36 C.F.R. § 800.4(b)(2). The ACHP has been charged by Congress with implementing the NHPA, and therefore, its regulations are entitled to deference under <u>Chevron</u>. <u>See</u> 16 U.S.C. 470s ("The Council is authorized to promulgate such rules and regulations as it deems necessary to govern the implementation of section 470f of this title in its entirety"); <u>Chevron</u>, 467 U.S. at 863-864. This Court should reject Plaintiffs claim and grant summary judgment for Federal Defendants.

## III.    CONCLUSION

For the foregoing reasons, the United States' motion for summary judgment should be granted, the Plaintiffs' motion for summary judgment should be denied, and the Plaintiffs' complaint should be dismissed in its entirety with prejudice.

July 21, 2006                                  Respectfully submitted,

                                              SUE ELLEN WOOLDRIDGE
                                              Assistant Attorney General
                                              Environment and Natural Resources Division

Of Counsel:                                   /s/_____
G. Kevin Jones                                GUILLERMO A. MONTERO
Intermountain Office of the Solicitor         Trial Attorney
U.S. Department of the Interior               United States Department of Justice
                                              Environment and Natural Resources Division
                                              Natural Resources Section
                                              P.O. Box 663
                                              Washington, D.C. 20044-0663
                                              (ph)(202) 305-0443/(fax)(202) 305-0274