**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

)
**GREAT OLD BROADS FOR**                        )
**WILDERNESS, _et al._,**                        )
)
**Plaintiffs,**                        )
)
**v.**                        )   **Civil No. 05-1433 (ESH)**
)
**DIRK KEMPTHORNE,**                        )
**Secretary of the Interior, _et al._,**                        )
)
**Defendants.**                        )
_____ )

**MEMORANDUM OPINION**

Plaintiffs Great Old Broads for Wilderness and the Center for Biological Diversity

challenge the management of livestock grazing within the Glen Canyon National Recreation

Area by the National Park Service ("NPS") and the Bureau of Land Management ("BLM").

Plaintiffs contend that the agencies have issued grazing permits and a management plan in

violation the Glen Canyon Enabling Act, 16 U.S.C. § 460dd _et seq._; the Park Service Organic

Act, 16 U.S.C. § 1 _et seq._; the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321

_et seq._; and the National Historic Preservation Act ("NHPA"), 16 U.S.C. 470 _et seq._  Before the

Court are the parties' cross-motions for summary judgment.  For the reasons below, the Court

will grant each motion in part.

**BACKGROUND**

The Glen Canyon National Recreation Area -- spanning more than a million acres of

northern Arizona and southeastern Utah (_see_ NPS Doc. 29 at 278 (August 1999 Grazing

Management Plan) ("Grazing Plan")) -- was established in 1972 "[i]n order to provide for public

outdoor recreation use and enjoyment of Lake Powell and lands adjacent thereto . . . and to preserve scenic, scientific, and historic features contributing to public enjoyment of the area[.]" *See* 16 U.S.C. § 460dd(a).  In setting aside the land, Congress did not ignore its history.  During the prior century, livestock had grazed continuously in the Canyon.  (*See* Grazing Plan at 278.) Under the terms of the Glen Canyon Enabling Act, BLM was authorized to administer grazing leases within the area in accordance with "[t]he same policies [it] followed . . . in issuing and administering . . . grazing leases on other lands under its jurisdiction[.]"  16 U.S.C. § 460dd-5. The BLM's authority within Glen Canyon, however, was made subject to the Secretary of the Interior's obligation to "administer, protect, and develop the recreation area" as provided in the NPS's Organic Act.  *See id.* (subjecting BLM's administration of grazing permits to § 460dd-3); *id.* § 460dd-3 ("The Secretary shall administer, protect, and develop the recreation area in accordance with the provisions of sections 1 and 2 to 4 of this title, as amended and supplemented[.]"); *see also id.* § 1 (providing that NPS shall manage units of the National Park System "by such means and measures as conform to [their] fundamental purpose . . . , which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.").

I.    **Management Documents**

        Consistent with its obligations under the Organic Act, *see* 16 U.S.C. § 1a-7(b), NPS developed a General Management Plan for Glen Canyon in 1979.  (*See* NPS Doc. 21 at 162 (Glen Canyon General Management Plan) ("General Management Plan").)  The plan recognized the predominance of grazing on the Canyon's lands, noting that "almost all accessible areas containing adequate forage and water [were] grazed" at the time of the document's drafting.  (*Id.*

at 182.)  It accordingly proposed the preparation of a supplemental "Grazing Resources Component" setting forth a "[d]etailed description of the condition of the range" and offering "[r]ecommendations for specific range improvement practices and devices, management activities, and maximum grazing intensities compatible with the purpose of the recreation area." (*Id.* at 180; *see also* Grazing Plan at 279.)

In the two decades following NPS's publication of the Glen Canyon General Management Plan, no such grazing component emerged.  In 1984, however, NPS and BLM entered a Memorandum of Understanding ("MOU") regarding the management of grazing within the recreation area.  (*See* NPS Doc. 22 at 235.)  The MOU -- acknowledging BLM's responsibility for the administration of grazing within Glen Canyon and NPS's responsibility for determining whether proposed grazing activities would be consistent with the values and purposes of the area -- established a framework by which BLM could consult with NPS in order to "ensure that grazing authorizations, range improvements" and other related actions would "not conflict with the Glen Canyon NRA enabling legislation . . . , the NPS Organic Act . . . , or the approved NPS General Management Plan for Glen Canyon NRA."  (*See id.* at 234.)  Under its terms, BLM was barred from authorizing grazing or related activities without first receiving a written "Values and Purposes Determination" from the NPS Regional Director "regarding the potential effect of the proposed action upon the values and purposes of the area."  (*Id*; *see also* NPS Doc. 155 at 1856 (NPS Management Policies 2001 § 1.4.7) ("Before approving a proposed action that could lead to an impairment of park resources and values, an NPS decisionmaker must consider the impacts of the proposed action and determine, in writing, that the activity will not lead to an impairment of park resources and values.  If there would be an impairment, the action may not be approved.").)  NPS was further required to provide BLM with "any terms and

conditions [it] deemed necessary . . . for inclusion in [a] proposed action to ensure the activity's

compatibility with the area's values and purposes." (*Id.*) This process was confirmed in a 1993

agreement between Glen Canyon's superintendent and BLM's state directors for Utah and

Arizona. (*See* NPS Doc. 1 ("Interagency Agreement between Bureau of Land Management and

National Park Service for Grazing Management on Glen Canyon National Recreation Area"); *see*

*also* NPS Doc. 15 (1998 "reaffirmation memorandum" renewing the agencies' commitment to

the agreement).)

On July 22, 1999, NPS adopted a Grazing Management Plan for Glen Canyon and a

corresponding finding of no significant impact ("FONSI"). (*See* Grazing Plan at 273.) As

provided in the area's General Management Plan, the document described the climate of Glen

Canyon, the history of grazing on its lands, the present condition of the area's various resources,

and the existing management scheme between BLM and NPS. (*See id.* at 280-87.) The

document also provided for the cooperative development of a monitoring plan under which

resource conditions would be evaluated to ensure their compliance with NPS and BLM

standards. (*Id.* at 286-87.) Most critically, however, the Grazing Management Plan set forth the

series of "goals and objectives" governing NPS's written determination as to whether any

proposed change to grazing activities within Glen Canyon would be consistent with the area's

values and purposes. (*See id.* at 284, 287.) For each of eight resource categories -- vegetation,

soils, water quality, wildlife, cultural resources, paleontological and quaternary resources, scenic

resources, and recreational resources -- the plan established an ultimate management "goal," the

"objectives" to be met in pursuit of that goal, and those actions to be taken in furtherance of the

stated objectives.[1]  (*See id*. at 287-88.)  Under the document's terms, "[i]f a proposed action meets these objectives, or can meet them by incorporating prescribed mitigation requirements, the actions will be considered to have complied with the 'purposes' of the recreation area" and "[t]he Superintendent will recommend that it be approved by the BLM authorizing official."  (*Id*. at 279.)

## II.    Grazing Permits

At the time of the Grazing Management Plan's publication, BLM was burdened by an unusually large number of permits requiring review prior to their renewal.  (*See* BLM Doc. 307 at 3549 (January 16, 2003 Bureau memorandum indicating that "a 'spike' in permit expirations in 1999 and 2000 occurred, which resulted in a backlog of expired permits that need[ed] to have [the renewing process] completed").)  *See also* 145 Cong. Rec. S10658 (daily ed. Sept. 9, 1999) (statement of Sen. Durbin) ("Many of the current [10-year] grazing permits were issued in the late 1980s and now are starting to expire in large numbers during a 2 or 3-year period.  These permits, numbering in the thousands, present the BLM with an unusually large and burdensome short-term renewal workload.").  Unwilling to impose the costs of BLM's backlog on the

---

[1] With respect to "vegetation," for instance, the plan set as a goal the maintenance of "naturally diverse plant communities and species populations similar to Potential Natural Community composition," a value defined in an appendix to the document.  (*See* Grazing Plan at 289.)  Five objectives were established with respect to that goal: (1) maintenance of "as natural a community as possible" in upland plant communities; (2) protection of "healthy populations of special status species, including federally listed threatened and endangered species" and others; (3) management and protection of "scientifically important areas and hanging gardens" from changes resulting from grazing; (4) protection of wetlands, riparian zones, and related vegetation; and (5) determining the "current status and trend of the grazed rangelands" within Glen Canyon.  (*Id.* at 289-94.)  Paired with each of these objectives were specific actions determined to be appropriate for obtaining the end.  For instance, in seeking to maintain natural upland plant communities, the plan provides maximum utilization levels for various types of vegetation and allotments, grazing seasons for various elevations, and potential natural community composition criteria.  (*Id.* at 289-92.)

region's ranchers,[2] Congress responded with a series of appropriations riders providing for the renewal of all expiring permits pending the completion of requisite review procedures.  Under the Consolidated Appropriations Act of 2000 -- the first such statute relevant to this litigation -- the Secretary of the Interior was required to "renew[]" any grazing permit that expired or was transferred during fiscal year 2000, with

> [t]he terms and conditions contained in the expiring permit . . . continu[ing] in effect under the new permit . . . until such time as the Secretary of the Interior completes processing of such permit . . . in compliance with all applicable laws and regulations, at which time such permit . . . may be canceled, suspended or modified, in whole or in part, to meet the requirements of such applicable laws and regulations.

Pub. L. No. 106-113, § 123, 113 Stat. 1501, 1501A-159 (1999).  Provisions identical in all relevant respects were subsequently enacted for those permits that expired or were transferred during fiscal years 2001, 2002 and 2003.  *See* Department of the Interior and Related Agencies Appropriations Act, Pub. L. No. 106-291, § 116, 114 Stat. 922, 943 (2000); Department of the Interior and Related Agencies Appropriations Act, Pub. L. No. 107-63, § 114, 115 Stat. 414, 438 (2001); Consolidated Appropriations Resolution, Pub. L. No. 108-7, § 328, 117 Stat. 11, 276 (2003) (requiring renewal of any grazing permit "that expires, is transferred, or waived during fiscal year 2003").  All told, twelve of the grazing permits contested in this case were renewed pursuant to these provisions.[3]  In 2003, Congress extended the same renewal requirement to all

---

[2] *See* 145 Cong. Rec. S10679 (daily ed. Sept. 9, 1999) (statement of Sen. Thomas) ("So here we are, almost at the end of September, with people who have leases that, if not studied, will be taken off the land at the end of the month.  [The rider] addresses this problem by allowing the BLM more time to complete the renewal process without causing unwarranted hardship on the rancher or farmer who utilizes the public lands to make a living.").

[3] Three of the permits were renewed following their expiration or transfer during fiscal year 2000.  (*See* BLM Doc. 162 (permit authorizing grazing on the Lower Cattle Allotment from December 13, 1999 to February 28, 2009); BLM Doc. 244 (permit authorizing grazing on the

permits that expired, were transferred, or were waived "during fiscal years 2004-2008[.]"

Department of the Interior and Related Agencies Appropriations Act, Pub. L. No. 108-108,

§ 325, 117 Stat. 1241, 1307 (2003).  In addition to the language included in the previous riders,

the 2003 legislation provided that

> beginning in November 2004, and every year thereafter, the Secretar[y] of the Interior . . . shall report to Congress the extent to which [the Secretary is] completing analysis required under applicable laws prior to the expiration of grazing permits, and beginning in May 2004, and every two years thereafter, the Secretar[y] shall provide Congress recommendations for legislative provisions necessary to ensure all permit renewals are completed in a timely manner.

*Id.* at 1308.  While creating this mechanism for congressional oversight, the provision stated that

"the Secretar[y] in [the Secretary's] sole discretion determine[s] the priority and timing for

completing required environmental analysis of grazing allotments based on the environmental

---

Sand Hills, Soap Creek and Badger Creek allotments from August 7, 1997 to August 6, 2007, but reflecting Bureau approval on June 14, 2000); BLM Doc. 338 (permit authorizing grazing on the Perkins Brothers Allotment from March 1, 2000 to February 28, 2010).)

Six of the permits were renewed following their expiration or transfer during fiscal year 2002.  (*See* BLM Doc. 42 (permit authorizing grazing on the Waterpocket and Bicknell allotments from March 1, 2002 to February 28, 2012); BLM Doc. 83 (permit authorizing grazing on the Indian Creek Allotment from March 2, 2002 to February 28, 2012); BLM Doc. 126 (permit authorizing grazing on the Slickhorn Allotment from March 1, 2002 to February 28, 2012); BLM Doc. 147 (permit authorizing grazing on the Texas-Mulley Allotment from March 1, 2002 until February 28, 2012); BLM Doc. 264 (permit authorizing grazing on the Ferry Swale Allotment from March 1, 2002 to February 28, 2012); BLM Doc. 277 (permit authorizing grazing on the Bunting Well Allotment from May 21, 2002 to April 30, 2009).)

Finally, three of the permits were renewed following their expiration, transfer or waiver during fiscal year 2003.  (*See* BLM Doc. 165 (permit authorizing grazing on the Alvey Wash, Collet, Little Desert, Lower Cattle, Black Ridge and Main Canyon allotments from July 1, 2003 to February 28, 2012); BLM Doc. 270 (permit authorizing grazing on the Wahweap Allotment from September 1, 2003 to August 31, 2013); BLM Doc. 60 (permit authorizing grazing on the Cyclone Co-op and Bullfrog allotments from March 1, 2003 to February 28, 2013).)

significance of the allotments and funding available to the Secretar[y] for this purpose." *Id.*

Thirty of the grazing permits contested here were renewed pursuant to this provision.[4]

---

[4] Eleven of the permits were renewed following their expiration, transfer or waiver during fiscal year 2004. (*See* BLM Doc. 13 (permit authorizing grazing on the Sewing Machine Allotment from October 30, 2003 to October 29, 2013); BLM Doc. 15 (permit authorizing grazing on the Sewing Machine Allotment from July 1, 2004 to June 30, 2014); BLM Doc. 181 (permit authorizing grazing on the Lake and Soda allotments from January 1, 2004 to December 31, 2013); BLM Doc. 185 (permit authorizing grazing on the Lake and Soda allotments from January 1, 2004 to December 31, 2013); BLM Doc. 192 (permit authorizing grazing on the Lake and Soda allotments from January 1, 2004 to December 31, 2013); BLM Doc. 195 (permit authorizing grazing on the Lake and Soda allotments from January 1, 2004 to December 31, 2013); BLM Doc. 202 (permit authorizing grazing on the Upper Warm Creek Allotment from January 1, 2004 to December 31, 2013); BLM Doc. 209 (permit authorizing grazing on the Lower Warm Creek and Wiregrass allotments from January 1, 2004 to December 31, 2013); BLM Doc. 215 (permit authorizing grazing on the Nipple Bench Allotment from January 1, 2004 to December 31, 2013); BLM Doc. 218 (permit authorizing grazing on the Nipple Bench Allotment from January 1, 2004 to December 31, 2013); BLM Doc. 231 (permit authorizing grazing on the Lower Warm Creek and Wiregrass allotments from January 1, 2004 to December 31, 2013).)

    Sixteen of the permits were renewed following their expiration, transfer or waiver during fiscal year 2005. (*See* BLM Doc. 14 (permit authorizing grazing on the Sewing Machine Allotment from March 1, 2001 to February 28, 2010, but reflecting Bureau approval on March 24, 2005); BLM Doc. 34 (permit authorizing grazing on the Rockies and Teasdale Ranch allotments from October 1, 2004 to September 30, 2014); BLM Doc. 35 (permit authorizing grazing on the Rockies Allotment from March 1, 1998 to February 28, 2008, but reflecting Bureau approval on April 5, 2005); BLM Doc. 51 (permit authorizing grazing on the Waterpocket Allotment from March 1, 2005 to February 28, 2015); BLM Doc. 52 (permit authorizing grazing on the Sandy #2, Sandy #3, Steele Butte and Waterpocket allotments from March 1, 2003 to February 28, 2013, but reflecting Bureau approval on April 5, 2005); BLM Doc. 53 (permit authorizing grazing on the Waterpocket and Sandy #3 allotments from November 9, 2001 to November 8, 2011, but reflecting Bureau approval on July 27, 2005); BLM Doc. 109 (permit authorizing grazing on the White Canyon Allotment from March 1, 2005 to February 28, 2015); BLM Doc. 119 (permit authorizing grazing on the Lake Canyon Allotment from March 1, 2005 to February 28, 2015); BLM Doc. 137 (permit authorizing grazing on the Perkins Brothers Allotment from March 1, 2005 to February 28, 2015); BLM Doc. 155 (permit authorizing grazing from January 1, 2004 to December 31, 2013, but reflecting Bureau approval on July 19, 2005); BLM Doc. 166 at 837-39 (permit authorizing grazing on the Lower Cattle Allotment from March 1, 2005 to February 28, 2015); BLM Doc. 177 (permit authorizing grazing on the Fortymile Ridge, Upper Cattle, Wide Hollow, Big Horn and Soda allotments from January 1, 2004 to December 31, 2013, but reflecting Bureau approval on July 19, 2005); BLM Doc. 186 (permit authorizing grazing on the Fortymile Ridge, Upper Cattle, Wide Hollow, Big Horn and Soda allotments from January 1, 2004 to December 31, 2013, but reflecting a Bureau approval date of July 19, 2005); BLM Doc. 188 (permit authorizing grazing on the Lake and

To date, neither NPS nor BLM has finalized its review of the renewed permits under

NEPA, NHPA, or NPS's Organic Act.[5]  (*See* Defs.' Mem. at 22 (acknowledging NPS and

BLM's "inability to fully process the [contested] permits in compliance with NEPA, the NHPA,

and the NPS Organic Act").)  According to BLM, the series of riders addressing grazing permit

renewals "allowed the emphasis to change from processing permits based on administrative

expiration dates to addressing resource issues in high priority watersheds."  (BLM Doc. 307 at

3550 (January 16, 2003 Bureau Instruction Memorandum to State Directors).)  Moreover, the

agency has stated that "all carryover grazing permits shall be fully processed using the

information from [state] land health standards evaluations as needed to complete environmental

impact analysis" by the end of fiscal year 2009.  (*Id.*)  The Secretary's failure to so far complete

---

Soda allotments from June 1, 2004 to December 31, 2013, but reflecting a Bureau approval date
of February 15, 2005); BLM Doc. 197 (permit authorizing grazing on the Lake and Soda
allotments from June 1, 2004 to December 31, 2013, but reflecting Bureau approval on February
15, 2005); BLM Doc. 223 at 1203-05 (permit authorizing grazing on the Rock Creek-Mudholes
Allotment from March 1, 2004 to April 30, 2009, but reflecting Bureau approval on August 25,
2005).)
      Finally, three of the challenged permits were renewed following their expiration, transfer
or waiver during fiscal year 2006.  (*See* BLM Doc. 63 (permit authorizing grazing on the
Pennell, Bicknell, Bullfrog, King Sheep, Sand Wash and Lime Kiln allotments from June 1,
2003 to May 31, 2013, but reflecting Bureau approval on November 16, 2005); BLM Doc. 64
(permit authorizing grazing on the Bullfrog and Pennell allotments from June 1, 2003 to May 31,
2013, but reflecting Bureau approval on November 16, 2005); BLM Doc. 138 (permit
authorizing grazing on the Perkins Brothers Allotment from October 1, 2005 to October 1,
2015).)

[5] The record, however, does reflect some progress in assessing the environmental impacts of
grazing within Glen Canyon.  Environmental assessments have been prepared with respect to
grazing on the White Canyon Allotment (*see* BLM Doc. 98 (August 21, 2001 environmental
assessment regarding the proposed renewal of a grazing permit for the White Canyon
Allotment); BLM Doc. 82 (October 31, 2005 Bureau memorandum indicating that a final
decision regarding the White Canyon Allotment had been delayed)); the Forty Mile Ridge
Allotment (*see* BLM Doc. 173 (June 27, 1997 assessment and FONSI)); and the Lee's Ferry
Allotment (*see* BLM Doc. 242 (May 2000 assessment addressing, in part, the Lee's Ferry
Allotment)).

this analysis -- and a conviction that the Secretary will not complete this analysis -- is at the heart of plaintiffs' complaint.

## ANALYSIS

In opposing defendants' Cross-Motion for Summary Judgment and arguing in support of their own, plaintiffs appear to articulate two challenges -- one to the Secretary's issuance of the forty-two grazing permits presently authorizing grazing within Glen Canyon,[6] and the other to NPS's Grazing Management Plan. The Court will address each *seriatim*.

## I.    Standard of Review

Under the Administrative Procedures Act, an administrative action may be set aside only where it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[7] *See* 5 U.S.C. § 706(2)(A)-(D); *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 375 (1989). "[T]his court will not second guess an agency decision or question whether the decision made was the best one." *C & W Fish Co., Inc. v. Fox, Jr.*, 931 F.2d 1556, 1565 (D.C. Cir. 1991). While administrative actions are thus granted deference -- more so in cases involving a technical determination within an agency's expertise, *see Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983) -- they are not spared a "thorough, probing, in-depth review." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971); *see also Marsh*, 490 U.S. at 378 (A court's review of administrative action "must be searching and careful," though "the ultimate standard of review is a narrow one.") (internal quotations omitted). Agencies must consider the relevant information and provide a satisfactory explanation for their actions, drawing a "rational

---

[6] Defendants identified all viable grazing permits in moving for summary judgment. (*See* Defs.' Mem. at 16 n.3.) Plaintiffs have not challenged these identifications.

[7] Section 706(1) of the APA further authorizes a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1). As discussed *infra*, plaintiffs have disclaimed any reliance on this provision.

connection between the facts found and the choice made." *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962). In sum, a reviewing court must consider whether an agency's decision was "'based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285 (1974)).

## II.    Grazing Permits

In plaintiffs' view, the permits authorizing grazing within Glen Canyon suffer from a series of infirmities. First, plaintiffs allege that NPS failed in its procedural obligations under its Organic Act -- obligations interpreted in various agreements between NPS and Bureau, as well as NPS's 2001 Management Policies -- by neglecting to prepare a written "values and purposes" determination prior to the issuance of each of the permits. (Pls.' Mem. at 4-7 (citing NPS Doc. 155 at 1856 (NPS Management Policies 2001 § 1.4.7)).) Second, plaintiffs contend that NPS violated the substantive requirements of its Organic Act by authorizing grazing that has impaired Glen Canyon values and resources.[8] (Pls.' Mem. at 10-; Pls.' Opp'n at 3-14.) Third, plaintiffs

---

[8] Plaintiffs' substantive arguments under the Service's Organic Act have proven somewhat difficult to understand. In their opening memorandum, plaintiffs contended that the "Secretary ha[d] taken no action to fix the adverse effects and impairment caused by livestock grazing[,]" and thereby violated the Secretary's "conservation and non-impairment duties" under the Organic Act. (*See* Pls.' Mem. at 17-19; *see id.* at 17 ("[I]n the six and a half years since it developed the Grazing Plan, the Park Service has not applied the Plan to any one of the 23 challenged allotments."); *see also* Pls.' Opp'n at 8 ("[W]hile the Park Service has discretion to determine how to comply with the Organic Act, it cannot sit by and take no action at all in the face of impairment.").) After the government characterized plaintiffs' argument as one seeking an order compelling conservation actions "unlawfully withheld or unreasonably delayed" under 5 U.S.C. § 706(1) (*see* Defs.' Mem. at 26-31), plaintiffs asserted that their substantive Organic Act claim challenged only the "Secretary's decision to grant permits that will lead to adverse impacts" and not any failure to act by the Park Service. (Pls.' Opp'n at 11; *see also id.* at 14 ("[T]he Secretary's decision to authorize grazing that is causing adverse impacts is arbitrary and capricious and contrary to law under § 706(2)(A).").) In their words, plaintiffs seek only "an

argue that both NPS and BLM acted contrary to the requirements of NEPA by authorizing grazing without first analyzing the site-specific impacts of such activity on the Canyon's individual grazing allotments. (Pls.' Mem. at 19-24; Pls.' Opp'n at 15-16.) Finally, plaintiffs allege that BLM failed to comply with the procedural requirements of the NHPA in authorizing grazing on each of the allotments within Glen Canyon. (Pls.' Mem. at 40-45.)

Though initially limiting their discussion of the numerous grazing riders to the riders' impact on BLM's NEPA obligations (*see* Pls.' Mem. at 24-29), plaintiffs ultimately concede, as they must, that the riders apply to the obligations of both agencies under NEPA, the NHPA, and the Organic Act. (*See*, *e.g.*, Pls. Opp'n at 15-17.) Plaintiffs argue, however, that the appropriation riders -- in "requir[ing] the Secretary to reissue the grazing permits with the same terms and conditions, and . . . prohibit[ing] the Secretary from modifying those permits until [he] complied with the law" -- affect only the relief available under each of the statutes in question. (*Id.* at 14-15, 20.) According to plaintiffs, while the provisions preclude the Court from "ordering cows off Glen Canyon for grazing without a valid permit[,]" they by no means bar the Court from entering a declaratory judgment concluding that "the Secretary failed to comply with the Organic Act, NHPA, and NEPA[.]"[9] (*Id.* at 20.) As to the timing of the Secretary's

---

order finding the Secretary violated the Organic Act . . . when he issued specific grazing permits." (*Id.* at 12.) Since plaintiffs have disavowed a broader substantive challenge under the statute, the Court will not address the viability of any such claim.

[9] Plaintiffs equivocate in identifying how the Secretary violated these statutes. In a footnote, plaintiffs declare that "[t]he Court could find" that the Secretary acted unlawfully "in either of two ways": by issuing the challenged permits "without conducting the proper procedures" or, alternatively, by "fail[ing] to make any progress in the last six years" in contravention of Congress's intent to extend time for compliance only temporarily. (Pls.' Opp'n at 20 n.3.) In light of their insistence that no claims of unreasonable delay have been raised under Section 706(1), plaintiffs acknowledge that "[t]he second approach does raise some puzzling questions with respect to the appropriate standard of review and may be the reason the Secretary framed Great Old Broads' claims as failure to act claims." (*Id.*) Plaintiffs leave these questions

compliance, plaintiffs seek a court order scheduling the requisite actions for each of those permits renewed prior to fiscal year 2004, and, in light of the Secretary's "sole discretion to determine the priority and timing for completing required environmental analysis" under the 2004-2008 rider, *see* Pub. L. No. 108-108, § 325, 117 Stat. at 1308, an order requiring the Secretary to "determine the priority and timing of the environmental analysis" on all other allotments.  (Pls.' Opp'n at 20-21.)

Plaintiffs' interpretation of the riders cannot be squared with their text.  In each of the provisions Congress unequivocally required the Secretary of the Interior to renew any expired, transferred or -- under the latter two statutes -- waived grazing permit whatever the Secretary's progress in "processing . . . such permit . . . in compliance with all applicable laws and regulations[.]"  *See* Pub. L. No. 106-113, § 123, 113 Stat. at 1501A-159; Pub. L. No. 106-291, § 116, 114 Stat. at 943; Pub. L. No. 107-63, § 114, 115 Stat. at 438; Pub. L. No. 108-7, § 328, 117 Stat. at 276; Pub. L. No. 108-108, § 325, 117 Stat. at 1307.  As plaintiffs read them, each of the provisions presented the Secretary with the choice of (1) acting unlawfully by renewing the relevant permits and thereby violating NEPA, the NHPA, and the Organic Act; or (2) acting unlawfully by delaying renewal of the relevant permits to allow compliance with NEPA, the NHPA, and the Organic Act, and thereby violating the riders.  This makes no sense.  Through the enactment of the riders, Congress amended "all applicable laws" to require reissuance of expired, transferred or waived grazing permits prior to the completion of otherwise required actions.  *See id.*; *see also Oregon Natural Desert Assoc. v. United States Forest Serv*., 2005 WL 1459328, at

---

unanswered, concluding that their resolution is "largely immaterial" as "the Secretary's complete abdication of the law within Glen Canyon for 30 years is both arbitrary and capricious and constitutes unreasonable delay."  (*Id.*)  As explained more fully herein, the Court cannot agree that the exact dimensions of plaintiffs' claims are somehow immaterial at this stage.  Both the lawfulness of the permits' issuance and the timeliness of the Secretary's compliance are therefore addressed below.

*9 (D. Or. 2005) (rejecting plaintiffs' claims of unlawful permit issuance and delay under NEPA in light of the riders, which "expressly tolled NEPA requirements as they pertain to managing grazing allotments," and thereby reversing the court's prior ruling at the preliminary injunction stage); *Oregon Natural Desert Assoc. v. United States Forest Serv*., 2005 WL 1334459, *11-12 (D. Or. 2005) (dismissing plaintiffs' NEPA challenge to a number of grazing permits and subsequent assessment delays in light of the riders, as "[t]he NEPA requirement for re-issuing a grazing permit ha[d] been held in abeyance by Congress with instruction to federal agencies to work on reducing the backlog of NEPA analyses")).  The Secretary's issuance of the contested permits, therefore, was not unlawful.

Plaintiffs' request for an order establishing a schedule for the Secretary's compliance with the various statutes -- or, in the case of those permits renewed pursuant to the 2004-2008 rider, an order requiring the Secretary to establish a schedule -- is also barred by the riders' text. Under APA Section 701(a)(2), agency actions "committed to agency discretion by law" are exempt from judicial review.  5 U.S.C. § 701(a)(2); *see also Milk Train, Inc. v. Veneman*, 310 F.3d 747, 752 (D.C. Cir. 2002) (holding that the district court lacked subject matter jurisdiction under Section 701(a)(2) over claims committed to agency discretion).  While this exemption is a narrow one, *see Citizens to Preserve Overton Park*, 401 U.S. at 410, it encompasses the present claims.  In the most recent of the riders, Congress provided that "the Secretar[y] in [the Secretary's] sole discretion" is to "determine the priority and timing for completing required environmental analysis of grazing allotments based on the environmental significance of the allotments and funding available to the Secretaries for this purpose[.]"  Pub. L. No. 108-108, § 325, 117 Stat. at 1308.  As plaintiffs stress, this language was not included in any of the previous riders, which cover a number of the permits contested in this case.  *See* Pub. L. No.

106-113, § 123, 113 Stat. at 1501A-159; Pub. L. No. 106-291, § 116, 114 Stat. at 943; Pub. L.

No. 107-63, § 114, 115 Stat. at 438; Pub. L. No. 108-7, § 328, 117 Stat. at 276.  (*See also* Pls.'

Opp'n at 22 ("[I]f this Court adopts the Secretary's interpretation of the FY 2004 rider, it only

bolsters Great Old Broads' argument that this Court has the authority to set a schedule under the

FY 2000-2003 riders because Congress felt it was necessary to add the 'sole discretion' language

in order to prevent courts from setting enforceable schedules.").)   This omission, however, is of

no consequence.  By its own terms, the provision granting "sole discretion" to the Secretary

applies to "grazing allotments" generally.  *See* Pub. L. No. 108-108, § 325, 117 Stat. at 1307.

While that discretion might have been limited to those permits renewed under the 2004 rider in

particular, Congress did not enact such a narrow provision.  Moreover, even absent such an

express grant of discretion, the earlier riders offer no standard by which to measure the agencies'

progress in complying with the relevant statutes, stating only that the terms of an expired,

transferred, or waived permit "shall continue in effect . . . until such time as the Secretary . . .

completes processing of such permit . . . in compliance with all applicable laws and

regulations[.]"  *See* Pub. L. No. 106-113, § 123, 113 Stat. at 1501A-159; Pub. L. No. 106-291,

§ 116, 114 Stat. at 943; Pub. L. No. 107-63, § 114, 115 Stat. at 438; Pub. L. No. 108-7, § 328,

117 Stat. at 276.  Nothing in this language provides a "'reference point'" against which the

propriety of the Secretary's timing can be measured.[10]  *See Milk Train, Inc.* 310 F.3d at 751

(holding that the district court was without subject matter jurisdiction to determine the

appropriateness of the defendant agency's distribution of funds in the absence of a statutory

---

[10] Plaintiffs' suggestion that NEPA, the NHPA, and the Organic Act themselves offer a
meaningful standard for measuring the agencies' progress is without merit.  (*See* Pls.' Opp'n at
21.)  In enacting the appropriations riders at issue, Congress amended the underlying statutes as
they pertained to the timing of the requirements they imposed.  Plaintiffs' reliance on those
statutes is accordingly misplaced.

standard governing the decision).  Because Section 701(a)(2) precludes review "if the statute is

drawn so that a court would have no meaningful standard against which to judge the agency's

exercise of discretion[,]" *Heckler v. Chaney*, 470 U.S. 821, 830 (1985), the Court is unable to

entertain plaintiffs' request for an order scheduling compliance.[11]

As plaintiffs' challenge to the grazing permits is barred by the riders that required their

renewal, the Court will grant defendants' motion for summary judgment with respect to

plaintiffs' permit claims.

## III.    Grazing Management Plan

Remaining for resolution are plaintiffs' challenges to NPS's Grazing Management Plan

under NEPA and the NHPA.

### A.    The National Environmental Policy Act

Under the National Environmental Policy Act, an agency proposing "[a] major Federal

action[] significantly affecting the quality of the human environment" is required to prepare an

environmental impact statement ("EIS") giving thorough consideration to the impacts of the

action and any available alternatives to the proposal.  42 U.S.C. § 4332(C).  The significance of a

proposed action is determined with reference to both its "context" and "intensity."  *See* 40 C.F.R.

§ 1508.27.  In considering the context of an action, an agency must address its impact upon

"society as a whole (human, national), the affected region, the affected interests, and the

locality."  *Id.* § 1508.27(a).  The question of an action's "intensity" is a more involved inquiry,

turning on such factors as potential "[i]mpacts that may be both beneficial and adverse[;]" the

---

[11] Plaintiffs' suggestion that the riders are inapplicable to ten permits specifying that they "do[] not exempt the holder from compliance with all laws, regulations and management plans governing the public use and administration of Glen Canyon National Recreation Area" is without merit.  (*See* Pls.' Opp'n at 23 (citing BLM Exs. 83, 109, 119, 126, 137, 138, 147, 202, 209 and 231).)  At issue in this case are the Secretary's obligations under various statutes, not the responsibilities of permit holders.

"degree to which the proposed action affects public health or safety[;]" any "[u]nique characteristics of the geographic area" in which the action is to be taken; the "degree to which the effects on the quality of the human environment are likely to be highly controversial[;]" the "degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks[;]" the "degree to which the action may adversely affect an endangered or threatened species[;]" the "degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration[;]" the "degree to which the action may adversely affect . . . objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources[;]" and "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." *Id.* § 1508.27(b).

An agency's evaluation of a proposed action may begin with the preparation of an environmental assessment ("EA"), "a concise public document . . . that serves to . . . [b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1501.3(a)(1). If the agency concludes that the action is not one "significantly affecting the quality of the human environment," it may issue a FONSI and thereby forego preparation of an EIS. *Id.* §§ 1501.4(e), 1508.13. Such a finding is evaluated under this Circuit's well-established standard:

> First, the agency must have accurately identified the relevant environmental concern. Second, once the agency has identified the problem, it must have taken a "hard look" at the problem in preparing the EA. Third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding. Last, if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the

17

agency finds that changes or safeguards in the project sufficiently
reduce the impact to a minimum.

*Coalition on Sensible Transportation v. Dole*, 826 F.2d 60, 66-67 (D.C. Cir. 1987) (quoting

*Sierra Club v. Dep't of Transportation*, 753 F.2d 120, 127 (D.C. Cir. 1985)).

In finding that its Grazing Management Plan would not have a significant impact on the

environment, NPS issued the following set of conclusions:

> The proposal [did] not constitute an action that normally requires
> preparation of an EIS. The proposal [would] not have a significant
> effect on the human environment. Negative environmental
> impacts that could occur [would be] minor and temporary in effect.
> There [would be] no unmitigated adverse impacts on public health
> or safety; threatened or endangered species; sites or districts listed
> in, or eligible for listing in the National Register of Historic Places;
> known ethnographic resources; or other unique characteristics of
> the region. No highly uncertain or controversial impacts, unique or
> unknown risks, cumulative effects, or elements of precedents were
> identified. Implementation of the action . . . [would] not violate
> any federal, state, or local law.

(Grazing Plan at 273.) Based on these conclusions, the agency determined that an EIS was not

required. Plaintiffs challenge this determination, contending that "[t]here is no question a

Grazing Plan governing livestock grazing on more than 750,000 acres of a congressionally

protected unit of the national park system is a major federal action significantly affecting the

human environment." (Pls.' Mem. at 30.) Addressing the various factors set forth by regulation,

plaintiffs argue that the environmental significance of the plan is evident in light of the "highly

uncertain" impact of livestock grazing within Glen Canyon; the protected status of the Canyon's

lands; the damage caused to Glen Canyon's historical and cultural resources by grazing; and the

cumulative impact of livestock grazing and other reasonably foreseeable actions, an impact left

unaddressed in the agency's assessment. (*Id.* at 30-35.)

In defending its assessment and finding, NPS maintains that the bulk of plaintiffs'
arguments are misplaced -- "premised on [the] unsupported assertion that the Grazing Plan itself
authorizes grazing in the Glen Canyon NRA." (Defs.' Mem. at 31.) On this point the agency is
correct. Despite plaintiffs' repeated assertions to the contrary, the Grazing Management Plan
pertains only to NPS's future determinations approving or disapproving proposed changes in
grazing activities within Glen Canyon; it does not itself authorize the grazing presently taking
place under BLM-issued permits.[12] This does not end the issue for, as is clear from the EA and
FONSI, there are future impacts stemming from the plan that the agency has failed to adequately
consider as required by NEPA.

Among the factors to be considered in determining whether a proposed action will
significantly affect the environment is cumulative impact -- "the impact on the environment
which results from the incremental impact of the action when added to other past, present, and
reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or
person undertakes such other actions." 40 C.F.R. § 1508.27(b)(7); *id.* § 1508.7. As the D.C.
Circuit has emphasized, "a meaningful cumulative impact analysis must identify (1) the area in
which the effects of the proposed project will be felt; (2) the impacts that are expected in that
area from the proposed project; (3) other actions -- past, present, and proposed, and reasonably
foreseeable -- that have had or are expected to have impacts in the same area; (4) the impacts or
expected impacts from these other actions; and (5) the overall impact that can be expected if the

---

[12] Because the plan does not authorize grazing on individual allotments, plaintiffs' challenge to
the assessment's failure to consider the site-specific impacts of such grazing cannot be sustained.
*See Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800-01 (9th Cir. 2003) ("NEPA requires
a full evaluation of site-specific impacts only when a 'critical decision' has been made to act on
site development -- *i.e.*, when 'the agency proposes to make an irreversible and irretrievable
commitment of the available to resources to a project at a particular site.'") (internal quotations
omitted).

individual impacts are allowed to accumulate." *Grand Canyon Trust v. FAA*, 290 F.3d 339, 342

(D.C. Cir. 2002) (internal quotations omitted).  A discussion of cumulative impacts is a

necessary part of any assessment.  While EAs are "not intended to be a lengthy document[,]"

they "must at a minimum address the considerations relevant to determining whether an EIS is

required" -- "NEPA regulations require that an agency consider cumulative impacts[.]"  *Id.* at

345; *see also* 40 C.F.R. § 1508.27(b)(7).

Despite this requirement, no cumulative impact analysis appears in NPS's assessment.

To the contrary, and as plaintiffs note, the EA declines to discuss the impact of various

recreational activities on Glen Canyon resources.  (*See* NPS Doc. 19 at 119 ("It is understood

that other impacts occur to the vegetation of Glen Canyon NRA, including . . . recreational

activity.  These impacts will not be analyzed in this section."); *id.* at 124 ("It is understood that

other outdoor recreation uses also negatively impact soil development and productivity.  These

recreational uses, like hiking, horseback riding, off-road vehicles, camping, etc., will not be

analyzed in this section."); *id.* at 128-29 ("It is also understood that recreational activities can

also affect water quality.  This Grazing Management Plan and the Environmental Assessment

will focus only on the issue of grazing and its affect on natural processes and aquatic resources

found within Glen Canyon NRA.")).  While the assessment does offer a series of paragraphs

preceded by the phrase "Cumulative Impacts," each is limited to a discussion of the potential

"[l]ong-term impacts" associated with each of the management alternatives addressed in the

document.  (*See id.* at 120, 125, 129-30, 134, 140, 142, 146, 148 and 151.)  In short, the EA

entirely fails -- without explanation -- to engage in the requisite impact analysis.

NPS does not attempt to suggest otherwise.  Instead, the agency contends that such an

analysis was not required as "the Grazing Plan has no impacts of its own[,]" having been

"intended only to ameliorate the adverse impacts of grazing in the Glen Canyon NRA[.]"  (Defs.'
Mem. at 39.)  "[W]hatever the potential impacts of the allegedly related actions described in
Plaintiffs' brief," NPS argues, "the Grazing Plan will not add to the sum total of impacts.  Put
simply, zero plus X still equals only X."  (*Id.*)  This argument is inconsistent with the agency's
EA and FONSI, both of which identify future impacts stemming from the Grazing Management
Plan.  (*See*, *e.g.*, *id.* at 123 ("For the proposed rangeland developments under [the chosen]
alternative, higher concentrations of animals may be detrimental to soil development
processes."); *see also* Grazing Plan at 273 (FONSI) ("Negative environmental impacts that could
occur are minor and temporary in effect.").)  Thus, while the agency is correct in its contention
that the impact of previously-authorized grazing cannot be assigned to the Grazing Management
Plan, it contradicts itself in asserting that the plan will have no future environmental effects
whatsoever.

Because NPS's EA fails to include the requisite cumulative impacts analysis, it cannot be
sustained.  *See Grand Canyon Trust*, 290 F.3d at 345; *see also Friends of the Earth, Inc. v.
United States Army Corps of Engineers,* 109 F.Supp. 2d 30, 42 (D.D.C. 2000) (rejecting EAs
containing "no actual analysis," but only a "conclusory statement" that cumulative impacts had
been "'minimal'"); *Defenders of Wildlife v. Babbitt*, 130 F.Supp. 2d 121, 138 (D.D.C. 2001)
(remanding an EIS "[b]ecause the discussion of cumulative impacts consists only of 'conclusory
remarks [and] statements that do not equip a decisionmaker to make an informed decision about
alternative courses of action, or a court to review the Secretary's reasoning'") (quoting *Natural
Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 298 (D.C.Cir.1988)).  As the present record is
insufficient to determine whether the Grazing Management Plan requires preparation of an EIS,

however, the Court will remand the case to NPS for further consideration of the environmental impacts stemming from the plan and other actions.

**B.     The National Historic Preservation Act**

Section 106 of the National Historic Preservation Act establishes procedures requiring federal agencies to consider the impacts of their actions on historic properties before taking them.  *See Ill. Commerce Comm'n v. ICC*, 848 F.2d 1246, 1260-61 (D.C. Cir. 1988) (describing Section 106 as a "'stop, look, and listen' provision").  Under the statute, an agency is required,

> prior to the approval of the expenditure of any Federal funds on [an] undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register.

16 U.S.C. § 470f.  In doing so, the agency must allow the Advisory Council on Historic Preservation ("ACHP") "a reasonable opportunity to comment with regard to such undertaking." *Id.*

The requirements of Section 106 are further detailed in ACHP regulations.  In satisfying its obligations under the statute, an agency must first determine whether a proposed action is an "undertaking" subject to the requirements of the Act.  36 C.F.R. § 800.3(a); *see also id.* § 800.16(y) ("Undertaking means a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance; and those requiring a Federal permit, license or approval.").  For all "undertakings," an agency must document the activity's area of potential effects and identify any historic properties within that area.  *See id.* § 800.4.  For each of the historic properties identified, the agency must assess the adverse effects stemming from the proposed action.  *Id.* § 800.5(a); *see also id.* § 800.5(a)(1) ("An adverse

effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association."). When an agency concludes that adverse effects will result from the action, it must consult with relevant State Historic Preservation Officers, Indian tribes, and the Advisory Counsel in order to "to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties." *Id*. § 800.6(a). Any finding of no adverse effect is subject to review by the consulting parties. *Id.* § 800.5(c).[13]

According to plaintiffs, NPS's assessment of the Grazing Management Plan violated the NHPA by neglecting to consider the impacts of grazing on historic properties within Glen Canyon. (Pls.' Mem. at 39.) While acknowledging that the EA discussed adverse effects within "limited areas" of the Canyon (*id.*; NPS Doc. 19 at 134-40 (assessment's discussion of "cultural resources")), plaintiffs contend that the agency has nonetheless failed to pursue mitigation of those effects or the comments of the Advisory Counsel. (Pls.' Mem. at 40.) In response, NPS maintains that the assessment reflects an appropriate use of the "phased" approach to NHPA compliance established in ACHP regulations. Under 36 C.F.R. § 800.4(b)(2), where alternative undertakings under consideration "consist of corridors or large land areas[,]" an agency "may use a phased process to conduct identification and evaluation efforts . . . [,] proceed[ing] with the identification and evaluation of historic properties in accordance with [the statute] [a]s specific

---

[13] ACHP regulations "encourage[] . . . [f]ederal agencies . . . to coordinate compliance with section 106 and the procedures in this part with any steps taken to meet the requirements of the National Environmental Policy Act . . . . Agencies should consider their section 106 responsibilities as early as possible in the NEPA process, and plan their public participation, analysis, and review in such a way that they can meet the purposes and requirements of both statutes in a timely and efficient manner." 36 C.F.R. § 800.8(a)(1).

aspects or locations of an alternative are refined." *Id.*; *see also id.* ("The agency official may also defer final identification and evaluation of historic properties if it is specifically provided for in a memorandum of agreement . . . , a programmatic agreement . . . , or the documents used by an agency official to comply with the National Environmental Policy Act . . . ."). Use of such an approach here, NPS contends, is "more than reasonable" in light of Glen Canyon's size and the density of historic sites on its lands. (Defs.' Mem. at 41.)

Though noting the Grazing Management Plan's objective of preventing adverse effects on historic properties "without appropriate mitigative actions and completion of consultation with the State Historic Preservation Officer as required under Section 106 of the National Historic Preservation Act[,]" NPS's assessment -- as plaintiffs protest -- makes no reference to the utilization of a phased identification process. (*See* NPS Doc. 19 at 138-39 (EA); Pls.' Opp'n at 28 n.8 (characterizing defendants' "phased process" argument as "an impermissible post hoc rationalization").) The Court need not, however, be detained by this fact. Because the assessment will be remanded for further consideration of environmental impacts within the Canyon, NPS will have ample opportunity to clarify the manner in which the Grazing Management Plan complies with the requirements of Section 106.

## CONCLUSION

For the foregoing reasons, the Court will grant plaintiffs' Motion for Summary Judgment insofar as it challenges the sufficiency of the impact analysis within NPS's Grazing Management

Plan EA.  Defendants' Cross-Motion for Summary Judgment will be granted in all other respects.

_____ s/ _____
ELLEN SEGAL HUVELLE
United States District Judge

Date:  September 20, 2006